# CIVIL ACTION NO.:  1:15-cv-1438

# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
08/13/2015
CT Log Number 527640384

**TO:**     Mark P Keener
            Gallagher, Evelius & Jones, LLP
            Fourth Floor, 218 North Charles Street
            Baltimore, MD 21201

**RE:**     **Process Served in District of Columbia**

**FOR:**    Bozzuto Building Company  (Domestic State: MD)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Allied World Specialty Insurance Company, etc., Pltf. vs. Bozzuto Building Company, Dft. |
| **DOCUMENT(S) SERVED:** | Information Sheet(s), Summons, Attachment(s), Complaint, Exhibit(s), Initial Order and Addendum |
| **COURT/AGENCY:** | Superior Court of the District of Columbia, DC
Case # 2015CA005912B |
| **NATURE OF ACTION:** | Breach of Contract - Bozzuto, failed to fulfill its obligations under the Petworth Subcontract of its obligation to make payment for work performed on the Petworth Project at the direction of DBMC, IMC and AWSIC |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/13/2015 at 16:30 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Hanna Lee Blake
Watt, Tieder, Hoffar & Fitzgerald, Llp
8405 Greensboro Drive
Suite 100
McLean, VA 22102
703-749-1000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 781152706434 |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1015 15th Street, N.W.
Suite 1000
Washington, DC 20005 |
| **TELEPHONE:** | 202-572-3133 |

Page 1 of  1 / FV

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

#537156

Filed
D.C. Superior Court
08/04/2015 13:27pm
Clerk of the Court

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

Allied World Speciality Insurance Company f/k/a Darwin National Assurance Company

vs

Bozzuto Building Company

Case Number: **2015 CA 005912 B**

Date: **August 4, 2015**

☐ One of the defendants is being sued in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Hanna Lee Blake <br> Firm Name: <br> Watt, Tieder, Hoffar & Fitzgerald, LLP <br> Telephone No.:          Six digit Unified Bar No.: <br> 703-749-1000          992512 | Relationship to Lawsuit <br> ☐ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☒ Non-Jury          ☐ 6 Person Jury          ☐ 12 Person Jury

Demand: $ 1,720,907.36          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____          Judge: _____          Calendar #: _____

Case No.: _____          Judge: _____          Calendar #: _____

---

NATURE OF SUIT:     *(Check One Box Only)*

### A. CONTRACTS                                    COLLECTION CASES

☒ 01 Breach of Contract          ☐ 07 Personal Property          ☐ 14 Under $25,000 Pltf. Grants Consent
☐ 02 Breach of Warranty          ☐ 09 Real Property-Real Estate   ☐ 16 Under $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 12 Specific Performance        ☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 15 Special Education Fees      ☐ 13 Employment Discrimination   ☐ 18 OVER $25,000 Consent Denied
☐ 10 Mortgage Foreclosure/Judicial Sale

### B. PROPERTY TORTS

☐ 01 Automobile                  ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage                     ☐ 06 Traffic Adjudication
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

### C. PERSONAL TORTS

☐ 01 Abuse of Process            ☐ 09 Harassment                  ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 10 Invasion of Privacy              Not Malpractice)
☐ 03 Assault and Battery         ☐ 11 Libel and Slander           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 12 Malicious Interference      ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 13 Malicious Prosecution       ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 14 Malpractice Legal           ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                       ☐ 16 Negligence- (Not Automobile,   ☐ 23 Tobacco
                                       Not Malpractice)             ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Oct.14

#537156

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 04 Condemnation (Emin. Domain)
- [ ] 05 Ejectment
- [ ] 07 Insurance/Subrogation
  Under $25,000 Pltf.
  Grants Consent
- [ ] 08 Quiet Title
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)

- [ ] 10 T.R.O./ Injunction
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment
- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award
  (DC Code § 16-4401)

- [ ] 25 Liens: Tax/Water Consent Granted
- [ ] 26 Insurance/ Subrogation
  Under $25,000 Consent Denied
- [ ] 27 Insurance/ Subrogation
  Over $25,000 Pltf. Grants Consent
- [ ] 28 Motion to Confirm Arbitration
  Award (Collection Cases Only)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 30 Liens: Tax/ Water Consent Denied
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower
- [ ] 34 Insurance/Subrogation
  Over $25,000 Consent Denied

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-1519 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a) (1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

_____
Attorney's Signature

August 4, 2015
_____
Date

CV-496/Oct 14

#537156

**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Allied World Specialty Insurance Company
f/k/a Darwin National Assurance Company

_____
                                                    Plaintiff

vs.                                    Case Number   2015 CA 005912 B

Bozzuto Building Company
_____
                                                    Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Hanna Lee Blake
_____
Name of Plaintiff's Attorney                          *Clerk of the Court*

8405 Greensboro Drive, Suite 100                By _____
Address                                                      Deputy Clerk

McLean, VA 22102
703-749-1000                                       Date   08/04/2015
_____
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오     ያማርኛ ትርጉም አማሪያን (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





## TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                           Demandante

        contra

                                           Número de Caso: _____

_____
                                           Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                      *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                      Por: _____
_____
Dirección                                              Subsecretario

_____

                                      Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화하십시요      የአማርኛ ትርጉም ካስፈለገዎ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc

#537156

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
(CIVIL DIVISION)

| | |
|---|---|
| ALLIED WORLD SPECIALTY<br>INSURANCE COMPANY f/k/a DARWIN<br>NATIONAL ASSURANCE COMPANY<br>1690 New Britain Avenue<br>Farmington, Connecticut 06032<br><br>       Plaintiff,<br><br>v.<br><br>BOZZUTO BUILDING COMPANY<br>7850 Walker Drive, Suite 400<br>Greenbelt, Maryland 20770<br><br>      Serve: <u>Registered Agent</u><br>          CT Corporation System<br>          1015 15th Street, N.W., Suite 1000<br>          Washington, DC 20005<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. <u>2015 CA 005912 B</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

COMES NOW, Plaintiff Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("AWSIC"), by counsel, and states the following for its Complaint against Defendant Bozzuto Building Company ("Bozzuto"):

### PARTIES AND JURISDICTION

1.     AWSIC is a Delaware corporation engaged in the business of insurance and suretyship, with its principal place of business located in Farmington, Connecticut.

2.     Upon information and belief, Bozzuto is organized and existing under the laws of the State of Maryland with its principal place of business located at 7850 Walker Drive, Suite 400, Greenbelt, Maryland 20770.

3.     Jurisdiction in this Court is proper pursuant to DC Code Ann. § 13-423 inasmuch as Bozzuto regularly transacts business within the District of Columbia, and Bozzuto performed as a general contractor on construction projects located in the District of Columbia that are at issue in this Complaint, among other factors.

## FACTUAL BACKGROUND

### The Agreement of Indemnity

4.     On or about January 9, 2013, Design Build Mechanical Corporation, VA ("DBMC") and related entities and individuals (collectively, "Indemnitors") executed an Agreement of Indemnity in which the Indemnitors, including DBMC, granted to AWSIC certain rights and undertook certain obligations in connection with and as inducement for AWSIC's issuance of performance and payment bonds on DBMC's behalf.

5.     A true and accurate copy of the Agreement of Indemnity is attached hereto as **Exhibit 1**.

6.     Section 3.9 of the Agreement of Indemnity states that "[e]ach Indemnitor expressly recognizes and covenants that this Agreement is a continuing obligation and that it will continue to apply to … any and all Bonds … heretofore or hereafter executed or caused to be executed by Surety on behalf of such applicant until this Agreement will be canceled in the manner hereinafter provided."

7.     In addition, pursuant to Section 5.1.1 of the Agreement of Indemnity, the Indemnitors, including DBMC, assigned to AWSIC all of their rights under their contracts, whether bonded or unbonded, as well as sums due for work performed under those contracts, among other rights.

#537156

8.     More specifically, Section 5.1.1 states, in relevant part:

Each Principal and Indemnitor hereby assigns, transfers, pledges, conveys and sets over to the Surety ... a security interest in the following, whether now owned or hereafter existing or acquired:

(a) all of the Principals' and/or Indemnitors' rights, title and interest in, and arising in any manner out of, all contracts ... (whether or not bonded), or in, or arising in any manner out of the Bonds;

(b) any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds including, but not limited to, all percentages retained, progress payments, deferred payments, compensation for extra work and proceeds of damage claims....

9.     DBMC and the other Indemnitors also designated AWSIC as their attorney-in-fact enabling AWSIC to pursue the Indemnitors' rights and the rights assigned to AWSIC under the terms of the Agreement of Indemnity.

10.     In that regard, Section 5.5 of the Agreement of Indemnity expressly states, in part:

Principal and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety, or any persons the Surety designates, as their attorney-in-fact with the right, but not the obligation, to exercise all of the Principals' and Indemnitors' rights assigned, transferred and set over to the Surety in this Agreement....

**The Petworth Safeway with Residences Project**

11.     Upon information and belief, Duball Petworth, LLC & Safeway Stores, Inc. awarded a contract to Bozzuto for a construction project commonly known as Petworth Safeway with Residences, located at 900 Randolph Street, N.W., Washington DC 20011 (the "Petworth Project").

12.     Thereafter, Bozzuto and DBMC entered into a subcontract (the "Petworth Subcontract"), dated January 4, 2013, in which DBMC agreed to perform certain plumbing work and HVAC work on the Petworth Project in exchange for payment of the subcontract sum of $4,040,100.00.

3

#537156

13.     A true and accurate copy of the Petworth Subcontract is attached hereto as **Exhibit 2.**

14.     Article 20(a) of the Petworth Subcontract states, in part:

> If required of the Contractor, the Contractor shall have the option to require the Subcontractor to furnish a bond or bonds in the form and amounts satisfactory to the Contractor at the time of execution of this Agreement.

15.     At Bozzuto's behest, on or about March 25, 2013, AWSIC (formerly Darwin National Assurance Company) issued a performance bond ("Petworth Performance Bond") and payment bond ("Petworth Payment Bond"), each of which were identified as bond number D00000008 (collectively, the "Petworth Bonds") for the Petworth Project in the penal amount of $4,040,100.00.

16.     True and accurate copies of the Petworth Bonds are attached hereto as **Exhibit 3**.

17.     On or about April 21, 2014, DBMC executed a Voluntary Letter of Default due to difficulties DBMC had been and was then experiencing in its ability to perform and complete certain work on the Petworth Project.

18.     In August 2014, AWSIC provided a copy of DBMC's Voluntary Letter of Default to and engaged Bozzuto in an effort to takeover and complete DBMC's scope of work on the Project in connection with AWSIC's obligations and rights under the Petworth Performance Bond.

19.     In late August or early September 2014, AWSIC engaged Integrated Mechanical Construction, LLC ("IMC"), as a completion contractor, to replace DBMC and to coordinate and complete DBMC's scope of work on the Petworth Project.

20.     DBMC's scope of work, by and through its own efforts and the efforts of the completion contractor, IMC, was performed through and including December 2014.

#537156

21.    Both DBMC and IMC performed work on the Petworth Project in a timely and workmanlike manner.

22.    Despite the work performed and associated costs incurred by DBMC, IMC and/or AWSIC, Bozzuto stopped making progress payments on the Petworth Project, without justification.

23.    Bozzuto has failed and/or refused to make payment for the earned contract balances, including retainage, of not less than $736,129.86 to DBMC for work it performed under the Petworth Subcontract, to IMC, as the completion contractor, or to AWSIC as performing surety, assignee and subrogee.

24.    As pretext for withholding payment, Bozzuto has asserted wholly unsubstantiated back charges against DBMC.

25.    In addition, at Bozzuto's direction, DBMC and/or its subcontractors performed additional work and incurred significant costs associated with changes, including, but not limited to upgrades made to the design and specifications for the Petworth Project, for which Bozzuto has failed and/or refused to make payment in the amount of, at least, $417,811.50.

26.    To date, Bozzuto owes AWSIC, as assignee and subrogee, not less than $1,153,941.36 for work performed on the Petworth Project.

**The Cathedral Commons Project**

27.    Upon information and belief, Cathedral Commons Partners, LLC awarded a contract to Bozzuto for a construction project commonly known as Cathedral Commons, located at 3336 & 3406 Wisconsin Avenue, N.W., Washington, DC 20016 (the "Cathedral Commons Project").

#537156

28.     Thereafter, DBMC entered into a subcontract with Bozzuto dated April 20, 2013 (the "Cathedral Commons Subcontract"), for the provision of certain plumbing work and HVAC related work in exchange for payment of the subcontract sum of $1,972,000.00.

29.     A true and accurate copy of the Cathedral Commons Subcontract is attached hereto as **Exhibit 4.**

30.     Article 20(a) of the Cathedral Commons Subcontract states, in part:

> If required of the Contractor, the Contractor shall have the option to require the Subcontractor to furnish a bond or bonds in the form and amounts satisfactory to the Contractor at the time of execution of this Agreement.

31.     At Bozzuto's behest, on or about July 1, 2013, AWSIC (formerly Darwin National Assurance Company) issued a performance bond ("Cathedral Commons Performance Bond") and a payment bond ("Cathedral Commons Payment Bond'), each of which were identified as bond number D00000055 (collectively, "Cathedral Commons Bonds") for the Cathedral Commons Project in the penal amount of $1,972,000.00.

32.     True and accurate copies of the Cathedral Commons Bonds are attached hereto as **Exhibit 5.**

33.     On or about April 21, 2014, DBMC executed a Voluntary Letter of Default due to difficulties DBMC had been and was then experiencing in its ability to perform and complete certain work on the Cathedral Commons Project.

34.     In August 2014, AWSIC provided a copy of DBMC's Voluntary Letter of Default to and engaged Bozzuto in an effort to takeover and complete DBMC's scope of work on the Project in connection with AWSIC's obligations and rights under the Performance Bond.

#537156

35.     In late August or early September 2014, AWSIC engaged IMC, as a completion contractor, to replace DBMC and to coordinate and complete DBMC's scope of work on the Cathedral Commons Project.

36.     DBMC's scope of work on the Cathedral Commons Project, by and through its own efforts and the efforts of the completion contractor, IMC, was performed through and including December 2014.

37.     Both DBMC and IMC performed work on the Cathedral Commons Project in a timely and workmanlike manner.

38.     Nonetheless, Bozzuto has failed and/or refused to make payment for the earned contract balances, including retainage, totaling not less than $566,966.00 to DBMC for work it performed under the Cathedral Commons Subcontract, to IMC, as the completion contractor, or to AWSIC as performing surety, assignee and subrogee.

39.     AWSIC brings this Complaint for itself based upon AWSIC's equitable subrogation rights and its assignment of rights pursuant to the Agreement of Indemnity by and between DBMC and AWSIC.

COUNT I
**BREACH OF CONTRACT – PETWORTH PROJECT**

40.     AWSIC hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 39 of the Complaint as though fully and separately set forth herein.

41.     Pursuant to the terms of the Petworth Subcontract and at the request of Bozzuto, DBMC performed work on the Project.

42.     DBMC performed its contractual obligations required by the Subcontract in a timely and workmanlike manner until and including August 2014.

7

43.     In addition, DBMC coordinated and/or performed work outside the scope of the Petworth Subcontract at Bozzuto's direction.

44.     Pursuant to AWSIC's obligations and rights under the Petworth Performance Bond, AWSIC engaged a completion contractor, IMC, to complete the scope of work set forth under the Petworth Subcontract.

45.     IMC, at AWSIC's direction, performed the work called for in the Petworth Subcontract through and including December 2014.

46.     Bozzuto, however, failed to fulfill its obligations under the Petworth Subcontract, including, but not limited to, its obligation to make payment for work performed on the Petworth Project by and/or at the direction of DBMC, IMC and/or AWSIC.

47.     Bozzuto's failures to perform its obligations under the Petworth Subcontract constitute material breaches of contract, for which Bozzuto is liable.

48.     In addition, Bozzuto's refusal to make payment to DBMC, IMC and/or AWSIC for work performed in a workmanlike manner, in accordance with the Petworth Subcontract and at Bozzuto's direction, constitutes a breach of Bozzuto's implied obligations of good faith and fair dealing under the Petworth Subcontract.

49.     DBMC and/or AWSIC have been damaged by, among other breaches, Bozzuto's failure and/or refusal to pay the remaining contract balance and costs of extra-contractual work Bozzuto directed DBMC to perform in accordance with the Petworth Subcontract totaling not less than $1,153,941.36.

50.     AWSIC, as assignee and subrogee, is entitled to be compensated by Bozzuto in the amount of not less than $1,153,941.36.

#537156

WHEREFORE, Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company respectfully requests judgment against the Defendant Bozzuto Building Company on Count I of the Complaint, in the sum of not less than One Million One Hundred Fifty-Three Thousand Nine Hundred Forty-One and 36/100 Dollars ($1,153,941.36), together with prejudgment and postjudgment interest, attorneys' fees, costs and such other further relief as the Court may deem just and proper.

## COUNT II
## QUANTUM MERUIT – PETWORTH PROJECT

51.     AWSIC hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 39 of the Complaint as though fully and separately set forth herein.

52.     Count II of the Complaint is pled in the alternative to Count I.

53.     At the request of Bozzuto, DBMC, IMC and/or AWSIC provided labor and/or materials on the Project.

54.     All of the services rendered by DBMC, IMC and/or AWSIC were rendered under such circumstances that Bozzuto knew that DBMC, IMC and/or AWSIC expected to be paid.

55.     Bozzuto has failed to pay for all of the work performed on the Petworth Project by or at the direction of DBMC, IMC and/or AWSIC.

56.     As a direct and proximate result of DBMC's, IMC's and/or AWSIC's work, Bozzuto has received a substantial benefit for which AWSIC, as assignee and subrogee, is entitled to be compensated.

57.     Bozzuto's acceptance and retention of the labor, materials, equipment, supervision, management and other construction services performed by or at the direction of DBMC, IMC and/or AWSIC makes it inequitable for Bozzuto to retain those benefits without payment for their value.

9

58.     Absent payment for the work performed, Bozzuto will be unjustly enriched by the value of the work performed by or at the direction of DBMC, IMC and/or AWSIC on the Petworth Project, at Bozzuto's request.

59.     The reasonable value of the work performed by DBMC is not less than $1,153,941.36 in excess of the payments received to date.

WHEREFORE, Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company respectfully requests judgment against the Defendant Bozzuto Building Company on Count II of the Complaint in the sum of not less than One Million One Hundred Fifty-Three Thousand Nine Hundred Forty-One and 36/100 Dollars ($1,153,941.36), together with prejudgment and postjudgment interest, attorneys' fees, costs and such other further relief as the Court may deem just and proper.

**COUNT III**
**BREACH OF CONTRACT – CATHEDRAL COMMONS PROJECT**

60.     AWSIC hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 39 of the Complaint as though fully and separately set forth herein.

61.     Pursuant to the terms of the Cathedral Commons Subcontract and at the request of Bozzuto, DBMC, IMC and/or AWSIC performed work on the Cathedral Commons Project.

62.     DBMC performed its contractual obligations required by the Cathedral Commons Subcontract in a timely and workmanlike manner until and including August 2014.

63.     Pursuant to AWSIC's obligations and rights under the Cathedral Commons Performance Bond, AWSIC engaged a completion contractor, IMC, to complete the scope of work set forth under the Cathedral Commons Subcontract.

#537156

64.    IMC, at AWSIC's direction under the Cathedral Commons Performance Bond, performed the work called for in the Cathedral Commons Subcontract through and including December 2014.

65.    Bozzuto, however, failed to fulfill its obligations under the Cathedral Commons Subcontract, including, but not limited to, its obligation to make payment for work performed on the Cathedral Commons Project by and/or at the direction of DBMC, IMC and/or AWSIC.

66.    Bozzuto's failures to perform its obligations under the Cathedral Commons Subcontract constitute material breaches of contract, for which Bozzuto is liable.

67.    In addition, Bozzuto's refusal to make payment to DBMC, IMC and/or AWSIC for work performed in a workmanlike manner, in accordance with the Cathedral Commons Subcontract and at Bozzuto's direction, is breaches of Bozzuto's implied obligations of good faith and fair dealing under the Cathedral Commons Subcontract.

68.    DBMC and/or AWSIC have been damaged by, among other breaches, Bozzuto's failure and/or refusal to pay the remaining contract balance owed on the Cathedral Commons Subcontract totaling not less than $566,966.00.

69.    AWSIC, as assignee and subrogee, is entitled to be compensated by Bozzuto in the amount of not less than $566,966.00.

WHEREFORE, Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company respectfully requests judgment against the Defendant Bozzuto Building Company on Count III of the Complaint in the sum of not less than Five Hundred Sixty-Six Thousand Nine Hundred Sixty-Six and 00/100 Dollars ($566,966.00), together with prejudgment and postjudgment interest, attorneys' fees, costs and such other further relief as the Court may deem just and proper.

#537156

## COUNT IV
## QUANTUM MERUIT – CATHEDRAL COMMONS PROJECT

70.     AWSIC hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 39 of the Complaint as though fully and separately set forth herein.

71.     Count IV of the Complaint is pled in the alternative to Count III.

72.     At the request of Bozzuto, DBMC, IMC and/or AWSIC provided labor and/or materials on the Cathedral Commons Project.

73.     All of the services rendered by DBMC, IMC and/or AWSIC were rendered under such circumstances that Bozzuto knew that DBMC, IMC and/or AWSIC expected to be paid.

74.     Bozzuto has failed to pay for all of the work performed by or at the direction of DBMC, IMC and/or AWSIC on the Cathedral Commons Project.

75.     As a direct and proximate result of work performed by or at the direction of DBMC, IMC and/or AWSIC, Bozzuto has received a substantial benefit for which AWSIC, as assignee and subrogee, is entitled to be compensated.

76.     Bozzuto's acceptance and retention of the labor, materials, equipment, supervision, management and other construction services performed by or at the direction of DBMC, IMC and/or AWSIC makes it inequitable for Bozzuto to retain those benefits without payment for their value.

77.     Absent payment for the work performed, Bozzuto will be unjustly enriched by the value of the work performed by or at the direction of DBMC, IMC and/or AWSIC on the Cathedral Commons Project, at Bozzuto's request.

78.     The reasonable value of the work performed by or at the direction of DBMC, IMC and/or AWSIC is not less than $566,966.00 in excess of the payment received to date.

#537156

WHEREFORE, Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company respectfully requests judgment against the Defendant Bozzuto Building Company on Count IV of the Complaint in the sum of not less than Five Hundred Sixty-Six Thousand Nine Hundred Sixty-Six and 00/100 Dollars ($566,966.00), together with prejudgment and postjudgment interest, attorneys' fees, costs and such other further relief as the Court may deem just and proper.

Dated this 4th day of August 2015.

Respectfully submitted,

ALLIED WORLD SPECIALTY INSURANCE COMPANY F/K/A DARWIN NATIONAL ASSURANCE COMPANY

By Counsel

Hanna Lee Blake, Esq. (DC Bar No. 992512)
WATT, TIEDER, HOFFAR & FITZGERALD, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000 (telephone)
(703) 893-8029 (facsimile)
hblake@watttieder.com

13

#537156



Darwin National Assurance Company
30 S. 17th St., Suite 810, Philadelphia, PA 19103

## AGREEMENT OF INDEMNITY

THIS AGREEMENT OF INDEMNITY (this "*Agreement*"), is made and entered into on this ____ day of _____ 2013__ by and among the following entities and individuals, to wit:

Principal(s)                              Address(es)

Design Build Mechanical Corporation, VA      3635 Concorde Parkway, Suite 700
                                             Chantilly, VA 20151

including any affiliate or subsidiary of any of the foregoing (all such persons, affiliates and subsidiaries being referred to collectively herein as the "*Principal*") and the following entities and individuals, each intending to be jointly and severally bound hereunder, to wit:

Indemnitor(s)                            Address(es)

Design Build Mechanical Corporation, VA      3635 Concorde Parkway, Suite 700
                                             Chantilly, VA 20151

Williams Group Inc., VA                      3635 Concorde Parkway, Suite 700
                                             Chantilly, VA 20151

Carl E. Williams, Jr.                        14000 Tara Hill Drive
                                             Clifton, VA 20124

Lisa Williams                                14000 Tara Hill Drive
                                             Clifton, VA 20124

including any affiliate or subsidiary of any of the foregoing (all such persons, affiliates and subsidiaries being referred to collectively herein as the "*Indemnitor*"), and

Darwin National Assurance Company, 30 S. 17th St., Philadelphia, PA 19103, together with its affiliated insurers and with each of their subsidiary, affiliate, successor and assigns of any of said insurance companies (which are referred to collectively herein as the "*Surety*").

EXHIBIT

1

#537156

## WITNESSETH

WHEREAS, in performing certain contracts and fulfilling related obligations, Principal may be required to obtain surety bonds, or similar undertakings or instruments of guarantee, and to renew, continue or substitute from time to time the same, or to obtain new bonds, undertakings or instruments of guarantee with the same or different penalties, and/or conditions (any one or more of which bonds, undertakings or instruments are hereinafter called a "Bond"); and

WHEREAS, acting upon the request of Principal and Indemnitors and in reliance upon the understanding that this Agreement be executed and the obligations hereunder be performed, Surety has agreed to execute Bonds or to cause Bonds to be executed and, in the same reliance, it may in the future execute or cause to be executed, one or more other Bonds on behalf of the Principal; and

WHEREAS, Indemnitors have a direct, substantial, material and beneficial interest in obtaining the Bonds and in keeping the Bonds outstanding and in the Surety's refraining from cancelling said Bonds

NOW THEREFORE, in consideration of the premises the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree, jointly and severally, with the Surety as follows:

### 1. Certain Definitions

"*Change of Control*" means any series of events by which (i) a person or group becomes or has the unconditional right to become the direct or indirect owner, directly or indirectly of 25% or more of the voting power of the voting stock of any Indemnitor, or (ii) an Indemnitor consolidates with or merges into another entity or organization, or transfers by any means all or substantially all of its assets to another entity or organization or (iii) during any period of twelve consecutive months, individuals who, at the beginning of such period, constituted the board of directors of an Indemnitor (together with any new director voted to the Indemnitor's board by vote of a majority of the directors then in office who either were directors at the beginning of such period) cease for any reason to constitute at least a majority of the board of directors of such Indemnitor.

"*Claim*" means any claim, notice of default, notice of termination, demand for payment, suit, or any other form of notice or claim or demand that the Surety receives in connection with any Bond.

"*Due Date*" will mean the fifth business day after the receipt date of a written demand from the Surety, unless otherwise specified in this Agreement.

"*Interest*" means interest at the rate of four percent (4%) per annum above the Wall Street Journal prime rate, as published on the Due Date.

"*Lien*" means any mortgage, pledge, assignment, encumbrance, or other security agreement or preferential arrangement of any kind or nature whatsoever.

"*Loss*" means the underlying dollar amount of all Claims and of all damages, expenses, costs, professional and consulting fees (including all legal fees and disbursements, interest and expenses of every nature (including premium and fees due but unpaid for the issuance and continuance of the Bonds) which the Surety sustains or incurs or becomes liable for by reason of (i) being required to

SUR CORP 09-01-2009                                   2

#537156

constitute or procures the execution of any Bond; or (b) having executed or procured the execution of any Bond; or (c) the administration of any amendments, waiver or supplement to any Bond; or (d) any Indemnitor's failure to perform or comply with any of the covenants and conditions of this Agreement; or (e) enforcement of, attempted enforcement of, or prosecution of rights under any Bond or this Agreement.

## II.   Representations and Warranties

The Indemnitor(s) and each of them hereby represent and warrant to the Surety as follows:

2.1   No information, exhibit or report furnished by any Indemnitor to the Surety in connection with the negotiation of, or compliance with this Agreement or in connection with any Bond, contains or will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading.

## III.   Indemnitor Covenants

Each Indemnitor hereby agrees and covenants with the Surety as follows:

3.1   PREMIUMS – to pay the Surety, when due or otherwise promptly upon Surety's demand, all of the premiums, costs and charges for Bonds requested from and/or issued by the Surety in accordance with its rate filings, in manual of rates, or as otherwise agreed upon; and where such premiums, costs and charges are annual, to continue to pay them at the then applicable rate (as such rate is set forth by the Surety) until the Indemnitors or Principals will deliver evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

3.2   INDEMNITY – at all times jointly and severally to indemnify and to hold the Surety harmless from and against any and all liability for any and all Loss, and in such connection, Indemnitors will pay the Surety for all Losses specified or otherwise described in Surety's notice, no later than close of business on the Due Date with respect to such notice, whether or not the Surety has actually made any payment thereon as of such Due Date.

3.3   DEPOSIT OF FUNDS – (a) to deposit with the Surety as collateral, by the Due Date and after receipt of the Surety's written demand, the sum equal to an amount determined by the Surety, to cover liability for Loss covered by Section 3.2, as determined by the Surety.   At Surety's sole option, such collateral will be in addition to and not in lieu of any other collateral previously provided to the Surety.   Further, if an Event of Default (as defined in this Agreement below) has occurred, the Surety will be entitled to demand that the Indemnitors place with Surety funds equal to the aggregate penal sum of all then- outstanding Bonds, to such sum is determined by the Surety in its sole discretion (regardless of whether any actual liability for Loss exists under any of the Bonds).

(b) If Indemnitors fail to pay in full the amount demanded pursuant to this Agreement on the Due Date, Indemnitors will pay interest on such overdue amount from the Due Date up to the date of

#537156

actual payment to the Surety.

(c) Surety will have the right to use the collateral, or any part thereof, in payment or satisfaction of any liability, Loss or expense for which the Indemnitors are or would be obligated to indemnify the Surety under the terms of this Agreement. The Indemnitors will be entitled to the refund of any unused portion of the deposit upon termination of the liability of the Surety on all Bonds and the termination of Indemnitors' performance of all obligations as the Surety under the terms of this Agreement.

(d) Indemnitors acknowledge that the failure to deposit with the Surety, by the Due Date, the sum demanded by the Surety as collateral security will cause the Surety irreparable harm for which the Surety has no adequate remedy at law. Indemnitors agree that the Surety will be entitled to injunctive relief for specific performance of the Indemnitors' obligation to deposit with the Surety the sum demanded as collateral security and hereby waive any claim or defenses to the contrary and the posting of any bonds by the Surety in connection therewith.

3.4   NEGATIVE PLEDGE —to not create, incur, or suffer to exist any Lien in, of or on any Indemnitor's or Principal's property except the following which will be considered "Permitted Liens":

3.4.1   Liens for taxes, assessments or governmental charges or levies on its property that (a) are not at the time delinquent or thereafter can be paid without penalty, or (b) are being contested in good faith and by appropriate proceedings and for which adequate reserves are set aside on its books;

3.4.2   Liens imposed by law, such as carriers', warehousemen's and mechanics' liens and other similar liens arising in the ordinary course of business which secure payment of obligations not more than 60 days past due or which are being contested in good faith by appropriate proceedings and for which adequate reserves are set aside on its books;

3.4.3   Liens arising out of pledges or deposits under worker's compensation laws, unemployment insurance, old age pensions, or other social security or retirement benefits, or similar legislation;

3.4.4   Utility easements, building and zone restrictions, minor defects or irregularities in title and such other encumbrances or charges against real property that generally exist on similar types of properties and which do not in any material way adversely affect the marketability of the same or interfere with the use thereof in the business of the Indemnitor or its subsidiaries;

3.4.5   Judgments and attachment liens that do not cause a default under this Agreement, or liens created by or existing from any litigation or legal proceeding that are being contested in good faith by appropriate proceedings, promptly instituted and diligently conducted, and for which adequate reserves or other appropriate provisions, if any, are made in respect of a claim not to exceed $100,000; and

3.4.6   Liens in favor of collecting or payor banks that have a right of setoff, revocation, refund or chargeback in their favor with respect to money or instruments of the Indemnitor or any of its subsidiaries on deposit with or in possession of such banks;

*provided, however, Indemnitors will provide the Surety notice within 10 days of the incurrence of*

SUR.00009.09 (11/2012)                                                  4

#537156

any Permitted Lien in excess of $100,000.

**1.5     CHANGE OF CONTROL** – us not permit any Change of Control to occur without the Surety's prior written consent, such consent not to be unreasonably withheld or denied.

**1.6     REPORTING/RIGHT TO INFORMATION** – to maintain a system of accounting established and administered in accordance with United States generally accepted accounting principles ("GAAP") and until such time as the potential liability of the Surety under any Bond or Bonds is terminated, the Indemnitors and its subsidiaries will promptly furnish to the Surety such information as the Surety may request from time to time, and the Surety will have the right to examine and copy the books, records and accounts of the Indemnitors. Further, the Indemnitor will furnish to the Surety;

1.6.1    Within 10 days of such event, (i) notice of any modification, change, amendment or termination of any credit facility agreements, (ii) notice of any technical or other default under any credit facility agreements as soon as possible and within 10 days of the occurrence thereof, whether or not such default has been waived or cured, (iii) notice of delivery of any certificate or notice required to be delivered by an Indemnitor to lenders or against under any credit facility agreements to which an Indemnitor is party;

1.6.2    As soon as possible and within 10 days after Indemnitor's receipt thereof, a copy of (i) any notice or claim to the effect that the Indemnitor or any of its subsidiaries is or may be liable to any person as a result of the release by the Indemnitor, any of its subsidiaries or any other Person of any toxic or hazardous waste or substance into the environment, and (ii) any notice alleging any violation of any federal, state or local environmental, health or safety law or regulation by the Indemnitor or any of its subsidiaries; and

1.6.3    Upon becoming aware of any demand, notice or proceeding which may result in liability to the Surety under any Bond, Principal and Indemnitors will provide notice promptly thereof. Such notices will include, but are not limited to bank notices and environmental notices of default. The Indemnitor further authorizes any bank, depository, creditor, Obligee of a Bond, subcontractor, materials supplier or other person, firm or corporation possessing records or having information concerning the financial affairs and operations of the Indemnitor to furnish to the Surety and its representatives or consultants any such records or information requested by the Surety.

**1.7     COOPERATION WITH INVESTIGATION** – to promptly, upon receipt of a notice from the Surety regarding the Surety's investigation of a Claim, or upon receipt of a request for additional information from the Surety regarding any Claim, provide the Surety with access to full, complete, accurate and up to date information regarding Indemnitor's position regarding the validity or defenses to the Claim. If the Indemnitor's attorney possesses information concerning the Claim, Indemnitor will instruct its attorney to cooperate with the Surety and Indemnitor will provide the Surety with access to said attorney and information.

**1.8     TRUST FUND** – to hold as a trust fund and/or as a constructive or equitable trust, all interest, title and rights in any contract or undertaking referred to in any Bond, or in, or arising in any matter out of, any Bond, including but not limited to payments for or on account of any contract, in which the Surety has an interest, which will inure to the Surety's benefit for any liability for Loss it may have or sustain under any Bond; and, further, it is expressly declared that all monies due or to become due under any contract covered by any Bond are trust funds, whether in the Indemnitors'

#537156

possession or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which the Surety would be liable under any Bond, said trust also inures to the Surety's benefit for any liability or loss it may have or sustain under any Bond or under this Agreement, and this Agreement constitutes notice of such trust.

**3.9    SURETYSHIP COVERED** – Each Indemnitor expressly recognizes and covenants that this Agreement is a continuing obligation and that it will continue to apply to and indemnify the Surety as to any and all Bonds (whether or not covered by any application signed by an applicant with such application to be considered a freely supplemental to this Agreement) heretofore or hereafter executed or caused to be executed by Surety on behalf of such applicant until this Agreement will be canceled in the manner hereinafter provided.

## IV.    Settlements, Use of Collateral and Payment

**4.1    SETTLEMENTS.** The Surety is granted the option to adjust, settle or compromise any Claim, demand, suit or judgment with respect to any Bond in Surety's sole discretion. An Indemnitor may request the Surety to litigate such Claim or demand, or to defend such suit, or to appeal from such judgment, but Surety will be under no obligation to do so unless (i) Surety is provided with an opinion of Indemnitor's counsel which indicates that such suit or appeal has reasonable basis in law, and (ii) the Indemnitor deposits with the Surety, at the time of such request, cash or collateral satisfactory to the Surety to be used to pay any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

**4.2    USE OF COLLATERAL.** Upon the occurrence of an Event of Default (as defined below), the Surety will have the right to use any collateral, or any part thereof, including but not limited to any letter of credit, in payment or settlement of such liabilities for which the Indemnitors (or any one of them) would be obliged to indemnify the Surety under the terms of this Agreement whether or not such liabilities arise out of or in connection with the Bond under which such collateral was delivered. The Surety may sell any property assigned to it pursuant to this Agreement at public or private sale, with or without notice, at any time or place without incurring any liability of any kind. The Surety may purchase any of the property at such sale and Indemnitors hereby waive any objection to Surety's purchase as aforesaid.

**4.3    PAYMENTS.** In the event of any Loss payment by the Surety, the Indemnitors further agree that in any accounting between the Surety and Indemnitors, the Surety will be entitled to charge for any and all disbursements made by it in good faith concerning the matters contemplated in this Agreement under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed, and that the vouchers or other evidence of any such payments the Surety made will be prima facie evidence of the fact and amount of the Surety's liability.

## V.    Assignment, Events of Default, Advances, Attorney-in-Fact

### 5.1    ASSIGNMENT; COLLATERAL

**5.1.1    Each Principal and Indemnitor hereby assigns, transfers, pledges, conveys and sets over to the Surety, as collateral to secure every obligation under this Agreement, whether such obligation has arisen before or after the date of this Agreement (with the assignment of any contract

#537156

to become effective as of the date of the Bond covering such contract), a security interest in the following, whether now owned or hereafter existing or acquired:

    (a) all of the Principals' and/or Indemnitors' rights, title and interest in, and arising in any manner out of, all contracts referred to in the Bonds (whether or not bonded), or in, or arising in any manner out of the Bonds;

    (b) any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds including, but not limited to, all percentages retained, progress payments, deferred payments, compensation for extra work and proceeds of damage claims;

    (c) all of the Principals' and/or Indemnitors' rights, title and interest in and to all machinery, supplies, equipment, plant, tools and materials of every nature and description which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites;

    (d) all proprietary systems, software or any other assets of a similar nature which are employed by the Principals in connection with any and all contractual work referred to in the bonds;

    (e) all of the Principals' and/or Indemnitors' rights, title and interest in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts;

    (f) all actions, causes of actions, claims and demands whatsoever which the Principal and/or Indemnitors may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman and

    (g) all proceeds of the foregoing.

    **5.1.2**  The foregoing assignment is effective as of the date of this Agreement's execution and delivery as to each contract covered by Bonds executed prior to such date, although nothing herein limits the Surety's right to claim under any prior assignment. As to any Bond executed and delivered on or after the date of this Agreement's execution and delivery, the assignment will be effective as of the respective Bond's effective date.

    **5.2**   **EVENTS OF DEFAULT** – Surety, or any person the Surety designates, may enforce the security interests granted herein and may take, and are hereby authorized and empowered by each Principal and each Indemnitor to take, any action necessary to obtain possession of the funds, rights and property subject thereto if any of the following occur (each an "Event of Default"):

    (1) any abandonment, breach of or failure, refusal or inability to perform, any contract

#537156

referred to in the Bonds or a fully Breach of any said Bonds;

(2) a failure by any Principal or Indemnitor, or delay, refusal, or inability to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract covered by a Bond;

(3) any breach of an obligation set forth in Article III of this Agreement;

(4) any Indemnitor's assignment for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for any Indemnitor or its property, whether insolvent or not, or any Indemnitor's application for reorganization or arrangement under the terms of the United States Bankruptcy Code or any similar laws of any state, possession or territory of the United States, or if other Persons initiate such proceedings, the continuation of those proceedings for a period of thirty days;

(5) any proceeding which deprives the Principal of, or interferes with, the use of any machinery, equipment, plant, tools, or material;

(6) any default under any credit facility agreement of any kind which is not waived by the lenders or any contracting party thereto; or

(7) the Principal's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Principal be an individual or, if the Principal is any other type of entity, any change in the Principal's name, principal place of business or existence.

3.3    TAKEOVER – If an Event of Default occurs, the Surety will have the option in its sole discretion and it is hereby authorized to take possession of any part or all of the work under any contract or contracts covered by any Bond, including, but not limited to, machinery, supplies, equipment, plant, tools and materials, without charge and at the Indemnitors' cost and expense, to complete or arrange completion of the same, and the Indemnitors will promptly upon demand pay to the Surety all Losses, fees, costs and expenses so incurred.

3.4    ADVANCES–the Surety is authorized and empowered (in its sole discretion and without any obligation to do so) to guarantee loans, to advance or lend to the Principal any money for any contracts referred to in or guaranteed by the Bonds  and all money the Surety expends in the completion of any such contracts, or lends or advances from time to time to the Principal, or the Surety guarantees for the purpose of any such contracts, and all costs, and expenses the Surety incurs in relation thereto, unless repaid with legal interest by the Principal to the Surety when due, will be a Loss by the Surety for which the Principal and the Indemnitors will be responsible, notwithstanding that said money or any part thereof should not be so used by the Principal.

3.5    ATTORNEY-IN-FACT  Principal and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety, or any persons the Surety designates, as their attorney-in-fact with the right, but not the obligation, to exercise all of the Principal' and Indemnitors' rights assigned, transferred and set over to the Surety in this Agreement, and in the Principals' and Indemnitors' name to make, execute, and deliver any and all additional or other assignments, documents, financing statements or papers the Surety deems necessary and proper to (i) vest in the Surety absolute title to any and all monies, property and rights hereby assigned and (ii) provide the protection and rights to the Surety contemplated by all of the provisions of this Agreement. The Principal and Indemnitors hereby ratify and confirm all of the Surety's acts and actions taken and done as such attorney-in-fact

SUR (JUL9-06)(10-30-20)                        8

and agree to protect and hold the Surety harmless for acts herein granted as attorney in fact.

## VI    Termination

6.1    *Immediately upon receipt of Surety's written request for its release and discharge from any Bond (or Bonds), Indemnitors will use their best efforts to cause the Surety to be fully and completely released and discharged from such Bond(s) and from all liability by reason of such Bond(s).*

6.2    Principal or Indemnitors may terminate this Agreement upon twenty days written notice sent by registered mail to the Surety at its principal bond office at 30 South 17th Street, Suite 810, Philadelphia, PA 19103, but any such notice of termination will not operate to modify, bar, or discharge the Principal or the Indemnitors as to the Bonds that may have been theretofore executed or Losses theretofore incurred. Such notice of termination will operate only with respect to those Principals and Indemnitors upon whose behalf such notice of termination will have been given. All other notices or certificates required to be delivered hereunder should also be sent to the above address.

## VII. General Provisions

7.1    **AMENDMENTS** – This Agreement may not be changed or modified orally. No change or modification will be effective unless made by written endorsement executed by the Surety to form a part hereof. The addition to this Agreement of any Indemnitor or Principal, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor or Principal only, notwithstanding any language herein to the contrary.

7.2    **CHANGES; WAIVER OF NOTICE** - The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors (any notice to Indemnitors being hereby expressly waived), to assent, or to refuse to assent, to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent, or to refuse to assent, to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors will remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors.

7.3    **NO WAIVER; REMEDIES CUMULATIVE** – No failure or delay on the part of Surety in the exercise of any power, right or privilege hereunder or under any Bond will impair such power, right or privilege or be construed to be a waiver of any default or to be acquiescence therein, and no single or partial exercise of any such power, right or privilege will preclude further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to Surety hereby are cumulative and will be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law, including every right and remedy which a personal surety without compensation would have and nothing herein contained will be considered or construed to waive.

SUR 00009 (D 1) (12/01)                            9

abridge or diminish any right or remedy which the Surety might have if this Agreement were not executed.

7.4   **COUNTERPARTS** – This Agreement may be executed in any number of counterparts, all of which taken together will constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. This Agreement will be effective as to each Indemnitor when such Indemnitor has executed it and notified the Surety by facsimile transmission that it has taken such action. The Indemnitors hereby acknowledge that the failure of anyone of them to execute this Agreement will not in any way affect the validity or enforceability of this Agreement as to those Indemnitors who have executed the Agreement.

7.5   **ENTIRE AGREEMENT** – This Agreement (together with any Bonds issued by the Surety on behalf of a Principal and any other documents delivered in connection herewith or therewith) constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof. This Agreement is between sophisticated parties, each of which has reviewed the Agreement and is fully knowledgeable about its terms and conditions. The parties therefore agree that this Agreement will be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of either of them.

7.6   **DECLINE EXECUTION** – All parties acknowledge and agree that nothing in this Agreement will be construed as an explicit or implicit commitment by Surety to execute, renew or extend any bonds to a Principal or otherwise. The Surety may, in its sole discretion, decline to execute, renew or extend any Bond and may cancel any Bond for whatever reason, in Surety's sole discretion, and the Principal and Indemnitors agree to make no claim to the contrary. Without limiting the foregoing, if the Surety will execute a Bid or Proposal Bond, it will have retain the right to decline to execute any Bond that may be required in connection with an award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination will not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors acknowledge that the Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and Indemnitors agree that they will have no claim against the Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to the Principal, or to accept any bond executed and delivered by the Surety, or that surety has been requested to execute and deliver.

7.7   **INVALIDITY; SAVINGS CLAUSE** – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction will not render the other provisions hereof invalid. In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity will not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing will be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors that the rights, powers, and remedies given the Surety under this Agreement will be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors or others, whether by the terms of any other agreement or by operation of law or otherwise.

SUR 00040 01 (112-2012)                                    10

7.8    GOVERNING LAW; JURISDICTION -This Agreement will be governed by and construed in accordance with the law of the State of New York without regard to conflict of laws principles. As to any legal action or proceeding related to this Agreement, the Indemnitors will be subject to the jurisdiction of the federal courts, or if such courts do not have jurisdiction than the state courts, located in the Borough of Manhattan in the State of New York, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or similar basis. Indemnitors further waive personal service.

7.9    NOTICE OF EXECUTION -The Principal and Indemnitors hereby waive notice of the execution of any Bond and of the acceptance of this Agreement, and also waive notice of any change in surety credit or other fact that might materially alter the Principal's and Indemnitors' obligations hereunder. The Principal and the Indemnitors hereby further waive all notice of any default, or any other act or facts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, in the end and effect that, the Principal and the Indemnitors will be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make as a result of lack of notice.

7.10    OTHER INDEMNITY -The Principal and the Indemnitors will continue to be bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice in or knowledge of the Principal and the Indemnitors, accepted, reduced or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, than the Principal or Indemnitors or others. It being expressly understood and agreed by the Principal and the Indemnitors that any and all other rights which the Surety may have or acquire against the Principal and the Indemnitors and/or others under any such other or additional agreement of indemnity or collateral will be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement. No Indemnitor will make any defense to the enforcement of this Agreement based on the addition or the release of any Indemnitor. The security interest, assignments, trust, indemnity and other rights granted herein, will not be deemed a waiver of Surety's equitable subrogation right or other rights, said security and rights being in addition to the rights of exoneration, subrogation, and other rights to which Surety is entitled to under law or in equity.

7.11    SUITS —Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action will not prejudice or bar the bringing of other suits, upon other causes of action, whether theretofore or thereafter arising.

7.12    CO-SURETIES — In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with coinsurers, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement will inure to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

7.13    UNIFORM COMMERCIAL CODE – This Agreement will constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, resolving or limiting the rights of the Surety under this Agreement or under law, or in equity. The Indemnitors will execute and deliver such other

#537156



Indemnitors as may be necessary or desirable to permit either the filing of this Agreement as a Financing Statement or the filing of a Financing Statement based upon this Agreement as a Security Agreement in such jurisdictions as the Surety will deem necessary or desirable. Each Indemnitor hereby authorizes the Surety to make such filings, including continuation statements and amendments thereto, without the signature of such Indemnitor.

IN WITNESS WHEREOF, the undersigned expressly recognize and covenant that this Agreement is a continuing obligation applying to and indemnifying the Surety as to any and all bonds heretofore or hereinafter executed by the Surety on behalf of the principal until this Indemnity Agreement will be terminated.

## PRINCIPAL

Corporate / Partnership Name: Design Build Mechanical Co po at n, V
*On behalf of all Principle* *(tan one)*

ATTEST/

BY:
Name & Title: Carl E.  Blann, Jr., President
Address: 3635 Concorde Parkway, Suite 700
Chantilly, VA 20151
FEIN: 27-3995732

## INDEMNITOR(S):

Corporate / Partnership Name: esign Build Me hanical C pora on, VA

Attes t:

BY:
Name & Title: Carl E. Williams, Jr., President
Address: 3635 Concorde Parkway, Suite 700
Chantilly, VA 20 51
FEIN:      95732

Corporate / Partnership Name: Williams Group at.

Attest/

BY:
Name & Title: Carl E. Williams, Jr., President
Address: 3635 Concorde Parkway, Suite 700
Chantilly, VA 20151
FEIN: 27-4208997

SU/R 00009 00 (11/2012)                              12

#537156



INDEMNITORS
(Continued)

Individual :

Attest :

Signature:
Name: Carl E. Williams, Jr.
Address: 14000 Turn Hill Drive
Clifton, VA 20124

SS# 249-35-473

Individual:

Attest:

Signature:
Name: Lisa       Willi   s
Address: 14000    urn Hill Drive
Clifton, VA 20124
SS# 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

## SURETY

Darwin National Assurance Company
On behalf of itself and its subsidiary and affiliated corporations

BY: _____
Name & Title: Robert F. Staples, Senior Vice President

#537156

**Corporate Acknowledgement**

STATE OF VA
COUNTY OF Fairfax

On this 9 day of January 2013, before me personally appeared Carl E. Williams, Jr. to me known to be the President of Design Build Mechanical Corporation, VA, the corporation executing the above instrument, and acknowledged said instruments to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that said instrument was executed by order of the Board of Dir t rs of said corporation.

Notary Public
Commission Expires 05/31/2013

STATE OF VA
COUNTY OF Fairfax

On this 9 day of January 2013, before me personally appeared Carl E. Williams, Jr. to me known to be the President of Williams Group, Inc., VA, the corporation executing the above instrument, and acknowledged said instruments to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that said instrument was executed by order of the Board of Directors of said corporation.

Notary Public
Commission Expires 05/31/2013

**Individual Acknowledgement**

STATE OF VA
COUNTY OF Fairfax

On this 9 day of January 2013, before me personally appeared Carl E. Williams to me known to be the individual(s) described in and who executed the foregoing agreement and acknowledged that the execution of the same was for the purposes, considerations and uses therein set forth as a free and voluntary act and deed.

Notary Public
Commission Expires 05/31/2013

SFB 00002 00 (11-2012)                    14



Individual Acknowledgement
(Continued)

STATE OF VA
COUNTY OF Fairfax

On this ___ day of ____ 2013, before me personally appeared Lisa Williams to me known to be the individual] described in and who executed the foregoing agreement and acknowledged that the execution of the same was for the purposes, considerations and uses therein set forth as a free and voluntary act and deed.

_____
Notary Public
Commission Expires      4 /05

#537156

**COPY OF RESOLUTION OF BOARD OF DIRECTORS AUTHORIZING
CORPORATE INDEMNITY OR SUBORDINATION**

At a regular/special meeting of the Board of Directors of Design Build Mechanical Corporation, VA (hereinafter called Company) duly called and held on the _____ day of ___JANUARY_____, 2013 a quorum being present, the following Preambles and Resolutions were adopted:

WHEREAS, this Company is materially interested through stock ownership or other interest in transactions appertaining to the general conduct of its business, including but not limited to various contracts or agreements in connection with which the Company and/or any present or future subsidiary or any subsidiary of a subsidiary, whether alone or in joint venture with others that names, firm (name) or any other, corporation, partnership or person upon written request of the Company, (hereinafter called Principal) has applied or will apply to any of the American International Companies (hereinafter called Surety) for certain bonds or undertakings of whatever kind or nature and

WHEREAS, the Surety is willing to execute such bonds or undertakings as surety upon the written indemnity of this Company or written subordination of moneys owed to this Company.

RESOLVED, that _____ Carl E. Williams, Jr. _____ President
                           (Type Name of Authorized Signatory)                    (Title)

                                                                                   (Title)

be and they are hereby authorized and empowered to execute any indemnity or subordination agreement or agreements required by the Surety as consideration for the execution by it of bonds or undertakings of whatever kind or nature in behalf of the Principal described:

RESOLVED FURTHER, that the said officers be and they are hereby authorized and empowered, as any time after or subsequent to the execution by said Surety of any such bonds or undertakings, to execute any and all amendments to said indemnity or subordination agreements or agreements and to execute any other or further agreements, relating to any such bonds or undertakings or to any collateral that may be or has been deposited with the Surety in connection therewith, and to take any and all other actions that may be required or requested by the Surety in the premises, and that any and all actions previously taken by the said officers of the kind and nature above described be and they are hereby ratified and accepted.

I, ____CARL R. WILLIAMS_ JR_____ Secretary of the Company, have compared the foregoing
        (Type Name of Secretary)
preambles and resolutions with the original thereof, as recorded in the Minute Book of said Company, and do certify that the same are correct and true transcripts therefrom, and of the whole of said original preambles and resolutions, which have not been amended, annulled or revoked, and are still in full force and effect.
                                                        CHANTILLY
Given under my hand and the seal of the Company, in the City of _____ State of ___VA___

_____ this ___9th__ day of ___JANUARY_____ , 2 13

(Affix Corporate Seal)

                                                                    (Signature)
                                                        CARL E. WILLIAMS JR , Secretary
                                                            (Name of Secretary)

SUR 00089 00 (11-2012)                          16

#537156

CONTRACT NO. 1172-025
CC: PROJECT #- 1172-15400 /FIELD/ACCTG
VERSION 27226 1V5 BCC FORM 006103-0000 UPDATED 9/15/06

BOND REQUIRED: <u>Yes</u>

## SUBCONTRACT AGREEMENT

THIS AGREEMENT, made and entered into this 4th day of January, 2013, by and between

> **Bozzuto Building Company**
> 7850 Walker Drive, Suite 400
> Greenbelt, MD 20770
> Attn: Matt Bland, Project Manager
> (301) 220-0100

(hereinafter called the "Contractor") and

> **Design Build Mechanical Corporation, VA**
> 3635 Concorde Pkwy., Suite 700
> Chantilly, VA 20151
> Attn: Scottie Williams
> (7030 465-0222

(hereinafter called "Subcontractor") for work to be performed at

> **Petworth Safeway with Residences**
> 900 Randolph Street, N.W.
> Washington DC 20011
> Attn: Harry Knackstedt, Superintendent
> (240) 832-8731

(hereinafter referred to as the "Project").

Contractor and Subcontractor covenant and agree as follows:

ARTICLE 1. SCOPE OF WORK

a.   Subcontractor agrees to perform and furnish all the work, labor, materials, as herein specified, and plant, equipment, tools, scaffolds, hoists, and everything of sort for accomplishing the work (hereinafter called the "Work") as described in the attached Exhibit 2, "Scope of Work".

b.   Subcontractor represents that it is fully qualified to perform this Agreement. Subcontractor hereby agrees that the Work will be performed in strict accordance with the Contract Documents as hereinafter defined in Article 2 and any Work not conforming to this Agreement's requirements, including substitutions not properly approved, may be considered defective. Subcontractor agrees to perform the Work to the full satisfaction of Contractor, the Inspecting Architect, and the Owner. Subcontractor shall commence the Work immediately when notified by Contractor and shall prosecute said Work in a good and workmanlike manner with due diligence and without delay. The Subcontractor shall immediately repair or replace all defective Work upon discovery or notification by the Contractor. The Contractor reserves the right to have any portion of the Work, which the Subcontractor has not been directed to proceed with or has not begun, accomplished by his own forces or by others.

c.   Subcontractor shall assume all obligations, risks and responsibilities, which the Contractor has assumed with respect to the Owner in accordance with the Contract Documents. Subcontractor shall have the right to enforce its rights and remedies and to defend against claims against it by the Owner as provided herein.

d.   This agreement is fully inclusive and shall not be affected by any changes in labor rates, transportation charges, costs of materials, etc., and the Subcontractor agrees that the price includes all taxes that he shall incur as a result of his prosecuting the Work.



EXHIBIT
2
(COMPLAINT)

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, CA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-035
DATE: 05/02/2013

## ARTICLE 2.  CONTRACT DOCUMENTS

a.    The Contract Documents for this Subcontract shall consist of this AGREEMENT and the EXHIBITS:

    Exhibit 1 – List of Contract Documents included in this Agreement
    Exhibit 2 – Scope of Work
    Exhibit 3 – General Requirements for Subcontractors/Vendors
    Exhibit 4 – Payment Schedule
    Exhibit 5 – Insurance Requirements
    Exhibit 6 – Tax Payer Identification Number
    Exhibit 7 – Acknowledgement of Payment and Settlement Date
    Exhibit 8 – Payment & Performance Bond (if applicable)
    Exhibit 9 – First Source Employment Agreement
    Exhibit 10 – Contractor's Qualifications & Assumptions
    Exhibit 11 – Accepted Value Engineering List
    Exhibit R – Rider to Contract

The Contract Documents also include the contract between Contractor and Owner which contract is incorporated by reference, as set forth in Article 5 herein, and any subsequent amendment to any Contract Document.

b.    Subcontractor represents and agrees that prior to the execution of this Agreement, it has (a) by its own independent investigation ascertained (i) the work required by this Agreement and the Contract Documents, (ii) the conditions involved in performing the work, and (iii) the obligations of this Agreement and the Contract Documents; and (b) verified all information furnished by the Contractor or others satisfying itself as to the correctness and accuracy of that information.  No allowance in the form of additional compensation is to be made by reason of any error on the part of Subcontractor with respect to such matters, nor will Subcontractor be relieved from its responsibilities hereunder by its failure to properly investigate.  This Subcontractor Agreement and Exhibits attached hereto shall constitute the complete contract and all prior negotiations, prior commitments and prior agreements whether oral or written are superceded hereby.  This Agreement may only be amended by a writing, including a change order issued by the Contractor and signed by both parties.

## ARTICLE 3.  CONTRACT SUM AND PAYMENT PROCEDURES

a.    The Contractor agrees to pay to the Subcontractor for the satisfactory performance and completion of the Work and of all the duties, obligations and responsibilities of Subcontractor under this Agreement the Sum of FOUR MILLION FORTY THOUSAND ONE HUNDRED DOLLARS, ($4,040,100.00) hereinafter, the Subcontract Amount.

b.    Partial payments will be made monthly on approximately the twenty fifth (25th) day of each month following receipt of payment by the Contractor from the Owner for Work completed by this Subcontractor during the previous month, provided the Subcontractor shall have submitted its request for payment on or before the 15 day of such previous month.  Partial payments shall be due to the Subcontractor in the amount of ninety percent (90%) of the work in place which has been approved by the Contractor, Owner, the Owner's Lender and Inspecting Architect and for which payment has been made to the Contractor by the Owner.  All payments will be made per the Payment Schedule attached hereto as Exhibit "4"  and made a part hereof.  A request for payment for an item noted in the Payment Schedule may only be made by the Subcontractor upon completion of that item to the satisfaction of the Contractor, Inspecting Architect and Owner.

c.    All invoices shall be supported to the extent required by the Contractor by affidavits, or other evidence satisfactory to Contractor, showing that all labor and material bills, taxes and all other indebtedness incurred by the Subcontractor for the Project up to and including the date of invoicing have been paid in full.  The Contractor may at its sole discretion withhold payments due the Subcontractor until satisfactory evidence of payment of all the Subcontractor's obligations has been accomplished.  A Partial Waiver of Lien and Subcontractor's Affidavit shall be provided with each request for payment, including the current request for payment, and a Final Waiver of Lien and Subcontractor's Affidavit shall be submitted with request for final payment.  All Waivers of Lien and Subcontractor's Affidavits shall be in a format acceptable to the Contractor.

d.    No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials nor shall it release Subcontractor from any of its obligations under this Agreement; nor shall entrance and use by the Owner constitute acceptance of the Work or any part thereof.

e.    Anything herein contained to the contrary notwithstanding, the Contractor reserves the right, at its sole discretion and without any fault or breach by Subcontractor, to make any payments directly to laborers, materialmen, subcontractors, sub-subcontractors, or any subcontractors or materialmen of any of them, for or on account of work performed or materials furnished under this Agreement.  If such payments are made in good faith and upon reasonable evidence of their validity, the Contractor shall have no liability to Subcontractor in connection therewith and shall deduct such payments from any balance owed to the Subcontractor.



SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1177-025
DATE: 1/04/2013

f.   Subcontractor shall, prior to the submission of the first request for payment, supply Contractor with the names, addresses and telephone numbers of all suppliers furnishing or to furnish materials for the Work covered hereby. No payment shall be made to Subcontractor until such information is furnished. Contractor reserves the right and is hereby authorized by Subcontractor to make all payment checks jointly payable to Subcontractor and material suppliers of Subcontractor.

g.   All material and work incorporated into the Project or for which partial payment has been made shall become the property of the Contractor or, if the Contract Documents so provide, the property of the Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by the Owner.

h.   The Contractor may withhold amounts otherwise due under this Agreement or any other agreement between the parties to cover the Contractor's reasonable estimate of any costs or liability the Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement or any other agreement between the parties. For purposes of this paragraph, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and the Contractor or any joint venture or other entity in which the Contractor has an ownership interest. Appropriate adjustments to the withheld sums shall be made when the exact amounts owed are determined.

i.   Final payment, subject to withholdings permitted hereunder, shall not be due until after the last of the following to occur: (a) Subcontractor's work has been completed and approved by the Owner and the Inspecting Architect, (b) the entire Project is complete, (c) all final payment prerequisites under the Contract Documents have been satisfied, (d) satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Agreement has been provided, and (e) the Contractor has been paid in full for the entire Project.

## ARTICLE 4.  LIEN RIGHT

a.   Subcontractor acknowledges that no lien shall attach to the Project real estate by virtue of any work done hereunder by the Subcontractor or by any suppliers, employees, materialmen, or others subcontractors employed by him if the Subcontractor is paid to date in accordance with this Agreement for work accepted and approved; and the Subcontractor warrants that all such parties shall be advised of the same and shall certify to the Contractor that they are aware thereof and bound thereby.

b.   Subcontractor will immediately discharge or cause to be discharged all liens, claims or attachments which may be filed in connection with the Work and will hold Contractor harmless therefrom if Subcontractor is paid to date for work accepted and approved. Failure to comply with the requirements of this Article within a period of seven (7) days after receipt of written notice from the Contractor of any lien, claim or attachment that may have been filed in connection with the Work shall place the Subcontractor in default and entitle the Contractor to exercise any of its remedies, including the right to terminate this Agreement in accordance with the provisions of Article 13.

c.   In the event that the Subcontractor fails to pay and discharge when due, any bills or obligations of any kind or nature whatsoever incurred by the said Subcontractor by reason of or in the fulfillment of this Agreement, whether or not a lien or notice of lien has been or may be filed with respect thereto, which bills or obligations in the opinion of Contractor are proper, the Contractor, at its sole option but without being obligated to do so, may pay all or any part of such bills or obligations. The Subcontractor hereby appoints the Contractor as agent and attorney-in-fact of the Subcontractor for the purpose of payment and discharging such bills and obligations, and the Contractor may deduct the amount of such bills as well as any expenses incurred in the payment of same, including interest, court costs and attorney's fees, from any sums due or to become due to the Subcontractor. The Subcontractor hereby expressly waives any right of redress or recovery against the Contractor by reason of any act or omission of the Contractor while acting as such agent and attorney-in-fact of the Subcontractor.

## ARTICLE 5.  SUBCONTRACTOR BOUND BY OWNER/CONTRACTOR AGREEMENT

a.   In respect to the Work covered by this Agreement, the Subcontractor shall be bound to the Contractor by the terms of this Agreement and the contract between the Owner and Contractor, and shall assume toward the Contractor all the obligations, risk and responsibilities which the Contractor, by that contract, assumes toward the Owner, provided that where any provision of those contract documents between the Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern.

b.   In event of a dispute between Contractor and Owner involving in any way the work of Subcontractor and if such dispute results in a proceeding, to which Subcontractor may become a party, then Subcontractor will join in such proceeding and will be bound by the result thereof.



] SUB
] PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

## ARTICLE 6. TIME IS OF THE ESSENCE

a.   Time is of the essence in the performance of the Work referred to in the Contract Documents, inasmuch as failure of the Subcontractor to commence and complete its Work as and when required by the Contractor may cause grave injury and damage to the Contractor by virtue of increased costs for construction financing, loss of interest on invested funds, loss of sales and good will, delayed receipt of income from rental units, extension of overhead costs and otherwise. Accordingly, the Subcontractor shall be prepared to commence Work within seven (7) days after receipt of notice from the Contractor to do so and will thereafter actually commence Work when and as required to do so by the Contractor. Such notice shall be given as the Project reaches the stage of construction, in accordance with the plans and specifications, where the Subcontractor's services are to be used, or at such earlier date as set forth in any supplement hereto. The Subcontractor further agrees to prosecute the Work with due diligence and will not in any manner delay or otherwise interfere with the work of the Contractor or other subcontractors.

b.   Subcontractor agrees to conform with the progress schedule, which the Contractor shall issue. This schedule shall allow the Subcontractor adequate time to complete his Work and, unless the Contractor is notified otherwise by the Subcontractor in writing within five (5) days of the receipt of the schedule, it shall be binding on the Subcontractor. The Contractor reserves the right to amend the progress schedule from time to time as the overall progress of the Project dictates, and the Subcontractor hereby discharges the Contractor from any liability incurred on account of such changes.

c.   If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor and at its own cost and expense, work such overtime as may be necessary, in the opinion of the Contractor, to make up for all time lost and take all necessary measures to avoid delay in the completion of the Work and of the Project, and; in any case, Subcontractor shall be responsible for all loss, costs and damages incurred by the Contractor as a result of such delay, including but not limited to all delay damages assessed against the Contractor by the Owner.

d.   Subcontractor will coordinate its work with the work of the Contractor, other subcontractors, and the Owner's other contractors, if any, so no delays or interference will occur in completion of any part or all of the Project.

e.   Subcontractor may be entitled to additional compensation for compliance with schedule amendments or to damages for delay but only to the extent that the contract documents between the Owner and Contractor entitle the Contractor to damages or to a contract adjustment increasing the price or Guaranteed Maximum Cost of the contract between the Contractor and Owner.

f.   The extent to which the Contractor provides temporary heat and temporary enclosures shall be at the sole discretion of the Contractor and shall be based upon general overall job progress, and the Subcontractor understands that the Project and Subcontract Amount are based upon this condition.

## ARTICLE 7. CHANGE ORDERS AND FIELD WORK ORDERS

a.   The Contractor may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the Work covered by the Contract Documents. Any unilateral order or agreement under this Article 7 shall be in writing. Subcontractor shall perform the work as changed without delay.

b.   Subcontractor shall submit to the Contractor any requests or claims for adjustment in the price, schedule or other provisions of the Agreement for changes directed by the Owner or the Contractor, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents. Said requests or claims shall be submitted in writing by Subcontractor within seven (7) days of the date that Subcontractor knew or should have known that it had a claim for an adjustment or within such shorter time as may be necessary to allow the Contractor to comply with the applicable provisions of the Owner-Contractor agreement. If the claim is not made within seven (7) days or the appropriate shorter period, the claim is waived. The Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including the Contractor. Agreement adjustments shall be made only to the extent that the Contractor is entitled to relief from or must grant relief to the Owner and the Subcontractor has complied with this Article. Further, each Agreement adjustment shall be equal only to Subcontractor's allocable share of any adjustment in the Contractor's contract with the Owner. Subcontractor's allocable share shall be determined by the Contractor, after allowance of the Contractor's normal overhead and profit on any recovery and the Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, the Contractor and other subcontractors or persons with interests in the adjustment. This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

c.   Payment on account of pending changes made by the Owner shall be made only if the Contractor receives such payment from the Owner for Subcontractor's changed work and the Subcontractor has complied with this Article. Each payment to Subcontractor on account of pending change orders shall be equal to Subcontractor's allocable share of the Contractor's payment from the Owner for the pending change as determined by the Contractor. Amounts paid on account of pending changes are provisional and not an admission of liability and shall be repaid to the Contractor on demand whenever the Contractor determines there has been an overpayment.



] SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

d.   For changes ordered by the Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Amount.  If Subcontractor considers any action or inaction by the Contractor other than a formal change order to be a change, it shall so notify the Contractor within three (3) days of said action or inaction and seek a confirmation from the Contractor.  Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

e.   For all changes in the work, the Subcontractor shall charge no more than the actual labor cost, including burden, of those individuals actually performing the changed work plus the actual cost of materials, including the cost of delivery, plus the actual direct cost of equipment utilized in the performance of the changed work, which in no event shall be greater than Industry Standards.  The Subcontractor's markup for overhead and profit on the actual direct labor and material cost shall not be greater than that allowed by the Contract Documents and in no event shall be greater than 15%.  Overhead and profit shall not be charged on change orders, which are the result of another subcontractor's performance (i.e., a backcharge to another subcontractor).  Subcontractor shall, at the Contractor's request, provide copies of payroll invoices, cancelled checks, invoices, receipts for all labor and material, and/or other documents which relate to a change.

f.   Subcontractor shall, within seven (7) days of a Contractor request, submit a reasonable price quotation for proposed changes.  If Subcontractor does not and the Contractor is required to submit a price quotation to the Owner which includes a proposed change to Subcontractor's work, the Contractor shall use its best estimate of the proposed change as it affects the Agreement in its quotation to the Owner, which estimate shall be the maximum equitable adjustment due to Subcontractor.

g.   In no event shall the Subcontractor perform any additional work without first receiving written authorization to do so from the Project Manager for the Contractor.  Field staff, including Contractor's superintendents, are not allowed to give such authorization.  Any claim for an adjustment that did not receive prior written approval from the Project Manager is void.

## ARTICLE 8.  COMPLIANCE WITH LAWS, ORDINANCES, ETC.

a.   The Subcontractor shall obtain all permits, licenses, and other governmental fees of any kind that may be necessary for the proper performance of its Work.  Subcontractor shall cooperate fully with and obtain such additional permits, if any, which may be required so that Contractor may at Contractor's cost and expense, connect with, attach to or add to Subcontractor's Work.  All fees for such additional permits shall be paid by Contractor.  The Subcontractor, its employees and all others acting under its direction or control, shall at all times comply with and abide by all Local, State and Federal statutes, ordinances, rules and regulations as well as those of any other public body having authority concerning the Work, including but not limited to the Occupational Safety and Health Act and all similar state and local safety codes and the Immigration Reform and Control Act of 1986 and any other applicable immigration laws or regulations.  The Subcontractor shall assume all liability and responsibility for all royalties, licenses, patent fees, and any other charges made in connection with the use of patented processes upon the Work or in connection therewith.  Subcontractor shall be responsible for the payment of all taxes of any nature related to the performance of its Work and shall pay all contributions and taxes for unemployment insurance or old age retirement benefits, annuities or pensions now or hereafter imposed by the United States or any state or governmental subdivision thereof, or labor organization measured by the wages, salaries or other remuneration paid persons employed by the Subcontractor engaged in the performance of the Work.  The Subcontractor shall comply with all rules and regulations applicable thereto.  In the event that the Contractor is held liable for payment of any taxes, penalties, fines or contributions as a result of the Subcontractor's noncompliance with the provisions of this Article, the Subcontractor shall supply the Contractor with all records necessary to compute such taxes or contributions and shall fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest).  The Subcontractor shall hold and save the Contractor harmless and indemnified against all claims including attorney's fees, arising out of any violation or noncompliance with the provisions of this Article.

b.   If hazardous substances are being used or located on site by the Subcontractor or the Subcontractor's subcontractors, the Subcontractor shall immediately give written notice to the Contractor of its chemical composition and dangers.  If the Subcontractor encounters asbestos, PCB, or other hazardous substances while completing its Work, Subcontractor shall immediately stop work and notify the Contractor's representative at the Project site.

## ARTICLE 9.  INSURANCE

a.   This Subcontractor shall provide insurance in accordance with the requirements of Exhibit #5 attached hereto and the Subcontract Amount includes the cost of said insurance.  The Subcontractor shall provide certificates of insurance naming the Contractor, the Owner, and such other parties designated in Exhibit #5 as named insureds, on all insurance coverages set forth in Exhibit #5.



] SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

b.   Evidence of insurance coverages noted in Exhibit #5 shall be provided to the Contractor at least seven (7) days prior to the start of any work by the Subcontractor in the field.  Any failure to so provide such insurance coverage on behalf of the Contractor, the Owner or other parties shall not relieve this Subcontractor in any way of his responsibilities, obligations and indemnification of the Contractor and the Owner from any acts, damages, accidents, injuries, claims and  the like, that occur at the Project site as a result of the operations and activities of this Subcontractor. This Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless the Contractor and Owner in all respects thereto. Insurance shall be carried by this Subcontractor for the duration of the entire construction of the Project including The Guarantee Period.  All insurance provided by the Subcontractor on the Project is non-cancelable without first providing the Contractor with thirty (30) days advance notice by registered mail of said cancellation.  Failure to maintain insurance coverage as described hereto and further set forth in Exhibit #5 shall be a breach of this Agreement by the Subcontractor.

c.   Subcontractor waives all rights of recovery against the Contractor, the Owner, and such other parties as are required by the Contractor and/or the Contract Documents for losses within the scope of Subcontractor's insurance.  Subcontractor will ensure that its subcontractors also waive such claims against the Contractor and Owner.

d.   If the Subcontractor fails to secure and maintain the required insurance, the Contractor shall have the right (without any obligation to do so, however) to secure the insurance in the name of and for the account of the Subcontractor, in which event, the Subcontractor shall pay the cost thereof and shall furnish, upon demand, all information that may be required in connection therewith.

e.   The obligations of Subcontractor in this Article shall survive termination of this Agreement.

## ARTICLE 10.  ASSIGNMENTS

a.   Subcontractor shall neither assign this Agreement nor employ other subcontractors for the execution of any part or all thereof without the express written approval of the Contractor and the Subcontractor's surety.  Such consent, if given, shall not release the Subcontractor from its obligations hereunder.  The Subcontractor agrees that it will be responsible for the acts and omissions of its subcontractors, sub-subcontractors and their employees to the same extent that it is responsible for acts and omissions of persons directly employed by it.  The Subcontractor agrees to bind every subcontractor and sub-subcontractor, and every subcontractor and sub-subcontractor agrees to be bound, by the terms of the Contract Documents so far as they are applicable to its Work.

b.   Subcontractor, by execution of this Agreement, contingently assigns to the Contractor all Subcontractor's subcontracts.  The assignment of each of Subcontractor's subcontracts shall take effect only upon Subcontractor's termination for default under Article 13 and the Contractor's affirmative acceptance of the assignment of the specific subcontract by written notice to Subcontractor and Subcontractor's subcontractor.  The Contractor shall have no liability to any of Subcontractor's subcontractors unless and until the Contractor affirmatively accepts the assignment as provided above.

c.   In the event of a termination by the Owner of the Contractor for default under the Owner/Contractor contract, the Owner may take assignment of this Agreement.

d.   This Agreement shall inure to the benefit of Contractor and its successors, and assigns, heirs and legal representatives, and shall be binding upon Subcontractor, its successors and permitted assigns, if any, pursuant to the terms hereof.

## ARTICLE 11.  LOSS OR DAMAGE TO WORK

a.   The Contractor shall not be responsible for loss or damage to equipment or materials belonging to the Subcontractor, except where incorporated or installed into the Project in a satisfactory manner in accordance with the provisions of this Agreement. The Contractor shall not be responsible for loss or damage to materials, tools, equipment, or other personal property owned, rented, or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused.

b.   Subcontractor shall pay for any damage to the work of another caused by Subcontractor, its employees, subcontractors, sub-subcontractors or agents.  Subcontractor shall not claim or be entitled to receive any compensation or damages because of failure of Owner, Architect or Contractor or other subcontractors to have related portions of the Project completed in time for the Subcontractor's Work.

c.   Subcontractor shall protect its work, materials, tools and equipment against any loss or damage by fire, theft, accident or other cause.  In the event of any injury, loss or damage to Subcontractor, its agents or employees or to its work, materials, or equipment, Subcontractor shall make no claim against Contractor by reason thereof.



J SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1171-015
DATE: 1/04/2013

## ARTICLE 12. CLEANUP

a.   All debris resulting from the Work shall be removed from the Work areas by the Subcontractor to locations on the Project Site designated by the Contractor as and when instructed by the Contractor's Superintendent. The Contractor shall have the right, where the Subcontractor fails to comply with its obligations under this Article, after 24 hours prior written notice, to accomplish the Subcontractor's cleanup with its own forces and equipment, and withhold the amount of all costs incurred in so doing from any amounts due the Subcontractor.

## ARTICLE 13. SUBCONTRACT'S FAILURE TO PERFORM OR DEFAULT

a.   If, in the sole opinion of the Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the Work according to the Contractor's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of the Contractor or of any other contractor or subcontractor, (4) fail to comply with any provision of this Agreement or other Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days' written notice and the Subcontractor fails to eliminate the condition specified in that notice within the time allowed, the Contractor, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to the Contractor for all cost, expenses, and damages resulting therefrom, (ii) terminate this Agreement, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to the Contractor and/or the Owner. In the event of termination by the Contractor, the Contractor may, at its option, (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method the Contractor may deem expedient. In case of termination by the Contractor, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full is made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the amount of all costs, expenses, and damages incurred by the Contractor including its reasonable overhead and profit, such excess shall be paid by the Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay the Contractor the difference immediately upon demand.

b.   If the Contractor wrongfully exercises its option under Article 13, that action shall be treated as a deductive change. If the Contractor wrongfully exercises its option under Article 13, that termination for default shall be considered a termination for the Contractor's convenience and Subcontractor shall be entitled to the applicable compensation provided in Article 18. Subcontractor's remedies under this Article 13.b. shall be exclusive. Nothing herein shall bar withholdings by the Contractor permitted by other provisions of this Agreement.

c.   Any claim arising out of or related to this Agreement shall not be subject to any requirement to mediate or arbitrate unless the parties mutually agree to such a proceeding. Any mutual agreement to mediate or arbitrate any one claim shall be strictly limited to the one claim and no other.

## ARTICLE 14. GUARANTEES

a.   Subcontractor warrants and guarantees that all the Work shall be free from defects in workmanship and materials at the time that it is completed and for a minimum period of one (1) year from date Owner accepts the Project (hereinafter the "Guarantee Period") and promptly upon Contractor's request, will correct by repair or replacements, without charge, any such defects (and any damage to other property, including without limitation the work of other subcontractors resulting therefrom or from the correction thereof) which may appear in the Work. Where the contract documents between the Owner and Contractor, or governmental bodies or agencies require guarantees extending beyond one year, or any additional warranties or guarantees are included in this Agreement, the Subcontractor's obligation shall remain in effect for such extended period of time.

b.   If the Subcontractor fails to commence and to complete the repair or replacement of improper or defective work, as specified, within a reasonable period of time as determined by the Contractor in its sole discretion, the Contractor may proceed to arrange to have such work completed and do so by whatever method it may deem expedient and may charge the cost thereof against any monies due to the Subcontractor. If the unpaid balance of the Subcontract Amount shall exceed the expense of finishing the Work, including proper allowance for additional managerial and administrative expenses, such excess shall be paid to the Subcontractor. If such expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor immediately upon demand.

c.   If the Subcontractor shall cover any portion of the Work prior to the Inspecting Architect having a reasonable time and opportunity to inspect, the Subcontractor, upon the request of the Architect, shall uncover that portion of the Work, and the costs of uncovering and replacing the Work shall be at the Subcontractor's sole expense.

d.   The obligations of Subcontractor in this Article shall survive termination of this Agreement.


SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-035
DATE: 1/04/2013

## ARTICLE 15.  LABOR TO BE EMPLOYED/SUBCONTRACTOR REPRESENTATIVE

a.   The Subcontractor shall not employ men, means, material or equipment which may cause strikes, work stoppages or any disturbances by workmen employed by the Subcontractor, Contractor, or other subcontractors on or in connection with the Work or the Project or the location thereof.

b.   Subcontractor understands that the Contractor, other subcontractors and/or other contractors of the Owner may employ both Union and Non-Union workers on the Project.  If required by the Contract Documents or specified in an Exhibit to this Agreement, Subcontractor agrees to employ Union labor.

c.   The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work any person unfit for or not skilled in the work assigned to him.  Subject to the foregoing and to preserving good relations with the public and requiring the discharge of any employees causing a breach of peace or other disturbance of said relations, the Contractor shall not in any way interfere with the Subcontractor's right to hire and fire its employees, assign duties to them, and fix their working hours, wages or terms and conditions of employment, which right shall be absolute.  Exceptions to this provision shall apply in those instances where Federal, State or Local Agencies having jurisdiction over the Project dictate a level of prevailing wage or oversee and establish minimum working standards or establish non-working hours for the Project.

d.   Subcontractor shall maintain a foreman on the job at all times with full authority and expertise to execute and direct the Subcontractor's Work in accordance with the Contract Documents and as directed by the Contractor's Superintendent.  The Subcontractor shall notify the Contractor's Superintendent upon arrival and departure of the Subcontractor's men from the job site.  The Contractor shall from time to time schedule job meetings, which shall be attended by an authorized representative of the Subcontractor with authority to make commitments, which shall be binding, on the Subcontractor.

e.   Should the Subcontractor fail to carry out or comply with the provisions of this Article, it shall be in default and the Contractor shall have the right to terminate this Agreement in accordance with Article 13 hereof.

## ARTICLE 16.  SEPARABILITY

In the event that any provision of this Agreement or any part of any Article thereof shall be declared invalid by a court of competent jurisdiction, it shall not affect the validity of any other parts of this Agreement or any other provisions of an Article containing an invalid provision, which shall remain in full force and effect.

## ARTICLE 17.  LIABILITY FOR DAMAGES AND INJURY

a.   Subcontractor shall defend (with a mutually agreeable attorney), indemnify, hold harmless and reimburse Owner, Contractor and their agents, officers, and employees (the "Indemnitees") from all claims, damages, losses and expenses (including, but not limited to attorney's fees and costs) attributable to bodily injury, sickness, disease or death or injury to or destruction of tangible property, including but not limited to the loss of use resulting therefrom, arising out of or in connection with the performance of the Work or any negligent act or omission of Subcontractor at or in connection with the Project, by anyone directly or indirectly employed by Subcontractor, its lower tier sub-subcontractors and suppliers, or anyone else for whose acts Subcontractor is liable even if caused jointly and concurrently by the negligence of the Indemnitees and Subcontractor (or any one or more of either of them).  In any and all claims against the Indemnitees by any employee of Subcontractor or anyone for whose acts Subcontractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount of or type of damages, compensation or benefits payable by or for Subcontractor or any sub-subcontractor under Workers' or Workmen's Compensations Acts, disability benefits or other employee benefit acts nor by any requirement for insurance. Subcontractor does not assume liability for loss or damage due solely to the negligence of Contractor.  The Subcontractor shall promptly reimburse the Contractor therefore, and if any such claims or suits remain outstanding at the time the Work is completed, final payment shall be deferred until they are adjusted.  The Subcontractor shall ensure that all of its subcontractors agree to bring any claims for damages or injuries against Subcontractor and not to bring such claims against the Contractor or Owner to the fullest extent permitted by law.

b.   Subcontractor shall be liable to the Contractor for all costs the Contractor incurs as a result of Subcontractor's failure to perform this Agreement in accordance with its terms.  Subcontractor's failure to perform shall include the failure of its lower-tier subcontractors or materialmen to perform.  Subcontractor's liability shall include but is not limited to (1) damages and other delay costs payable by the Contractor to the Owner; (2) the Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; (5) excess reprocurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs.



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

c.  Subcontractor's assumption of liability herein includes but is not limited to assumption of all liabilities on account of or in any way related to Subcontractor's Work, which the Contractor has assumed under the Contract Documents or under agreements with third parties who may be affected by construction of the Project.

d.  Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 9, or otherwise. All amounts owed by Subcontractor to the Contractor as a result of the liability provisions of this Agreement shall be paid upon demand.

e.  The Subcontract Amount includes one hundred dollars ($100.00) as specific consideration for indemnification under this Agreement.

### ARTICLE 18. TERMINATION FOR CONVENIENCE

a.  The Contractor, at its sole discretion, may terminate this Agreement without cause at any time by giving at least ten (10) days' prior written notice of such termination to the Subcontractor. Upon any termination of this Agreement pursuant to this Article, and subject to all of the terms and provisions herein contained, the Subcontractor shall be entitled to payment up to the Contract Amount for all accepted work furnished or installed by it. However, the Contractor may retain from any monies due the Subcontractor, an amount sufficient to cover the Subcontractor's obligations under the Article 14. Guarantee. Upon the expiration of such obligations, the balance of such amount, if any, shall be paid to the Subcontractor. The Subcontractor, upon termination of this Agreement, shall forthwith peaceably and quietly surrender to the Contractor all premises, facilities, machinery, and equipment furnished by or belonging to the Contractor and shall cooperate with the Contractor in facilitating the transition of work to a new party.

b.  Subcontractor shall not be entitled to anticipate profits on work unperformed or on material or equipment unfurnished.

### ARTICLE 19. DISCONTINUANCE OR SUSPENSION OF WORK

If, as a result of fire, earthquake, Act of God, war, strike, picketing, boycott, lockout or other cause beyond the control of Owner or Contractor, Owner or Contractor decide, in their sole discretion, that it is inadvisable to proceed with the Work hereunder then Subcontractor shall, upon receiving written notice thereof from Owner or Contractor, immediately discontinue any further work hereunder until such time as Owner or Contractor may deem it advisable to resume said Work. Subcontractor will resume the Work promptly upon receiving notice from Contractor to do so and Subcontractor shall not be entitled to any damages or compensation on account of any such cessation of work as a result of any of the causes set forth herein.

### ARTICLE 20. SUBCONTRACTOR'S BOND

a.  If required of the Contractor, the Contractor shall have the option to require the Subcontractor to furnish a bond or bonds in the form and amounts satisfactory to the Contractor at the time of execution of this Agreement. In such case, the Subcontractor will be paid additional reasonable compensation for the cost of such bond or bonds.

b.  Any Subcontractor's bonds shall cover the faithful performance of this Agreement, the payment of all obligations arising therefrom and the maintenance of the completed improvements for one (1) year from the date of final approval and acceptance (and also where any governmental bodies or agencies or the Contract Documents including the contract between the Owner and Contractor require guarantees extending beyond one (1) year, for such extended period) against defective workmanship and materials (even where furnished by Contractor or its suppliers) and liability for damages resulting therefrom. The bond(s) will be issued by a surety acceptable to the Contractor, and must be in the form attached hereto as Exhibit #8.

### ARTICLE 21. USE OF CONTRACTOR'S EQUIPMENT

Contractor's equipment will be available for use by Subcontractor only at Contractor's discretion and upon mutually satisfactory terms. In using such equipment or facilities (including but not limited to rigging, blocking, hoisting equipment and scaffolding), Subcontractor shall be responsible for and shall indemnify, defend (with counsel chosen by Contractor), and hold Contractor harmless from and against any and all claims, actions, demands, damages, liabilities or expenses, including attorney's fees, which may arise from such use. Subcontractor has examined and will examine all such equipment and understands that Contractor makes no warranty regarding the same, such use being at Subcontractor's own risk.



SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Penworth Safeway with Residences
CONTRACT # 1173-035
DATE: 1/04/2013

## ARTICLE 22. SAFETY

This Subcontractor is to provide adequate and proper safety protection for its men and equipment and shall strictly comply with all the rules and regulations of the federal and state Occupational Safety and Health Acts. Hard hats will be worn by all personnel employed on the job by this Subcontractor at all times. Payments may be withheld for any failure by Subcontractor to comply with the requirements of this Article. Accidents to employees or sub-subcontractors of this Subcontractor will be promptly reported in detail to the Job Superintendent. Fines resulting from acts of this Subcontractor for failure to comply with the safety regulations and the requirements of OSHA or a state or local agency will be promptly paid by this Subcontractor or deducted from its Subcontract Amount.

## ARTICLE 23. EQUAL OPPORTUNITY AND NON-DISCRIMINATION

Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold Contractor harmless of, from and against any and all loss, cost, damage, charge or expense, caused or contributed to by the violation or claimed violation by the Subcontractor of the Labor Management Relations Act of 1947, as amended, the equal employment opportunities laws, and any applicable and valid order, rule or regulation issued by any appropriate governmental agency in accordance with those laws. Subcontractor agrees to abide by and comply with all federal, state and local nondiscrimination laws, rules and regulations including but not limited to the Fair Housing Act, Americans with Disabilities Act, and similar state and local laws as they may apply to the Work.

## ARTICLE 24. ATTORNEYS' FEES

Should any litigation or arbitration be commenced between the parties hereto concerning the Work, any provision of this Agreement or the rights or obligations of either party in relation hereto, the party, Subcontractor or Contractor, prevailing in such litigation or arbitration shall be entitled to a reasonable sum for attorneys' fees in such proceedings, unless any part of this litigation or arbitration is related to an Article 13 default as part of Contractor's claim against Subcontractor or as part of Contractor's defense to Subcontractor's claim for payment.

## ARTICLE 25. DEMANDS AND NOTICES

All notices, demands, requests and other communications required or permitted to be given hereunder or by law to either party hereto shall be in writing and shall be deemed duly served or delivered when personally delivered to the party to whom it is addressed or when personally delivered to a supervisorial employee of said party or, when in lieu of said personal service, deposited in the United States Mail, first class postage prepaid, addressed to the Contractor or Subcontractor at the address that appears for each of them in this Subcontract. Either party hereto may change its address for the purposes of this Article by giving written notice of such change to the other party in the manner provided in this Article.

## ARTICLE 26. CAPTIONS

The captions used for the sections in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of the intent of this Agreement, or any section thereof.

## ARTICLE 27. SINGULAR NUMBER

Whenever used in this Agreement, the singular number shall include, the plural, and the use of any gender shall be applicable to all genders.

## ARTICLE 28. AUTHORITY

If Subcontractor is a corporation, the person signing this Agreement on behalf of such corporation hereby warrants that he or she has full authority from such corporation to sign this Agreement and obligate the corporation.

## ARTICLE 29. FAILURE TO NEGOTIATE PAYMENTS

Any payment hereunder that remains unclaimed or un-cashed or otherwise unconverted by the Subcontractor shall after a five (5) year period, automatically, without any further action of any party, become the sole property of Contractor.



[   ] SUB
PM

#537156

## ARTICLE 30.  CONFLICT IN INTEREST

Until Subcontractor's obligations under this Agreement are completely fulfilled and the Project is complete, Subcontractor agrees not to perform any work related to the Project directly for the Owner, other contractors or any other entity or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by Contractor.  All work for this Project performed by Subcontractor shall be processed and handled exclusively through Contractor.

## ARTICLE 31.  SUBCONTRACTOR'S OBLIGATION TO THE OWNER

a.   In addition to its contractual obligations pursuant to the terms of this Agreement, Subcontractor is obligated directly to the Owner for the quality of work.

b.   The services to be provided by Subcontractor hereunder are for the benefit of one or more partnerships, corporations, limited liability companies or joint ventures formed or to be formed to own and/or develop the project involved (together, the "Owner").  The Owner possesses some identity of interest with the Contractor and it is agreed that the Owner can enforce directly against Subcontractor all warranties or common law or statutory remedies, or contractual obligations with respect to the quality of the Work by a lawsuit for damages without the necessity of including the Contractor as a party to the litigation or arbitration.  In this respect, Subcontractor expressly waives any requirement of privity between it and the Owner for the purposes of the Owner's making claims for defective work under this Agreement on any of the above said grounds.

c.   If for any reason the abovesaid waiver is not enforceable, Subcontractor agrees that Contractor may assign to Owner at any time all of the benefits of this Agreement with respect to the Subcontractor's obligation to provide a work product free from defects and that Owner may then enforce those obligations directly as if it had contracted with Subcontractor directly.

d.   If claim is made against Owner in any way arising out of the quality of Subcontractor's work, Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless Owner against any and all monetary damages sustained by Owner including attorney fees, incurred as a result of such claim.  It is agreed that the statute of limitations controlling such claim by the Owner shall begin to run at the earliest from the date of any judgment against the Owner arising out of Subcontractor's defective work.  This obligation shall survive termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CONTRACTOR:
BOZZUTO BUILDING COMPANY

BY:      Josh Peters
TITLE:   Vice President

WITNESS

SUBCONTRACTOR:
DESIGN BUILD MECHANICAL CORPORATION, VA

BY:
TITLE:   Vice President

WITNESS:

#537156



# BOZZUTO
## CONSTRUCTION

> **Exhibit 1: List of Drawings & Specifications**

| | | | |
|---|---|---|---|
| Petworth Safeway with Residences | | | Project # 1172 |
| 300 Randolph Street, NW | | Tel: | |
| Washington DC 20011 | | Fax: | |

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| **Drawings** | | | |
| **Architectural** | | | |
| A101 | G2 Level East Slab Plan 1/8" | 5/17/2012 | 0 |
| A102 | G2 and G1 Level West Slab Plans 1/8" | 5/17/2012 | 0 |
| A103 | G1 Level East Slab Plan 1/8" | 5/17/2012 | 0 |
| A104 | Ground Floor East Slab Plan 1/8" | 5/17/2012 | 0 |
| A105 | Ground Floor and 2nd Floor West Slab Plans 1/8" | 5/17/2012 | 0 |
| A106 | 2nd Floor East Slab Plan 1/8" | 5/17/2012 | 0 |
| A201 | G2 and G1 Garage Level Plans - 1/16" Scale | 5/17/2012 | 0 |
| A202 | Ground Floor and Mezzanine Level Plans - 1/16" Scale | 5/17/2012 | 0 |
| A203 | 2nd and 3rd Floor Plans - 1/16" Scale | 5/17/2012 | 0 |
| A204 | 4th, 5th, 6th Floor and Roof Plans - 1/16" Scale | 5/17/2012 | 0 |
| A211 | G2 Partial Garage Level Plan - East - 1/8" Scale | 5/17/2012 | 0 |
| A212 | G1 and G2 Partial Garage Level Plans - West - 1/8" Scale | 5/17/2012 | 0 |
| A213 | G1 Partial Garage Level Plan - East - 1/8" Scale | 5/17/2012 | 0 |
| A214 | Ground Floor Partial Plan - East - 1/8" Scale | 5/17/2012 | 0 |
| A215 | Ground and Second Floor Partial Plans - West - 1/8" Scale | 5/17/2012 | 0 |
| A216 | 2nd Floor Partial Plan - East - 1/8" Scale | 5/17/2012 | 0 |
| A217 | 3rd Floor Plan - 1/8" Scale | 5/17/2012 | 0 |
| A218 | Typical (4th and 5th) Floor Partial Plan - 1/8" Scale | 5/17/2012 | 0 |
| A219 | 6th Floor Partial Plan - East - 1/8" Scale | 5/17/2012 | 0 |
| A220 | Main Roof Plan - 1/8" Scale | 5/17/2012 | 0 |
| A301 | Partial Ground Floor Plans 1/4" | 5/17/2012 | 0 |
| A302 | Mezzanine and Res Lobby 2 Plans 1/4" | 5/17/2012 | 0 |
| A321 | 1/4" Partial 2nd Floor Plan - NW | 5/17/2012 | 0 |
| A322 | 1/4" Partial 2nd Floor Plan - NE | 5/17/2012 | 0 |
| A323 | 1/4" Partial 2nd Floor Plan - SW | 5/17/2012 | 0 |
| A324 | 1/4" Partial 2nd Floor Plan - SE | 5/17/2012 | 0 |



#537158



**BOZZUTO**
CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| A325 | 1/4" Partial Typical Floor Plan - NW | 5/17/2012 | 0 |
| A326 | 1/4" Partial Typical Floor Plan - NE | 5/17/2012 | 0 |
| A327 | 1/4" Partial Typical Floor Plan - SW | 5/17/2012 | 0 |
| A328 | 1/4" Partial Typical Floor Plan - SE | 5/17/2012 | 0 |
| A329 | 1/4" Partial 6th Floor - NW | 5/17/2012 | 0 |
| A331 | 1/4" Stair S1 Plans and Sections | 5/17/2012 | 0 |
| A332 | 1/4" Stair S2 Plans and Sections | 5/17/2012 | 0 |
| A333 | 1/4" Stair S3 Plans and Sections | 5/17/2012 | 0 |
| A334 | Safeway Stairs and Elevators - Plans and Sections | 5/17/2012 | 0 |
| A401 | Building Sections | 5/17/2012 | 0 |
| A402 | Building Sections @ Courtyard | 5/17/2012 | 0 |
| A403 | Garage Intake Plans and Sections | 5/17/2012 | 0 |
| A501 | Building Elevations North | 5/17/2012 | 0 |
| A502 | Building Elevations East and West | 5/17/2012 | 0 |
| A503 | Building Elevations South | 5/17/2012 | 0 |
| A504 | Courtyard Elevations Façade "E" | 5/17/2012 | 0 |
| A601 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A602 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A603 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A604 | Façade "B" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A605 | Façade "B" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A606 | Façade "A & B" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A607 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A608 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A609 | Façade "B" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A610 | Façade "C" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A610A | Façade "C" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A611 | Façade "D" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A612 | Façade "D" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A613 | Façade "D" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A614 | Façade "D" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A615 | Façade "D" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A616 | Façade "C" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A617 | Façade "C" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| A618 | Façade "C" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A619 | Façade "A" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A620 | Façade "E" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A620A | Façade "E" Wall Sections, Partial Elevations and Plans | 5/17/2012 | 0 |
| A621 | Façade "A" Typical Section Details | 5/17/2012 | 0 |
| A622 | Façade "A" Typical Section Details | 5/17/2012 | 0 |
| A622A | Façade "A" Section Details | 5/17/2012 | 0 |
| A623 | Façade "A" Typical Section Details | 5/17/2012 | 0 |
| A624A | Façade "A & B" Section Details - 2HR Walls | 5/17/2012 | 0 |
| A625 | Façade 'B' Typical Section Details | 5/17/2012 | 0 |
| A627 | Façade "C" Section Details | 5/17/2012 | 0 |
| A627A | Façade "C" Section Details | 5/17/2012 | 0 |
| A628 | Façade "C" Section Details | 5/17/2012 | 0 |
| A630 | Façade "D" Section Details | 5/17/2012 | 0 |
| A630B | Façade "D" Section & Plan Details | 5/17/2012 | 0 |
| A631 | Façade "E" Section Details | 5/17/2012 | 0 |
| A632 | Façade 'A' Plan & Elevation Details | 5/17/2012 | 0 |
| A633 | Façade 'A' Plan Details | 5/17/2012 | 0 |
| A635 | Façade "A" Plan Details | 5/17/2012 | 0 |
| A637 | Façade "B" Plan Details | 5/17/2012 | 0 |
| A640 | Façade "E" Plan Details | 5/17/2012 | 0 |
| A642 | Retail Entrance Canopy Plan and Details | 5/17/2012 | 0 |
| A643 | Residential Entrance Canopies Plans and Details | 5/17/2012 | 0 |
| A644 | Garage Screen Detail | 5/17/2012 | 0 |
| A651 | Miscellaneous Exterior and Interior Details | 5/17/2012 | 0 |
| A651A | Duct Assembly Details | 5/17/2012 | 0 |
| A652 | Garage Details | 5/17/2012 | 0 |
| A653 | Concrete Stair Details | 5/17/2012 | 0 |
| A653A | Steel stair Details | 5/17/2012 | 0 |
| A654 | Elevator Details | 5/17/2012 | 0 |
| A655 | Typical Roof Details | 5/17/2012 | 0 |
| A656 | Courtyard and Flashing Details | 5/17/2012 | 0 |
| A657 | Typical Ramp Details | 5/17/2012 | 0 |
| A658 | Trash Chute and Duct Enclosure Plans, Section, & Details | 5/17/2012 | 0 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| A701 | Wall Type Schedule - Podium | 5/17/2012 | 0 |
| A701A | Wall Type Schedule - Above Podium | 5/17/2012 | 0 |
| A702 | Floor and Roof Assemblies | 5/17/2012 | 0 |
| A703 | Door Schedule | 5/17/2012 | 0 |
| A703A | Door Schedule | 5/17/2012 | 0 |
| A704 | Jamb and Head Details | 5/17/2012 | 0 |
| A705 | Window Schedule | 5/17/2012 | 0 |
| A706 | Exterior Storefront, Curtainwall Details | 5/17/2012 | 0 |
| A706A | Interior Storefront, Curtainwall and Louver Schedule | 5/17/2012 | 0 |
| A707 | Finish and Color Schedule | 5/17/2012 | 0 |
| A801 | Kitchen Interior Plans and Elevations - Type B Units | 5/17/2012 | 0 |
| A802 | Kitchen Interior Plans and Elevations - Type A Units | 5/17/2012 | 0 |
| **Civil** | | | |
| 1 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 2 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 3 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 4 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 5 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 6 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 7 OF 7 | TEMPORARY SUPPORT OF EXCAVATION | 5/16/2012 | 1 |
| 1 OF 21 | COVER SHEET | 5/15/2012 | 2 |
| 2 OF 21 | GENERAL NOTES AND LEGEND | 5/15/2012 | 2 |
| 3 OF 21 | BOUNDRY AND TOPOGRAPHIC SURVEY | 5/15/2012 | 2 |
| 4 OF 21 | BOUNDRY AND TOPOGRAPHIC SURVEY | 5/15/2012 | 2 |
| 5 OF 21 | EXISTING CONDITIONS AND DEMOLITION PLAN | 5/15/2012 | 2 |
| 6 OF 21 | SITE PLAN | 5/15/2012 | 2 |
| 7 OF 21 | GRADING PLAN | 5/15/2012 | 2 |
| 8 OF 21 | UTILITY PLAN | 5/15/2012 | 2 |
| 9 OF 21 | UTILITY PROFILES | 5/15/2012 | 2 |
| 10 OF 21 | UTILITY PROFILES | 5/15/2012 | 2 |
| 11 OF 21 | UTILITY PROFILES | 5/15/2012 | 2 |
| 12 OF 21 | STORMWATER MANAGEMENT/BMP & DETAILS | 5/15/2012 | 2 |
| 13 OF 21 | SITE DETAILS | 5/15/2012 | 2 |
| 14 OF 21 | SITE DETAILS | 5/15/2012 | 2 |

#537156


**BOZZUTO**
CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| 15 OF 21 | SITE DETAILS | 5/15/2012 | 2 |
| 16 OF 21 | SITE DETAILS | 5/15/2012 | 2 |
| 17 OF 21 | DC WATER WORKSHEETS | 5/15/2012 | 2 |
| 18 OF 21 | EROSION AND SEDIMENT CONTROL PLAN PHASE I | 5/15/2012 | 2 |
| 19 OF 21 | EROSION AND SEDIMENT CONTROL PLAN PHASE II | 5/15/2012 | 2 |
| 20 OF 21 | EROSION AND SEDIMENT CONTROL NOTES | 5/15/2012 | 2 |
| 21 OF 21 | EROSION AND SEDIMENT CONTROL DETAILS | 5/15/2012 | 2 |
| | | | |
| Electrical | | | |
| E100 | SYMBOLS, NOTES & ABBREVS | 5/17/2012 | 0 |
| E111 | G2 LIGHTING PLAN - EAST | 5/17/2012 | 0 |
| E112 | G1 & G2 LIGHING PLAN - WEST | 5/17/2012 | 0 |
| E113 | G1 LIGHTING PLAN - EAST | 5/17/2012 | 0 |
| E114 | GROUND FLOOR LIGHTING PLAN - EAST | 5/17/2012 | 0 |
| E114A | RESIDENT LOBBY 1, 2 & MEZZ | 5/17/2012 | 0 |
| E115 | GROUND & 2ND WEST & CAFÉ LIGHING PLAN | 5/17/2012 | 0 |
| E116 | 2ND FLOOR LIGHTING PLAN - EAST | 5/17/2012 | 0 |
| E116A | CLUB & FITNESS LIGHTING PLAN | 5/17/2012 | 0 |
| E117 | TYPICAL (3RD -6TH) FLOOR LIGHING PLAN | 5/17/2012 | 0 |
| E211 | G2 POWER/FIRE ALARM PLAN - EAST | 5/17/2012 | 0 |
| E212 | G1&G2 POWER/FIRE ALARM PLAN - WEST | 5/17/2012 | 0 |
| E213 | G1 POWER/FIRE ALARM PLAN - EAST | 5/17/2012 | 0 |
| E214 | GROUND POWER /FIRE ALARM PLAN - EAST | 5/17/2012 | 0 |
| E215 | GROUND & 2ND POWER/FIRE ALARM PLAN - WEST | 5/17/2012 | 0 |
| E215A | MEZZANINE POWER/FIRE ALARM PLAN | 5/17/2012 | 0 |
| E216 | 2ND FLOOR POWER/FIRE ALARM PLAN - EAST | 5/17/2012 | 0 |
| E217 | TYPICAL (3RD-6TH) POWER/FIRE ALARM PAN | 5/17/2012 | 0 |
| E218 | 6TH FLOOR POWER/FIRE ALARM PLAN - EAST | 5/17/2012 | 0 |
| E219 | MAIN ROOF POWER/FIRE ALARM PLAN | 5/17/2012 | 0 |
| E301 | UNIT PLANS | 5/17/2012 | 0 |
| E302 | UNIT PLANS | 5/17/2012 | 0 |
| E303 | UNIT PLANS | 5/17/2012 | 0 |
| E401A | POWER RISER DIAGRAM - ALTERNATE | 5/17/2012 | 0 |
| E402A | MAIN ELEC ROOM DETAILS - ALTERNATE | 5/17/2012 | 0 |
| E403 | ELEC - FIRE ALARM & TELECOM RISER | 5/17/2012 | 0 |

#537156



Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| E404 | FIRE ALARM ANNUNCIATOR PANEL | 5/17/2012 | 0 |
| E405 | ELECTRICAL SCHEDULES AND DETAILS | 5/17/2012 | 0 |
| E501 | PANEL - BOARD SCHEDULES | 5/17/2012 | 0 |
| E502 | PANEL - BOARD SCHEDULES | 5/17/2012 | 0 |
| E503 | PANEL - BOARD SCHEDULES | 5/17/2012 | 0 |
| E601 | ELECTRICAL EQUIPMENT SCHEDULE | 5/17/2012 | 0 |
| MEPCOM | MEP Camcheck Envelop Compliance Certificate | 5/17/2012 | 0 |

**Interior Design**

| CVR ID | COVER SHEET | 5/17/2012 | 0 |
|---|---|---|---|
| IDN-01 | GENERAL NOTES, ABBREVIATIONS, LEGEND AND DRAWINGS INDEX | 5/17/2012 | 0 |
| IDN-02 | ICC/ANSI A117.1 - 2003 STANDARD | 5/17/2012 | 0 |
| IDS-01 | SPECIFICATIONS | 5/17/2012 | 0 |
| IDS-02 | DOOR/WINDOW/TRANSITION DETAILS AND SPECIFICATIONS | 5/17/2012 | 0 |
| IDS-03 | FINISH SPECIFICATIONS | 5/17/2012 | 0 |
| ID1-01 | DESIGN PLAN - RESIDENTIAL LOBBY 1 & 2, MEZZANINE | 5/17/2012 | 0 |
| ID1-02 | DESIGN PLAN - 2ND FLOOR CORRIDOR | 5/17/2012 | 0 |
| ID1-03 | DESIGN PLAN - CLUBROOM, FITNESS & TYPICAL ELEVATOR LOBBIES | 5/17/2012 | 0 |
| ID1-04 | DESIGN PLAN - TYPICAL CORRIDOR | 5/17/2012 | 0 |
| ID2-01 | REFLECTED CEILING PLAN - RESIDENTIAL LOBBY 1 & 2, MEZZANINE | 5/17/2012 | 0 |
| ID2-02 | REFLECTED CEILING PLAN - 2ND FLOOR CORRIDOR | 5/17/2012 | 0 |
| ID2-03 | REFLECTED CEILING PLAN - CLUBROOM, FITNESS & TYPICAL ELEVATOR LOBBIES | 5/17/2012 | 0 |
| ID2-04 | REFLECTED CEILING PLAN - TYPICAL CORRIDOR | 5/17/2012 | 0 |
| ID3-01 | POWER AND COMM PLAN - RESIDENTIAL LOBBY 1 & 2, MEZZANINE | 5/17/2012 | 0 |
| ID3-02 | POWER AND COMM PLAN - CLUBROOM AND FITNESS | 5/17/2012 | 0 |
| ID4-01 | FINISH PLAN - RESIDENTIAL LOBBY 1 & 2, MEZZANINE | 5/17/2012 | 0 |
| ID4-02 | FINISH PLAN - CLUBROOM, FITNESS & TYPICAL ELEVATOR LOBBIES | 5/17/2012 | 0 |

**Landscape**

| L0.01 | GENERAL NOTES | 5/17/2012 | 0 |
|---|---|---|---|
| L1.00 | OVERALL SITE PLAN | 5/17/2012 | 0 |
| L1.11 | HARDSCAPE PLAN - AREA 1 | 5/17/2012 | 0 |



#537156



**BOZZUTO**
CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| L1.12 | HARDSCAPE PLAN - AREA 2 | 5/17/2012 | 0 |
| L1.13 | HARDSCAPE PLAN - CAFÉ AREA ENLARGEMENT | 5/17/2012 | 0 |
| L1.21 | HARDSCAPE PLAN - LEVEL 2 | 5/17/2012 | 0 |
| L2.11 | LAYOUT PLAN - AREA 1 | 5/17/2012 | 0 |
| L2.12 | LAYOUT PLAN - AREA 2 | 5/17/2012 | 0 |
| L2.13 | LAYOUT PLAN - CAFÉ AREA ENLARGEMENT | 5/17/2012 | 0 |
| L2.21 | LAYOUT PLAN - LEVEL 2 | 5/17/2012 | 0 |
| L3.11 | GRADING PLAN - AREA 1 | 5/17/2012 | 0 |
| L3.12 | GRADING PLAN - AREA 2 | 5/17/2012 | 0 |
| L3.13 | GRADING PLAN - CAFÉ AREA ENLARGEMENT | 5/17/2012 | 0 |
| L3.21 | GRADING PLAN - LEVEL 2 | 5/17/2012 | 0 |
| L4.01 | HARDSCAPE DETAILS | 5/17/2012 | 0 |
| L4.02 | HARDSCAPE DETAILS | 5/17/2012 | 0 |
| L4.03 | HARDSCAPE DETAILS | 5/17/2012 | 0 |
| L4.21 | ROOF DECK DETAILS | 5/17/2012 | 0 |
| L4.51 | PRODUCT INFORMATION | 5/17/2012 | 0 |
| L5.11 | LANDSCAPE PLAN - AREA 1 | 5/17/2012 | 0 |
| L5.12 | LANDSCAPE PLAN - AREA 2 | 5/17/2012 | 0 |
| L5.21 | LANDSCAPE PLAN - LEVEL 2 | 5/17/2012 | 0 |
| L6.01 | LANDSCAPE DETAILS | 5/17/2012 | 0 |
| L6.51 | PLANT SCHEDULE | 5/17/2012 | 0 |

**Mechanical**

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| M100 | MECH - SYMBOLS NOTES AND ABBREVS. | 5/17/2012 | 0 |
| M200 | MECH - G2 PARTIAL FLOOR PLAN - EAST | 5/17/2012 | 0 |
| M201 | MECH - G1&G2 PARTIAL FLOOR PLAN - WEST | 5/17/2012 | 0 |
| M202 | MECH - G1 PARTIAL FLOOR PLAN - EAST | 5/17/2012 | 0 |
| M203 | MECH - GROUND FLOOR PARTIAL PLAN - EAST | 5/17/2012 | 0 |
| M204 | MECH - GROUND FLOOR PARTIAL PLAN - WEST | 5/17/2012 | 0 |
| M205 | MECH - 2ND FLOOR PARTIAL PLAN - EAST | 5/17/2012 | 0 |
| M206 | MECH - TYPICAL (3RD - 5TH) FLOOR PLAN | 5/17/2012 | 0 |
| M207 | MECH - 6TH FLOOR PLAN | 5/17/2012 | 0 |
| M208 | MECH - MAIN ROOF PLAN | 5/17/2012 | 0 |
| M300 | MECH - LOBBIES & MEZZ. PARTIAL PLAN - SE | 5/17/2012 | 0 |
| M301 | MECH - 2ND FLOOR PARTIAL PLAN - NE | 5/17/2012 | 0 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| M302 | MECH - 2ND FLOOR PARTIAL PLAN - NW | 5/17/2012 | 0 |
| M303 | MECH - 2ND FLOOR PARTIAL PLAN - SE | 5/17/2012 | 0 |
| M304 | MECH - 2ND FLOOR PARTIAL PLAN - SW | 5/17/2012 | 0 |
| M305 | MECH - TYP. FLOOR PARTIAL PLAN - NE | 5/17/2012 | 0 |
| M306 | MECH - TYP. FLOOR PARTIAL PLAN - NW | 5/17/2012 | 0 |
| M307 | MECH - TYP. FLOOR PARTIAL PLAN - SE | 5/17/2012 | 0 |
| M308 | MECH - TYP. FLOOR PARTIAL PLAN - SW | 5/17/2012 | 0 |
| M309 | MECH - 8TH FLOOR PARTIAL PLAN - NE | 5/17/2012 | 0 |
| M310 | MECH - 8TH FLOOR PARTIAL PLAN - NW | 5/17/2012 | 0 |
| M311 | MECH - 8TH FLOOR PARTIAL PLAN - SE | 5/17/2012 | 0 |
| M312 | MECH - 8TH FLOOR PARTIAL PLAN - SW | 5/17/2012 | 0 |
| M400 | MECH - RISERS | 5/17/2012 | 0 |
| M401 | MECH - RISERS | 5/17/2012 | 0 |
| M500 | MECH - SCHEDULES | 5/17/2012 | 0 |
| M600 | MECH - DETAILS | 5/17/2012 | 0 |
| M601 | MECH - DETAILS | 5/17/2012 | 0 |

**Plumbing**

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| P100 | PLUMBING - SYMBOLS, NOTES & ABBREVIATIONS | 5/17/2012 | 0 |
| P200 | Plumbing G2 Level Plan East | 5/17/2012 | 0 |
| P201 | Plumbing G2 Level Plan West | 5/17/2012 | 0 |
| P202 | Plumbing G1 Level Partial Plan East | 5/17/2012 | 0 |
| P203 | Plumbing G1 Level Partial Plan West | 5/17/2012 | 0 |
| P204 | Plumbing Ground Floor Plan East | 5/17/2012 | 0 |
| P205 | Plumbing Ground Floor Plan West | 5/17/2012 | 0 |
| P206 | Plumbing Ground Floor Sanitary | 5/17/2012 | 0 |
| P207 | Plumbing Second Floor Plan | 5/17/2012 | 0 |
| P208 | Plumbing Third Thru Fifth Floor Plan | 5/17/2012 | 0 |
| P209 | Plumbing Sixth Floor Plan | 5/17/2012 | 0 |
| P210 | Plumbing Roof Plan | 5/17/2012 | 0 |
| P211 | Plumbing Mezzanine Plan | 5/17/2012 | 0 |
| P301 | PLUMBING - PARTIAL TYPICAL FLOOR PLANS | 5/17/2012 | 0 |
| P302 | PLUMBING - PARTIAL TYPICAL FLOOR PLANS | 5/17/2012 | 0 |
| P401 | Plumbing Riser Diagram Fire Protection | 5/17/2012 | 0 |
| P402 | Plumbing Riser Diagram Natural Gas | 5/17/2012 | 0 |



#537156



| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| P403 | Plumbing Riser Diagram Storm | 5/17/2012 | 0 |
| P404 | Plumbing Riser Diagram Storm | 5/17/2012 | 0 |
| P405 | Plumbing Riser Diagram Storm | 5/17/2012 | 0 |
| P406 | Plumbing Riser Diagram Domestic Water | 5/17/2012 | 0 |
| P407 | Plumbing Riser Diagram Domestic Water | 5/17/2012 | 0 |
| P408 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P409 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P410 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P411 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P412 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P413 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P414 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P415 | Plumbing Riser Diagram Sanitary | 5/17/2012 | 0 |
| P416 | Plumbing Riser Diagram Washer Drain | 5/17/2012 | 0 |
| P500 | PLUMBING SCHEDULES | 5/17/2012 | 0 |
| P501 | PLUMBING DETAILS | 5/17/2012 | 0 |
| P502 | PLUMBING DETAILS | 5/17/2012 | 0 |

### Structural

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| S101 | General Structural Notes | 5/17/2012 | 0 |
| S102 | Typical Details | 5/17/2012 | 0 |
| S103 | Typical Details | 5/17/2012 | 0 |
| S104 | Typical Details | 5/17/2012 | 0 |
| S211 | G2 Level East Foundation Plan | 5/17/2012 | 0 |
| S212 | G2 Level West Foundation Plan & G1 Level West Framing Plan | 5/17/2012 | 0 |
| S213 | G1 Level East Framing Plan | 5/17/2012 | 0 |
| S214 | Ground Floor East Framing Plan | 5/17/2012 | 0 |
| S215 | Ground Floor & Second West Framing Plan & Mezzanine Framing Plan | 5/17/2012 | 0 |
| S216 | 2nd Floor Podium Slab Framing Plan | 5/17/2012 | 0 |
| S217 | 3rd Floor Framing Plan | 5/17/2012 | 0 |
| S218 | Fourth & Fifth Floor Framing Plan | 5/17/2012 | 0 |
| S219 | Sixth Floor Framing Plan | 5/17/2012 | 0 |
| S220 | Roof Framing Plan | 5/17/2012 | 0 |
| S301 | SECTIONS | 5/17/2012 | 0 |



#537156



**BOZZUTO**
CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| S302 | SECTIONS | 5/17/2012 | 0 |
| S401 | SECTIONS | 5/17/2012 | 0 |
| S501 | Wood Framing Schedules | 5/17/2012 | 0 |
| S502 | Concrete Column and Footing Schedules | 5/17/2012 | 0 |
| **Title Sheets** | | | |
| G001 | Cover Sheet | 5/17/2012 | 0 |
| G001A | 3D Views | 5/17/2012 | 0 |
| G001B | Perspective Views | 5/17/2012 | 0 |
| G002 | Index of Drawings | 5/17/2012 | 0 |
| G003 | Abbreviations, Graphic Symbols and General Notes | 5/17/2012 | 0 |
| G101 | Building Area | 5/17/2012 | 0 |
| G102 | Zoning Analysis | 5/17/2012 | 0 |
| G103 | Unit Mix | 5/17/2012 | 0 |
| G104 | Code Analysis | 5/17/2012 | 0 |
| G105 | Code Analysis | 5/17/2012 | 0 |
| G106 | Code Analysis | 5/17/2012 | 0 |
| G107 | Code Analysis | 5/17/2012 | 0 |
| **Reports** | | | |
| **Architectural** | | | |
| GEO1 | Subsurface Exploration and Geotechnical Evaluation | 5/14/2012 | 0 |
| **Specifications** | | | |
| **Architectural** | | | |
| 000002 | Project Directory | 5/17/2012 | 0 |
| 000110 | Table of Contents | 5/17/2012 | 0 |
| 003100 | Available Project Information | 5/17/2012 | 0 |
| 007200 | General Conditions (AIA Document A201) | 5/17/2012 | 0 |
| 007300 | Supplementary Conditions | 5/17/2012 | 0 |
| 011000 | Summary | 5/17/2012 | 0 |
| 012000 | Price and Payment Procedures | 5/17/2012 | 0 |
| 013000 | Administrative Requirements | 5/17/2012 | 0 |
| 013216 | Construction Progress Schedule | 5/17/2012 | 0 |
| 013516 | High Performance Building Requirements | 5/17/2012 | 0 |

#537156

 **BOZZUTO** CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| 014000 | Quality Requirements | 5/17/2012 | 0 |
| 014213 | Abbreviations and Definitions | 5/17/2012 | 0 |
| 015000 | Temporary Facilities and Controls | 5/17/2012 | 0 |
| 015721 | Indoor Air Quality Controls | 5/17/2012 | 0 |
| 016000 | Product Requirements | 5/17/2012 | 0 |
| 016116 | Volatile Organic Compound (VOC) Content Restrictions | 5/17/2012 | 0 |
| 017000 | Execution and Closeout Requirements | 5/17/2012 | 0 |
| 017419 | Construction Waste Management and Disposal | 5/17/2012 | 0 |
| 017800 | Closeout Submittals | 5/17/2012 | 0 |
| 018129 | Integrated Pest Controls | 5/17/2012 | 0 |
| 019113 | General Commissioning Requirements | 5/17/2012 | 0 |
| 033000 | Cast-In-Place Concrete | 5/17/2012 | 0 |
| 033800 | Post-Tensioned Concrete | 5/17/2012 | 0 |
| 035400 | Cast Underlayment | 5/17/2012 | 0 |
| 040511 | Masonry Mortaring and Grouting | 5/17/2012 | 0 |
| 042000 | Unit Masonry | 5/17/2012 | 0 |
| 047200 | Cast Stone Masonry | 5/17/2012 | 0 |
| 051200 | Structural Steel Framing | 5/17/2012 | 0 |
| 053100 | Steel Decking | 5/17/2012 | 0 |
| 054000 | Cold-Formed Metal Framing | 5/17/2012 | 0 |
| 055000 | Metal Fabrications | 5/17/2012 | 0 |
| 055100 | Metal Stairs | 5/17/2012 | 0 |
| 055305 | Metal Gratings and Floor Plates | 5/17/2012 | 0 |
| 057000 | Decorative Metal | 5/17/2012 | 0 |
| 061000 | Rough Carpentry | 5/17/2012 | 0 |
| 061753 | Shop-Fabricated Wood Trusses | 5/17/2012 | 0 |
| 062000 | Finish Carpentry | 5/17/2012 | 0 |
| 071113 | Bituminous Dampproofing | 5/17/2012 | 0 |
| 071300 | Sheet Waterproofing | 5/17/2012 | 0 |
| 071713 | Bentonite Panel Waterproofing | 5/17/2012 | 0 |
| 072100 | Thermal Insulation | 5/17/2012 | 0 |
| 072119 | Foamed-In-Place Insulation | 5/17/2012 | 0 |
| 072400 | Exterior Insulation and Finish System | 5/17/2012 | 0 |
| 072500 | Weather Barriers | 5/17/2012 | 0 |



#537156



**BOZZUTO**
CONSTRUCTION

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 074113 | Metal Roof Panels | 5/17/2012 | 0 |
| 074646 | Fiber Cement Siding | 5/17/2012 | 0 |
| 075050 | Vegetated Roof Components | 5/17/2012 | 0 |
| 075201 | Rubberized Asphalt Roofing | 5/17/2012 | 0 |
| 075400 | Thermoplastic Membrane Roofing | 5/17/2012 | 0 |
| 076200 | Sheet Metal Flashing and Trim | 5/17/2012 | 0 |
| 077200 | Roof Accessories | 5/17/2012 | 0 |
| 078400 | Firestopping | 5/17/2012 | 0 |
| 079005 | Joint Sealers | 5/17/2012 | 0 |
| 081113 | Hollow Metal Doors and Frames | 5/17/2012 | 0 |
| 081416 | Wood Doors | 5/17/2012 | 0 |
| 083100 | Access Doors and Panels | 5/17/2012 | 0 |
| 083323 | Overhead Coiling Doors | 5/17/2012 | 0 |
| 083613 | Sectional Doors | 5/17/2012 | 0 |
| 084229 | Automatic Entrances | 5/17/2012 | 0 |
| 084313 | Aluminum-Framed Storefronts | 5/17/2012 | 0 |
| 084426 | Structural Glass Canopies | 5/17/2012 | 0 |
| 085113 | Aluminum Windows and Glass Doors | 5/17/2012 | 0 |
| 089100 | Louvers | 5/17/2012 | 0 |
| 092116 | Gypsum Board Assemblies | 5/17/2012 | 0 |
| 093000 | Tiling | 5/17/2012 | 0 |
| 095100 | Acoustical Ceilings | 5/17/2012 | 0 |
| 096500 | Resilient Flooring | 5/17/2012 | 0 |
| 096566 | Resilient Athletic Flooring | 5/17/2012 | 0 |
| 096800 | Carpeting | 5/17/2012 | 0 |
| 099000 | Painting and Coating | 5/17/2012 | 0 |
| 102113.19 | Plastic Toilet Compartments | 5/17/2012 | 0 |
| 102213 | Wire Mesh Partitions | 5/17/2012 | 0 |
| 102214 | Chain Link Partitions | 5/17/2012 | 0 |
| 104400 | Fire Protection Specialties | 5/17/2012 | 0 |
| 105623 | Mail Boxes | 5/17/2012 | 0 |
| 105623 | Wire Storage Shelving | 5/17/2012 | 0 |
| 107313 | Awnings | 5/17/2012 | 0 |
| 111313 | Loading Dock Bumpers | 5/17/2012 | 0 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 111316 | Loading Dock Seals and Shelters | 5/17/2012 | 0 |
| 111319.13 | Loading Dock Levelers | 5/17/2012 | 0 |
| 113100 | Residential Appliances | 5/17/2012 | 0 |
| 122113 | Horizontal Louver Blinds | 5/17/2012 | 0 |
| 123530 | Residential Casework | 5/17/2012 | 0 |
| 124813 | Entrance Floor Mats and Frames | 5/17/2012 | 0 |
| 129313 | Bicycle Racks | 5/17/2012 | 0 |
| 142010 | Passenger Elevators | 5/17/2012 | 0 |
| 142020 | Freight Elevators | 5/17/2012 | 0 |
| 149100 | Facilities Chutes | 5/17/2012 | 0 |
| 210513 | Common Motor Requirements for Fire Suppression | 5/17/2012 | 0 |
| 210517 | Sleeves and Sleeve Seals for Fire-Suppression Piping | 5/17/2012 | 0 |
| 210518 | Escutcheons for Fire-Suppression Piping | 5/17/2012 | 0 |
| 210548 | Vibration Isolation for Fire-Suppression Systems | 5/17/2012 | 0 |
| 210553 | Identification for Fire-Suppression Piping and Equipment | 5/17/2012 | 0 |
| 210700 | Fire-Suppression Systems Insulation | 5/17/2012 | 0 |
| 211200 | Fire-Suppression Standpipes | 5/17/2012 | 0 |
| 211313 | Wet-Pipe Sprinkler Systems | 5/17/2012 | 0 |
| 211316 | Dry-Pipe Sprinkler Systems | 5/17/2012 | 0 |
| 213113 | Electric-Driven Centrifugal Fire Pump | 5/17/2012 | 0 |
| 213400 | Pressure-Maintenance Pumps | 5/17/2012 | 0 |
| 213900 | Controllers for Fire-Pump Drivers | 5/17/2012 | 0 |
| 220513 | Common Motor Requirements for Plumbing Equipment | 5/17/2012 | 0 |
| 220516 | Expansion Fittings and Loop for Plumbing Piping | 5/17/2012 | 0 |
| 220517 | Sleeves and Sleeve Seals for plumbing Piping | 5/17/2012 | 0 |
| 220518 | Escutcheons for Plumbing Piping | 5/17/2012 | 0 |
| 220519 | Meters and Gages for Plumbing | 5/17/2012 | 0 |
| 220523 | General-Duty Valves for Plumbing Piping | 5/17/2012 | 0 |
| 220529 | Hangers and Supports for Plumbing Piping and Equipment | 5/17/2012 | 0 |
| 220533 | Heat Tracing for Plumbing Pipes | 5/17/2012 | 0 |
| 220548 | Vibration and Seismic Controls for Plumbing Piping and Equipment | 5/17/2012 | 0 |
| 220553 | Identification for Plumbing Piping and Equipment | 5/17/2012 | 0 |
| 220719 | Plumbing Piping Insulation | 5/17/2012 | 0 |

#537156



**Exhibit 1: List of Drawings & Specifications**
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 221116 | Domestic Water piping | 5/17/2012 | 0 |
| 221119 | Domestic Water Piping Specialties | 5/17/2012 | 0 |
| 221123.13 | Domestic Water packaged Booster Pumps | 5/17/2012 | 0 |
| 221316 | Sanitary Waste and Vent Piping | 5/17/2012 | 0 |
| 221319 | Sanitary Waste Piping Specialties | 5/17/2012 | 0 |
| 221323 | Sanitary Waste Interceptors | 5/17/2012 | 0 |
| 221329 | Sanitary Sewage Pumps | 5/17/2012 | 0 |
| 221413 | Facility Storm Drainage Piping | 5/17/2012 | 0 |
| 221423 | Storm Drainage Piping Specialties | 5/17/2012 | 0 |
| 221429 | Sump Pumps | 5/17/2012 | 0 |
| 223300 | Electric, Domestic-Water Heaters | 5/17/2012 | 0 |
| 224100 | Residential Plumbing Fixtures | 5/17/2012 | 0 |
| 224213.16 | Commercial Urinals | 5/17/2012 | 0 |
| 224216.13 | Commercial Lavatories | 5/17/2012 | 0 |
| 224216.16 | Commercial Sinks | 5/17/2012 | 0 |
| 224713 | Drinking Fountains | 5/17/2012 | 0 |
| 230513 | Common Motor Requirements for HVAC Equipment | 5/17/2012 | 0 |
| 230517 | Sleeves and Sleeve Seals for HVAC Piping | 5/17/2012 | 0 |
| 230516 | Escutcheons for HVAC piping | 5/17/2012 | 0 |
| 230529 | Hangers and Supports for HVAC Piping and Equipment | 5/17/2012 | 0 |
| 230548 | Vibration and Seismic Controls for HVAC Piping and Equipment | 5/17/2012 | 0 |
| 230593 | Testing, Adjusting, and Balancing | 5/17/2012 | 0 |
| 230713 | Duct Insulation | 5/17/2012 | 0 |
| 230719 | HVAC Piping Insulation | 5/17/2012 | 0 |
| 230800 | Commissioning of HVAC | 5/17/2012 | 0 |
| 230900 | Instrumentation and Control for HVAC | 5/17/2012 | 0 |
| 231123 | Facility Natural-Gas Piping | 5/17/2012 | 0 |
| 232300 | Refrigerant Piping | 5/17/2012 | 0 |
| 233113 | Metal Ducts | 5/17/2012 | 0 |
| 233300 | Air Duct Accessories | 8/17/2012 | 0 |
| 233413 | Axial HVAC Fans | 5/17/2012 | 0 |
| 233423 | HVAC Power Ventilators | 5/17/2012 | 0 |
| 233713 | Diffusers, Registers, and Grilles | 5/17/2012 | 0 |
| 234100 | Particulate Air Filtration | 5/17/2012 | 0 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| 237433 | Dedicated Outdoor-Air Units | 5/17/2012 | 0 |
| 238113 | Packaged Terminal Air-Conditioners | 5/17/2012 | 0 |
| 238126 | Split-System Air-Conditioners | 5/17/2012 | 0 |
| 238233 | Convectors | 5/17/2012 | 0 |
| 238239 | Unit Heaters | 5/17/2012 | 0 |
| 238313 | Radiant-Heating Cables and Mats | 5/17/2012 | 0 |
| 260500 | Common Work Results for Electrical | 5/17/2012 | 0 |
| 260519 | Conductors and Cables | 5/17/2012 | 0 |
| 260526 | Grounding and Bonding for Electrical Systems | 5/17/2012 | 0 |
| 260529 | Hangers and Supports for Electrical Systems | 5/17/2012 | 0 |
| 260533 | Raceway and Boxes for Electrical Systems | 5/17/2012 | 0 |
| 260553 | Identification for Electrical Systems | 5/17/2012 | 0 |
| 260573 | Overcurrent Protective Device Coordination Study | 5/17/2012 | 0 |
| 260923 | Lighting Control Devices | 5/17/2012 | 0 |
| 262413 | Switchboards | 5/17/2012 | 0 |
| 262416 | Panelboards | 5/17/2012 | 0 |
| 262500 | Enclosed Bus Assemblies | 5/17/2012 | 0 |
| 262713 | Electricity Metering | 5/17/2012 | 0 |
| 262726 | Wiring Devices | 5/17/2012 | 0 |
| 262813 | Fuses | 5/17/2012 | 0 |
| 262816 | Enclosed Switches and Circuit Breakers | 5/17/2012 | 0 |
| 263213 | Engine Generators | 5/17/2012 | 0 |
| 263600 | Transfer Switches | 5/17/2012 | 0 |
| 265100 | Interior Lighting | 5/17/2012 | 0 |
| 265600 | Exterior Lighting | 5/17/2012 | 0 |
| 270500 | Common Work Results for Communications | 5/17/2012 | 0 |
| 283111 | Digital, Addressable Fire-Alarm System | 6/17/2012 | 0 |

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-015
DATE: 1/04/2013

EXHIBIT "2"

SCOPE OF WORK

PLUMBING

Provide all labor, material, tools, supervision and equipment necessary to fully execute the requirements to furnish, deliver and install:

Division 01 – General Requirements
Division 03 – Concrete, as it applies to your Work
Section 078400 – Firestopping, as it applies to your Work
Section 079005 – Joint Sealers, as it applies to your Work
Division 11 – Equipment, as it applies to your Work
Division 14 – Conveying Equipment, as it applies to your Work
Division 21 – Fire Suppression, as it applies to your Work
Division 22 – Plumbing
Division 23 – Heating, Ventilating, and Air Conditioning
Division 26 – Electrical, as it applies to your Work

The Work of this Agreement shall be performed in strict accordance with the Contract Documents including all applicable Requests for Information and shall be complete in every respect. Should any information in this Agreement be in conflict with the Contract Documents, this Subcontractor shall notify the Contractor in writing immediately and prior to proceeding with the Work.

The descriptions below and separation of the documents into various sections is for convenience only and is not intended in any way to limit the scope of this Agreement. Without limiting the generality hereof, the Work of this agreement shall include, but is not necessarily limited to, the items listed below:

**GENERAL:**

1. **Work Compliance.** This Subcontractor shall furnish and install all labor, materials, equipment and services necessary for to the execution and completion of all plumbing and gas piping systems for site improvements and planned structures in accordance with the Contract Documents, applicable codes, Fair Housing, A.N.S.I., A.D.A., local jurisdiction, and all onsite and offsite work necessary to complete the Petworth Safeway with Residences Project as related to this scope of work.

2. **Bond.** A Payment and Performance Bond is required for the work of the Subcontract. This Subcontractor will provide a Payment and Performance Bond, prior to commencing work on this project, from a Surety Company in the form outlined in Exhibit 5. The cost of the Payment and Performance Bond has been included in the Subcontract Amount

3. **Complete Systems.** In addition to the other requirements of this Agreement, it is understood that this Subcontractor is expected to provide complete and operational systems/assemblies fit for their intended purpose, which are free of any defects and consistent with the intent of the Contract Documents. Additional compensation shall not be allowed for coordinating the Work of this Agreement with the work of other trades and/or the Contract Documents, complying with the requirements bearing on the Work of this subcontract by any authority having jurisdiction over the project, and/or performing minor changes or corrections to the Contract Documents.

4. **License.** This Subcontractor certifies that he is licensed to execute the Work in the jurisdiction of the project. This Subcontractor will be responsible for the transfer and fees of any permits or licenses necessary for the execution of the Work.

5. **Code Compliance.** The Work will be in accordance with any and all applicable codes and plan review agencies.

6. **Permits.** This Subcontractor will be responsible for securing any permits necessary to complete the Work and will be responsible for the fees thereof. The General Contractor is not responsible for inspection fees resulting from failed inspections of this Subcontractor's Work.

7. **Mobilizations.** This Subcontractor will execute the mobilizations necessary to accommodate phased construction of this project.

**SPECIFIC SCOPE ITEMS:**

8. **Systems.** This Subcontractor shall furnish and install all plumbing work necessary for a complete plumbing system as outlined in the Contract Documents including, but not limited to, a sanitary sewer system, storm piping system, hot and cold domestic water supply system, ice maker systems, gas piping system, condensate drain piping system, vents, cleanouts, sand and oil interceptors, trench drains, roof drains, floor drains, domestic water pumps, sump pumps, and all associated plumbing fixtures, equipment, valves and fittings.


SUB
PM

#537156

9. **Excavation.** This Subcontractor shall include excavation, trenching, bedding, backfill and compaction required to complete the work of this Agreement. This Subcontractor shall be responsible for the removal of all spoils to a location on-site, as directed by the Superintendent. Return building pad to its original condition with respect to your work.

10. **Existing Utility Elevations.** Confirm invert elevations for all storm and sanitary utility tie-ins and calculate the correct slope for all underground piping prior to installation. Notify Contractor immediately if minimum slope, per code, cannot be achieved.  All mains and laterals shall be run five (5) feet outside of the building at the location(s) shown on the plumbing drawings.

11. **Tub Protection.** This Subcontractor shall furnish and install tub liner/protectors in each tub.

12. **Gas Piping System.** This Subcontractor shall furnish and install a gas piping system, with all fittings, valves, gauges, and accessories for a complete system per the Contract Documents and Local Codes. The building, and Safeway gas meters shall be furnished and installed by others. The building, and Safeway emergency generator gas meters shall be and installed by this Subcontractor. This Subcontractor shall be responsible for the final connections to the emergency generator.  Gas meters shall be furnished by others.

13. **Utility Tie-Ins.** This Subcontractor shall extend all sanitary, storm, fire, and water lines to five feet outside of the building envelope and make all final connections of the aforementioned.

14. **Sanitary and Storm Systems Piping.** This Subcontractor shall furnish and install all sanitary, and storm system piping as schedule 40 PVC or CPVC, as required. This includes all sanitary and storm piping and risers within the Safeway shell.

15. **Grease Line.** This Subcontractor shall furnish and install the grease line for the Safeway shell. Work to start at 5'-0" inside the GI level and tie into the Grease interceptor at the exterior of the building, final connection by this Subcontractor. Grease interceptor to be furnished and installed by others. All mains and laterals shall be run five (5) feet outside of the building at the location(s) shown on the plumbing drawings.

16. **Domestic Water and Fire Service Entrances.** This Subcontractor shall furnish and install all domestic, and fire water service entrances per the Contract Documents. All service entrances to be Ductile Iron. Fire service entrance is to terminate at the double check valve assembly, furnished and installed by this Subcontractor. Coordinate with the Fire Protection Subcontractor.

17. **Domestic Water Piping.** This Subcontractor shall furnish and install all above grade water mains and dwelling unit piping less than 2-1/2" as CPVC, greater than 2-1/2" is to be Corzan CPVC.

18. **Safeway Water Main.** This Subcontractor shall furnish and install the water main serving the Safeway shell, from the water room to the ground floor, as Corzan CPVC.

19. **Pipe Insulation.** This Subcontractor shall furnish and install all pipe insulation per Code minimum requirements.

20. **Identification for Plumbing Systems.** This Subcontractor shall furnish and install all identification tagging, labeling, and signage of your work and equipment per the Contract Documents. Hand written labels will not be an acceptable means of identification.

21. **Washing Machines.** This Subcontractor shall furnish and install all washing machine boxes, overflow pans, drain lines, and associated risers.

22. **Water Sub-Meters.** This Subcontractor shall install all flow tubes at each unit. Water sub-meters to be furnished and installed by others.

23. **Fixture Accessories.** This Subcontractor shall furnish and install all trim, stops, traps, air gaps, water hammer arrestors, and all piping associated with the plumbing fixtures. All exposed plumbing supply and waste piping to be chrome. Each fixture shall have a separate shut off valve located at the fixture. Chrome escutcheon plates are to be utilized at all floor, wall and cabinet penetrations. Bath and shower fixtures and piping are to be firmly attached to structural members so that the shower head, tub fill and valves are firmly in place and do not move during operation. Framing is by others.

24. **Fixtures.** This Subcontractor shall furnish and supply all plumbing fixtures per the Contract Documents, with the exceptions taken below under the "Project Modifications" section.

25. **Mechanical Closets.** This Subcontractor shall furnish and install plenum rated materials and equipment within all the dwelling unit mechanical closets, as they are return air plenums.

26. **Mechanical Closet Floor Drains.** This Subcontractor shall furnish and install floor drains in all mechanical closets per the Contract Documents.

27. **Dishwashers.** This Subcontractor shall be responsible for all piping to and final connections of the dishwashers, electrical connections by others. An air gap shall be included at each dishwasher if required by local authorities and/or the Contract Documents.  Dishwashers will be installed by others.

28. **Disposals.** This Subcontractor shall install all disposals, furnished by others, with electrical connections by others.



SUB
PM

#537156

29. **Icemakers.** This Subcontractor shall be responsible for all piping to and final connections of rough-in for apartment icemakers. Connections shall include a recessed box, a mini hammer arrestor, and in-line backflow preventers, securely attached to framing members, behind the refrigerator with a shut off valve. Box shall match the rating of the wall assembly.

30. **Hose Bibs.** This Subcontractor shall furnish and install all hose bibs per the Contract Documents.

31. **Backflow Preventers.** This Subcontractor shall furnish and install all OS&Y Valve, back-flow preventers as required by code. Back-flow preventers to meet all requirements of local government agencies and building officials.

32. **Irrigation Backflow Preventers.** This Subcontractor shall furnish and install two (2) 1-1/2" backflow preventers for the irrigation systems.

33. **Water Heaters.** This Subcontractor shall furnish and install 40 gallon water heaters at the one bedroom dwelling units and 50 gallon water heaters at the two bedroom dwelling units, with expansion tank or expansion valve, temperature and pressure relief valve, 2" overflow pan with drain.

34. **Kitchen and Bathroom Sinks.** This Subcontractor shall make all final connections of kitchen and bathroom sinks, furnished by others.

35. **Vents.** This Subcontractor shall furnish and install all vent pipes, and vent caps, as required.

36. **Pressure Reducing Valves.** This Subcontractor shall furnish and install pressure reducing valves as required by code.

37. **Drinking Fountains.** This Subcontractor shall furnish and install all drinking fountains as indicated in the Contract Documents.

38. **Weatherproofing.** This Subcontractor shall seal all penetrations through building wrap, per the Weather Barriers specification.

39. **Trash Chute.** Furnish and install backflow preventer, water line, and make all connections for the sanitizer rinse device (furnished by others) at the trash chutes.

40. **Commissioning.** This Subcontractor shall comply with all requirements of the building commissioning process including but not limited to, startup and testing all plumbing systems, and personnel training, per the Contract Documents.

41. **Roof Penetrations.** This Subcontractor shall furnish boots, to be installed by others, for all plumbing pipes which penetrate the roof. These boots shall be for the applications of which they are being applied.

42. **Drains.** This Subcontractor shall furnish and install all area drains, floor drains, hub drains, express drains, drain covers, grates, trap primers, and accessories per the Contract Documents.

43. **Sump Pumps.** This Subcontractor shall furnish and install complete sump pump systems with submersible pumps and piping per the Contract Documents.

44. **Trench Drains.** This Subcontractor shall furnish and install all trench drains per the Contract Documents.

45. **Pipe Caps.** This Subcontractor shall furnish and install caps for all pipes during construction with plastic caps. Duct tape is not acceptable.

46. **Disinfection and Sterilization.** This Subcontractor shall perform all disinfection and sterilization to their systems put in place, as required by the Contract Documents and all applicable codes.

47. **Heat Trace.** This Subcontractor shall furnish and install all heat trace in the garages per the Contract Documents required for the scope of this work. Power connection to be by others.

48. **Condensate Drain Piping.** This Subcontractor shall furnish and install a complete condensate drain piping system per the Contract Documents. Condensate piping from HVAC equipment to condensate risers or hub drains is by others.

49. **Shower Pans.** This Subcontractor shall provide all shower pans in the 2B Units

## PROJECT MODIFICATIONS.:

The following changes have been made to the Contract Documents and are included in this Agreement:

1. Code minimum plumbing insulation – water lines exposed to freezing and horizontal roof drain lines only.

2. CPVC shall be used for all domestic water lines throughout (except in the plenum through the retail space).

3. Solid wall PVC sewer and storm lines, servicing the residential units above the Safeway, shall be used in lieu of no hub cast iron.

4. Pro Flo PF5210CPWS lavatory faucet will be used in lieu of the specified Moen L64621.

[   ] SUB
[   ] PM

#537156

5.   Pro Flo PF3001 valve and PF7611SCP tub trim in lieu of the specified Moen M62320 valve and M2353 trim.

6.   Pro Flo PFXC6011CP kitchen faucet in lieu of the specified Kohler 10433.

## ALLOWANCES:

The following allowances are included in this Agreement.  All billings against an allowance must be accompanied with all backup requested by the Contractor. Prior to performing any of the Work associated with allowances, direction must be granted by the Contractor in writing.

None.

## UNIT PRICES:

All billings must be accompanied with all backup requested by the Contractor. Prior to performing any of the additional work listed below, approval must be granted in writing by the Project Manager or Superintendent.  It is understood the below rates include all costs associated with the work including but not limited to labor, materials, sales tax, overhead, fees, markups, insurance, benefits, etc. The following unit prices may be used by the Contractor to compute charges for extra work. This Subcontractor agrees to the following unit prices should those services be required.

None.

## SCHEDULE:

Time is of the essence in the execution of the work of this Agreement.  Therefore, sufficient labor and materials must be provided at all times to meet the Job Progress Schedule as reasonably updated by Contractor.  This Subcontractor shall take whatever steps necessary, including additional manpower, equipment, overtime, additional shifts, etc. at its sole cost and expense, to perform its work in the time frame indicated.  This Subcontractor may be asked to perform Saturday, Sunday and Holiday work, at no additional cost to the Contractor as required to meet the Schedule, as updated by the Superintendent.

The following durations shall be met by this Subcontractor:

1.   All submittals (product data, shop drawings, etc.) are to be submitted for approval within (15) business days of the execution of the contract.

2.   All Close-Out Documents are to be submitted for approval within (60) business days of the execution of the contract.  This should include a "sample" warranty letter, with the official warranty letter being issued upon request by the Contractor at the end of the project.

## ALTERNATES:

If directed in writing by the Contractor, this Subcontractor shall perform the following alternate work. A corresponding change order will be issued adjusting the Contract Amount by the appropriate amount. All alternates include all costs associated with the change including but not limited to labor, material, overhead, profit, sales tax, shipping, inspection, testing, etc. All other terms and conditions of this Agreement shall apply to the alternate work completed under this Agreement.

1.   Change Domestic Water Piping in Retail Ceiling from Copper to CPVC  – DEDUCT $ 31,000.00

2.   Change Sanitary/Storm Piping in Retail Ceiling Space from Cast Iron to PVC  – DEDUCT $ 173,000.00

<strong>END OF EXHIBIT "2"</strong>



#537156

EXHIBIT "2"

SCOPE OF WORK

HVAC

Provide all labor, material, tools, supervision and equipment necessary to fully execute the requirements to furnish, deliver and install:

Division 01 - General Requirements
Division 03 -- Concrete, as it applies to your Work
Section 078400 -- Firestopping, as it applies to your Work
Section 079005 -- Joint Sealers, as it applies to your Work
Division 11 -- Equipment, as it applies to your Work
Division 14 -- Conveying Equipment, as it applies to your Work
Division 21 -- Fire Suppression, as it applies to your Work
Division 22 -- Plumbing, as it applies to your Work
Division 23 -- Heating, Ventilating, and Air Conditioning
Division 26 -- Electrical, as it applies to your work

The Work of this Agreement shall be performed in strict accordance with the Contract Documents including all applicable Requests for Information and shall be complete in every respect. Should any information in this Agreement be in conflict with the Contract Documents, this Subcontractor shall notify the Contractor in writing immediately and prior to proceeding with the Work.

The descriptions below and separation of the documents into various sections is for convenience only and is not intended in any way to limit the scope of this Agreement. Without limiting the generality hereof, the Work of this agreement shall include, but is not necessarily limited to, the items listed below:

**GENERAL:**

1. **Work Compliance.** This Subcontractor shall furnish and install all labor, materials, equipment and services necessary for to the execution and completion of all heating, ventilation, and air conditioning work, for site improvements and planned structures in accordance with the Contract Documents, applicable codes, Fair Housing, A.N.S.I., A.D.A., local jurisdiction, and all onsite and offsite work necessary to complete the Petworth Safeway with Residences Project as related to this scope of work.

2. **Bond.** A Payment and Performance Bond is required for the work of the Subcontract. This Subcontractor will provide a Payment and Performance Bond, prior to commencing work on this project, from a Surety Company in the form outlined in Exhibit 5. The cost of the Payment and Performance Bond has been included in the Subcontract Amount

3. **Complete Systems.** In addition to the other requirements of this Agreement, it is understood that this Subcontractor is expected to provide complete and operational systems/assemblies fit for their intended purpose, which are free of any defects and consistent with the intent of the Contract Documents. Additional compensation shall not be allowed for coordinating the Work of this Agreement with the work of other trades and/or the Contract Documents, complying with the requirements bearing on the Work of this subcontract by any authority having jurisdiction over the project, and/or performing minor changes or corrections to the Contract Documents.

4. **License.** This Subcontractor certifies that he is licensed to execute the Work in the jurisdiction of the project. This Subcontractor will be responsible for the transfer and fees of any permits or licenses necessary for the execution of the Work.

5. **Code Compliance.** The Work will be in accordance with any and all applicable codes and plan review agencies.

6. **Permits.** This Subcontractor will be responsible for securing any permits necessary to complete the Work and will be responsible for the fees thereof. The General Contractor is not responsible for inspection fees resulting from failed inspections of this Subcontractor's Work.

7. **Mobilizations.** This Subcontractor will execute the mobilizations necessary to accommodate phased construction of this project.

**SPECIFIC SCOPE ITEMS:**

8. **HVAC System.** This Subcontractor shall furnish and supply all heating, ventilating, and air conditioning equipment as required for a complete HVAC system including, but not limited to, duct work, duct insulation, all piping, access panels, registers, fire dampers, thermostats, refrigerant lines, risers, drain lines, venting, control wiring, variable frequency drives, integral disconnects, accessories, grilles, diffusers, mechanical louvers, sleeves, exhaust fans, heat pumps, air handler units, unit heaters, compressors, roof top units, etc. as shown on the Contract Documents.

9. **Housekeeping Pads.** This Subcontractor shall provide layout for concrete pads for HVAC equipment as required. Concrete will be provided one time by the Concrete Subcontractor.

 SUB
PM

#537156

10. **Identification for HVAC Systems.** This Subcontractor shall furnish and install all identification tagging, labeling, and signage of your work and equipment per the Contract Documents. Hand written labels will not be an acceptable means of identification.

11. **Garage CO Detection System.** This Subcontractor shall furnish and install the garage Carbon Monoxide detection, monitoring and exhaust system including, but not limited to, all supply, exhaust, and circulating fans, sensors, ductwork, piping, control wiring, monitoring equipment, accessories, etc. per the Contract Documents. Electrical Power wiring and conduit will be by electrician.

12. **Stair Pressurization System.** This Subcontractor shall furnish and install a complete pressurization system for all stairwells including, but not limited to, all pressurization fans, ductwork, dampers, louvers, controllers and control wiring, switches, accessories, etc. to integrate with the emergency fire alarm system per the Contract Documents.

13. **Controls.** This Subcontractor shall furnish and install all control devices including, but not limited to, thermostats, Hand/Off/Auto switches, motor starters, meters, gauges, etc. for your work per the Contract Documents. Power to be by others.

14. **Condensate Risers.** This Subcontractor shall furnish, install, and make final connections from their equipment to the primary condensate drain system per the Contract Documents. Primary condensate drain risers will be installed by the plumbing subcontractor.

15. **Refrigerant Lines.** This Subcontractor shall furnish, install, insulate, and charge all refrigerant lines. Lines shall run inside walls and shall penetrate the roof and foundations as indicated.

16. **Emergency Generator.** This Subcontractor shall furnish and install the exhaust vent for the emergency generator per the Contract Documents.

17. **Dryer Exhaust.** This Subcontractor shall furnish and install the dryer exhaust system in the residential units including, but not limited to, booster fans, all ductwork, brick vents, screens, dryer boxes, access panels, accessories, etc. per the Contract Documents. Dryer ductwork shall be integral to the exterior brick vent. This Subcontractor shall verify that all dryer runs meet the requirements of the dryer manufacturer. Final connection to dryer is by others.

18. **Insulation.** This Subcontractor shall furnish and install HVAC plumbing and ductwork insulation per the Contract Documents.

19. **Bathroom Exhaust Fans.** This Subcontractor shall furnish and install Energy Star rated bathroom exhaust fans and associated ductwork.

20. **Duct Liner.** This Subcontractor shall furnish and install duct liner per Contract Documents.

21. **AHU Steel Supports.** This Subcontractor shall furnish and install all neoprene pads required per the Contract Documents. AHU steel supports to be furnished and installed by others.

22. **Diffusers and Grilles.** This Subcontractor shall furnish and install, including, but not limited to, all diffusers, grilles, registers, brick vents, bird screens, etc. as required per the Contract Documents.

23. **Inline Devices.** This Subcontractor shall furnish and install, including, but not limited to, all volume dampers, air turning devices, relief vents, flexible connections, grounding straps, cleanouts, accessories, etc. in the duct systems per the Contract Documents.

24. **Dampers.** This Subcontractor shall furnish and install, including, but not limited to, fire dampers, smoke dampers, and combination smoke/fire dampers, smoke detectors, heat sensors, controls, accessories, etc. at all fire rated walls and slabs, where required by Code and the Contract Documents.

25. **Vibration Isolation.** This Subcontractor shall furnish and install, including, but not limited to, all vibration isolators, pads, bases, mounts, hangers, etc. for all mechanical ductwork, risers, and equipment per the Contract Documents.

26. **Weatherproofing.** This Subcontractor shall seal all penetrations through the building wrap, per the Weather Barrier specification, as it relates to this scope of work. This Subcontractor shall be responsible for coordinating all penetrations with the appropriate subcontractor.

27. **Condenser Pads.** This Subcontractor shall furnish and install the following for the condensers; Mason Industries Type ND, or equal, double deflection neoprene mounts on top of fiberglass pads.

28. **Air Filters.** This Subcontractor shall furnish and install MERV 8 rated air filters for the mechanical systems during construction and include one (1) filter change to MERV 13 rated air filters at time of turnover to the Owner or as directed by the Project Superintendent.

29. **Access Panels.** This Subcontractor shall furnish and layout wall mounted access panels as required for your work. A rated panel must be used in a rated wall assembly. Wall mounted access panels to be installed by the Drywall subcontractor. Duct-mounted access panels to be installed by this Subcontractor.

30. **Galvanizing.** This Subcontractor shall provide galvanized steel ductwork per the Contract Documents.

31. **Curbs and Flashing.** This Subcontractor shall furnish curbs and flashing for roof penetrations including, but not limited to, refrigerant lines, drain lines, duct risers, etc. Curbs and flashing to be installed by others - coordinate rooftop equipment installation with roofing subcontractor to assure proper flashing of curbs and penetrations.

32. **Cleaning and Protection.** This Subcontractor shall furnish, install, and maintain all HVAC system protection per the Contract Documents and LEED requirements to protect the system from dust, debris, and microbial contaminants throughout construction. This Subcontractor shall shrink wrap the ends of all ductwork in the fabrication shop before delivery to the project site. This Subcontractor shall furnish and install caps on all pipes and sleeves during construction to prevent debris and trash from entering the system.

TSUB
PM

#537156

33. **Metal Guards.** This Subcontractor shall protect all mechanical lines and piping with metal guards at both sides of all studs to prevent drywall screws from contacting your work.

34. **Preoccupancy Cleanout.** This Subcontractor shall perform one of the following two options; (Option 1) Flush at least 14,000 cu.ft./ sq.ft. of outdoor air prior to occupancy OR (Option 2) Conduct IAQ baseline testing prior to occupancy (not less than 1 test per 25,000 sf of contiguous floor area).

35. **Safeway Shell.** This Subcontractor shall furnish and install unit heaters throughout the Safeway shell.

36. **Commissioning.** This Subcontractor shall participate and provide including, but not limited to, all testing, documentation, and training associated with the commissioning of the building, including tests for duct leakage, HVAC water piping pressure, HVAC system balancing, etc. as required by the Contract Documents and LEED requirements. This Subcontractor shall assist in developing and maintaining the Indoor Air Quality requirements for the project.

    a.  Certified testing and balancing at the Common Areas.

    b.  Uncertified testing and balancing at the Dwelling Units.

37. **Mechanical Louvers.** This Subcontractor shall furnish and install all interior mechanical louvers per the Contract Documents. Exterior architectural louvers to be furnished and installed by others.

38. **Design Changes.** No changes to the ductwork layout or installation details will be permitted without prior approval of the design engineer.

39. **Exterior Wall Penetrations.** The location of all duct penetrations through the exterior of the building facade shall align both horizontally and vertically and shall be approved by the Contractor and Owner. All penetrations shall be through a siding block or other method as directed by Contractor at no additional cost to the Contractor.

40. **Mechanical Closets.** This Subcontractor shall furnish and install plenum rated materials and equipment within all the dwelling unit mechanical closets, as they are return air plenums.

## PROJECT MODIFICATIONS:

The following changes have been made to the Contract Documents and are included in this Agreement:

1.  RTU-1 Greenheck Model RVE-50-52P-30L-17.5.

2.  RTU-2 Greenheck Model RVE-50-52P-30L-17.5.

3.  RTU-3 Greenheck Model RVE-50-52P-30L-17.5.

4.  RTU-4 Greenheck Model RVE-50-52P-30L-20.

5.  1A Air Handler – Goodman Model ASPF183016*.

    a.  Heat Kit Selection – Goodman Model HKR-05C*, HKR-08C*.

    b.  Heat Pump – Goodman Model SSZ140181A (15 SEER).

6.  1B Air Handler – Goodman Model ASPF183016*.

    a.  Heat Kit Selection – Goodman Model HKR-05C*, HKR-08C*.

    b.  Heat Pump – Goodman Model SSZ140181A (15 SEER).

7.  2A Air Handler – Goodman Model ASPF183016*.

    a.  Heat Kit Selection – Goodman Model HKR-05C*, HKR-08C*.

    b.  Heat Pump – Goodman Model SSZ140241A (15 SEER).

8.  2B Air Handler – Goodman Model ASPF183016*.

    a.  Heat Kit Selection - Goodman Model HKR-05C*, HKR-08C*.

    b.  Heat Pump – Goodman Model SSZ140241A (15 SEER).

9.  3A Air Handler – Goodman Model ASPF313716*.

    a.  Heat Kit Selection - Goodman Model HKR-08C*.

    b.  Heat Pump – Goodman Model SSZ140301A (15 SEER).

10. HP-1A Air Handler – Goodman Model AVPTC426014.

    a.  Heat Kit Selection - Goodman Model HKR-15C*.

    b.  Heat Pump – Goodman Model SSZ140481A (15 SEER)


SUB
PM

#537156

11. HP-1B Air Handler – Goodman Model AVPTC313714 .
   a.   Heat Kit Selection - Goodman Model HKR-08C°.
   b.   Heat Pump – Goodman Model SSZ140301A (15 SEER).
12. HP-2 Air Handler – Goodman Model AVPTC313714 .
   a.   Heat Kit Selection - Goodman Model HKR-08C°.
   b.   Heat Pump – Goodman Model SSZ140241A (15 SEER).
13. HP-3 Air Handler – Goodman Model AVPTC313714 .
   a.   Heat Kit Selection - Goodman Model HKR-10C°.
   b.   Heat Pump – Goodman Model SSZ140361B (15 SEER).
14. HP-4A Air Handler – Goodman Model AVPTC426014.
   a.   Heat Kit Selection - Goodman Model HKR-15C°.
   b.   Heat Pump – Goodman Model SSZ160601B (15 SEER).
15. HP-4B Air Handler – Goodman Model AVPTC426014.
   a.   Heat Kit Selection - Goodman Model HKR-15C°.
   b.   Heat Pump – Goodman Model SSZ160601B (15 SEER).
16. HP-5 Air Handler – Goodman Model AVPTC426014.
   a.   Heat Kit Selection - Goodman Model HKR-15C°.
   b.   Heat Pump – Goodman Model SSZ160601B (15 SEER).

## UNIT PRICES:

All billings must be accompanied with all backup requested by the Contractor. Prior to performing any of the additional work listed below, approval must be granted in writing by the Project Manager or Superintendent. It is understood the below rates include all costs associated with the work including but not limited to labor, materials, sales tax, overhead, fees, markups, insurance, benefits, etc. The following unit prices may be used by the Contractor to compute charges for extra work. This Subcontractor agrees to the following unit prices should those services be required.

None.

## SCHEDULE:

Time is of the essence in the execution of the work of this Subcontract. Therefore, sufficient labor and materials must be provided at all times to meet the Job Progress Schedule as reasonably updated by Contractor. This Subcontractor shall take whatever steps necessary, including additional manpower, equipment, overtime, additional shifts, etc. at its sole cost and expense, to perform its work in the time frame indicated. This Subcontractor may be asked to perform Saturday, Sunday and Holiday work, at no additional cost to the Contractor as required to meet the schedule. The following durations shall be met by this Subcontractor:

1. All submittals (product data, shop drawings, etc.) are to be submitted for approval within (25) business days of the execution of the contract.

2. All Close-Out Documents are to be submitted for approval within (60) business days of the execution of the contract. This should include a "sample" warranty letter, with the official warranty letter being issued upon request by the Contractor at the end of the project.

## ALTERNATES:

If directed in writing by the Contractor, this Subcontractor shall perform the following alternate work. A corresponding change order will be issued adjusting the Contract Amount by the appropriate amount. All alternates include all costs associated with the change including but not limited to labor, material, overhead, profit, sales tax, shipping, inspection, testing, etc. All other terms and conditions of this Agreement shall apply to the alternate work completed under this Agreement.

None

END OF EXHIBIT "2"


SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1173-035
DATE: 1/04/2013

## EXHIBIT "3"

### GENERAL REQUIREMENTS FOR SUBCONTRACTORS

### PART I: PROJECT SPECIFIC REQUIREMENTS

1.  <u>WORK HOURS:</u>  7:00 AM to 4:00 PM

2.  <u>DELIVERY HOURS:</u>  7:00 AM to 2:00 PM

3.  <u>REQUISITIONS:</u>  DUE BY: 15 day of each month.  PAYABLE ON: 25 day of the following month.

### PART II: GENERAL REQUIREMENTS

1.  <u>COORDINATION OF WORK</u> - The Subcontractor shall familiarize himself with the methods of construction and the work sequence that the Contractor plans to use in order to plan his own Work in such a way as to expedite construction operations.  The Subcontractor shall setup and maintain a rate of progress subject to the Contractor's direction and control for purposes of coordinating the overall construction progress.  The Subcontractor assumes full responsibility for coordinating his Work with that of the other trades and, before proceeding, the Subcontractor shall request and obtain from the Contractor all information necessary to enable him to properly fit his Work to all surrounding work.  The Subcontractor shall immediately notify the Contractor of any deviations or discrepancies between Contract Documents and work already installed and, in such case, shall not proceed with his work until he has received instructions from the Contractor.  Should any work be necessary for the proper completion of the Project, such work shall be performed as fully as if described and delineated herein.  If Subcontractor proceeds with work, he has accepted the condition of the site and work previously performed.

2.  <u>EROSION CONTROL</u> - Avoid, wherever possible, disturbing the existing vegetation of the site, and in the event vegetation is disturbed, stabilize the disturbed area after completion of the work to minimize erosion.  In the event this Subcontractor disturbs, either intentionally or unintentionally, any erosion control structures to do his work, he will replace or repair said structures at the close of each working day.  Subcontractor must take all Control measures to prevent all erosion, siltation and sedimentation of existing site vegetation, wetlands, waterways, construction areas, adjacent areas and off-site areas.

    a.  Erosion control measures shall include, but are not limited to: Siltation control fencing, construction entrance/exit station, and catch basin inserts.

    b.  Erosion control measures shall be accomplished adjacent to or in the work areas including but not limited to: soil stockpiles, debris and recycling stockpiles, and cut and fill slopes and other striped and graded areas.

    c.  Additional means of protection shall be provided by the Subcontractor as required for continued or unforeseen erosion problems    Periodic maintenance of all sediment control structures shall be provided to ensure intended purpose is accomplished.  Sediment control measures shall be in working condition at the end of each day.

    d.  After significant precipitation, sediment control structures shall be inspected for integrity.  Any damaged device shall be correct immediately.

3.  <u>COMPLETENESS</u> - It is understood and agreed that this Subcontractor will provide a finished and acceptable product and will be responsible for all details, accessories and appurtenances necessary to accomplish a complete and acceptable job whether the specific details are indicated on the plans or not.

4.  <u>CUTTING AND PATCHING</u> - This Subcontractor will be responsible for all cutting and patching required for his work.  Any cutting or patching required as a result of this Subcontractor's failure to prosecute or coordinate his work in a timely manner will be this Subcontractor's responsibility at no additional cost to Contractor and/or Owner.  This work will include any sealing (fireproofing) at any penetrations through walls, ceilings or floors.

5.  <u>DEFECTS</u> - Subcontractor shall report in writing to Contractor any alleged defects in the work of any other party, on or in which Subcontractor is to install the Work and Subcontractor's failure to do so shall be deemed to be an acknowledgment by Subcontractor that such other work is fit and proper for the Work of Subcontractor, and Subcontractor shall thereby waive any claim or defense based upon such alleged defect to justify any failure of performance on Subcontractor's part.

6.  <u>MATERIALS AND SAMPLES</u> - Prior to delivery of material, the Subcontractor shall submit to the Contractor and Owner for approval or rejection, a sample and, if required, product data for each item to be supplied by him.  These samples, after such approval, shall constitute a


SUB
PM

#537156

minimum acceptable standard for the Project, provided they meet all specifications required by the Agreement.  Materials not in accordance with the accepted sample or the specifications shall not be installed and shall be removed and replaced by the Subcontractor at his expense.  The Subcontractor, at his own expense, shall furnish such samples of his work and make or cause to be made such material tests or test of his work performed as may be required from time to time by the Contractor and any governmental agencies that may have jurisdiction over the Project.

7.   SHOP DRAWINGS – Subcontractor shall submit to Contractor, Owner, and Architect, for the approval, complete shop drawings and samples as Contractor, Owner and Architect may deem necessary for the proper performance of the Work and/or as may be required by the Contract Documents.  Prior to installation, Subcontractor shall make such corrections in any such shop drawings as may be required by Contractor, Architect or Owner and shall resubmit corrected shop drawings to Contractor without delay.  Review and/or approval of shop drawings, product data, or samples by Contractor and/or the Architect shall not relieve Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents, nor shall it relieve Subcontractor of the necessity to ensure precise measurements and fittings of the Work.  All Shop Drawings and samples shall be submitted so as to cause no delay to the Project Schedule, Subcontractor's work or the work of any other subcontractor.  In addition, Subcontractor shall furnish Contractor with a duplicate copy of all plans and specifications, drawings, diagrams and applications prepared and submitted in conjunction with obtaining such permits as may be required by law, regulation or ordinance.

8.   AS-BUILT DRAWINGS – Record drawings shall be maintained at the job site to indicate any deviation from the Drawings.  The record drawings shall be delivered to Contractor at the completion of the Work.

9.   SERVICE/MAINTENANCE MANUAL – The Subcontractor shall submit to the Contractor (prior to acceptance of the first apartment units) three (3) typed service and maintenance manuals.  The manuals shall include operating information, troubleshooting information, instructions for ordering parts; recommendations for stocking of spare parts; names, addresses and phone numbers of suppliers and local maintenance facilities.

10.  LEED – This Subcontractor will meet all the Sustainable Requirements within the Contract Documents and will provide all required documentation, certificates, submittals, material tracking, etc. as set forth by the U.S. Green Building Council, LEED for New Construction v2.2; including but not limited to: recycled content, regional materials, Energy Star requirements, and VOC limits for material.

11.  FIRST SOURCE – This Subcontractor acknowledges and understands the requirements of the First Source hiring and reporting and acknowledges First Source participation within this Subcontract set forth in Exhibit "9".

12.  OPERATING TESTS – Upon completion and prior to acceptance of this Subcontractor's Work, this Subcontractor will subject all systems installed by him to such operating tests as may be required by the Contractor, Owner, the Architect, and Federal, State and local inspectors to demonstrate satisfactory functional and operating efficiency.  All instruments, facilities and labor required to conduct the tests will be provided by this Subcontractor at no cost to the Contractor and/or any other parties.

13.  INSTRUCTIONS - The Subcontractor will thoroughly instruct the Owner's designated representatives in the proper operation and maintenance of all systems.

14.  PRINCIPAL AXIS LINES – Contractor shall provide a single survey on which this Subcontractor shall layout the Work.  However, Subcontractor shall layout the Work and be responsible for the accuracy thereof, using care to insure that all finished surfaces are in perfect alignment.  Subcontractor shall be liable for any damage suffered by Contractor or other Subcontractors caused by his failure to layout and install his Work correctly.  This Agreement includes all layouts as required to complete the Work of this Agreement.  This Subcontractor will request any and all principal axis lines and information it may require from the Project Superintendent in a timely manner so as to allow for sufficient scheduling time.

15.  STORED MATERIALS - This Subcontractor may be eligible for payment for materials properly stored, but it will be at the sole discretion of the Contractor, and subject to the terms and conditions of the Owner/Contractor Agreements and, if allowed by the Owner and the Owner's Lender.  If allowed and in addition to any other requirements contained herein, Subcontractor will prepare and execute a "Bill of Sale" that explicitly describes the materials sold to Contractor on a form acceptable to Contractor, Owner, and Owner's lenders.  Subcontractor shall provide an "All Risk" insurance policy in an amount sufficient to cover the replacement cost of the material.  This policy will name as the insured the Contractor and Owner.  The deductible on this policy is $100.00 per occurrence.  Payment for materials stored offsite will in no way be acknowledged by the Contractor as acceptance of materials.  It will be the responsibility of the Subcontractor to assure delivery and installation of all materials as specified in this Contract.

16.  VEHICLE/ROAD CLEANUP – This Subcontractor will ensure all vehicles are cleaned before leaving the site.  This Subcontractor shall clean streets as required to complete the Work of the Subcontract Agreement and as required by local or state officials.  This Subcontractor shall clean all mud, dirt or debris resulting from the performance of this Subcontractor's Work from roadways while the Subcontractor is working on site.

17.  STAGING AND PARKING – This Subcontractor acknowledges the limited access on this project.  Any on-site parking, storage containers and trailers are prohibited.

18.  TRAFFIC CONTROL – This Subcontractor will provide all certified flagmen, traffic control, plates, cones, drums, flashing arrow panels, barricades and any other traffic control appurtenances, as required, to complete the Work of this Agreement.



#537156

19. DELIVERY, STORAGE AND HANDLING - This Subcontractor includes the expediting, receiving, handling, hoisting, rigging, storage and protection of all materials and equipment required for the performance of this Subcontract, whether purchased by this Subcontract or others. Subcontractor shall notify and coordinate with the Contractor prior to scheduling the delivery of any materials.

    a. All deliveries are to be in strict accordance with the Project Site Logistics Superintendent and drivers are to follow the direction given by the Project Site Logistics Superintendent.

    b. Deliveries shall be scheduled down to the minute of arrival. Any deliveries and/or trucks that do not report, or are not pre-approved, will be waived off and not permitted to enter the site. Trucks are not permitted to park and block traffic in the neighborhood.

    c. Each delivery ticket must be signed and dated by Subcontractor's foreman or designated representative. A copy of each signed and dated delivery ticket shall be attached to the invoice for the materials and submitted to Contractor with applications for payment.

    d. Subcontractor shall be responsible for receipt and verification of materials received on site as conforming to the Contract Documents and shall also be responsible for the protection of any such materials. Storage of all materials associated with the Work shall be the responsibility of Subcontractor. Subcontractor acknowledges that storage space on site is limited and cannot be guaranteed. If such storage is allowed on site, Subcontractor acknowledges that it may be required to relocate any and all items as determined by Contractor in its discretion as it believes necessary for the progress of the Project.

20. SAFETY – This Subcontractor will maintain and/or reinstall all fall protection, opening covers, and/or erosion sediment controls removed during the course of the work. The Contractor enforces the use of personal protective equipment (PPE), such as hardhats, protective eyewear, hearing protection, work-boots, and protective clothing on the jobsite at all times. This Subcontractor understands short pants, sleeveless shirts, sneakers, etc. will not be permitted onsite and will ensure his workforce is equipped accordingly.

    a. All workers on the project site must wear at all times a Type 2 reflective safety vest with your company name and/or logo printed on the back with one and half inch font (minimum) letters. This includes your employees, subcontractors and sub-subcontractors. Anyone not wearing a vest will not be permitted onsite.

    b. This Subcontractor shall maintain a Certified OSHA Competent person onsite at all times. Any safety violations that are witnessed on the project are to be reported to the Superintendent immediately.

    c. Any safety violations by this Subcontractor shall be corrected immediately upon becoming aware of the violation. Failure to take such action will result in a stop work order and the Subcontractor may be issued fines that are consistent with OSHA standards.

21. MEETINGS - An authorized representative of this Subcontractor shall attend all on site job progress and safety meetings while this Subcontractor is working on site and at other times as requested by the Contractor.

22. DAILY REPORT – This Subcontractor will provide the Superintendent with a detailed daily report each day by 9:00 am for previous day's work. Information in the report at a minimum should include: manpower, location(s) of work, description of work performed, equipment/material deliveries, and equipment used onsite, etc.

23. TEMPORARY POWER AND LIGHTING - This Subcontractor is responsible for providing all temporary power and lighting necessary to complete the work of this Subcontract.

24. PERMITS - The building permit will be obtained by others. This Subcontractor is required to obtain all other permits necessary to complete the work of this Subcontract.

25. INSPECTIONS – This Subcontractor shall be responsible for scheduling, coordinating and obtaining approvals for all inspections necessary for the work of this Agreement. Any cost or fees resulting from failed inspections, as a result of this Subcontractor's failure, shall be the responsibility of this Subcontractor.

26. FIRE STOPPING – This Subcontractor will fire stop and seal all floor and wall penetrations resulting from performance of the work of this Agreement as required by the Contract Documents and building codes.

27. SLEEVE PENETRATIONS – This Subcontractor will sleeve all penetrations through and under footings, walls, concrete slabs and elevated decks per the Contract Documents. Conduits or pipes shall be installed in the area that extends out at a 45-degree angle from the bottom of the footings. This Subcontractor will furnish and install all box outs and sleeves required to complete the Work of this Agreement.

28. ACCESS PANELS – This Subcontractor will furnish and layout access panels, as required for the Work. A rated panel must be used in rated assemblies. This Subcontractor will furnish panels to the appropriate subcontractor as required in sequence with the work, prior to the hanging and finishing drywall at each panel location. This Subcontractor will layout the access panels as required the Project Superintendent.


SUB
PM

#537156

29. <u>MISS UTILITY</u> – This Subcontractor shall notify Miss Utility prior to the commencement of any trenching or excavation work and will keep a written record of such calls and confirmation numbers. This Subcontractor shall also renew and maintain open tickets for the duration of all trenching and excavation activities.

30. <u>PAYMENT APPLICATIONS</u> - This Subcontractor shall submit all payment applications through the electronic GCPay system for approval. Instructions for GCPay will be provided by the Contractor to the Subcontractor.

END OF EXHIBIT "3"


SUB
PM
#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

## EXHIBIT "4"

### PAYMENT SCHEDULE

| SUBCONTRACTOR /VENDOR: | Design Build Mechanical Corporation, VA | CONTRACT NUMBER: | 1172-025 |
|---|---|---|---|
| PROJECT: | Petworth Safeway with Residences | PROJECT NO.: | 1172 |

| ITEM NO. | COST CODE | DESCRIPTION | UNIT | UNIT PRICE | VALUE $ |
|---|---|---|---|---|---|
| 001 | 51400-15700-0000 | Bond | 1 | $80,000.00 | $80,000.00 |
| 002 | 51400-15700-0000 | Mobilization | 1 | $40,000.00 | $40,000.00 |
| 003 | 51400-15700-0000 | Permits | 1 | $50,000.00 | $50,000.00 |
| 004 | 51400-15700-0000 | Sleeve Drawings | 1 | $25,000.00 | $25,000.00 |
| 005 | 51400-15700-0000 | Coordination Drawings | 1 | $40,000.00 | $40,000.00 |
| 006 | 51400-15400-0000 | | | | |
| 007 | 51400-15400-0000 | PLUMBING | | | |
| 008 | 51400-15400-0000 | Plumbing Underground - G2 | 0 | $0.00 | $0.00 |
| 009 | 51400-15400-0000 | Drains, C.O. Material | 1 | $8,000.00 | $8,000.00 |
| 010 | 51400-15400-0000 | Drains, C.O. Labor | 1 | $5,000.00 | $5,000.00 |
| 011 | 51400-15400-0000 | DWV Below Material | 1 | $30,000.00 | $30,000.00 |
| 012 | 51400-15400-0000 | DWV Below Labor | 1 | $50,000.00 | $50,000.00 |
| 013 | 51400-15400-0000 | Sump Pumps & Basins Material | 1 | $35,000.00 | $35,000.00 |
| 014 | 51400-15400-0000 | Sump Pumps & Basins Labor | 1 | $25,000.00 | $25,000.00 |
| 015 | 51400-15400-0000 | Sand/Oil Intercept Basins Material | 1 | $25,000.00 | $25,000.00 |
| 016 | 51400-15400-0000 | Sand/Oil Intercept Basins labor | 1 | $20,000.00 | $20,000.00 |
| 017 | 51400-15400-0000 | Elevator Sump Pumps Material | 1 | $5,500.00 | $5,500.00 |
| 018 | 51400-15400-0000 | Elevator Sump Pumps Labor | 1 | $3,000.00 | $3,000.00 |
| 019 | 51400-15400-0000 | | | | |
| 020 | 51400-15400-0000 | PARKING PLUMBING - G2 | 1 | $0.00 | $0.00 |
| 021 | 51400-15400-0000 | Sleeve Material | 1 | $5,000.00 | $5,000.00 |
| 022 | 51400-15400-0000 | Sleeve Labor | 1 | $7,000.00 | $7,000.00 |
| 023 | 51400-15400-0000 | DWV Above Material | 1 | $14,000.00 | $14,000.00 |
| 024 | 51400-15400-0000 | DWV Above Labor | 1 | $18,000.00 | $18,000.00 |
| 025 | 51400-15400-0000 | Domestic Water Above Material | 1 | $14,000.00 | $14,000.00 |
| 026 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $10,000.00 | $10,000.00 |
| 027 | 51400-15400-0000 | Booster Pumps Material | 1 | $50,000.00 | $50,000.00 |
| 028 | 51400-15400-0000 | Booster Pumps Labor | 1 | $30,000.00 | $30,000.00 |
| 029 | 51400-15400-0000 | Service Laterals Material | 1 | $9,010.00 | $9,010.00 |
| 030 | 51400-15400-0000 | Service Laterals Labor | 1 | $7,000.00 | $7,000.00 |
| 031 | 51400-15400-0000 | Fire Line Back Flow Material | 1 | $6,000.00 | $6,000.00 |
| 032 | 51400-15400-0000 | Fire Line Back Flow Labor | 1 | $4,000.00 | $4,000.00 |
| 033 | 51400-15400-0000 | | | | |
| 034 | 51400-15400-0000 | PARKING PLUMBING - G1 | | | |
| 035 | 51400-15400-0000 | Sleeve Material | 1 | $5,000.00 | $5,000.00 |
| 036 | 51400-15400-0000 | Sleeve Labor | 1 | $7,000.00 | $7,000.00 |
| 037 | 51400-15400-0000 | Drains, C.O. Material | 1 | $8,000.00 | $8,000.00 |
| 038 | 51400-15400-0000 | Drains, C.O. Labor | 1 | $5,000.00 | $5,000.00 |
| 039 | 51400-15400-0000 | DWV Above Material | 1 | $14,000.00 | $14,000.00 |
| 040 | 51400-15400-0000 | DWV Above Labor | 1 | $18,000.00 | $18,000.00 |
| 041 | 51400-15400-0000 | Domestic Water Above Material | 1 | $12,000.00 | $12,000.00 |
| 042 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $15,000.00 | $15,000.00 |
| 043 | 51400-15400-0000 | Service Laterals Material | 1 | $9,000.00 | $9,000.00 |
| 044 | 51400-15400-0000 | Service Laterals Labor | 1 | $7,000.00 | $7,000.00 |
| 045 | 51400-15400-0000 | Natural Gas Material | 1 | $18,000.00 | $18,000.00 |
| 046 | 51400-15400-0000 | Natural Gas Labor | 1 | $9,000.00 | $9,000.00 |
| 047 | 51400-15400-0000 | | | | |
| 048 | 51400-15400-0000 | 1st FLOOR – RETAIL | | | |
| 049 | 51400-15400-0000 | Sleeve Material | 1 | $5,000.00 | $5,000.00 |
| 050 | 51400-15400-0000 | Sleeve Labor | 1 | $7,000.00 | $7,000.00 |
| 051 | 51400-15400-0000 | Drains, C.O. Material | 1 | $12,000.00 | $12,000.00 |


SUB.
PM

#537156

| | | | | | |
|---|---|---|---|---|---|
| 052 | 51400-15400-0000 | Drains, C.O. Labor | 1 | $8,000.00 | $8,000.00 |
| 053 | 51400-15400-0000 | DWV Above Material | 1 | $41,400.00 | $41,400.00 |
| 054 | 51400-15400-0000 | DWV Above Labor | 1 | $38,000.00 | $38,000.00 |
| 055 | 51400-15400-0000 | Domestic Water Above Material | 1 | $16,000.00 | $16,000.00 |
| 056 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $26,000.00 | $26,000.00 |
| 057 | 51400-15400-0000 | Natural Gas Material | 1 | $8,000.00 | $8,000.00 |
| 058 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,000.00 | $4,000.00 |
| 059 | 51400-15400-0000 | | | | |
| 060 | 51400-15400-0000 | 2nd FLOOR AND ROOF | | | |
| 061 | 51400-15400-0000 | Sleeve Material | 1 | $12,300.00 | $12,300.00 |
| 062 | 51400-15400-0000 | Sleeve Labor | 1 | $16,400.00 | $16,400.00 |
| 063 | 51400-15400-0000 | Drains, C.O. Material | 1 | $16,400.00 | $16,400.00 |
| 064 | 51400-15400-0000 | Drains, C.O. Labor | 1 | $12,300.00 | $12,300.00 |
| 065 | 51400-15400-0000 | DWV Above Material | 1 | $41,000.00 | $41,000.00 |
| 066 | 51400-15400-0000 | DWV Above Labor | 1 | $36,900.00 | $36,900.00 |
| 0687 | 51400-15400-0000 | Domestic Water Above Material | 1 | $24,600.00 | $24,600.00 |
| 068 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $20,500.00 | $20,500.00 |
| 079 | 51400-15400-0000 | Natural Gas Material | 1 | $8,200.00 | $8,200.00 |
| 070 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,100.00 | $4,100.00 |
| 071 | 51400-15400-0000 | Fixtures Material | 1 | $57,400.00 | $57,400.00 |
| 072 | 51400-15400-0000 | Fixtures Labor | 1 | $10,250.00 | $10,250.00 |
| 073 | 51400-15400-0000 | | | | |
| 074 | 51400-15400-0000 | 3rd FLOOR | | | |
| 075 | 51400-15400-0000 | DWV Above Material | 1 | $45,000.00 | $45,000.00 |
| 076 | 51400-15400-0000 | DWV Above Labor | 1 | $40,500.00 | $40,500.00 |
| 077 | 51400-15400-0000 | Domestic Water Above Material | 1 | $27,000.00 | $27,000.00 |
| 078 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $22,500.00 | $22,500.00 |
| 079 | 51400-15400-0000 | Natural Gas Material | 1 | $9,000.00 | $9,000.00 |
| 080 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,500.00 | $4,500.00 |
| 081 | 51400-15400-0000 | Fixtures Material | 1 | $63,000.00 | $63,000.00 |
| 082 | 51400-15400-0000 | Fixtures Labor | 1 | $11,250.00 | $11,250.00 |
| 083 | 51400-15400-0000 | | | | |
| 084 | 51400-15400-0000 | 4th FLOOR | | | |
| 085 | 51400-15400-0000 | DWV Above Material | 1 | $45,000.00 | $45,000.00 |
| 086 | 51400-15400-0000 | DWV Above Labor | 1 | $40,500.00 | $40,500.00 |
| 087 | 51400-15400-0000 | Domestic Water Above Material | 1 | $27,000.00 | $27,000.00 |
| 088 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $22,500.00 | $22,500.00 |
| 089 | 51400-15400-0000 | Natural Gas Material | 1 | $9,000.00 | $9,000.00 |
| 090 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,500.00 | $4,500.00 |
| 091 | 51400-15400-0000 | Fixtures Material | 1 | $63,000.00 | $63,000.00 |
| 092 | 51400-15400-0000 | Fixtures Labor | 1 | $11,250.00 | $11,250.00 |
| 093 | 51400-15400-0000 | | | | |
| 094 | 51400-15400-0000 | 5th FLOOR | | | |
| 095 | 51400-15400-0000 | DWV Above Material | 1 | $45,000.00 | $45,000.00 |
| 096 | 51400-15400-0000 | DWV Above Labor | 1 | $40,500.00 | $40,500.00 |
| 097 | 51400-15400-0000 | Domestic Water Above Material | 1 | $27,000.00 | $27,000.00 |
| 098 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $22,500.00 | $22,500.00 |
| 099 | 51400-15400-0000 | Natural Gas Material | 1 | $9,000.00 | $9,000.00 |
| 100 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,500.00 | $4,500.00 |
| 101 | 51400-15400-0000 | Fixtures Material | 1 | $63,000.00 | $63,000.00 |
| 102 | 51400-15400-0000 | Fixtures Labor | 1 | $11,250.00 | $11,250.00 |
| 103 | 51400-15400-0000 | | | | |
| 104 | 51400-15400-0000 | 6th FLOOR | | | |
| 105 | 51400-15400-0000 | DWV Above Material | 1 | $42,000.00 | $42,000.00 |
| 106 | 51400-15400-0000 | DWV Above Labor | 1 | $37,800.00 | $37,800.00 |
| 107 | 51400-15400-0000 | Domestic Water Above Material | 1 | $25,200.00 | $25,200.00 |
| 108 | 51400-15400-0000 | Domestic Water Above Labor | 1 | $21,000.00 | $21,000.00 |
| 109 | 51400-15400-0000 | Natural Gas Material | 1 | $8,400.00 | $8,400.00 |
| 110 | 51400-15400-0000 | Natural Gas Labor | 1 | $4,200.00 | $4,200.00 |
| 111 | 51400-15400-0000 | Fixtures Material | 1 | $58,800.00 | $58,800.00 |
| 112 | 51400-15400-0000 | Fixtures Labor | 1 | $10,500.00 | $10,500.00 |
| 113 | 51400-15400-0000 | | | | |
| 114 | 51400-15400-0000 | ROOF | | | |
| 115 | 51400-15400-0000 | Drains Material | 1 | $18,000.00 | $18,000.00 |
| 116 | 51400-15400-0000 | Drains Labor | 1 | $16,000.00 | $16,000.00 |
| 117 | 51400-15400-0000 | Natural Gas Material | 1 | $17,000.00 | $17,000.00 |
| 118 | 51400-15400-0000 | Natural Gas Labor | 1 | $7,800.00 | $7,800.00 |
| 119 | 51400-15700-0000 | | | | |
| 120 | 51400-15700-0000 | MECHANICAL | | | |
| 121 | 51400-15700-0000 | Parking Floor - G2 | 1 | $0.00 | $0.00 |
| 122 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $8,000.00 | $8,000.00 |
| 123 | 51400-15700-0000 | Duct Fabrication Material | 1 | $10,000.00 | $10,000.00 |
| 124 | 51400-15700-0000 | Duct install Material | 1 | $500.00 | $500.00 |



SUB
PM

#537156

| 125 | 51400-15700-0000 | Duct install Labor | 1 | $6,500.00 | $6,500.00 |
|---|---|---|---|---|---|
| 126 | 51400-15700-0000 | Garage Exhaust Fans Material | 1 | $50,000.00 | $50,000.00 |
| 127 | 51400-15700-0000 | Garage Exhaust Fans Labor | 1 | $25,000.00 | $25,000.00 |
| 128 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $9,000.00 | $9,000.00 |
| 129 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $12,000.00 | $12,000.00 |
| 130 | 51400-15700-0000 | CO Monitoring | 1 | $15,000.00 | $15,000.00 |
| 131 | 51400-15700-0000 | | | | |
| 132 | 51400-15700-0000 | **PARKING FLOOR - G1** | | | |
| 133 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $8,000.00 | $8,000.00 |
| 134 | 51400-15700-0000 | Duct Fabrication Material | 1 | $10,000.00 | $10,000.00 |
| 135 | 51400-15700-0000 | Duct install Material | 1 | $500.00 | $500.00 |
| 136 | 51400-15700-0000 | Duct install Labor | 1 | $6,500.00 | $6,500.00 |
| 137 | 51400-15700-0000 | Garage Exhaust Fans Material | 1 | $50,000.00 | $50,000.00 |
| 138 | 51400-15700-0000 | Garage Exhaust Fans Labor | 1 | $25,000.00 | $25,000.00 |
| 139 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $9,000.00 | $9,000.00 |
| 140 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $12,000.00 | $12,000.00 |
| 141 | 51400-15700-0000 | CO Monitoring | 1 | $15,000.00 | $15,000.00 |
| 142 | 51400-15700-0000 | | | | |
| 143 | 51400-15700-0000 | **1st FLOOR - RETAIL** | | | |
| 144 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $14,350.00 | $14,350.00 |
| 145 | 51400-15700-0000 | Duct Fabrication Material | 1 | $20,500.00 | $20,500.00 |
| 146 | 51400-15700-0000 | Duct install Material | 1 | $8,200.00 | $8,200.00 |
| 147 | 51400-15700-0000 | Duct install Labor | 1 | $16,400.00 | $16,400.00 |
| 148 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $12,300.00 | $12,300.00 |
| 149 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $24,600.00 | $24,600.00 |
| 150 | 51400-15700-0000 | | | | |
| 151 | 51400-15700-0000 | **2nd FLOOR** | | | |
| 152 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $14,350.00 | $14,350.00 |
| 153 | 51400-15700-0000 | Duct Fabrication Material | 1 | $20,500.00 | $20,500.00 |
| 154 | 51400-15700-0000 | Duct install Material | 1 | $12,300.00 | $12,300.00 |
| 155 | 51400-15700-0000 | Duct install Labor | 1 | $20,500.00 | $20,500.00 |
| 156 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $26,650.00 | $26,650.00 |
| 157 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $61,500.00 | $61,500.00 |
| 158 | 51400-15700-0000 | Snaplock pipe & fitting Labor | 1 | $4,100.00 | $4,100.00 |
| 159 | 51400-15700-0000 | Snaplock pipe & fitting Material | 1 | $5,330.00 | $5,330.00 |
| 160 | 51400-15700-0000 | | | | |
| 161 | 51400-15700-0000 | **3rd FLOOR** | | | |
| 162 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $15,750.00 | $15,750.00 |
| 163 | 51400-15700-0000 | Duct Fabrication Material | 1 | $22,500.00 | $22,500.00 |
| 164 | 51400-15700-0000 | Duct install Material | 1 | $13,500.00 | $13,500.00 |
| 165 | 51400-15700-0000 | Duct install Labor | 1 | $22,500.00 | $22,500.00 |
| 166 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $29,250.00 | $29,250.00 |
| 167 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $67,500.00 | $67,500.00 |
| 168 | 51400-15700-0000 | Snaplock pipe & fitting Labor | 1 | $4,500.00 | $4,500.00 |
| 169 | 51400-15700-0000 | Snaplock pipe & fitting Material | 1 | $5,850.00 | $5,850.00 |
| 170 | 51400-15700-0000 | | | | |
| 171 | 51400-15700-0000 | **4th FLOOR** | | | |
| 172 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $15,750.00 | $15,750.00 |
| 173 | 51400-15700-0000 | Duct Fabrication Material | 1 | $22,500.00 | $22,500.00 |
| 174 | 51400-15700-0000 | Duct install Material | 1 | $13,500.00 | $13,500.00 |
| 175 | 51400-15700-0000 | Duct install Labor | 1 | $22,500.00 | $22,500.00 |
| 176 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $29,250.00 | $29,250.00 |
| 177 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $67,500.00 | $67,500.00 |
| 178 | 51400-15700-0000 | Snaplock pipe & fitting Labor | 1 | $4,500.00 | $4,500.00 |
| 179 | 51400-15700-0000 | Snaplock pipe & fitting Material | 1 | $5,850.00 | $5,850.00 |
| 180 | 51400-15700-0000 | | | | |
| 181 | 51400-15700-0000 | **5th FLOOR** | | | |
| 182 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $15,750.00 | $15,750.00 |
| 183 | 51400-15700-0000 | Duct Fabrication Material | 1 | $22,500.00 | $22,500.00 |
| 184 | 51400-15700-0000 | Duct install Material | 1 | $13,500.00 | $13,500.00 |
| 185 | 51400-15700-0000 | Duct install Labor | 1 | $22,500.00 | $22,500.00 |
| 186 | 51400-15700-0000 | Mechanical Equipment Labor | 1 | $29,250.00 | $29,250.00 |
| 187 | 51400-15700-0000 | Mechanical Equipment Material | 1 | $67,500.00 | $67,500.00 |
| 188 | 51400-15700-0000 | Snaplock pipe & fitting Labor | 1 | $4,500.00 | $4,500.00 |
| 189 | 51400-15700-0000 | Snaplock pipe & fitting Material | 1 | $5,850.00 | $5,850.00 |
| 190 | 51400-15700-0000 | | | | |
| 191 | 51400-15700-0000 | **6th FLOOR** | | | |
| 192 | 51400-15700-0000/ | Duct Fabrication Labor | 1 | $14,700.00 | $14,700.00 |
| 193 | 51400-15700-0000/ | Duct Fabrication Material | 1 | $21,000.00 | $21,000.00 |
| 194 | 51400-15700-0000/ | Duct install Material | 1 | $12,600.00 | $12,600.00 |
| 195 | 51400-15700-0000/ | Duct install Labor | 1 | $21,000.00 | $21,000.00 |
| 196 | 51400-15700-0000/ | Mechanical Equipment Labor | 1 | $27,300.00 | $27,300.00 |
| 197 | 51400-15700-0000/ | Mechanical Equipment Material | 1 | $63,000.00 | $63,000.00 |



SUB PM

#537156

| 198 | 51400-15700-0000 | Snaplock pipe & fitting Labor | 1 | $4,200.00 | $4,200.00 |
|-----|------------------|-------------------------------|---|-----------|-----------|
| 199 | 51400-15700-0000 | Snaplock pipe & fitting Material | 1 | $5,460.00 | $5,460.00 |
| 200 | 51400-15700-0000 | | | | |
| 201 | 51400-15700-0000 | ROOF & GENERAL MECHANICAL ITEMS | | | |
| 202 | 51400-15700-0000 | Roof Top Unit Material | 1 | $210,000.00 | $210,000.00 |
| 203 | 51400-15700-0000 | Roof Top Unit Labor | 1 | $40,000.00 | $40,000.00 |
| 204 | 51400-15700-0000 | Split System Material | 1 | $150,000.00 | $150,000.00 |
| 205 | 51400-15700-0000 | Split System Labor | 1 | $30,000.00 | $30,000.00 |
| 206 | 51400-15700-0000 | Fans Material | 1 | $65,000.00 | $65,000.00 |
| 207 | 51400-15700-0000 | Fans Labor | 1 | $40,000.00 | $40,000.00 |
| 2098 | 51400-15700-0000 | Duct Fabrication Labor | 1 | $10,000.00 | $10,000.00 |
| 209 | 51400-15700-0000 | Duct Fabrication Material | 1 | $15,000.00 | $15,000.00 |
| 210 | 51400-15700-0000 | Duct Install Material | 1 | $8,000.00 | $8,000.00 |
| 211 | 51400-15700-0000 | Duct Install Labor | 1 | $10,500.00 | $10,500.00 |
| 212 | 51400-15700-0000 | Test & Balance Labor | 1 | $15,000.00 | $15,000.00 |
| 213 | 51400-15700-0000 | Controls | 1 | $30,000.00 | $30,000.00 |
| 214 | 51400-15700-0000 | Air Distribution Material | 1 | $40,000.00 | $40,000.00 |
| 215 | 51400-15700-0000 | Air Distribution Labor | 1 | $27,000.00 | $27,000.00 |

CONTRACT TOTAL:                                     $4,040,100.00

ACCEPTED BY: _____
Dezign Build Mechanical Corporation, VA

ACCEPTED BY: _____
Bozzuto Building Company

RETAINER TERMS:   10.00%
(For Accounting Use Only)

END OF EXHIBIT "4"

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1171-035
DATE: 1/04/2013

## EXHIBIT "5"

## INSURANCE REQUIREMENTS

Certificate Holder - Contractor: <u>Bozzuto Building Company</u>

The Subcontractor shall provide at his own expense, all necessary insurance in amounts equal to or greater than the limits set forth below:

1.  Commercial General Liability Coverages:

| | | |
|---|---|---|
| a. | General Aggregate | $2,000,000 |
| b. | Products/Completed Operation (such coverage to continue for three years after completion of all work) | $2,000,000 |
| c. | Personal and Advertising Injury | $1,000,000 |
| d. | Each Occurrence | $1,000,000 |
| e. | Fire Damage (any one fire) | $ 100,000 |
| f. | Medical Expenses (any one person) | $ 5,000 |
| g. | Contractual Liability Coverage for all written Contracts. | |
| h. | Exclusions X, C, U (Explosion, Collapse, Underground) will be deleted. | |

2.  Automobile Liability Coverages - Any automobile, with Combined Single Limit of $1,000,000.

3.  Excess Liability - Umbrella Form, with Each Occurrence and Aggregate Limit of $5,000,000.

4.  Workmen's Compensation and Employer's Liability Insurance with Limits set forth under the State Regulations governing each workman employed in, about or upon the Project as provided in each and every statue applicable to Workmen's Compensation and Employer's Liability.

The Certificate of Insurance shall state:

<u>Bozzuto Building Company, Duball Petworth, LLC & Safeway Stores, Inc., TBD and Bozzuto & Associates, Inc., including all subsidiaries, affiliated or associated companies, corporations, limited partnerships, limited liability companies or other related entities are additional insured with respect to liability for work performed on their behalf by Design Build Mechanical Corporation, VA.  All such entities and persons shall be additional insureds under endorsements to the Subcontractor's General Liability policy.</u>

Certificates of Insurance shall be forwarded to the General Contractor.  The certificate shall state that the policy shall not be cancelled or otherwise amended without first providing the Owner, the General Contractor and any mortgage lenders with thirty (30) days advance notice by registered mail of said cancellation.  The Subcontractor acknowledges and agrees that a "Hold Harmless" made out in the name of the General Contractor and Owner is part of this Subcontract and shall include the following language:

The Subcontractor hereby indemnifies the General Contractor, the Owner, and their respective officers, directors, agents and employees, and lending institutions, and holds each of them harmless from and against any and all liability, suits, action, demands, loss or damage (just or unjust) and all costs or fees including, without limitation, attorneys' fees, associated therewith, on account of injuries to person or property, including accidental death and damage to adjoining structures and premises, occurring on the site of the Project, or in connection with the work, or by reason of the operations under this contract, whether or not such liability be the result of negligence, errors or omissions, acts or actions, or for any other reasons or causes of this Subcontractor, his agents, servants, employees and contractors.



SUB
PM

#537156

At least seven (7) days prior to commencing any work covered by the Contract, the Subcontractor shall furnish to the General Contractor a certificate or certificates in triplicate of the insurance required under the foregoing provisions. Such certificates shall list the various coverages and shall contain, in addition to any provisions hereinbefore required, a provision that it will be automatically renewed upon expiration and continued in full force until final acceptance by the Owner and General Contractor of all work covered by the Subcontract and the Contract, including the period for all warranty work under the Subcontract and Contract, unless the General Contractor is given written notification as described above. Upon request, the Subcontractor shall furnish the General Contractor with a certified copy of each policy and endorsement. All insurance required to be procured and maintained as aforesaid must be procured from insurance companies approved by the General Contractor and authorized to do business in the and/or the State of the Project. If at any time the above policies shall be cancelled, terminated or modified so that the insurance is not in effect as above required, then, if the General Contractor shall so direct, the Subcontractor shall suspend performance of the work covered in the Subcontract. If the said work is so suspended, no extension of time shall be due on account thereof. If said work is not suspended, then the General Contractor may at its option obtain insurance affording coverage equal to that afforded above and the cost of such insurance shall be deducted in full amount from the monthly requisition of payment due the Subcontractor.

Subcontractor expressly waives all rights of recovery against the Owner, the General Contractor and such other parties as are covered by Subcontractor's insurance coverages pursuant to the foregoing provisions. Subcontractor will ensure that its subcontractors also waive all such claims covered by any insurance.

The abovesaid Subcontractor's policies shall be primary insurance for all claims related to the Subcontract, with all policies of the Owner, the General Contractor or others being secondary non-contributory policies. Neither the procurement nor the maintenance of any type of insurance by the Owner or the General Contractor shall in any way be construed or be deemed to limit, discharge, waive or release the Subcontractor from any of the obligations and risks imposed upon him by the Contract or Subcontract or by law or to be a limitation on the nature or extent of such obligations and risks.

Any insurance not described above which this Subcontractor desires for his own protection shall be at his own responsibility and at his own expense.

[   ] SUB
[   ] PM
#537156

EXHIBIT "5" CONTINUED

## ACORD CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YY) XX/XX/XX |
| --- |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
| --- | --- |

Phone Number

Your Agent
Street Address
City, State  Zip Code

| COMPANIES AFFORDING COVERAGE | |
| --- | --- |
| COMPANY A | ABC Insurance Company |
| COMPANY B | |
| COMPANY C | |
| COMPANY D | |

INSURED

Design Build Mechanical Corporation, VA
3635 Concorde Pkwy., Suite 700
Chantilly, VA  20151

**SAMPLE**

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EFFECTIVE DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- |
| A | **GENERAL LIABILITY** | XXXX1234567 | XX/XX/XX | XX/XX/XX | GENERAL AGGREGATE | $ 2,000,000 |
| | X  COMMERCIAL GENERAL LIABILITY | | | | PRODUCTS - COMP/OP AGG. | $ 2,000,000 |
| | CLAIMS MADE  X  OCCUR | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | EACH OCCURRENCE | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | FIRE DAMAGE (Any one fire) | $ 100,000 |
| | X  POLICY | | | | MED EXP (Any one person) | $ 5,000 |
| A | **AUTOMOBILE LIABILITY** | XXXX1234567 | XX/XX/XX | XX/XX/XX | COMBINED SINGLE LIMIT | $ 1,000,000 |
| | ANY AUTO | | | | | |
| | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | SCHEDULED AUTOS | | | | | |
| | X  HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | X  NON OWNED AUTOS | | | | | |
| | | | | | PROPERTY DAMAGE | $ |
| A | **GARAGE LIABILITY** | XXXX1234567 | XX/XX/XX | XX/XX/XX | AUTO ONLY - EA ACCIDENT | $ |
| | ANY AUTO | | | | OTHER THAN AUTO ONLY | $ |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | **EXCESS LIABILITY** | XXXX1234567 | XX/XX/XX | XX/XX/XX | EACH OCCURRENCE | $ 5,000,000 |
| | X  OCCUR  CLAIMS MADE | | | | AGGREGATE | $ 5,000,000 |
| | DEDUCTIBLE | | | | | $ |
| | RETENTION | | | | | |
| A | **WORKERS COMPENSATION** | XXXX1234567 | XX/XX/XX | XX/XX/XX | X  WC STATUTORY LIMITS | |
| | EMPLOYERS' LIABILITY | | | | X  OTHER | |
| | THE PROPRIETOR/ | | | | EL EACH ACCIDENT | $ 100,000 |
| | PARTNERS/EXECUTIVE    INCL | | | | EL DISEASE - POLICY LIMIT | $ 500,000 |
| | OFFICERS ARE:    EXCL | | | | EL DISEASE - EA EMPLOYEE | $ 100,000 |
| | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

ADDITIONAL INSUREDS: SEE NEXT PAGE

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| BOZZUTO BUILDING COMPANY 7850 WALKER DRIVE, SUITE 400 GREENBELT, MD 20770  ADDITIONAL INSUREDS: SEE NEXT PAGE | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL MAIL 30 DAYS PRIOR WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT.  AUTHORIZED REPRESENTATIVE |

| ACORD 25-S (1/95) | 7-93 | ACORD CORPORATION 1988 |
| --- | --- | --- |


SUB
PM

#537156

EXHIBIT "5" CONTINUED

ADDITIONAL INSUREDS

Bozzuto Building Company, Duball Petworth, LLC & Safeway Stores, Inc., TBD and Bozzuto & Associates, Inc., including all subsidiaries, affiliated or associated companies, corporations, limited partnerships, limited liability companies or other related entities are additional insured with respect to liability for work performed on their behalf by Design Build Mechanical Corporation, VA. All such entities and persons shall be additional insureds under endorsements to the Subcontractor's General Liability policy.

END OF EXHIBIT "5"

SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

EXHIBIT "6"

TAXPAYER IDENTIFICATION NUMBER

**Form W-9**
(Rev. November 2000)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer Identification Number and Certification**

Give form to the requester. Do not send to the IRS.

**Print or type — See Specific Instructions on page 2.**

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor ☐ Corporation ☐ Partnership ☐ Other ▸ ___   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

**Part I   Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

**Part II   Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here   Signature of U.S. person ▸            Date ▸

**Purpose of Form**

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                    Form W-9 (Rev. 11-2000)

Page 1 of 4

#537156

Form W-9 (Rev. 11-2005)  Page 2

● The U.S. grantor or other owner of a grantor trust and not the trust, and

● The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules regarding partnerships* on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

TSUB
PM
#537156

Form W-9 (Rev. 11-2005)

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

Note. If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

Exempt payees. Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
| --- | --- |
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees; and payments for services paid by a federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see Limited liability company (LLC) on page 2), enter your SSN (or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

Note. See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at www.socialsecurity.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting www.irs.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note. Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.

SUB
PM

#537156

Form W-9 (Rev. 11-2005)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

**END OF EXHIBIT "6"**

SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

## EXHIBIT "7"
## ACKNOWLEDGEMENT OF PAYMENT AND SETTLEMENT DUE
### (SAMPLE)

TO:            Petworth Safeway with Residences
                   Bozzuto Building Company
                   7850 Walker Drive, Suite 400
                   Greenbelt, MD 20770

SUBCONTRACTOR:       Design Build Mechanical Corporation, VA
                   3635 Concorde Pkwy., Unit 700
                   Chantilly, VA 20151

PROJECT LOCATION:      900 Randolph Street, N.W.
                   Washington DC 20011

SUBCONTRACT DATE:     4/5/2013
SUBCONTRACTOR TRADE:   Plumbing and HVAC - 4,040,100

To induce Bozzuto Building Company to pay funds to the undersigned on or about the date hereof, the undersigned represents and agrees as follows:

I.      Amount of payment requested:
        A.    CONTRACT SUMMARY
               1.    The original price of the aforesaid contract is $4,040,100.00
               2.    Extra changes to the contract in accordance with Work Orders which have been agreed to by both parties, as noted above, are $0.00
               3.    The adjusted contract price therefore is $4,040,100.00
               4.    Repairs and misc. supplies not included in the adjusted contract are $0.00
               5.    The adjusted contract price plus non-contract work/supplies is $4,040,100.00

        B.    PAYMENT SUMMARY
               1.    As of Period to Date the company has earned on the aforesaid contract and non-contract work/supplies by reason of its performance of labor and services and/or supplying of materials the sum of $0.00
               2.    Total retainage to date is $0.00
               3.    Total earned less retainage is $0.00
               4.    Prior to this settlement, the company has received in payment on said contract the sum of $0.00
               5.    The company is now requesting payment in the amount of $0.00

        C.    BALANCE DUE
               1.    The balance owing upon the completion of the contract including retention, if any, after this payment will be $0.00

II.     Affidavit of Payment of Debts and Claims:
       The undersigned hereby certifies and warrants, under oath, that, except as listed below, he has paid in full or has otherwise satisfied all obligations for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims for damages, including all applicable taxes, arising in any manner to date in connection with the performance of the Contract referenced above.

       EXCEPTIONS: (If none, write "None". If required, the Subcontractor shall furnish satisfactory bond to Bozzuto Building Company for each exception.)

III.    Affidavit of Release of Lien:
       For the above said consideration, the undersigned waives any rights in the nature of lien, claims or bond claims, which it may have for labor performed and/or materials furnished to date and agrees that payment of the amount stated in item B(5) above by Bozzuto Building Company is in full settlement of any amount due for any and all labor performed and/or material furnished to date, except as listed below. The undersigned warrants that he has not assigned any claim for payment.

       EXCEPTIONS: (If none, write "None". If required, the Subcontractor shall furnish bond satisfactory to Bozzuto Building Company for each exception.)

       It is also acknowledged that the priority date as to any subsequent liens is hereby waived. The undersigned also warrants that he is duly authorized to make oath hereto and to act for the subcontractor.

ATTEST:                            EXECUTED UNDER SEAL ON _____
                                                  (Insert Date)

State of ............ County of ...............

Subscribed & sworn to before me this

_____ Day of _____ , 20 _____        BY: _____

Notary Public _____

My Commission Expires _____       _____
                                                   (Name & title)

Page 1 of 1


SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2011

## ACKNOWLEDGEMENT OF PAYMENT AND SETTLEMENT DUE
(SAMPLE)

TO:               Petworth Safeway with Residences
Bozzuto Building Company
7850 Walker Drive, Suite 400
Greenbelt, MD 20770

SUBCONTRACTOR:    Design Build Mechanical Corporation, VA
3635 Concorde Pkwy., Unit 700
Chantilly, VA 20151

PROJECT LOCATION:    900 Randolph Street, N.W.
Washington DC 20011

SUBCONTRACT DATE:    4/5/2013
SUBCONTRACTOR TRADE:  Plumbing and HVAC - 4,040,100

To induce Bozzuto Building Company to pay funds to the undersigned on or about the date hereof, the undersigned represents and agrees as follows:

IV.    Amount of payment requested:
    A.    CONTRACT SUMMARY
        1.    The original price of the aforesaid contract $4,040,100.00.
        2.    Extra changes to the contract in accordance with Work Orders which have been agreed to by both parties, as noted above, are $0.00
        3.    The adjusted contract price therefore is $0.00
        4.    Repairs and misc. supplies not included in the adjusted contract are
        5.    The adjusted contract price plus non-contract work/supplies is $0.00

    B.    PAYMENT SUMMARY
        1.    As of Period to Date the company has earned on the aforesaid contract and non-contract work/supplies by reason of its performance of labor and services and/or supplying of materials the sum of $0.00
        2.    Total retainage to date is $0.00
        3.    Total earned less retainage is $0.00
        4.    Prior to this settlement, the company has received in payment on said contract the sum of $0.00
        5.    The company is now requesting payment in the amount of $0.00

    C.    BALANCE DUE
    The balance owing upon the completion of the contract including retention, if any, after this payment will be $0.00

V.    Affidavit of Payment of Debts and Claims:
The undersigned hereby certifies and warrants, under oath, that, except as listed below, he has paid in full or has otherwise satisfied all obligations for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims for damages, including all applicable taxes, arising in any manner to date in connection with the performance of the Contract referenced above.

EXCEPTIONS: (If none, write "None". If required, the Subcontractor shall furnish satisfactory bond to Bozzuto Building Company for each exception.)

VI.    Affidavit of Release of Lien:
For the above said consideration, the undersigned waives any rights in the nature of lien, claims or bond claims, which it may have for labor performed and/or materials furnished to date and agrees that payment of the amount stated in item B(3) above by Bozzuto Building Company is in full settlement of any amount due for any and all labor performed and/or material furnished to date, except as listed below. The undersigned warrants that he has not assigned any claim for payment.

### FULL AND FINAL LIEN RELEASE

It is also acknowledged that the priority date as to any subsequent liens is hereby waived. The undersigned also warrants that he is duly authorized to make oath hereto and to act for the subcontractor.

ATTEST:                              EXECUTED UNDER SEAL ON _____
                                              (Insert Date)

State of _____ County of _____

Subscribed & sworn to before me this

_____ Day of _____ 20 ____          BY: _____

Notary Public _____

My Commission Expires _____    _____
                                              (Name & title)

Page 1 of 2



#537156

## AFFIDAVIT OF OUTSTANDING ACCOUNTS
(SAMPLE)

**Petworth Safeway with Residences**

We further certify that all outstanding claims for labor, insurance, unemployment benefits, taxes, union benefits, subcontracts materials, rental, expendable equipment and any other obligation incurred in the performance of said agreement have been paid in full in accordance with our requirements of said agreements except such outstanding claims as are listed below, which statement contains all claims against the Subcontractor which are not yet paid (all amounts owed, even if under extended periods of credits, must be included in this statement).

We also certify that these due and payable accounts will be paid as shown below out of funds to be received from the Contractor for this period and signed receipts will be presented prior to and as a condition of receiving the next check, if requested by the Contractor.

| | | PAYMENTS DUE AND TO BE MADE | |
| NAME OF FIRM: | AMOUNT OWING: | AMOUNT | DATE: |
| --- | --- | --- | --- |
| | | | |

(Use your own continuation sheet if required, if "none" so state)

The undersigned Subcontractor, having heretofore entered in to a subcontract with the Bozzuto Building Company to perform certain services in connection with the above operation, and having made AFFIDAVIT OF OUTSTANDING ACCOUNTS, in connection with request for payment in order to induce the Bozzuto Building Company to make a payment at this time in the amount of $[total due] agrees as follows:

1. That said payment is in strict compliance with the terms and conditions of said contract.

2. That said payment shall be received as a trust fund and applied by the undersigned, first for the discharge of his obligations for all labor, subcontract work, materials, equipment, supplies, services, Etc, in connection with this project.

3. That said payment will not be deposited with any depository to whom the Subcontract has given any evidence of an indebtedness which gives to the depository any legal rights to such funds or any part there of.

4. That the person executing this Certificate on behalf of the Subcontractor is an authorized officer of the Subcontractor, having personal knowledge of all of the matters hereinabove set forth and duly authorized to execute this Certificate and bind the Subcontractor hereto.

Design Build Mechanical Corporation, VA

_____

(Name of Subcontractor)                    (Signature of Officer)

_____           _____

(Date)                                      (Title of Officer)

STATE OF

COUNTY OF

Being familiar with penalties for making a false statement under oath, as to any matters herein above set forth, I solemnly swear that I am the

_____ of Design Build Mechanical Corporation

(Title of Officer)

The Subcontractor named herein and who executed the forgoing statement: that I am familiar with all of the matters set forth, and that I have read the forgoing statement subscribed by me and I know the contents thereof, and that the same is true to my knowledge.

SWORN AND SUBSCRIBED TO BEFORE ME

This____ Day of_____ , 20 _____        BY:_____
                                              (SIGNATURE OF OFFICER)

_____
(NOTARY PUBLIC AFFIX STAMP)

_____
(COMMISSION EXPIRES)                    **END OF EXHIBIT "7"**

Page 2 of 2



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-023
DATE: 1/04/2013

EXHIBIT "8"

## PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, VA, 3635 Concorde Pkwy., Suite 700, Chantilly, VA 20151 (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME a corporation organized and existing under the laws of the State of BONDING COMPANY STATE, (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of FOUR MILLION FORTY THOUSAND ONE HUNDRED DOLLARS, ($4,040,100.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by Duball Petworth, LLC & Safeway Stores, Inc. for Petworth Safeway with Residences and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/5/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of (PLUMBING & HVAC), ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, 20_____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

| | |
|---|---|
| (Principal) | (Seal) |

Design Build Mechanical Corporation, VA
3635 Concorde Pkwy., Suite 700, Chantilly, VA 20151

Witness:                                              By:

_____                    _____
Or, Secretary's Attest                          (Signature and Title)          (Seal)


| | |
|---|---|
| (Surety) | |

BONDING COMPANY

Witness:                                              By:

_____                    _____
Or, Secretary's Attest                          (Signature and Title)          (Seal)



SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 1/04/2013

## EXHIBIT "8"

## PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, VA, 3635 Concorde Pkwy., Suite 700, Chantilly, VA, 20151, (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME, a corporation organized and existing under the laws of the State of BONDING COMPANY STATE, (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of FOUR MILLION FORTY THOUSAND ONE HUNDRED DOLLARS, ($4,040,100.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by Duball Petworth, LLC & Safeway Stores, Inc. for Petworth Safeway with Residences and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/5/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of (PLUMBING & HVAC), ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of said Subcontract within the time provided therein and any extensions thereof that may be granted by the Obligee, and during the life of any guaranty required under said Subcontract, and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract that may hereafter be made, and shall indemnify and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee may sustain by reason of failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, 20____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____ (Principal) _____ (Seal)

Design Build Mechanical Corporation, VA
3635 Concorde Pkwy., Suite 700, Chantilly, VA   20151

Witness:                                              By:

_____                  _____
Or, Secretary's Attest                              (Signature and Title)              (Seal)

_____ (Surety)

BONDING COMPANY

Witness:                                              By:

_____                  _____
Or, Secretary's Attest                              (Signature and Title)              (Seal)

## END OF EXHIBIT "8"



SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-015
DATE: 1/04/2013

**EXHIBIT "9" -- FIRST SOURCE
AGREEMENT**

### GOVERNMENT OF THE DISTRICT OF COLUMBIA

Department of Employment Services

| | | |
|---|---|---|
| VINCENT C. GRAY<br>MAYOR | ☆ ☆ ☆  | LISA M. MALLORY<br>ACTING DIRECTOR |

*Memorandum*

To:     Diana Dorsey Hill
        Office of the Surveyor
        Department of Consumer and Regulatory Affairs

From:   Eric B. Scott
        Associate Director
        Office of Employer Services

Date:   June 30, 2011

Subject: Review of the First Source Employment Agreement

The Department of Employment Services (DOES) has reviewed the following contractual document for compliance with D.C. Law 14-24, Mayor's Order 83-265 and D.C. Law 5-93 for S.O. 11-4571, submitted by Duball Petworth, LLC of the alley closing of Square 2905. Please be advised that this applicant has met the criteria of the Department of Employment Services for street and alley closing applicants.

If you need additional information regarding the First Source Employment Agreement, please contact Anetta Graham on (202) 698-3757.

Attachments



SUB
PM

#537156



## Government of the District of Columbia
## FIRST SOURCE EMPLOYMENT AGREEMENT

Contract Number: Zoning Commission Case No. 11-09

Employer Name: Duball Petworth, LLC

Project Contract Amount: TBD

Employer Contract Award: TBD

Project Name: Petworth Safeway Redevelopment

Project Address: 3830 Georgia Avenue, NW     Ward: 4

Nonprofit Organization with 50 Employees or Less: ☐ Yes  ☒ No

This First Source Employment Agreement, in accordance with The First Source Employment Agreement Act of 1984 (codified in D.C. Official Code §§ 2-219.01 – 2.219.05), The Apprenticeship Requirements Amendment Act of 2004 (Codified in D.C. Official Code §§ 2-219.03 and 32-1431) for recruitment, referral, and placement of District of Columbia residents, is between the District of Columbia Department of Employment Services, hereinafter referred to as "DOES", and  Duball Petworth, LLC                                          , hereinafter, referred to as EMPLOYER. Under this Employment Agreement, the EMPLOYER will use DOES as its first source for recruitment, referral, and placement of new hires or employees for all new jobs created by the Project. The Employer will hire 51% District of Columbia residents for all new jobs created by the Project, and 35 % of all apprenticeship hours be worked by DC residents employed by EMPLOYER in connection with the Project shall be District residents registered in programs approved by the District of Columbia Apprenticeship Council.

I.     GENERAL TERMS

   A.   Subject to the terms and conditions set forth herein, the EMPLOYER will use DOES as its first source for the recruitment, referral and placement for jobs created by the Project.

   B.   The EMPLOYER will require all Project contractors with contracts totaling $100,000 or more, and Project subcontractors with subcontracts totaling $100,000 or more, to enter into a First Source Employment Agreement with DOES.

   C.   DOES will provide recruitment, referral and placement services to the EMPLOYER, which are subject to the limitations set out in this Agreement.

   D.   The participation of DOES in this Agreement will be carried out by the Office of Employer Services, which is responsible for referral and placement of employees, or such other offices or divisions designated by the Office of the Director, of DOES.

   E.   This Agreement will take effect when signed by the parties below and will be fully effective for the duration of the Project contract and any extensions or modification to the Project contract.

1

*Revised 3/11 for the Government of the District of Columbia*



SUB
PM

#537156

F.   This Agreement will not be construed as an approval of the EMPLOYER'S bid package, bond application, lease agreement, zoning application, loan, or contract/subcontract for the Project.

G.   DOES and the EMPLOYER agree that, for purposes of this Agreement, new hires and jobs created for the Project (both union and nonunion) include all EMPLOYER'S job openings and vacancies in the Washington Standard Metropolitan Statistical Area created for the Project as a result of internal promotions, terminations, and expansions of the EMPLOYER'S workforce, as a result of this project, including loans, lease agreements, zoning applications, bonds, bids, and contracts.

H.   This Agreement includes apprentices as defined and as amended, in D.C. Law 2-156. D.C. Official Code §§ 32-1401- 1431.

I.   The EMPLOYER, prime subcontractors and subcontractors who contract with the District of Columbia government to perform construction, renovation work, or information technology work with a single contract, or cumulative contracts, of at least $500,000, let within a 12-month period will be required to register an apprenticeship program with the District of Columbia Apprenticeship Council; and this includes but is not limited to, any construction or renovation contract or subcontract signed as the result of, a loan, bond, grant, Exclusive Right Agreement, street or alley closing, or a leasing agreement of real property for one (1) year or more. In furtherance of the foregoing, the EMPLOYER shall enter into an agreement with its contractors, including the general contractor, that requires that such contractors and subcontractors for the Project participate, in apprenticeship programs for the Project that: (i) meet the standards set forth in Chapter 11 of Title 7 of the District of Columbia Municipal Regulations, and (ii) have an apprenticeship program registered with the District of Columbia's Apprenticeship Council.

## II.   RECRUITMENT

A.   The EMPLOYER will complete the attached Employment Plan, which will indicate the number of new jobs projected to be created on the Project, salary range, hiring dates, residency status, ward information, new hire justification and union requirements.

B.   The Employer will post all job vacancies in the DOES' Virtual One-Stop (VOS) at www.jobs.dc.gov within five (5) days of executing the Agreement. Should you need assistance posting job vacancies, please contact Job Bank at (202) 698-6001.

C.   The EMPLOYER will notify DOES, by way of the First Source Office of its Specific Need for new employees for the Project, within at least five (5) business days (Monday - Friday) upon Employers identification of the Specific Need. This must be done before using any other referral source. Specific Needs shall include, at a minimum, the number of employees needed by job title, qualifications, hiring date, rate of pay, hours of work, duration of employment, and work to be performed.

D.   Job openings to be filled by internal promotion from the EMPLOYER'S current workforce do not need to be referred to DOES for placement and referral. However, EMPLOYER shall notify DOES of such promotions.

**2**
*Revised 3/11 for the Government of the District of Columbia*


SUB
[ ] PM

#537156

E.    The EMPLOYER will submit to DOES, prior to commencing work on the Project, the names, residency status and ward information of all current employees, including apprentices, trainees, and laid-off workers who will be employed on the Project.

### III.    REFERRAL

A.    DOES will screen applicants and provide the EMPLOYER with a list of applicants according to the Notification of Specific Needs supplied by the EMPLOYER as set forth in Section II (B).

B.    DOES will notify the EMPLOYER, prior to the anticipated hiring dates, of the number of applicants DOES will refer.

### IV.    PLACEMENT

A.    The EMPLOYER will make all decisions on hiring new employees but will, in good faith, use reasonable efforts to select its new hires or employees from among the qualified persons referred by DOES.

B.    In the event that DOES is unable to refer qualified personnel meeting the Employer's established qualifications, within five (5) business days (Monday - Friday) from the date of notification, from the EMPLOYER , the EMPLOYER will be free to directly fill remaining positions for which no qualified applicants have been referred. Notwithstanding, the EMPLOYER will still be required to hire 51% District residents for all new jobs created by the Project.

C.    After the EMPLOYER has selected its employees, DOES will not be responsible for the employees' actions and the EMPLOYER hereby releases DOES, and the Government of the District of Columbia, the District of Columbia Municipal Corporation, and the officers and employees of the District of Columbia from any liability for employees' actions.

### V.    TRAINING

A.    DOES and the EMPLOYER may agree to develop skills training and on-the-job training programs; the training specifications and cost for such training will be mutually agreed upon by the EMPLOYER and DOES and will be set forth in a separate Training Agreement.

### VI.    CONTROLLING REGULATIONS AND LAWS

A.    To the extent that this Agreement is in conflict with any federal labor laws or governmental regulations, the federal laws or regulations shall prevail.

B.    DOES will make every effort to work within the terms of all collective bargaining agreements to which the EMPLOYER is a party.

C.    The EMPLOYER will provide DOES with written documentation that the EMPLOYER has provided the representative of any collective bargaining unit involved

3

*Revised 3/11 for the Government of the District of Columbia*



] SUB
1 PM
#537156

with this Project a copy of this Agreement and has requested comments or objections. If the representative has any comments or objections, the EMPLOYER will promptly provide them to DOES.

VII.    EXEMPTIONS

A.    All contracts, subcontracts or other forms of government-assistance less than $100,000.

B.    Employment openings the contractor will fill with individuals already employed by the company.

C.    Job openings to be filled by laid-off workers according to formally established recall procedures and rosters.

D.    Construction or renovation contracts or subcontracts in the District of Columbia totaling less than $500,000 are exempt from the requirements of Section I(H) and I(I) of the General Terms hereof.

E.    Non-profit organization with 50 or less employees are exempt from the requirements.

VIII.    AGREEMENT MODIFICATIONS, RENEWAL, MONITORING, AND PENALTIES

A.    If, during the term of this Agreement, the EMPLOYER should transfer possession of all or a portion of its business concerns affected by this Agreement to any other party by lease, sale, assignment, merger, or otherwise this First Source Agreement shall remain in full force and effect and transferee shall remain subject to all provisions herein. In addition, the EMPLOYER as a condition of transfer shall:

     1.    Notify the party taking possession of the existence of this EMPLOYER'S First Source Employment Agreement.

     2.    Notify DOES within seven (7) business days of the transfer. This advice will include the name of the party taking possession and the name and telephone of that party's representative.

B.    DOES will monitor EMPLOYER'S performance under this Agreement. The EMPLOYER will cooperate with the DOES monitoring and will submit a Contract Compliance Form to DOES monthly.

C.    To assist DOES in the conduct of the monitoring review, the EMPLOYER will make available to DOES, upon request, payroll and employment records for the review period indicated for the Project.

D.    The Employer will provide DOES additional information upon request.

E.    With the submission of the final request for payment from the District, the EMPLOYER shall:

6
*Revised 3/11 for the Government of the District of Columbia*



SUB
PM
MCB
#537156

1. Document in a report to DOES its compliance with the requirement that 51% of the new employees hired by the EMPLOYER for the Project be District residents; or

2. Submit to DOES a request for a waiver of compliance of the requirement that 51% of the new employees hired by the EMPLOYER the Project be District residents which will include the following documentation:
   a. Documentation supporting EMPLOYERS good faith effort to comply;
   b. Referrals provided by DOES and other referral sources; and
   c. Advertisement of job openings listed with DOES and other referral sources.

F. The DOES may waive the requirement that 51% of the new employees hired by the EMPLOYER for the Project be District residents, if DOES finds that:

1. A good faith effort to comply is demonstrated by the EMPLOYER; or

2. The EMPLOYER is located outside the Washington Standard Metropolitan Statistical Area and none of the contract work is performed inside the Washington Standard Metropolitan Statistical Area:

   The Washington Standard Metropolitan Statistical Area includes the District of Columbia, the Virginia Cities of Alexandria, Falls Church, Manasas, Manassas Park, Fairfax, and Fredericksburg; the Virginia Counties of Fairfax, Arlington, Prince William, Loundon, Stafford, Clarke, Warren, Fauquier, Culpeper, Spotsylvania, and King George; the Maryland Counties of Montgomery, Prince Georges, Charles, Frederick, and Calvert; and the West Virginia Counties of Berkeley and Jefferson.

3. The EMPLOYER enters into a special workforce development training or placement arrangement with DOES; or

4. DOES certifies that there are insufficient numbers of District residents in the labor market possessing the skills required by the EMPLOYER for the positions created as a result of the Project. No failure by Employer to request a waiver under any other provision hereunder shall be considered relevant to a requested waiver under this Subsection.

G. Willful breach of the First Source Employment Agreement by the EMPLOYER, failure to submit the Contract Compliance Report, or deliberate submission of falsified data, may be enforced by the DOES through imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract for the positions created by EMPLOYER.

H. The parties acknowledge that the provisions of E and F of Article VIII apply only to First Source hiring.

I. Nonprofit organizations with 50 or less employees are exempt from the requirement that 51% of the new employees hired by the EMPLOYER on the Project be District residents.

5

*Revised 3/11 for the Government of the District of Columbia*

[ ] SUB
[ ] PM

#537156

J.    The EMPLOYER and DOES, or such other agent as DOES may designate, may mutually agree to modify this Agreement.

K.    The EMPLOYER's noncompliance with the provisions of this Agreement may result in termination.

IX.    LOCAL, SMALL, DISADVANTAGES USINESS ENTERPRISE

A.    Is your firm a certified Local, Small, Disadvantaged Business Enterprise (LSDBE)? ☐ YES ☒ NO

If yes, certification number: _____

X.    APPRENTICESHIP PROGRAM

A.    Do you have a registered Apprenticeship program with the D.C. Apprenticeship Council? ☐ YES ☒ NO

If yes, D.C. Apprenticeship Council Registration Number: _____

XI.    SUBCONTRACTOR

A.    Is your firm a subcontractor on this project? ☐ YES ☒ NO
If yes, name of prime contractor: _____

Dated this ____ 21st ____ day of ____ June ____ 20 11

_____    _____
Signature Dept. of Employment Services    Signature of Employer

President of Duball, LLC as Managing member of Duball Peterson, LLC

Name of Company

11111 Sunset Hills Road, Suite 200, Reston, VA 20190

Address

703-234-5631

Telephone

Dubickm@duball-llc.com

E-mail

6
*Revised 3/11 for the Government of the District of Columbia*


SUB PM
MCB
#537156

## EMPLOYMENT PLAN

NAME OF EMPLOYER: Duball Petworth, LLC

ADDRESS OF EMPLOYER: 11111 Sunset Hills Road, Suite 200, Reston, VA 20190

TELEPHONE NUMBER: 703-234-5631  FEDERAL IDENTIFICATION NO.: 27-3864634

CONTACT PERSON: Marc A Dubick   TITLE: President of Duball, LLC as Managing Member of Duball Petworth, LLC

E-MAIL: Dubickm@duball-llc.com  TYPE OF BUSINESS: For profit development company

DISTRICT CONTRACTING AGENCY: Office of Planning

CONTRACTING OFFICER: Stephen Cochran  TELEPHONE NUMBER: 202-442-8806

TYPE OF PROJECT: Planned Unit Development  CONTRACT AMOUNT: TBD

EMPLOYER CONTRACT AMOUNT: TBD

PROJECT START DATE: Spring 2012   PROJECT END DATE: Spring 2014

EMPLOYER START DATE: TBD    EMPLOYER END DATE: TBD

**NEW JOB CREATION PROJECTIONS:** Please indicate ALL new position(s) your firm will create as a result of the Project. If the firm WILL NOT be creating any new employment opportunities, please complete the attached justification sheet with an explanation. Attach additional sheets as needed.

| | JOB TITLE | # OF JOBS F/T PART T | SALARY RANGE | UNION MEMBERSHIP NAME/LOCAL | PRODUCT # | PROJECTED HIRE DATE |
|---|---|---|---|---|---|---|
| A | See exhibit A | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |
| I | | | | | | |
| J | | | | | | |
| K | | | | | | |

7
Revised 3/11 for the Government of the District of Columbia



SUB
PM
MCB
#537156

## Exhibit A

## NEW JOB CREATION PROJECTIONS

### GENERAL CONTRACTOR

The hiring needs of the general contractor have not yet been determined for the Project. All contractors involved in contracts equal to or greater than $100,000 will be required to comply with the requirements of this Employment Agreement.

### SUB-CONTRACTORS

All sub-contractors involved in contracts equal to or greater than $100,000 will be required to comply with the requirements of this Employment Agreement.



#537156

**CURRENT EMPLOYEES:** Please list the names, residency status and ward information of all current employees, including apprentices, trainees, and transfers from other projects, who will be employed on the Project. Attach additional sheets as needed.

| NAME OF EMPLOYEE | CURRENT DISTRICT RESIDENT √Please Check | WARD |
|---|---|---|
| SEE BELOW(1) | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |
| | ☐ | |

(1) The general contractor has not yet determined the staffing requirement for this Project. All contractors and sub-contractors will be required to comply with the Employment Agreement.

8
*Revised 3/11 for the Government of the District of Columbia*



SUB
PM

#537156

JUSTIFICATION SHEET: Please provide a detailed explanation of why the Employer will not have any new hires on the Project.

END OF EXHIBIT "9"

9

Revised 3/11 for the Government of the District of Columbia



SUB
PM
MCB
#537156

EXHIBIT "10"

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

**GENERAL:**

1. We assume the Owner will pay all local fees including, but not limited to, tap fees, connection fees, power company fees (or other such utility), system development charges, lost parking meter revenue fees, water meter fees, testing and inspection fees, and obtain all necessary approvals. Permit Fees and Permit Expediting costs for permits, similar but not limited to, site work permits, building permits and final Certificate of Occupancy Permits have not been included in the cost of the work. We have not included public improvement bonds of any type, nor other fees or costs for which developers are typically responsible. We have included subcontractor inspection permits and municipality fees required for temporary power, temporary water and the construction trailer as necessary for the performance of the work.

2. We have assumed that equal or better alternate manufacturers, systems, and practices will be allowed for certain items and products. It is also assumed that the specifications are considered open and competitive with no proprietary restrictions. In the event that the bid specifications are silent to a design, we have included specifications that are typical on an apartment project of this type or as detailed in our proposal and qualifications. If there is a conflict with design intent then we will work with the Owner and Designer to adjust such requirements in a manner that is consistent with our proposal and industry standards.

3. Unless stated below or otherwise required by the contract documents, we have assumed manufacturer's standard colors, patterns, and finishes.

4. We have included certain allowances within this proposal. These allowances are for labor, material, equipment, profit, shipping and other costs associated with, or related to the work covered by such allowance, unless otherwise noted.

5. We have not included the cost of a General Contractor Payment & Performance bond nor for Builders Risk Insurance. We have assumed that the Owner will provide an acceptable Builder's Risk insurance policy, with a deductible not to exceed five thousand dollars, for the project.

6. Our price is based upon an 'open shop' environment. In the event any requirements relating to organized labor are imposed upon the Contract, or encountered by the Contractor, the Contractor shall be entitled to proceed in accordance with Article 14.1 of the General Conditions of the Construction Contract.

7. The owner is responsible for and our proposal anticipates the complete installation, connection, and energizing of the permanent power on or prior to a target date (see Project Schedule). If this date is not met for any reason, it may result in a delay to the completion of the project, and / or additional project cost. The owner will issue a change order for the delays and costs associated.

8. We have not included participation in any mandatory socio-economic hiring program or Federal Davis-Bacon Wage Scale unless noted below:

   a. First Source – The provisions of the "old" First Source Agreement are included in this contract, and no provisions for the "new" First Source Agreement have been included.

9. Items considered FF&E and by Owner, including but not limited to the following, are not included:

   a. Moveable Landscape Furniture

   b. Residential Furniture

   c. Leasing Office Furniture

   d. Safelok System

1 of 13



#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

10. We have assumed that adequate access to the site will be provided in order to conduct construction activities in one continuous operation to completion.

11. We have not included parking meter removal and/or reinstallation.

12. It is assumed the CAD backgrounds to all construction documents will be provided free of charge by the owner to BCC for shop drawings as long as the appropriate consultant waivers are signed.

### DIVISION 2 - SITEWORK:

1. We have not included steel, concrete or geotechnical testing for the Work. This is assumed "By Owner".

2. It is assumed that the geo-technical report recommendations have been incorporated into the contract drawings. While we have reviewed the geo-technical report for reference, our price and scope of work is limited to what is on the contract drawings and specifications.

3. BCC acknowledges that per the Geotech report the hauling off of soils is required. Our pricing is based on excluding any work associated with the handling, transporting, disposing or containment of asbestos, oil, gasoline, Freon, lead, PCB's or other solid, liquid, gaseous or thermal irritant or contaminant. Pumping of casual surface water only is included. Minor dewatering (using a 2-inch pump) is included. Pumping or dewatering of the site relative to water table is not included. The Owner shall pay any costs incurred for dewatering requiring a pump larger than two (2) inches. We have assumed that the onsite soils are adequate to support the proposed development and suitable for use in structural fills without the use of mechanical or chemical manipulation.

4. The Contractor will coordinate the activities of the public utility contractors while they are on-site (gas, phone, electric and cable television, etc.). The Owner shall pay all design and connection fees for the installation of the primary service, procure the designs, execute necessary agreements, obtain required approvals in a timely manner, and schedule their work to take place so that the Contractor may perform the work in a normal sequence and in a timely manner.

5. Our pricing includes drilled piles.

6. Any and all utility work is assumed to be performed during normal work hours or within standard DDOT approved work hours of 9:30am to 3:30pm. Any restricted work hours, required night-tapping and other after-hours work has been excluded.

7. It is assumed that the base-paving course has been designed to adequately support / withstand construction loading. The Owner will be responsible for all costs associated with repairs to asphalt damaged due to construction traffic loading.

8. Maintenance and watering of landscape areas after Substantial Completion of the project has been excluded.

9. The Contractor will demo the existing Safeway store. This includes slab on grade, and foundations. The capping of all utilities and all abatement will be performed by the owner.

10. We have assumed the existing granite curb will be removed and reused, if possible.

11. Video and/or recording of the existing storm/sanitary laterals are excluded.

12. Pedestal pavers are to be 24"x24"x2" Hanover Concrete Pavers with the Tudor finish. We have assumed this as landscape section and plan views do not reference any specific material selection. We have based our pricing on detail 22/LA.51.

2 of 13



SUB
PM

#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

13. Site tables as shown on 4/L4.02, 6/L44.51, and 7/L4.51 are excluded and by Owner.

14. Rigid insulation at landscaped areas on the structure (i.e. courtyard) is to be 25 psi whiteboard. This is located under the soil, and decorative stone.

15. We have excluded the wood top on the round concrete tables and benches. We have provided a precast top instead.

16. Irrigation system for the courtyard and café area is to be fed by the domestic water supply only. The cistern will supply water only for the panhandle irrigation and will have a backup domestic water supply.

17. Work listed as (By Others) in the landscape drawings is not included. Listed items include but are not limited to, twin-20 streetlights, bus pad, litter baskets, pendant post streetlight, traffic signal pole, etc. We have included the (3) DC #16 streetlights shown on L1.11 along Randolph Street.

18. We have included approximately 524 SY of mill and overlay along Randolph Street as shown on civil drawings 5 of 21. Included in this total are approximately 2' (95 SY total) along the granite curb on Randolph Street. We have assumed a standard "DC paving mix" will be used and have included the removal of the temporary patch, and placement of a 10" concrete base with plates for the 48 hour curing period.

19. VE Item #1 – To furnish an alternate soil material at the elevated decks (Courtyard and Residential Roof Deck). Soil is to be 70% top soil and 30% compost.

20. VE Item #4.01 – For the Courtyard wood Pro Wood Microshades decking shall be used in lieu of Ipe.

21. VE Item #5 – The use of quart sized planting shall be used in lieu of gallon sized plantings

DIVISION 3 - CONCRETE:

1. Post tension beams are assumed to have 540 kips of post-tension per beam as no schedule was provided.

2. Garage drive isle ramp is assumed to be 8" of concrete with 8" of stone base and welded wire mesh. Details are unclear as to exact profile of the ramp.

3. Drain tile is included at the interior of the perimeter of the building only. Interior drain tile is not shown.

4. VE Item #14 – At slab on grade only a 6 mil. vapor barrier (S211 note 1) will be used in lieu of the 15 mil. vapor barrier (S101 Cast In Place notes).

5. VE Item #16 – 1/8" sound mat will be used in lieu of ¼" under the gyperete at all hard surfaces in the dwelling units (kitchens, baths, living rooms/dining rooms). The gyperete is to be ¼"

DIVISION 4 – MASONRY:

1. Masonry brick types and Cast stone materials are included per the "Petworth Safeway with Residences – Product Selections" dated 2/8/2012.

2. Due to discrepancies in main elevations and enlarged elevations, brick type six (6) is excluded and has been included as brick type three (3) per detail A7/A610. Enlarged elevations differ and are assumed to take precedence. We see no other place on the project where brick type six is used.

3 of 13



#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

3. All brick returns at windows have been included.

4. Perma-a-barrier flashing with stainless steel drip edge will be used in lieu of the specified stainless steel flashing.

5. VE Item #22 – Row-lock sills and soldier course head at all openings on South and West walls in lieu of cast stone. Only included at Residential levels.

6. VE Item #26 – The cap and veneer at interior courtyard 4' planter wall only to be double rowlock tops and brick veneer specified brick #2.

**DIVISION 5 – METALS:**

1. Corner guards at the drive aisle of the garage are to be standard size.

2. Pipe protection at the garage standpipes is not shown. We have included twenty (20) in our pricing.

3. A metal pan stair and metal railings at residential lobby to mezzanine level is included as no details are shown.

4. Galvanized hung shelf angles are included as shown on A628 and A630 and only at the 2nd floor locations.

5. Hung angles above all overhead door and loading dock entries locations have been assumed.

6. SWY stair #1 & #2 support legs or hangers to support the intermediate platforms are included, none are shown.

7. Balcony railings (type 1 & 2) are to be baked enamel. Finish meets AAMA 2603. Colors to be selected are standard white, black, clay, or bronze.

8. Garage grate as detailed on A644 includes aluminum channel as detailed with interstitial 1.8" posts, and 2 x 2 woven mesh. Colors to be selected to match balcony railings as white, black, clay, or bronze.

9. Tube steel at storefront is included per detail on S302. Added reinforcement for the storefront, to tie back to the tube steel or precast, is not shown therefore is excluded.

10. VE Item #8.01 – The arbor located at on the panhandle courtyard and detailed on 2/L1.21 and detailed on 12/L4.21 has been excluded.

11. VE Item #47 – The metal canopy located at the Randolph Street residential entrance has been excluded.

12. VE Item #131 – The (3) sets of railings between columns E & D on 1/A502 East Elevation have been excluded/deleted. AAP iRail aluminum railings (2.5" posts, .75" vertical pickets) only at the courtyards.

**DIVISION 6 – CARPENTRY:**

1. All interior trim to be paint grade, with the following profiles:

   a. Base – WM-663

   b. Shoe Molding – WM-1276

   c. Window Stool – WM-1021

4 of 13



SUB PM
mc
#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

    d.  Door Casing, Slider Casing and Window Apron – WM-376

2.  All windows will have a drywall return at the interior.

## DIVISION 7 – THERMAL AND MOISTURE PROTECTION:

1.  Roofing:

    a.  The four (4) RTU's on the main roof top are assumed to have typical curb and flashing.

    b.  VE Item #33.02 – A 60 mil mechanically attached TPO roof system will be installed in lieu of fleece back PVC roof system.

2.  Siding:

    a.  All Hardie products are to be ColorPlus.

    b.  All trim around vinyl windows is to be PVC.  Enlarged elevations are assumed to govern.

    c.  Material for the Axon brackets at the roof (detail F4/A621) are not called out therefore we have included them as PVC.

    d.  VE Item #31 – Hardi trim will be used at trim widths of 12" and less in lieu of PVC trim.  PVC trim to be used at areas with trim widths over 12"

3.  EIFS:

    a.  Due to discrepancies between the main elevations and enlarged elevations, bands at the perimeter of the panel at the bottom of the 3rd and 6th floors are to be EIFS.

4.  Insulation:

    a.  Insulation at floor ceiling assemblies between unit and at residential corridors is detailed as optional and therefore has been excluded.

    b.  Insulation is assumed at bays of the steel studs at retail and storefront areas.

## DIVISION 8 – DOORS, WINDOWS AND HARDWARE:

1.  Doors:

    a.  VE Item #38.03 – Flush stain grade wood unit entry doors, particle core, plain sliced white birch, prefinished in lieu of one panel paint grade Supa wood doors.

    b.  VE Item #57 – The FG-01 swing doors located at the balconies of units E1 and F1 have been deleted and are being replaced with window type H-12A.

2.  Hardware:

    a.  Saflok Insync unit entry locks are FF&E and by Owner thus they are not included.  A lever lock set is included at each unit entry.

    b.  VE Item #39 – Schlage grade 1 B60NF deadlocks shall be used at unit and corridor mechanical rooms (UM1) in lieu of Best Grade 1 #8T3.

    c.  VE Item #132 – Change the Schlage F series LAT hardware to Dexter Solstice by Schlage J series

3.  Overhead Doors:

5 of 13



#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

a. Coiling doors are to be 18 gauge F-265 flat non-insulated slats with ¼" clear laminated glass.

b. Sectional doors include 2" low headroom track with ¼" clear laminated glass.

c. Manufacturer's standard one (1) year warranty is included, special warranty is excluded.

d. Transmitter/remote controls on sectional doors have been excluded as no count was specified.

e. Acoustical Isolation on coiling doors has been excluded as this will void the door warranty.

f. Specified auxiliary items on coiling doors have been excluded as none are shown.

g. The following doors have been included as no details were provided:

    a. EG1GE - (1) – Parking Garage – approx. 22'-0"x10'-0" - motor operated, non-insulated coiling door

    b. GISID - (1) - Retail Loading Dock – approx. 4'-8"x7'-0" - motor operated, non-insulated coiling door

    c. GISIB - (1) - Retail Loading Dock – approx. 8'-0"x8'-0" - motor operated, non-insulated coiling fire door

    d. GISIB - (1) - Retail Loading Dock – approx. 8'-0"x8'-0" - motor operated, non-insulated coiling fire door

    e. GIRLH - (1) – Residential Loading Hallway/Door – approx. 8'-0"x8'-0" - motor operated, non-insulated coiling fire door

    f. GIRTB - (1) – Residential Trash/Recycle – approx. 8'-0"x 8'-0" - motor operated, non-insulated coiling fire door

4. Aluminum Storefront / Vinyl Windows

    a. Aluminum Storefront – Residential/Retail:

        (1) All the exterior aluminum Storefront system to be manufactured by YKK-AP America, Inc. or equal.

        (2) Glass and glazing of all the vision glass with one (1) inch clear Solar Ban 60 Low-E insulated glass and tempered where required by code.

        (3) Glass and glazing of all aluminum sliding doors with ¼" clear tempered glass at the entry-level doors.

        (4) We have included custom XL 3 coat kynar paint aluminum finish.

        (5) VE Items #47.3 – A single mullion storefront system will be used in lieu of a double mullion system shown on detail A1/A633.

        (6) VE Item #53 – The impact resistant doors at courtyard and roof have been deleted and replaced with standard doors

    b. Vinyl Windows:

        (1) We have provided vinyl windows in lieu of aluminum. Crystal 300 series vinyl windows, Crystal 1500 vinyl sliding glass doors and Sunview series Essex balcony doors; however, we reserve the right to substitute alternate manufacturers with specifications equal or greater than those models specified above.

        (2) All glass that is furnished will be argon filled with low-E coating.

6 of 13


#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

    (3) We have included a beige finish.

    (4) Our proposed window has a minimum STC rating of 28.

**DIVISION 9 – FINISHES:**

1. Common Areas

    a. Engineered Wood Flooring is assumed at the Club Room.

    b. Vinyl Composition Tile – Armstrong Excelon is included at the mechanical closets in the corridors, as nothing was specified.

    c. VE Item #66 – Corridor carpet is to be Bigelow – "Map it Out" line (32oz)

2. Residential Units

    a. Ceramic Tile – three (3) inch by six (6) inch Dal Tile at the tub/shower surrounds. Ceramic Tile to extend 6'-0" above finish floor.

    b. VE Item #59 – All waterproofing membrane below floor tile at unit bathrooms has been excluded except at the 2nd floor concrete podium.

    c. VE Item #63 – Soundmat,(Acousti-Mat LP installed under gypcrete) at carpeted areas in bedrooms has been excluded.

**DIVISION 10- SPECIALTIES:**

1. Bath Accessories in the units are to be Gatco Latitude II series. Clarifications to specification deviations are below:

    a. Medicine cabinets are excluded.

    b. Curved shower rods have been included.

    c. VE Item #70 & 71 – Grab bars are to be the standard 1 ¼" diameter concealed screw, stainless steel in lieu of the specified brass finish, in units and common areas.

2. Fire Extinguishers:

    a. Extinguishers are manufactured by Buckeye Fire Equipment or equal. We have included sixteen (16) at the garage and forty-six (46) at the common areas as none are shown.

    b. Cabinets are Strike First 228-SN or equal, 20-gauge steel, recessed, and fire-rated as required maintaining the wall rating.

    c. Extinguishers are 10lb ABC.

3. Signage:

    a. Interior safety and egress signage to meet code minimum is included. This consists of room numbers, room names and interior information signage

    b. All exterior signage, with the exception of the parking garage signage, is excluded.

**DIVISION 11 – APPLIANCES / EQUIPMENT:**

7 of 13



#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

1.  We reserve the right to, at any time and for any reason such as availability or cost, substitute alternate appliances with specifications equal or greater than those models specified below.

2.  VE item 73.12 – The following items are included for the appliance package:

   a.  We have included furnishing and installing the following Appliances in the standard and ADU – all appliances stainless steel unless noted otherwise:

      (1)  Washer/Dryers - GE # GTUN275E e-star, white

      (2)  Refrigerator - GE # GTL21KBZ 21 cf, clean steel, e-star

      (3)  Range - GE # JBP66SM

      (4)  Dishwasher - GE # GSD3360 e-star, ss, 5 cycle 3 opt.

      (5)  Garbage Disposer - GE # GFC325 1/3 HP

      (6)  Microwave - GE # JVM1740S 1.7 cf

   b.  We have included furnishing and installation each of the following Appliances in the standard ANSI and ADU ANSI units – all appliances stainless steel unless noted otherwise:

      (1)  Washers - GE # WCVH4800; 24" front load in white

      (2)  Dryers - GE # DSKS433; 24" front load in white

      (3)  Wall Mount Stack Kit – GE#WMK35 (for all ANSI units)

      (4)  Refrigerator - GE # GTL21KBX 21 cf, clean steel, e-star

      (5)  Range - GE # JSP42S 30" slide in self-clean

      (6)  Microwave - GE # JEB1860S, 1.8 CF countertop

      (7)  Hood - GE # JV536H

      (8)  Dishwasher – GE # GLDT696D e-star

      (9)  Garbage Disposer - GE # GFC325 1/3 HP

   c.  We have included furnishing and installation each of the following Appliances in the standard studio and ADA studio units – all appliances stainless steel unless noted otherwise:

      (1)  Washer/Dryers - GE # GTUN275E; in white

      (2)  Refrigerator - GE # GTK18IC, 18 cf., top freezer, clean steel

      (3)  Range - GE # JBP66SM

      (4)  Microwave - GE # JES1142S

      (5)  Hood - GE # JV536H Profile

      (6)  Dishwasher – GE # GSD3360, e-star, 5 cycle 3 opt

      (7)  Garbage Disposer - GE # GFC325 1/3 HP

   d.  We have included furnishing and installation each of the following Appliances in the standard studio ANSI units – all appliances stainless steel unless noted otherwise:

      (1)  Washers – GE # WCVH4800; in white

      (2)  Dryers - GE # DSKS433; in white

8 of 13

[   ] SUB
[   ] PM
#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

    (3) Wall Mount Stack Kit – GE#WMK35

    (4) Refrigerator - GE # GTK18IC, 18 cf., top freezer, clean steel

    (5) Range - GE # JSP42S 30" slide in self-clean

    (6) Microwave - GE # JES1142S

    (7) Hood - GE # JV536H Profile

    (8) Dishwasher – GE # GLDT696D, e-star, ADA

    (9) Garbage Disposer - GE # GFC325 1/3 HP

e.  We have included furnishing and installation each of the following Appliances in the Common Area and Courtyard:

    (1) Under counter Refrigerator: ZDBR240, stainless trim glass door.

    (2) Under counter Refrigerator: ZIFS240, stainless steel.

    (3) Under counter Icemaker: ZDIS150, stainless steel.

    (4) Seal Drain Pump Kit ZPK1

    (5) Microwave Drawer: JEB1860D, black.

    (6) Refrigerator: GE GDSC3KCY, black.

    (7) Countertop Microwave: GE PEM31DMBB, black.

    (8) Dishwasher: GE PDW1800NSS, stainless steel.

    (9) Dishwasher: GE GLDA696MBB, black.

    (10) Garbage Disposal: Insinkerator Badger 5XP

## DIVISION 12 – CABINETS & WINDOW TREATMENT:

1. Cabinets:

    a.  Birch flat panel, Shaker style cabinets are included in kitchens and bathrooms respectively. Finish selection to be by Owner, choosing from manufacturer's standard colors.

        (1) VE Item # 77 – Non-Full Overlay doors will be used in lieu of the specified overlay doors.

        (2) VE Item #80 – Cabinets above the refrigerators have been deleted.

        (3) VE Item #81 – Plastic laminate countertops will be used in lieu of granite in all ADUs

    b.  We have included stainless steel undermount sinks at all kitchens and undermount ceramic sinks at all vanities.

2. Window Treatments:

    a.  VE Item #72.03 – We have included Bali Customisers (.006 gauge) to be used in lieu of Bali Classic (.008 gauge), at all dwelling unit windows and French doors. Springs Vertical blinds are included at sliding glass doors in the units.

9 of 13

] SUB
] PM

#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

b. Clubhouse and Common Area window treatments are assumed to be FF&E by Owner and are not included.

## DIVISION 14 – ELEVATORS:

1. Our pricing includes furnishing and installing elevators with the following characteristics:

   a. Safeway Elevators:

      (1) Elevators 1, 2, and 3 cab finishes are per Specifications section 14 20 10-2.02-D-Lines 4-6.

      (2) Elevator 4 is per Specifications section 14 20 20-2.03.

      (3) Pricing includes eight (8) hours of regular time and four (4) hours of overtime for a standby technician during the Grand Opening or a Preview Party.

   b. Residential Elevators:

      (1) Pricing includes the Manufacturer's standard finishes for the cabs and stainless steel hoistway entrances as described below:

         (a) VE Item 93.1 – Baked enamel hoistway entrances in lieu of stainless steel shall be used at all entrances except at the following locations:

             (i) Georgia Avenue main Lobby (Residential Elevators 1 and 2)

             (ii) Georgia Avenue Mezzanine Level (Residential Elevators 1 and 2)

## DIVISION 14 - TRASH CHUTES:

1. Pricing includes a trash compactor with the following specifications:

   a. Chute Source Model AP 100.

   b. 5 HP motor.

   c. 14 gallon hydraulic tank.

2. Pricing includes four (4) steel two-cubic yard compaction containers and eight (8) 90-gallon recycling tote carts.

3. Pricing includes pneumatic push button chute intake doors to comply with new ADA standards, effective March 1, 2012.

4. VE Item #91.1 – The Perlite in the trash chute has been excluded.

## DIVISION 15 – HVAC:

1. We have assumed that the HVAC system may be modified slightly to achieve a more efficient layout and to co-ordinate with other trades. Such changes will be made consistent with a code-minimum design and per the approved Engineer drawings.

2. Pricing includes MERV 13 filters for air handling equipment per Specifications section 01 57 21-2.01.

10 of 13

SUB
PM

#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

3. Pricing includes uncertified testing and balancing at the dwelling units and certified testing and balancing at all common areas, which is in line with LEED Silver requirements, as the specifications were not clear.

4. VE Items #94 – Goodman equipment will be used in lieu of specified for all mechanical equipment.

5. VE Item #105 – Alternate equipment manufacture to be used in lieu of the specified equipment for all roof-top units.

DIVISION 15 – PLUMBING:

1. We have assumed that the layout of the plumbing may be modified slightly to allow for a more efficient layout and riser system and to coordinate with other trades. Such changes shall be made consistent with a plumbing code minimum design. Where plumbing design details are missing from the Contract Documents we have assumed that a plumbing code minimum design installation will be used.

2. The building water meter will be furnished by the Owner and installed by the plumber.

3. We assume all gas meters are furnished and installed by Washington Gas.

4. Pricing includes below grade and above grade sanitary and storm sewer piping as schedule 40, solid wall PVC.

5. Forty (40) gallon water heaters at all the one bedroom dwelling units and fifty (50) gallon water heaters at all the two bedroom dwelling units are included. The Electric Water Heater Schedule, on P500, listed the exact same specifications for EWH-1 and EWH-2. It is assumed one of the EWH tags is to be a 50 gal. water heater rather than both tags being the exact same 40 gal. water heater.

6. The gas system pressure is assumed to be 2 psi or higher.

7. We assume that any water piping within the Safeway shell and residential building do not require heat trace.

8. Seismic restraints for plumbing piping and equipment per Specifications section 22 05 48 are not included.

9. VE Item #98 – Pricing includes a code minimum requirement for the insulation of all exposed plumbing lines. We have included the insulation of water lines exposed to freezing and at all horizontal roof drain lines only.

10. VE Item #100 – CPVC shall be used for all domestic water lines throughout in lieu of copper.

11. VE Item #103 – PVC sewer lines servicing the residential units and PVC storm lines shall be used in lieu of no hub cast iron at the Safeway.

12. VE Item #106 – Pro Flo PF210CPWS lavatory faucet will be used in lieu of the specified Moen L64621.

13. VE Item #107 – Pro Flo PF3001 valve and PF7611SCP tub trim in lieu of the specified Moen M62320 valve and M2353 trim.

14. VE Item #109 – Pro Flo PFXC6011CP kitchen faucet in lieu of the specified Kohler 10433.

DIVISION 15 – FIRE PROTECTION:

11 of 13



#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

1. The sprinkler spacing and head locations will be in accordance with the manufacturer's listing, local codes and the fire marshal approved sprinkler drawings.

2. Pricing excludes seismic restraints for fire suppression piping and equipment per Specifications section 21 05 48.

3. One (1) fire pump is included per the Specifications: 1,500 GPM, 75 HP, 208V, 3 PH.

4. Pricing includes the following pipe material:

   a. VE Item #85 – For all pipes 2 ½" and larger black steel schedule 10 shall be used in lieu of schedule 40 at Safeway store and residential units.

   b. VE Item #88 – Sprinklers shall be spaced a maximum of 400 sqft per head in lieu of the specified 130 sqft. per head.

   c. Parking Garages:

      i. VE Item #87 – Black steel schedule 40 shall be used in lieu of galvanized schedule 40 for all pipes sizes 1"-2" in the parking garages.

      ii. VE Item #87 – Black steel schedule 10 shall be used in lieu of galvanized schedule 40 for all pipe sizes 2 ½" or larger in the parking garages.

   d. CPVC pipe for the dwelling units.

**DIVISION 16 – ELECTRICAL:**

1. Where the requirements of the Contract Documents provide for an electrical design in excess of the minimum allowable by the applicable electrical code, we have assumed that a code minimum design / installation will be utilized.

2. All cabling within the wood framed structure is to be Romex.

3. The primary ductbank is assumed to be four (4) - 4" lay-in conduit, not concrete encased.

4. We assume the primary and secondary feeders are to be furnished and installed by Pepco.

5. Pricing includes aluminum SER feeders and sub feeders as allowed per Code and the Specifications.

6. We assume fifty (50) lf of four (4) - 2" conduit for the CATV/Verizon ductbank.

7. All work will be performed in accordance with NEC 2008.

8. Pricing for the power distribution has been priced per E401A and E402A which both depict conduit power distribution. We have excluded any and all bus duct power distribution.

9. VE Item #9 – Tivoli Litesphere LED string lighting with white light and clear globes at 12" o.c. will be used in lieu of the specified catenary fixture.

10. VE Item #114 – Biltmore Lighting Model #B542GU313-CH-27K will be used in lieu of the specified Type A – fluorescent in the dwelling units

11. VE Item #115 – Biltmore Lighting Model #B202-5LED-WH-CH will be used in lieu of the specified Type PL9 and WS-1 in the common areas

12. VE Items #117 – Amerlux Exterior Model #PT01/D154-TS20R will be used in lieu of the specified Types E in the courtyard

12 of 13

SUB
] PM

#537156

Petworth Safeway
Contractor Qualifications and Assumptions
October 4, 2012

13. We have excluded the RG6 homeruns from the dwelling units to the Telecom closets on the floors.

14. We have excluded the Cat5e homeruns from the dwelling units to the Telecom closets on the floors.

DIVISION 17 – ENTRY ACCESS:

1. One (1) year of maintenance and monitoring for all systems is included.
2. The entry access system includes an access control system to control entry into the residential area from the building exterior, Safeway shell, stairwells, and parking garages.
3. The entry access system includes controlled access to the residential parking garage overhead door through the use of a pedestal and key fobs.
4. Pricing includes an access control system to control entry into the Leasing/Management Office area and the Amenities area.
5. Seven (7) cameras for security with the capability of two (2) weeks of continuous recording are included.

- End of Contractor Clarifications -

END OF EXHIBIT "10"

13 of 13



#537156

Exhibit "11"

## Petworth Safeway

## Value Engineering Summary Sheet

| ITEM | CSI | DESCRIPTION |
|---|---|---|
| 1 | 2.01 | Alternate soil material at elevated decks (Courtyard and Residential Roof Deck). |
| 4.01 | 2.05 | Courtyard wood deck - ProWood Microshades decking ilo Ipe. |
| 5 | 2.06 | VE plantings - Quart sized plantings ilo Gallon sized plantings |
| 8.01 | 2.10 | Remove the arbor from the pan handle courtyard shown on 12/L4.21. Includes glass panel. |
| 9 | 2.11c | String lighting, white lights with clear globes at 12" o.c., in lieu of the specified catenary fixture |
| 11 | 2.13 | Demo Safeway building and abandon site utilities. |
| 14 | 3.02 | 6 mil. vapor barrier (s211 note 1) in lieu of 15 mil. vapor barrier (S101 Cast In Place notes) per geotech recommendations for all slab-on-grade. |
| 16 | 3.04 | 1/8" sound mat in lieu of 1/4", at dwelling unit hard surfaces (kitchens, baths, living rooms/dining rooms). |
| 22 | 4.01 | Furnish and install row-lock sills and soldier course head at all openings on South and West walls ilo cast stone. Includes façades C and D. Only included at residential levels. |
| 23.02 | 4.06 | Brick type 5 to be Watsontown Manhattan Regency Gray modular, non-glazed brick ilo Elign Butler Shadow Gray #4038 glazed brick. Cannot be take with 4.21. |

SUB
PM

#537156

## Petworth Safeway
## Value Engineering Summary Sheet

| ITEM | CSI | DESCRIPTION |
|---|---|---|
| 23.02 | 4.08 | Brick type 4 to be General Shale - Utility Size Dutch Chocolate Cored Face Brick ilo Hanson 212 utility - Includes Safeway brick; Cannot be taken with item 4.02. |
| 23.02 | 4.09 | Brick type 3 to be General Shale - Utility Size Flashed Northern Rose Cored Face Brick ilo Redland TM 801 utility. Cannot be taken with item 4.02, 4.16, 4.24, 4.27. |
| 23.02 | 4.10 | Brick type 1 to be General shale - Modular Size Full Range Smooth Cored Face Brick ilo Belden 470-479 modular at street facades. Cannot be taken with item 4.02, 4.23, 4.26. |
| 23.02 | 4.15 | Brick type 2 to be General Shale - Utility Size Flashed Range Radcliff Cored Face Brick ilo Continental 494 utility. Cannot be taken with item 4.02. |
| 26 | 4.12 | Convert cap and veneer at interior courtyard 4' planter wall only to double rowlock tops and brick veneer specified brick #2. Cannot be taken with 4.03, 3.08, 3.09, 3.10. |
| 31 | 7.02 | Hardie trim ilo PVC trim (at trim areas around windows). |
| 33.02 | 7.05 | 60 mil. Mechanically attached TPO roof system ilo fleeceback PVC roof system. |
| 39 | 8.05 | Furnish and install Schlage grade 1 B60NE deadlocks at unit and corridor mechanical |
| 47 | 5.04 | Delete Canopy at Randolph Street residential entrance - metal |
| 47.3 | 8.13d | Use single mullion at system perimeter ilo double mullions as shown on detail |
| 53 | 8.19 | Delete impact resistant doors at courtyard & roof. Replace with standard doors. |
| 57 | 8.23n | Delete the FG-01 swing doors at the balconies of units E1 and F1, and replace with |
| 59 | 9.02 | Delete waterproofing membrane at all floors except podium level. |
| 63 | 9.06 | Eliminate soundmat (Acousti-Mat LP installed under gypcrete) from carpeted areas in |
| 66 | 9.09 | Change corridor carpet to Bigelow - "Map it out" line (32oz) |
| 70 | 10.01 | Furnish and install standard 1-1/4" diameter concealed screw, stainless steel grab bars |
| 71 | 10.02 | Furnish and install standard 1-1/4" diameter concealed screw stainless steel grab bars |
| 72.03 | 10.05 | Furnish and install Bali Customisers (.005 gauge) ilo Bali Classic (.008 gauge). |
| 77 | 12.02 | Non- full overlay doors ilo full overlay doors |
| 80 | 12.06 | Delete all cabinets above the refrigerators so kitchens mimic the picture shown on |
| 81 | 12.07 | Use plastic laminate tops at the ADU's in lieu of granite |
| 85 | 13.05 | Piping sizes 2-1/2" and larger for the standpipe, Safeway store, and residential units |



#537156

Petworth Safeway
Value Engineering Summary Sheet

| ITEM | CSI | DESCRIPTION |
|------|-----|-------------|
| 87 | 13.07 | Piping in the parking garage shall be black steel schedule 40 for sizes 1"-2" in lieu of |
| 88 | 13.08 | Sprinkler head spacing in the garage shall be a maximum of 400 sq. ft. per head in |
| 93.1 | 14.09 | Baked enamel hoistway entrances ilo stainless steel - at all entrances, with exception |
| 94 | 15.01 | Alternate equipment manufacturer, Goodman in lieu of specified. Corridor air |
| 98 | 15.05 | Code minimum insulation. |
| 100 | 15.07 | CPVC domestic water lines throughout in lieu of the combination of CPVC and |
| 103 | 15.10 | PVC sewer lines servicing the residential units and PVC storm lines in lieu of no tub |
| 105 | 15.12 | Alternate equipment manufacturer for roof-top units. |
| 106 | 15.13c | ProFlo PF5210CPWS lavatory faucet in lieu of Moen L64621. |
| 107 | 15.14 | ProFlo PF3001 valve and PF7611SCP tub trim in lieu of Moen M62320 valve and |
| 109 | 15.16 | ProFlo PFXC601CP kitchen faucet in lieu of Kohler 10433 |
| 114 | 16.03 | Alternate light fixture at the dwelling units: Type A - flourescent |
| 115 | 16.04 | Alternate light fixtures at the common areas: Types PL-9 and WS-1. |
| 117 | 16.06 | Alternate light fixture at the courtyard: Types E. |
| 128 | 21.00 | ADU Finishes ilo of specified finishes - see email 7/11/12 from Duball |
| 131 | 5.05 | Keep perimeter railings as specified horizontal pickets, delete 3 set of railings between |
| 132 | 8.25 | change the voltage of select CTL modulate to the Dexter of damage T-Series marginally of T-Series |
| 135 | 4.23 | Brick type 1 to be Cunningham Modular Baystone, Coral, Sandstone or Tan Brick ilo Belden 470-479 modular at street facades. Cannot be taken with item 4.02, 4.10, 4.26 |
| 136 | 4.24 | Brick type 3 to be Cunningham Utility Baystone, Coral, Sandstone or Tan Brick ilo Redland TM 801 utility. Cannot be taken with item 4.02, 4.09, 4.16, 4.27 |
| 137 | 4.25 | Brick type 5 to be Cunningham Modular Smoke Gray Brick ilo Elign Butler Shadow Gray #4038 glazed brick. Cannot be take with 4.02, 4.06, 4.21. |
| 138 | 4.26 | Brick type 1 to be Watsontown, Broadway Smooth Ironspot ilo Belden 470-479 modular at street facades. Cannot be taken with item 4.02, 4.10, 4.23 |
| 139 | 4.27 | Brick type 3 to be Watsontown, Windsor, Type 8, Matt ilo Redland TM 801 utility. Cannot be taken with item 4.02, 4.09, 4.16, 4.24. |



JSEB
PM

#537156

## Petworth Safeway
## Value Engineering Summary Sheet

| ITEM | CSI | DESCRIPTION |
|------|-----|-------------|
|      |     | Flexible flashing with s/s drip in lieu of all stainless steel flashing |
| 140  | 4.28 | |

**End of Exhibit "11"**



#537156

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1172-025
DATE: 6/11/13

EXHIBIT "R"

STANDARD SUBCONTRACT RIDER FOR
THE Petworth Safeway with Residences PROJECT* FOR
DESIGN BUILD MECHANICAL CORPORATION, VA

The purpose of this Exhibit "R" is to make changes to the Contract No. 1172-025 dated 1/4/2013 between Bozzuto Building Company ("Contractor") and  Design Build Mechanical Corporation, VA ("Subcontractor") for the Scope of Work Plumbing and HVAC  for the Petworth Safeway with Residences project located at: 900 Randolph Street, N.W., Washington DC  20011.

Changes to the standard long form Subcontract Agreement are to be made are as follows:

ARTICLE 1.  SCOPE OF WORK

(Deletions):

b.   Subcontractor represents that it is fully qualified to perform this Agreement. Subcontractor hereby agrees that the Work will be performed in strict accordance with the Contract Documents as hereinafter defined in Article 2 and any Work not conforming to this Agreement's requirements, including substitutions not properly approved, may be considered defective. Subcontractor agrees to perform the Work to the full satisfaction of Contractor, the Inspecting Architect, and the Owner. Subcontractor shall commence the Work immediately when notified by Contractor and shall prosecute said Work in a good and workmanlike manner with due diligence and without delay.  The Subcontractor shall immediately repair or replace all defective Work upon discovery or notification by the Contractor.  The Contractor reserves the right to have any portion of the Work, which the Subcontractor has not been directed to proceed with or has not begun, accomplished by his own forces or by others.

ARTICLE 3.  CONTRACT SUM AND PAYMENT PROCEDURES

(Deletions/Additions):

c.   All invoices shall be supported to the extent required by the Contractor by affidavits, or other evidence satisfactory to Contractor, showing that all labor and material bills, taxes and all other indebtedness incurred by the Subcontractor for the Project up to and including the date of invoicing have been paid in full.  The Contractor may at its sole discretion withhold payments due the Subcontractor until satisfactory evidence of payment of all the Subcontractor's obligations has been accomplished. A Partial Waiver of Lien and Subcontractor's Affidavit shall be provided with each request for payment, including the current request for payment, and a Final Waiver of Lien and Subcontractor's Affidavit shall be submitted with request for final payment.  All Waivers of Lien and Subcontractor's Affidavits shall be in a format acceptable to the Contractor.

e.   Anything herein contained to the contrary notwithstanding, the Contractor reserves the right, at its sole discretion and without any fault or breach by Subcontractor, to make any payments directly to laborers, materialmen, subcontractors, sub-subcontractors, or any subcontractors or materialmen of any of them, for or on account of work performed or materials furnished under this Agreement.  If such payments are made in good faith and upon reasonable evidence of their validity, the Contractor shall have no liability to Subcontractor in connection therewith and shall deduct such payments from any balance owed to the Subcontractor.  Contractor shall notify subcontractor in writing, three (3) business days prior to making such payment.

h.   The Contractor may withhold amounts otherwise due under this Agreement or any other agreement between the parties to cover the Contractor's reasonable estimate of any costs or liability the Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement, or any other agreement between the parties.  For purposes of this paragraph, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and the Contractor or in a joint venture or other entity in which the Contractor has an ownership interest.  Appropriate adjustments to the withheld sums shall be made when the exact amounts owed are determined.

Design Build Mechanical Corporation, VA
SUB
PM

#537156

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1137-025
DATE: 6/11/13

## ARTICLE 4.  LIEN RIGHT

### (Additions/Deletions):

b.  To the extent that Subcontractor is paid to date, the work invoiced and approved, in accordance with the terms of this Agreement, Subcontractor will immediately discharge or cause to be discharged all liens, claims, or attachments which may be filed in connection with the Work and will hold Contractor harmless therefrom. If Subcontractor is paid to date for work invoiced and approved. Failure to comply with the requirements of this Article within a period of seven (7) days after receipt of written notice from the Contractor of any lien, claim or attachment that may have been filed in connection with the Work shall place the Subcontractor in default and entitle the Contractor to exercise any of its remedies, including the right to terminate this Agreement in accordance with the provisions of Article 13.

c.  In the event that the Subcontractor fails to pay and discharge when due, any bills or obligations of any kind or nature whatsoever incurred by the said Subcontractor by reason of or in the fulfillment of this Agreement, whether or not a lien or notice of lien has been or may be filed with respect thereto, which bills or obligations in the opinion of Contractor are proper, the Contractor, and with three (3) business days prior written notice to subcontractor, but at its sole option but without being obligated to do so, may pay all or any part of such bills or obligations. The Subcontractor hereby appoints the Contractor as agent and attorney-in-fact of the Subcontractor for the purpose of payment and discharging such bills and obligations, and the Contractor may deduct the amount of such bills as well as any expenses incurred in the payment of same, including interest, court costs and attorney's fees, from any sums due or to become due to the Subcontractor.  The Subcontractor hereby expressly waives any right of redress or recovery against the Contractor by reason of any act or omission of the Contractor while acting as such agent and attorney-in-fact of the Subcontractor.

## ARTICLE 6.  TIME IS OF THE ESSENCE

### (Additions/Deletions):

b.  Subcontractor agrees to conform with the progress schedule, which the Contractor shall issue.  This schedule shall allow the Subcontractor adequate time to complete his Work and, unless the Contractor is notified otherwise by the Subcontractor in writing within five (5) days of the receipt of the schedule, it shall be binding on the Subcontractor. The Contractor reserves the right to amend the progress schedule from time to time as the overall progress of the Project dictates, and, subject to the notice and response provisions in this Article 6.b, the Subcontractor hereby discharges the Contractor from any liability incurred on account of such changes.

c.  If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor and at its own cost and expense, work such overtime as may be necessary, in the opinion of the Contractor, to make up for all time lost and take all necessary measures to avoid delay in the completion of the Work and of the Project, and, in any case, Subcontractor shall be responsible for all loss, costs and damages incurred by the Contractor as a result of such delay, including but not limited to all delay damages assessed against the Contractor by the Owner.

## ARTICLE 7.  CHANGE ORDERS AND FIELD WORK ORDERS

### (Additions/Deletions):

b.  Subcontractor shall submit to the Contractor any requests or claims for adjustment in the price, schedule or other provisions of the Agreement for changes directed by the Owner or the Contractor, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents.  Said requests or claims shall be submitted in writing by Subcontractor within seven (7) business days of the date that Subcontractor knew or should have known that it had a claim for an adjustment or within such shorter time as may be necessary to allow the Contractor to comply with the applicable provisions of the Owner-Contractor agreement.  If the claim is not made within seven (7) business days or the appropriate shorter period, the claim is waived.  The Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including the Contractor.  Agreement adjustments shall be made only to the extent that the Contractor is entitled to relief from or must grant relief to the Owner and the Subcontractor has complied with this Article.  Further, each Agreement adjustment shall be equal only to Subcontractor's allocable share of any adjustment in the Contractor's contract with the Owner.  Subcontractor's allocable share shall be determined by the Contractor, after allowance of the Contractor's normal overhead and profit on any recovery and the Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, the Contractor and other subcontractors or persons with interests in the adjustment.  This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

Design Build Mechanical Corporation, VA
SUB
PM

#537156

d.   For changes ordered by the Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Amount. If Subcontractor considers any action or inaction by the Contractor other than a formal change order to be a change, it shall so notify the Contractor within three five (35) days of said action or inaction and seek a confirmation from the Contractor. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

## ARTICLE 9.  INSURANCE

**(Additions/Deletions):**

b.   Evidence of insurance coverages noted in Exhibit #5 shall be provided to the Contractor at least seven (7) days prior to the start of any work by the Subcontractor in the field.  Any failure to so provide such insurance coverage on behalf of the Contractor, the Owner or other parties shall not relieve this Subcontractor in any way of his responsibilities, obligations and indemnification of the Contractor and the Owner from any acts, damages, accidents, injuries, claims and the like, that occur at the Project site as a result of the operations and activities of this Subcontractor.  This Subcontractor agrees to indemnify, defend (with mutually agreeable counsel chosen by Contractor ), and hold harmless the Contractor and Owner in all respects thereto. Insurance shall be carried by this Subcontractor for the duration of the entire construction of the Project including The Guarantee Period.  All insurance provided by the Subcontractor on the Project is non-cancelable without first providing the Contractor with thirty (30) days advance notice by registered mail of said cancellation.  Failure to maintain insurance coverage as described herein and further set forth in Exhibit #5 shall be a breach of this Agreement by the Subcontractor.

## ARTICLE 11.  LOSS OR DAMAGE TO WORK

**(Additions/Deletions):**

a.   The Contractor shall not be responsible for loss or damage to equipment or materials belonging to the Subcontractor, except where incorporated or installed into the Project in a satisfactory manner in accordance with the provisions of this Agreement.  The Contractor shall not be responsible for loss or damage to materials, tools, equipment, or other personal property owned, rented, or used by the Subcontractor or anyone employed by it in the performance of the Work, unless such damage is the negligence or willful misconduct of the Contractor, however caused.

c.   Subcontractor shall protect its work, materials, tools and equipment against any loss or damage by fire, theft, accident or other cause.  In the event of any injury, loss or damage to Subcontractor, its agents or employees or to its work, materials, or equipment,  Subcontractor shall make no claim against Contractor by reason thereof, unless loss or damage are due to the negligence of Contractor.

## ARTICLE 12.  CLEANUP

a.   All debris resulting from the Work shall be removed from the Work areas by the Subcontractor to locations on the Project Site designated by the Contractor as and when instructed by the Contractor's Superintendent.  The Contractor shall have the right, where the Subcontractor fails to comply with its obligations under this Article, after 24 48 hours prior written notice, to accomplish the Subcontractor's cleanup with its own forces and equipment, and withhold the amount of all costs incurred in so doing from any amounts due the Subcontractor.

## ARTICLE 13. SUBCONTRACT'S FAILURE TO PERFORM OR DEFAULT

**(Additions/Deletions):**

a.   If, in the sole opinion of the Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the Work according to the Contractor's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of the Contractor or of any other contractor or subcontractor, (4) fail to comply with any provision of this Agreement or other Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days' written notice to Subcontractor and Subcontractor Surety(s) and the Subcontractor fails to eliminate the condition specified in that notice within the time allowed, the Contractor, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to the Contractor for all cost, expenses, and damages resulting therefrom, (ii) terminate this Agreement, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations

Design Build Mechanical Corporation, VA

#537156

hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to the Contractor and/or the Owner. In the event of termination by the Contractor, the Contractor may, at its option, (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method the Contractor may deem expedient. In case of termination by the Contractor, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full is made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the amount of all costs, expenses, and damages incurred by the Contractor including its reasonable overhead and profit, such excess shall be paid by the Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay the Contractor the difference immediately upon demand.

## ARTICLE 14. GUARANTEES

### (Additions/Deletions):

b.   The Contractor shall notify the Subcontractor of improper or defective work and shall  provide Subcontractor an opportunity to cure such defective or improper work. If the Subcontractor fails to commence and to diligently pursue to completion the repair or replacement of improper or defective work, as specified, within a reasonable period of time as determined by the Contractor in its sole discretion, the Contractor may proceed to arrange to have such work completed and do so by whatever method it may deem expedient and may charge the cost thereof against any monies due to the Subcontractor. If the unpaid balance of the Subcontract Amount shall exceed the expense of finishing the Work, including proper allowance for additional managerial and administrative expenses, such excess shall be paid to the Subcontractor. If such expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor immediately upon demand.

## ARTICLE 15. LABOR TO BE EMPLOYED/SUBCONTRACTOR REPRESENTATIVE

### (Deletions):

a.   Subcontractor understands that the Contractor, other subcontractors and/or other companies of the Owner may employ both Union and Non-Union workers at the Project. If required by the Contract Documents or specified in an Exhibit to this Agreement, Subcontractor agrees to employ Union labor.

b.e   The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work any person unfit for or not skilled in the work assigned to him. Subject to the foregoing and to preserving good relations with the public and requiring the discharge of any employees causing a breach of peace or other disturbance of said relations, the Contractor shall not in any way interfere with the Subcontractor's right to hire and fire its employees, assign duties to them, and fix their working hours, wages or terms and conditions of employment, which right shall be absolute. Exceptions to this provision shall apply in those instances where Federal, State or Local Agencies having jurisdiction over the Project dictate a level of prevailing wage or oversee and establish minimum working standards or establish non-working hours for the Project.

c.d   Subcontractor shall maintain a foreman on the job at all times with full authority and expertise to execute and direct the Subcontractor's Work in accordance with the Contract Documents and as directed by the Contractor's Superintendent. The Subcontractor shall notify the Contractor's Superintendent upon arrival and departure of the Subcontractor's men from the job site. The Contractor shall from time to time schedule job meetings, which shall be attended by an authorized representative of the Subcontractor with authority to make commitments, which shall be binding, on the Subcontractor.

d.e   Should the Subcontractor fail to carry out or comply with the provisions of this Article, it shall be in default and the Contractor shall have the right to terminate this Agreement in accordance with Article 13 hereof.

## ARTICLE 17. LIABILITY FOR DAMAGES AND INJURY

### (Deletions):

a.   Subcontractor shall defend (with a mutually agreeable attorney), indemnify, hold harmless and reimburse Owner, Contractor and their agents, officers, and employees (the "Indemnitees") from all claims, damages, losses and expenses (including, but not limited to attorney's fees and costs) attributable to bodily injury, sickness, disease or death or injury to or destruction of tangible property, including but not limited to the loss of use resulting therefrom, arising out of or in connection with the performance of the Work or any negligent act or omission of Subcontractor at or in connection with the Project, by anyone directly or indirectly employed by

Design Build Mechanical Corporation, VA

SUB

PM

#537156

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Petworth Safeway with Residences
CONTRACT # 1177-035
DATE: 6/11/13

Subcontractor, its lower tier sub-subcontractors and suppliers, or anyone else for whose acts Subcontractor is liable, even if caused jointly and concurrently by the negligence of the indemnitees and Subcontractor (or any one or more of either of them). In any and all claims against the Indemnitees by any employee of Subcontractor or anyone for whose acts Subcontractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount of or type of damages, compensation or benefits payable by or for Subcontractor or any sub-subcontractor under Workers' or Workmen's Compensation Acts, disability benefits or other employee benefit acts nor by any requirement for insurance. Subcontractor does not assume liability for loss or damage due solely to the negligence of Contractor. The Subcontractor shall promptly reimburse the Contractor therefore, and if any such claims or suits remain outstanding at the time the Work is completed, final payment shall be deferred until they are adjusted. The Subcontractor shall ensure that all of its subcontractors agree to bring any claims for damages or injuries against Subcontractor and not to bring such claims against the Contractor or Owner to the fullest extent permitted by law.

## ARTICLE 19.  DISCONTINUANCE OR SUSPENSION OF WORK

### (Addition/Deletion):

If, as a result of fire, earthquake, Act of God, war, strike, picketing, boycott, lockout or other cause beyond the control of Owner or Contractor, Owner or Contractor decide, in their sole discretion, that it is inadvisable to proceed with the Work hereunder then Subcontractor shall, upon receiving written notice thereof from Owner or Contractor, immediately discontinue any further work hereunder until such time as Owner or Contractor may deem it advisable to resume said Work. Subcontractor will resume the Work promptly upon receiving notice from Contractor to do so to the extent that the sum of any stoppages as outlined in this Article 19 does not exceed 120 days in any 365 day period, and Subcontractor shall not be entitled to any damages or compensation on account of any such cessation of work as a result of any of the causes set forth herein.

## ARTICLE 23.  EQUAL OPPORTUNITY AND NON-DISCRIMINATION

### (Additions/Deletions):

Subcontractor agrees to indemnify, defend (with mutually agreeable counsel chosen by Contractor ), and hold Contractor harmless of, from and against any and all loss, cost, damage, charge or expense, caused or contributed to by the violation or claimed violation by the Subcontractor of the Labor Management Relations Act of 1947, as amended, the equal employment opportunities laws, and any applicable and valid order, rule or regulation issued by any appropriate governmental agency in accordance with those laws. Subcontractor agrees to abide by and comply with all federal, state and local nondiscrimination laws, rules and regulations including but not limited to the Fair Housing Act, Americans with Disabilities Act, and similar state and local laws as they may apply to the Work.

## ARTICLE 24.  ATTORNEYS' FEES

### (Deletions):

Should any litigation or arbitration be commenced between the parties hereto concerning the Work, any provision of this Agreement or the rights or obligations of either party in relation hereto, the party, Subcontractor or Contractor, prevailing in such litigation or arbitration shall be entitled to a reasonable sum for attorneys' fees in such proceedings unless support of this litigation or arbitration is related to an Article 9 default as part of Contractor's claim against Subcontractor or as part of Contractor's defense to Subcontractor's claim for payment.

ACCEPTED:

Design Build Mechanical Corporation, VA

By: _____

Title: _____

Date: 6/12/13

Bozzuto Building Company

By: _____

Title: VP

Date: 6/17/13

**\*This is not a Standard Rider.  Future Contract terms and conditions will be negotiated on a project by project basis.**

Design Build Mechanical Corporation, VA
SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Petworth Safeway with Residences
CONTRACT # 1173-025
DATE: 1/4/2013

Bond No. D00000009

EXHIBIT "8"

PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, 14325 Willard Road Unit J Chantilly, VA 20159 (hereinafter called "Principal"), as Principal and Darwin National * a corporation organized and existing under the laws of the State of Delaware , (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Construction Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of FOUR MILLION FORTY THOUSAND ONE HUNDRED DOLLARS, ($4,040,100.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

*Assurance Company

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by Duball Petworth, LLC & Safeway Stores, Inc. for Petworth Safeway with Residences and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 1/4/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of Plumbing & HVAC ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this 25 day of Mar, 20 13 , the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____ (Principal)              (Seal)

Design Build Mechanical Corporation
14325 Willard Road
Unit J
Chantilly, VA  20159

Witness:                                    By:

_____                   Darwin National Assurance Company
  Or, Secretary's Attest                    _____
                                            (Signature and Title)        (Seal)

_____ (Surety)

                                            BONDING COMPANY
Witness:                                    By:

_____

Page 1 of 4

[  ] SUB
[  ] PM



EXHIBIT
3
#537156
(complaint)

Or, Secretary's Attest

(Signature and Title)                    (Seal)

Eunani Jong, Attorney in Fact

[  ] SUB
[  ] PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Petworth Safeway with Residences
CONTRACT #1173-025
DATE: 1/4/2013

Bond No. 000000006                    EXHIBIT "8"

PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, That <u>Design Build Mechanical Corporation, 14325 Willard Road Unit J</u>

<u>Chantilly, VA  20159</u> (hereinafter called "Principal"), as Principal and <u>Darwin National*</u> a corporation organized and existing under the laws of the State of <u>Delaware</u> (hereinafter called "Surety"), as Surety, are held and firmly bound unto <u>Bozzuto Construction Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770</u> (hereinafter called "Obligee"), in the sum of <u>FOUR MILLION FORTY THOUSAND ONE HUNDRED DOLLARS, ($4,040,100.00),</u> for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

        *Assurance Company

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by <u>Duball Petworth, LLC &</u> <u>Safeway Stores, Inc.</u> for <u>Petworth Safeway with Residences</u> and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated <u>1/4/2013</u> to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of <u>Plumbing & HVAC ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2',</u> which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of said Subcontract within the time provided therein and any extensions thereof that may be granted by the Obligee, and during the life of any guaranty required under said Subcontract, and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract that may hereafter be made, and shall indemnify and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee may sustain by reason of failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this __25__ day of May 2013 __ , the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____      _____
          (Principal)                          (Seal)

                                     Design Build Mechanical Corporation
                                     14325 Willard Road
                                     Unit J
                                     Chantilly, VA  20159

Witness:                             By:

_____      _____
   Or, Secretary's Attest               (Signature and Title)      (Seal)


                                     Darwin National Assurance Company
                                              (Surety)

                                     BONDING COMPANY
Witness:                             By:

_____      _____
                                     Jason Long, Attorney in Fact

                                     Page 3 of 4

                                                      [  ] SUB
                                                      [  ] PM


#537156

Or, Secretary's Attest                    (Signature and Title)          (Seal)

END OF EXHIBIT "8"

[ ] SUB
[ ] PM

#537156



## DARWIN NATIONAL ASSURANCE COMPANY
30 S. 17th St., Suite 810, Philadelphia, PA 19103

### POWER OF ATTORNEY

Issue Date: February 19, 2013                    No. _____ 1

**KNOW ALL MEN BY THESE PRESENTS:**
Darwin National Assurance Company, a Delaware corporation (the "Company") does hereby appoint

NAME(s):      Eamonn Long                   Cathy Urquhart

FIRM:      Alliant Insurance Services     OFFICE LOCATION: 222 Bloomingdale Road, Suite 402, White Plains, NY 10605

Its true and lawful Attorney(s)-in-Fact, with full authority to execute on its behalf bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, issued in the course of its business, and to bind the Company thereby. This Power of Attorney shall remain in full force and effect for one year from the issued date above-referenced and shall expire on close of business of the first anniversary of such Issue Date.

IN WITNESS WHEREOF, DARWIN NATIONAL ASSURANCE COMPANY has caused these presents to be executed by the officer named below, who is duly authorized and empowered to execute on the Company's behalf.

This 19th day of February, 2013

Name: Robert E. Staples
Title: Senior Vice President

State of Pennsylvania     )
County of Philadelphia    ) ss.

On this 19th day of February, 2013, before me came the above-named officer of DARWIN NATIONAL ASSURANCE COMPANY, to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seals of said corporation thereto by authority of his office.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MICHAEL W. ZAHODSKI, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 18, 2014

Notary – Michael W. Zahodski
My Commission Expires: 11-18-2014

---

### CERTIFICATE

Excerpt of Resolution adopted by the Board of Directors of the DARWIN NATIONAL INSURANCE COMPANY, in December 2012:

"RESOLVED, that the President, or any Vice President be, and hereby is, authorized to appoint Attorneys-in-Fact to represent and act for and on behalf of the Company to execute bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, and to attach thereto the corporate seal of the Company, in the transaction of its surety business;

"RESOLVED, that the signatures and attestations of such officers and the seal of the Company may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company when so affixed with respect to any bond, undertaking, recognizance or other contract of indemnity or writing obligatory in the nature thereof;

"RESOLVED, that the facsimile or mechanically reproduced signature of the Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a copy of any Power of Attorney of the Company, with signatures affixed as and above noted, shall be valid and binding upon the Company with the same force and effect as though manually affixed."

"RESOLVED, that any such Attorney-In-Fact delivering a secretarial certification that the foregoing resolutions still be in effect may insert in such certification the date thereof, said date to be not later than the date of delivery thereof by such Attorney-In-Fact."

I, TIMOTHY J. CURRY, Secretary of the DARWIN NATIONAL INSURANCE COMPANY, do hereby certify that the foregoing excerpt of Resolution adopted by the Board of Directors of this corporation, and the Power of Attorney issued pursuant thereto, are true and correct, and that both the Resolution and the Power of Attorney are in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the facsimile seal of the corporation, this 19th day of February, 2013.

Secretary: Timothy J. Curry

SUR 00007 00 (11/2012)

#537156

CONTRACT NO. 1152- 932
CC: PROJECT #: 1152-15700 /FIELD/ACCTG
VERSION 777761V5 BCC FORM 006100-0600 UPDATED 3/13/06

BOND REQUIRED: YES

## SUBCONTRACT AGREEMENT

THIS AGREEMENT, made and entered into this 20th day of April, 2013 by and between

    **Bozzuto Building Company**
    **7850 Walker Drive, Suite 400**
    **Greenbelt, MD 20770**
    **Attn: Steve Tapparo, Project Manager**
    **(301) 220-0100**

(hereinafter called the "Contractor") and



    **Design Build Mechanical Corporation**
    **3635 Concorde Parkway**
    **Suite 700**
    **Chantilly, VA   20151**
    **703-465-0222**
    **Attn: Michael Robinson**

(hereinafter called "Subcontractor") for work to be performed at

    · **Cathedral Commons**
    **3336 & 3406 Wisconsin Avenue, N.W.**
    **Washington, DC   20016**
    **Attn: John Bell, Superintendent**
    **(240) 417-9796**

(hereinafter referred to as the "Project").

Contractor and Subcontractor covenant and agree as follows:

### ARTICLE 1.  SCOPE OF WORK

a.   Subcontractor agrees to perform and furnish all the work, labor, materials, as herein specified, and plant, equipment, tools, scaffolds, hoists, and everything of sort for accomplishing the work (hereinafter called the "Work") as described in the attached Exhibit 2, "Scope of Work".

b.   Subcontractor represents that it is fully qualified to perform this Agreement. Subcontractor hereby agrees that the Work will be performed in strict accordance with the Contract Documents as hereinafter defined in Article 2 and any Work not conforming to this Agreement's requirements, including substitutions not properly approved, may be considered defective. Subcontractor agrees to perform the Work to the full satisfaction of Contractor, the Inspecting Architect, and the Owner. Subcontractor shall commence the Work immediately when notified by Contractor and shall prosecute said Work in a good and workmanlike manner with due diligence and without delay. The Subcontractor shall immediately repair or replace all defective Work upon discovery or notification by the Contractor. The Contractor reserves the right to have any portion of the Work, which the Subcontractor has not been directed to proceed with or has not begun, accomplished by his own forces or by others.

                                                                            #537156

c.   Subcontractor shall assume all obligations, risks and responsibilities, which the Contractor has assumed with respect to the Owner in accordance with the Contract Documents. Subcontractor shall have the right to enforce its rights and remedies and to defend against claims against it by the Owner as provided herein.

d.   This agreement is fully inclusive and shall not be affected by any changes in labor rates, transportation charges, costs of materials, etc., and the
Subcontractor agrees that the price includes all taxes that he shall incur as a result of his prosecuting the Work.



EXHIBIT
4
(COMPLAINT)

537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 032
DATE: 4/30/2013

## ARTICLE 2. CONTRACT DOCUMENTS

a.   The Contract Documents for this Subcontract shall consist of this AGREEMENT and the EXHIBITS:

Exhibit 1 – List of Contract Documents included in this Agreement
Exhibit 2 – Scope of Work
Exhibit 3 – General Requirements for Subcontractors/Vendors
Exhibit 4 – Payment Schedule
Exhibit 5 – Insurance Requirements
Exhibit 6 – Tax Payer Identification Number
Exhibit 7 – Acknowledgement of Payment and Settlement Date
Exhibit 8 – Payment & Performance Bond (if applicable)
Exhibit 9 – First Source Employment Agreement
Exhibit 10 – Project Schedule
Exhibit 11 – Parking and Site Utilization Plan
Exhibit "R" – Rider to Contract

The Contract Documents also include the contract between Contractor and Owner which contract is incorporated by reference, as set forth in Article 5 herein, and any subsequent amendment to any Contract Document.

b.   Subcontractor represents and agrees that prior to the execution of this Agreement, it has (a) by its own independent investigation ascertained (i) the work required by this Agreement and the Contract Documents, (ii) the conditions involved in performing the Work, and (iii) the obligations of this Agreement and the Contract Documents; and (b) verified all information furnished by the Contractor or others satisfying itself as to the correctness and accuracy of that information. No allowance in the form of additional compensation is to be made by reason of any error on the part of Subcontractor with respect to such matters, nor will Subcontractor be relieved from its responsibilities hereunder by its failure to properly investigate. This Subcontractor Agreement and Exhibits attached hereto shall constitute the complete contract and all prior negotiations, prior commitments and prior agreements whether oral or written are superseded hereby. This Agreement may only be amended by a writing, including a change order issued by the Contractor and signed by both parties.

## ARTICLE 3. CONTRACT SUM AND PAYMENT PROCEDURES

a.   The Contractor agrees to pay to the Subcontractor for the satisfactory performance and completing of the Work and all the duties, obligations and responsibilities of Subcontractor under this Agreement the Sum of ONE MILLION NINE HUNDRED SEVENTY TWO THOUSAND DOLLARS ($1,972,000.00) hereinafter, the Subcontract Amount.

b.   Partial payments will be made monthly on or before the 7th day following receipt of payment by the Contractor from the Owner for Work completed by this Subcontractor during the previous month, provided the Subcontractor shall have submitted its request for payment on or before the 25th day of such previous month. Partial payments shall be due to the Subcontractor in the amount of ninety percent (90%) of the work in place which has been approved by the Contractor, Owner, the Owner's Lender and Inspecting Architect and for which payment has been made to the Contractor by the Owner. All payments will be made per the Payment Schedule attached hereto as Exhibit "4" and made a part hereof. A request for payment for an item noted in the Payment Schedule may only be made by the Subcontractor upon completion of that item to the satisfaction of the Contractor, Inspecting Architect and Owner.

c.   All invoices shall be supported to the extent required by the Contractor by affidavits, or other evidence satisfactory to Contractor, showing that all labor and material bills, taxes and all other indebtedness incurred by the Subcontractor for the Project up to and including the date of invoicing have been paid in full. The Contractor may at its sole discretion withhold payments due the Subcontractor until satisfactory evidence of payment of all the Subcontractor's obligations has been accomplished. A Partial Waiver of Lien and Subcontractor's Affidavit shall be provided with each request for payment, including the current request for payment, and a Final Waiver of Lien and Subcontractor's Affidavit shall be submitted with request for final payment. All Waivers of Lien and Subcontractor's Affidavits shall be in a format acceptable to the Contractor.

d.   No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials nor shall it release Subcontractor from any of its obligations under this Agreement; nor shall entrance and use by the Owner constitute acceptance of the Work or any part thereof.

e.   Anything herein contained to the contrary notwithstanding, the Contractor reserves the right, at its sole discretion and without any fault or breach by Subcontractor, to make any payments directly to laborers, materialmen, subcontractors, sub-subcontractors, or any subcontractors or materialmen of any of them, for or on account of work performed or materials furnished under this Agreement. If such payments are made in good faith and upon reasonable evidence of their validity, the Contractor shall have no liability to Subcontractor in connection therewith and shall deduct such payments from any balance owed to the Subcontractor.



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 001
DATE: 6/20/2013

f.   Subcontractor shall, prior to the submission of the first request for payment, supply Contractor with the names, addresses and telephone numbers of all suppliers furnishing or to furnish materials for the Work covered hereby. No payment shall be made to Subcontractor until such information is furnished. Contractor reserves the right and is hereby authorized by Subcontractor to make all payment checks jointly payable to Subcontractor and material suppliers of Subcontractor.

g.   All material and work incorporated into the Project or for which partial payment has been made shall become the property of the Contractor or, if the Contract Documents so provide, the property of the Owner, however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by the Owner.

h.   The Contractor may withhold amounts otherwise due under this Agreement or any other agreement between the parties to cover the Contractor's reasonable estimate of any costs or liability the Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement or any other agreement between the parties. For purposes of this paragraph, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and the Contractor or any joint venture or other entity in which the Contractor has an ownership interest. Appropriate adjustments to the withheld sums shall be made when the exact amounts owed are determined.

i.   Final payment, subject to withholdings permitted hereunder, shall not be due until after the last of the following to occur: (a) Subcontractor's work has been completed and approved by the Owner and the Inspecting Architect, (b) the entire Project is complete, (c) all final payment prerequisites under the Contract Documents have been satisfied, (d) satisfactory proof of payment of all amounts owed by Subcontractor in connection with this Agreement has been provided, and (e) the Contractor has been paid in full for the entire Project.

### ARTICLE 4. LIEN RIGHT

a.   Subcontractor acknowledges that no lien shall attach to the Project real estate by virtue of any work done hereunder by the Subcontractor or by any suppliers, employees, materialmen, or others subcontractors employed by him if the Subcontractor is paid to date in accordance with this Agreement for work accepted and approved, and the Subcontractor warrants that all such parties shall be advised of the same and shall certify to the Contractor that they are aware thereof and bound thereby.

b.   Subcontractor will immediately discharge or cause to be discharged all liens, claims or attachments which may be filed in connection with the Work and will hold Contractor harmless therefrom if Subcontractor is paid to date for work accepted and approved. Failure to comply with the requirements of this Article within a period of seven (7) days after receipt of written notice from the Contractor of any lien, claim or attachment that may have been filed in connection with the Work shall place the Subcontractor in default and entitle the Contractor to exercise any of its remedies, including the right to terminate this Agreement in accordance with the provisions of Article 13.

c.   In the event that the Subcontractor fails to pay and discharge when due, any bills or obligations of any kind or nature whatsoever incurred by the said Subcontractor by reason of or in the fulfillment of this Agreement, whether or not a lien or notice of lien has been or may be filed with respect thereto, which bills or obligations in the opinion of Contractor are proper, the Contractor, at its sole option but without being obligated to do so, may pay all or any part of such bills or obligations. The Subcontractor hereby appoints the Contractor as agent and attorney-in-fact of the Subcontractor for the purpose of payment and discharging such bills and obligations, and the Contractor may deduct the amount of such bills as well as any expenses incurred in the payment of same, including interest, court costs and attorney's fees, from any sums due or to become due to the Subcontractor. The Subcontractor hereby expressly waives any right of redress or recovery against the Contractor by reason of any act or omission of the Contractor while acting as such agent and attorney-in-fact of the Subcontractor.

### ARTICLE 5. SUBCONTRACTOR BOUND BY OWNER/CONTRACTOR AGREEMENT

a.   In respect to the Work covered by this Agreement, the Subcontractor shall be bound to the Contractor by the terms of this Agreement and the contract between the Owner and Contractor, and shall assume toward the Contractor all the obligations, risk and responsibilities which the Contractor, by that contract, assumes toward the Owner, provided that where any provision of those contract documents between the Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern.

b.   In event of a dispute between Contractor and Owner involving in any way the work of Subcontractor and if such dispute results in a proceeding, to which Subcontractor may become a party, then Subcontractor will join in such proceeding and will be bound by the result thereof.

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 832
DATE: 6/28/2013

## ARTICLE 6.  TIME IS OF THE ESSENCE

a.  Time is of the essence in the performance of the Work referred to in the Contract Documents, inasmuch as failure of the Subcontractor to commence and complete its Work as and when required by the Contractor may cause grave injury and damage to the Contractor by virtue of increased costs for construction financing, loss of interest on invested funds, loss of sales and good will, delayed receipt of income from rental units, extension of overhead costs and otherwise.  Accordingly, the Subcontractor shall be prepared to commence Work within seven (7) days after receipt of notice from the Contractor to do so and will thereafter actually commence Work when and as required to do so by the Contractor.  Such notice shall be given as the Project reaches the stage of construction, in accordance with the plans and specifications, where the Subcontractor's services are to be used, or at such earlier date as set forth in any supplement hereto.  The Subcontractor further agrees to prosecute the Work with due diligence and will not in any manner delay or otherwise interfere with the work of the Contractor or other subcontractors.

b.  Subcontractor agrees to conform with the progress schedule, which the Contractor shall issue.  This schedule shall allow the Subcontractor adequate time to complete his Work and, unless the Contractor is notified otherwise by the Subcontractor in writing within five (5) days of the receipt of the schedule, it shall be binding on the Subcontractor.  The Contractor reserves the right to amend the progress schedule from time to time as the overall progress of the Project dictates, and the Subcontractor hereby discharges the Contractor from any liability incurred on account of such changes.

c.  If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor and at its own cost and expense, work such overtime as may be necessary, in the opinion of the Contractor, to make up for all time lost and take all necessary measures to avoid delay in the completion of the Work and of the Project, and, in any case, Subcontractor shall be responsible for all loss, costs and damages incurred by the Contractor as a result of such delay, including but not limited to all delay damages assessed against the Contractor by the Owner.

d.  Subcontractor will coordinate its work with the work of the Contractor, other subcontractors, and the Owner's other contractors, if any, so no delays or interference will occur in completion of any part or all of the Project.

e.  Subcontractor may be entitled to additional compensation for compliance with schedule amendments or to damages for delay but only to the extent that the contract documents between the Owner and Contractor entitle the Contractor to damages or to a contract adjustment increasing the price or Guaranteed Maximum Cost of the contract between the Contractor and Owner.

f.  The extent to which the Contractor provides temporary heat and temporary enclosures shall be at the sole discretion of the Contractor and shall be based upon general overall job progress, and the Subcontractor understands that the Project and Subcontract Amount are based upon this condition.

## ARTICLE 7.  CHANGE ORDERS AND FIELD WORK ORDERS

a.  The Contractor may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the Work covered by the Contract Documents.  Any unilateral order or agreement under this Article 7 shall be in writing.  Subcontractor shall perform the work as changed without delay.

b.  Subcontractor shall submit to the Contractor any requests or claims for adjustment in the price, schedule or other provisions of the Agreement for changes directed by the Owner or the Contractor, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents.  Said requests or claims shall be submitted in writing by Subcontractor within seven (7) days of the date that Subcontractor knew or should have known that it had a claim for an adjustment or within such shorter time as may be necessary to allow the Contractor to comply with the applicable provisions of the Owner-Contractor agreement.  If the claim is not made within seven (7) days or the appropriate shorter period, the claim is waived.  The Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including the Contractor.  Agreement adjustments shall be made only to the extent that the Contractor is entitled to relief from or shall grant relief to the Owner and the Subcontractor has complied with this Article.  Further, each Agreement adjustment shall be equal only to Subcontractor's allocable share of any adjustment in the Contractor's contract with the Owner.  Subcontractor's allocable share shall be determined by the Contractor, after allowance of the Contractor's normal overhead and profit on any recovery and the Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, the Contractor and other subcontractors or persons with interests in the adjustment.  This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

c.  Payment on account of pending changes made by the Owner shall be made only if the Contractor receives such payment from the Owner for Subcontractor's changed work and the Subcontractor has complied with this Article.  Each payment to Subcontractor on account of pending change orders shall be equal to Subcontractor's allocable share of the Contractor's payment from the Owner for the pending change as determined by the Contractor.  Amounts paid on account of pending changes are provisional and not an admission of liability and shall be repaid to the Contractor on demand whenever the Contractor determines there has been an overpayment.



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 033
DATE: 4/29/2013

d.　For changes ordered by the Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Amount. If Subcontractor considers any action or inaction by the Contractor other than a formal change order to be a change, it shall so notify the Contractor within three (3) days of said action or inaction and seek a confirmation from the Contractor. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

e.　For all changes in the work, the Subcontractor shall charge no more than the actual labor cost, including burden, of those individuals actually performing the changed work plus the actual cost of materials, including the cost of delivery, plus the actual direct cost of equipment utilized in the performance of the changed work, in no event shall be greater than Industry Standards. The Subcontractor's markup for overhead and profit on the actual direct labor and material cost shall not be greater than that allowed by the Contract Documents and in no event shall be greater than 15%. Overhead and profit shall not be charged on change orders, which are the result of another subcontractor's performance (i.e., a backcharge to another subcontractor). Subcontractor shall, at the Contractor's request, provide copies of payroll invoices, cancelled checks, invoices, receipts for all labor and material, and/or other documents which relate to a change.

f.　Subcontractor shall, within seven (7) days of a Contractor request, submit a reasonable price quotation for proposed changes. If Subcontractor does not and the Contractor is required to submit a price quotation to the Owner which includes a proposed change to Subcontractor's work, the Contractor shall use its best estimate of the proposed change as it affects the Agreement in its quotation to the Owner, which estimate shall be the maximum equitable adjustment due to Subcontractor.

g.　In no event shall the Subcontractor perform any additional work without first receiving written authorization to do so from the Project Manager for the Contractor. Field staff, including Contractor's superintendents, are not allowed to give such authorization. Any claim for an adjustment that did not receive prior written approval from the Project Manager is void.

## ARTICLE 8.  COMPLIANCE WITH LAWS, ORDINANCES, ETC.

a.　The Subcontractor shall obtain all permits, licenses, and other governmental fees of any kind that may be necessary for the proper performance of its Work. Subcontractor shall cooperate fully with and obtain such additional permits, if any, which may be required so that Contractor may at Contractor's cost and expense, connect with, attach to or add to Subcontractor's Work. All fees for such additional permits shall be paid by Contractor. The Subcontractor, its employees and all others acting under its direction or control, shall at all times comply with and abide by all Local, State and Federal statutes, ordinances, rules and regulations as well as those of any other public body having authority concerning the Work, including but not limited to the Occupational Safety and Health Act and all similar state and local safety codes and the Immigration Reform and Control Act of 1986 and any other applicable immigration laws or regulations. The Subcontractor shall assume all liability and responsibility for all royalties, licenses, patent fees, and any other charges made in connection with the use of patented processes upon the Work or in connection therewith. Subcontractor shall be responsible for the payment of all taxes of any nature related to the performance of its Work and shall pay all contributions and taxes for unemployment insurance or old age retirement benefits, annuities or pensions now or hereafter imposed by the United States or any state or governmental subdivision thereof, or labor organization measured by the wages, salaries or other remuneration paid persons employed by the Subcontractor engaged in the performance of the Work. The Subcontractor shall comply with all rules and regulations applicable thereto. In the event that the Contractor is held liable for payment of any taxes, penalties, fines or contributions as a result of the Subcontractor's noncompliance with the provisions of this Article, the Subcontractor shall supply the Contractor with all records necessary to compute such taxes or contributions and shall fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest). The Subcontractor shall hold and save the Contractor harmless and indemnified against all claims including attorney's fees, arising out of any violation or noncompliance with the provisions of this Article.

b.　If hazardous substances are being used or located on site by the Subcontractor or the Subcontractor's subcontractors, the Subcontractor shall immediately give written notice to the Contractor of its chemical composition and dangers. If the Subcontractor encounters asbestos, PCB, or other hazardous substances while completing its Work, Subcontractor shall immediately stop work and notify the Contractor's representative at the Project site.

## ARTICLE 9.  INSURANCE

a.　This Subcontractor shall provide insurance in accordance with the requirements of Exhibit #5 attached hereto and the Subcontract Amount includes the cost of said insurance. The Subcontractor shall provide certificates of insurance naming the Contractor, the Owner, and such other parties designated in Exhibit #5 as named insureds, on all insurance coverages set forth in Exhibit #5.



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 032
DATE: 4/30/2013

b.  Evidence of insurance coverages noted in Exhibit #5 shall be provided to the Contractor at least seven (7) days prior to the start of any work by the Subcontractor in the field. Any failure to so provide such insurance coverage on behalf of the Contractor, the Owner or other parties shall not relieve this Subcontractor in any way of his responsibilities, obligations and indemnification of the Contractor and the Owner from any acts, damages, accidents, injuries, claims and the like, that occur at the Project site as a result of the operations and activities of this Subcontractor. This Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless the Contractor and Owner in all respects thereto. Insurance shall be carried by this Subcontractor for the duration of the entire construction of the Project including The Guarantee Period. All insurance provided by the Subcontractor on the Project is non-cancelable without first providing the Contractor with thirty (30) days advance notice by registered mail of said cancellation. Failure to maintain insurance coverage as described hereto and further set forth in Exhibit #5 shall be a breach of this Agreement by the Subcontractor.

c.  Subcontractor waives all rights of recovery against the Contractor, the Owner, and such other parties as are required by the Contractor and/or the Contract Documents for losses within the scope of Subcontractor's insurance. Subcontractor will ensure that its subcontractors also waive such claims against the Contractor and Owner.

d.  If the Subcontractor fails to secure and maintain the required insurance, the Contractor shall have the right (without any obligation to do so, however) to secure the insurance in the name of and for the account of the Subcontractor, in which event, the Subcontractor shall pay the cost thereof and shall furnish, upon demand, all information that may be required in connection therewith.

e.  The obligations of Subcontractor in this Article shall survive termination of this Agreement.

## ARTICLE 10.  ASSIGNMENTS

a.  Subcontractor shall neither assign this Agreement nor employ other subcontractors for the execution of any part or all thereof without the express written approval of the Contractor and the Subcontractor's surety. Such consent, if given, shall not release the Subcontractor from its obligations hereunder. The Subcontractor agrees that it will be responsible for the acts and omissions of its subcontractors, sub-subcontractors and their employees to the same extent that it is responsible for acts and omissions of persons directly employed by it. The Subcontractor agrees to bind every subcontractor and sub-subcontractor, and every subcontractor and sub-subcontractor agrees to be bound, by the terms of the Contract Documents so far as they are applicable to its Work.

b.  Subcontractor, by execution of this Agreement, contingently assigns to the Contractor all Subcontractor's subcontracts. The assignment of each of Subcontractor's subcontracts shall take effect only upon Subcontractor's termination for default under Article 13 and the Contractor's affirmative acceptance of the assignment of the specific subcontract by written notice to Subcontractor and Subcontractor's subcontractor. The Contractor shall have no liability to any of Subcontractor's subcontractors unless and until the Contractor affirmatively accepts the assignment as provided above.

c.  In the event of a termination by the Owner of the Contractor for default under the Owner/Contractor contract, the Owner may take assignment of this Agreement.

d.  This Agreement shall inure to the benefit of Contractor and its successors, and assigns, heirs and legal representatives, and shall be binding upon Subcontractor, its successors and permitted assigns, if any, pursuant to the terms hereof.

## ARTICLE 11.  LOSS OR DAMAGE TO WORK

a.  The Contractor shall not be responsible for loss or damage to equipment or materials belonging to the Subcontractor, except where incorporated or installed into the Project in a satisfactory manner in accordance with the provisions of this Agreement. The Contractor shall not be responsible for loss or damage to materials, tools, equipment, or other personal property owned, rented, or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused.

b.  Subcontractor shall pay for any damage to the work of another caused by Subcontractor, its employees, subcontractors, sub-subcontractors or agents. Subcontractor shall not claim or be entitled to receive any compensation or damages because of failure of Owner, Architect or Contractor or other subcontractors to have related portions of the Project completed in time for the Subcontractor's Work.

c.  Subcontractor shall protect its work, materials, tools and equipment against any loss or damage by fire, theft, accident or other cause. In the event of any injury, loss or damage to Subcontractor, its agents or employees or to its work, materials, or equipment, Subcontractor shall make no claim against Contractor by reason thereof.



#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 022
DATE: 4/20/2012

## ARTICLE 12. CLEANUP

a.   All debris resulting from the Work shall be removed from the Work areas by the Subcontractor to locations on the Project Site designated by the Contractor as and when instructed by the Contractor's Superintendent. The Contractor shall have the right, where the Subcontractor fails to comply with its obligations under this Article, after 24 hours prior written notice, to accomplish the Subcontractor's cleanup with its own forces and equipment, and withhold the amount of all costs incurred in so doing from any amounts due the Subcontractor.

## ARTICLE 13. SUBCONTRACT'S FAILURE TO PERFORM OR DEFAULT

a.   If, in the sole opinion of the Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the Work according to the Contractor's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of the Contractor or of any other contractor or subcontractor, (4) fail to comply with any provision of this Agreement or other Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days' written notice and the Subcontractor fails to eliminate the condition specified in that notice within the time allowed, the Contractor, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to the Contractor for all cost, expenses, and damages resulting therefrom, (ii) terminate this Agreement, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to the Contractor and/or the Owner. In the event of termination by the Contractor, the Contractor may, at its option, (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method the Contractor may deem expedient. In case of termination by the Contractor, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full is made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the amount of all costs, expenses, and damages incurred by the Contractor including its reasonable overhead and profit, such excess shall be paid by the Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay the Contractor the difference immediately upon demand.

b.   If the Contractor wrongfully exercises its option under Article 13, that action shall be treated as a deductive change. If the Contractor wrongfully exercises its option under Article 13, that termination for default shall be considered a termination for the Contractor's convenience and Subcontractor shall be entitled to the applicable compensation provided in Article 18. Subcontractor's remedies under this Article 13.b. shall be exclusive. Nothing herein shall bar withholdings by the Contractor permitted by other provisions of this Agreement.

c.   Any claim arising out of or related to this Agreement shall not be subject to any requirement to mediate or arbitrate unless the parties mutually agree to such a proceeding. Any mutual agreement to mediate or arbitrate any one claim shall be strictly limited to the one claim and no other.

## ARTICLE 14. GUARANTEES

a.   Subcontractor warrants and guarantees that all the Work shall be free from defects in workmanship and materials at the time that it is completed and for a minimum period of one (1) year from date Owner accepts the Project (hereinafter the "Guarantee Period") and promptly upon Contractor's request, will correct by repair or replacements, without charge, any such defects (and any damage to other property, including without limitation the work of other subcontractors resulting therefrom or from the correction thereof) which may appear in the Work. Where the contract documents between the Owner and Contractor, or governmental bodies or agencies require guarantees extending beyond one year, or any additional warranties or guarantees are included in this Agreement, the Subcontractor's obligation shall remain in effect for such extended period of time.

b.   If the Subcontractor fails to commence and to complete the repair or replacement of improper or defective work, as specified, within a reasonable period of time as determined by the Contractor in its sole discretion, the Contractor may proceed to arrange to have such work completed and do so by whatever method it may deem expedient and may charge the cost thereof against any monies due to the Subcontractor. If the unpaid balance of the Subcontract Amount shall exceed the expense of finishing the Work, including proper allowance for additional managerial and administrative expenses, such excess shall be paid to the Subcontractor. If such expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor immediately upon demand.

c.   If the Subcontractor shall cover any portion of the Work prior to the Inspecting Architect having a reasonable time and opportunity to inspect, the Subcontractor, upon the request of the Architect, shall uncover that portion of the Work, and the costs of uncovering and replacing the Work shall be at the Subcontractor's sole expense.

d.   The obligations of Subcontractor in this Article shall survive termination of this Agreement.



#537156

## ARTICLE 15.  LABOR TO BE EMPLOYED/SUBCONTRACTOR REPRESENTATIVE

a.  The Subcontractor shall not employ men, means, material or equipment which may cause strikes, work stoppages or any disturbances by workmen employed by the Subcontractor, Contractor, or other subcontractors on or in connection with the Work or the Project or the location thereof.

b.  Subcontractor understands that the Contractor, other subcontractors and/or other contractors of the Owner may employ both Union and Non-Union workers on the Project.  If required by the Contract Documents or specified in an Exhibit to this Agreement, Subcontractor agrees to employ Union labor.

c.  The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work any person unfit for or not skilled in the work assigned to him.  Subject to the foregoing and to preserving good relations with the public and requiring the discharge of any employees causing a breach of peace or other disturbance of said relations, the Contractor shall not in any way interfere with the Subcontractor's right to hire and fire its employees, assign duties to them, and fix their working hours, wages or terms and conditions of employment, which right shall be absolute.  Exceptions to this provision shall apply in those instances where Federal, State or Local Agencies having jurisdiction over the Project dictate a level of prevailing wage or oversee and establish minimum working standards or establish non-working hours for the Project.

d.  Subcontractor shall maintain a foreman on the job at all times with full authority and expertise to execute and direct the Subcontractor's Work in accordance with the Contract Documents and as directed by the Contractor's Superintendent.  The Subcontractor shall notify the Contractor's Superintendent upon arrival and departure of the Subcontractor's men from the job site.  The Contractor shall from time to time schedule job meetings, which shall be attended by an authorized representative of the Subcontractor with authority to make commitments, which shall be binding, on the Subcontractor.

e.  Should the Subcontractor fail to carry out or comply with the provisions of this Article, it shall be in default and the Contractor shall have the right to terminate this Agreement in accordance with Article 13 hereof.

## ARTICLE 16.  SEPARABILITY

In the event that any provision of this Agreement or any part of any Article thereof shall be declared invalid by a court of competent jurisdiction, it shall not affect the validity of any other parts of this Agreement or any other Article containing an invalid provision, which shall remain in full force and effect.

## ARTICLE 17.  LIABILITY FOR DAMAGES AND INJURY

a.  Subcontractor shall defend (with a mutually agreeable attorney), indemnify, hold harmless and reimburse Owner, Contractor and their agents, officers, and employees (the "Indemnitees") from all claims, damages, losses and expenses (including, but not limited to attorney's fees and costs) attributable to bodily injury, sickness, disease or death or injury to or destruction of tangible property, including but not limited to the loss of use resulting therefrom, arising out of or in connection with the performance of the Work or any negligent act or omission of Subcontractor at or in connection with the Project, by anyone directly or indirectly employed by Subcontractor, its lower tier sub-subcontractors and suppliers, or anyone else for whose acts Subcontractor is liable even if caused jointly and concurrently by the negligence of the Indemnitees and Subcontractor (or any one or more of either of them).  In any and all claims against the Indemnitees by any employee of Subcontractor or anyone for whose acts Subcontractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount of or type of damages, compensation or benefits payable by or for Subcontractor or any sub-subcontractor under Workers' or Workmen's Compensations Acts, disability benefits or other employee benefit acts nor by any requirement for insurance.  Subcontractor does not assume liability for loss or damage due solely to the negligence of Contractor.  The Subcontractor shall promptly reimburse the Contractor therefore, and if any such claims or suits remain outstanding at the time the Work is completed, final payment shall be deferred until they are adjusted.  The Subcontractor shall ensure that all of its subcontractors agree to bring any claims for damages or injuries against Subcontractor and not to bring such claims against the Contractor or Owner to the fullest extent permitted by law.

b.  Subcontractor shall be liable to the Contractor for all costs the Contractor incurs as a result of Subcontractor's failure to perform this Agreement in accordance with its terms.  Subcontractor's failure to perform shall include the failure of its lower-tier subcontractors or materialmen to perform.  Subcontractor's liability shall include but is not limited to (1) damages and other delay costs payable by the Contractor to the Owner; (2) the Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; (5) excess reprocurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs.

c.   Subcontractor's assumption of liability herein includes but is not limited to assumption of all liabilities on account of or in any way related to Subcontractor's Work, which the Contractor has assumed under the Contract Documents or under agreements with third parties who may be affected by construction of the Project.

d.   Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 9, or otherwise.  All amounts owed by Subcontractor to the Contractor as a result of the liability provisions of this Agreement shall be paid upon demand.

e.   The Subcontract Amount includes one hundred dollars ($100.00) as specific consideration for indemnification under this Agreement.

### ARTICLE 18.  TERMINATION FOR CONVENIENCE

a.   The Contractor, at its sole discretion, may terminate this Agreement without cause at any time by giving at least ten (10) days' prior written notice of such termination to the Subcontractor.  Upon any termination of this Agreement pursuant to this Article, and subject to all of the terms and provisions herein contained, the Subcontractor shall be entitled to payment up to the Contract Amount for all accepted work furnished or installed by it.  However, the Contractor may retain from any monies due the Subcontractor, an amount sufficient to cover the Subcontractor's obligations under the Article 14, Guarantee.  Upon the expiration of such obligations, the balance of such amount, if any, shall be paid to the Subcontractor.  The Subcontractor, upon termination of this Agreement, shall forthwith peaceably and quietly surrender to the Contractor all premises, facilities, machinery, and equipment furnished by or belonging to the Contractor and shall cooperate with the Contractor in facilitating the transition of work to a new party.

b.   Subcontractor shall not be entitled to anticipate profits on work unperformed or on material or equipment unfurnished.

### ARTICLE 19.  DISCONTINUANCE OR SUSPENSION OF WORK

If, as a result of fire, earthquake, Act of God, war, strike, picketing, boycott, lockout or other cause beyond the control of Owner or Contractor, Owner or Contractor decide, in their sole discretion, that it is inadvisable to proceed with the Work hereunder then Subcontractor shall, upon receiving written notice thereof from Owner or Contractor, immediately discontinue any further work hereunder until such time as Owner or Contractor may deem it advisable to resume said Work.  Subcontractor will resume the Work promptly upon receiving notice from Contractor to do so and Subcontractor shall not be entitled to any damages or compensation on account of any such cessation of work as a result of any of the causes set forth herein.

### ARTICLE 20.  SUBCONTRACTOR'S BOND

a.   If required of the Contractor, the Contractor shall have the option to require the Subcontractor to furnish a bond or bonds in the form and amounts satisfactory to the Contractor at the time of execution of this Agreement.  In such case, the Subcontractor will be paid additional reasonable compensation for the cost of such bond or bonds.

b.   Any Subcontractor's bonds shall cover the faithful performance of this Agreement, the payment of all obligations arising therefrom and the maintenance of the completed improvements for one (1) year from the date of final approval and acceptance (and also where any governmental bodies or agencies or the Contract Documents including the contract between the Owner and Contractor require guarantees extending beyond one (1) year, for such extended period) against defective workmanship and materials (even where furnished by Contractor or its suppliers) and liability for damages resulting therefrom.  The bond(s) will be issued by a surety acceptable to the Contractor, and must be in the form attached hereto as Exhibit #8.

### ARTICLE 21.  USE OF CONTRACTOR'S EQUIPMENT

Contractor's equipment will be available for use by Subcontractor only at Contractor's discretion and upon mutually satisfactory terms.  In using such equipment or facilities (including but not limited to rigging, blocking, hoisting equipment and scaffolding), Subcontractor shall be responsible for and shall indemnify, defend (with counsel chosen by Contractor), and hold Contractor harmless from and against any and all claims, actions, demands, damages, liabilities or expenses, including attorney's fees, which may arise from such use.  Subcontractor has examined and will examine all such equipment and understands that Contractor makes no warranty regarding the same, such use being at Subcontractor's own risk.

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 122
DATE: 4/20/2013

## ARTICLE 22.  SAFETY

This Subcontractor is to provide adequate and proper safety protection for its men and equipment and shall strictly comply with all the rules and regulations of the federal and state Occupational Safety and Health Acts. Hard hats will be worn by all personnel employed on the job by this Subcontractor at all times. Payments may be withheld for any failure by Subcontractor to comply with the requirements of this Article. Accidents to employees or sub-subcontractors of this Subcontractor will be promptly reported in detail to the Job Superintendent. Fines resulting from acts of this Subcontractor for failure to comply with the safety regulations and the requirements of OSHA or a state or local agency will be promptly paid by this Subcontractor or deducted from its Subcontract Amount.

## ARTICLE 23.  EQUAL OPPORTUNITY AND NON-DISCRIMINATION

Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold Contractor harmless of, from and against any and all loss, cost, damage, charge or expense, caused or contributed to by the violation or claimed violation by the Subcontractor of the Labor Management Relations Act of 1947, as amended, the equal employment opportunities laws, and any applicable and valid order, rule or regulation issued by any appropriate governmental agency in accordance with these laws. Subcontractor agrees to abide by and comply with all federal, state and local nondiscrimination laws, rules and regulations including but not limited to the Fair Housing Act, Americans with Disabilities Act, and similar state and local laws as they may apply to the Work.

## ARTICLE 24.  ATTORNEYS' FEES

Should any litigation or arbitration be commenced between the parties hereto concerning the Work, any provision of this Agreement or the rights or obligations of either party in relation hereto, the party, Subcontractor or Contractor, prevailing in such litigation or arbitration shall be entitled to a reasonable sum for attorneys' fees in such proceedings, unless any part of this litigation or arbitration is related to an Article 13 default as part of Contractor's claim against Subcontractor or as part of Contractor's defense to Subcontractor's claim for payment.

## ARTICLE 25.  DEMANDS AND NOTICES

All notices, demands, requests and other communications required or permitted to be given hereunder or by law to either party hereto shall be in writing and shall be deemed duly served or delivered when personally delivered to the party to whom it is addressed or when personally delivered to a supervisorial employee of said party or, when in lieu of said personal service, deposited in the United States Mail, first class postage prepaid, addressed to the Contractor or Subcontractor at the address that appears for each of them in this Subcontract. Either party hereto may change its address for the purposes of this Article by giving written notice of such change to the other party in the manner provided in this Article.

## ARTICLE 26.  CAPTIONS

The captions used for the sections in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of the intent of this Agreement, or any section thereof.

## ARTICLE 27.  SINGULAR NUMBER

Whenever used in this Agreement, the singular number shall include, the plural, and the use of any gender shall be applicable to all genders.

## ARTICLE 28.  AUTHORITY

If Subcontractor is a corporation, the person signing this Agreement on behalf of such corporation hereby warrants that he or she has full authority from such corporation to sign this Agreement and obligate the corporation.

## ARTICLE 29.  FAILURE TO NEGOTIATE PAYMENTS

Any payment hereunder that remains unclaimed or un-cashed or otherwise unconverted by the Subcontractor shall after a five (5) year period, automatically, without any further action of any party, become the sole property of Contractor.



#537156

### ARTICLE 30.  CONFLICT IN INTEREST

Until Subcontractor's obligations under this Agreement are completely fulfilled and the Project is complete, Subcontractor agrees not to perform any work related to the Project directly for the Owner, other contractors or any other entity or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by Contractor.  All work for this Project performed by Subcontractor shall be processed and handled exclusively through Contractor.

### ARTICLE 31. SUBCONTRACTOR'S OBLIGATION TO THE OWNER

a. In addition to its contractual obligations pursuant to the terms of this Agreement, Subcontractor is obligated directly to the Owner for the quality of work.

b. The services to be provided by Subcontractor hereunder are for the benefit of one or more partnerships, corporations, limited liability companies or joint ventures formed or to be formed to own and/or develop the project involved (together, the "Owner").  The Owner possesses some identity of interest with the Contractor and it is agreed that the Owner can enforce directly against Subcontractor all warranties or common law or statutory remedies, or contractual obligations with respect to the quality of the Work by a lawsuit for damages without the necessity of including the Contractor as a party to the litigation or arbitration.  In this respect, Subcontractor expressly waives any requirement of privity between it and the Owner for the purposes of the Owner's making claims for defective work under this Agreement on any of the above said grounds.

c. If for any reason the aforesaid waiver is not enforceable, Subcontractor agrees that Contractor may assign to Owner at any time all of the benefits of this Agreement with respect to the Subcontractor's obligation to provide a work product free from defects and that Owner may then enforce those obligations directly as if it had contracted with Subcontractor directly.

d. If claim is made against Owner in any way arising out of the quality of Subcontractor's work, Subcontractor agrees to indemnify, defend (with counsel chosen by Contractor), and hold harmless Owner against any and all monetary damages sustained by Owner including attorney fees incurred as a result of such claim.  It is agreed that the statute of limitations controlling such claim by the Owner shall begin to run at the earliest from the date of any judgment against the Owner arising out of Subcontractor's defective work.  This obligation shall survive termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CONTRACTOR:                                    SUBCONTRACTOR:
BOZZUTO BUILDING COMPANY            DESIGN BUILD MECHANICAL CORPORATION

BY:     Mike Green                                   BY:
TITLE:  Vice President                            TITLE:   Vice President

WITNESS                                               WITNESS

#537156

BOZZUTO

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| A406A-S | Main Lobby, Elevator 6 and 7 and Escalator - Plans and Sections | 12/1/2011 | 0 |
| A406B-S | Main Lobby, Elevator 6 and 7 and Escalator - Elevations | 12/1/2011 | 0 |
| A407-S | Newark Ave. Parking Ramps Plans and Sections | 12/1/2011 | 0 |
| A408-S | Newark Ave. Parking Ramps Sections and Details | 12/1/2011 | 0 |
| A409-S | Storefront Plan Details at Wisconsin & Newark Ave | 12/1/2011 | 0 |
| A410-S | Sections and Details  Loading Dock Enlarged Floor Plan | 12/1/2011 | 0 |
| A411 -S | Receiving Area, Trash and Dumpster Area  Enlarged Floor Plans, Sections and Details | 12/1/2011 | 0 |
| A415-S | Restrooms Plans, Elevations and Details | 12/1/2011 | 0 |
| A420-S | Plan Details | 12/1/2011 | 0 |
| A500-S | Partition Types | 12/1/2011 | 0 |
| A501-S | Partition Types | 12/1/2011 | 0 |
| A502-S | Partition Types and Detail | 12/1/2011 | 0 |
| A510-S | Door Schedule, Door and Frame Types with Door Frame Details | 12/1/2011 | 0 |
| A520-S | Exterior Window Types | 12/1/2011 | 0 |
| A521-S | Exterior Window Details | 12/1/2011 | 0 |
| A522-S | Exterior Window Details | 12/1/2011 | 0 |
| A523 -S | Interior Window Details | 12/1/2011 | 0 |
| A525-S | Interior Window Types | 12/1/2011 | 0 |
| A526-S | Interior Window Details | 12/1/2011 | 0 |
| A530-S | Concrete and Metal Stair Details | 12/1/2011 | 0 |
| A532-S | Elevator Hoistway Details | 12/1/2011 | 0 |
| A535-S | Misc. Loading Dock and Parking Garage Details | 12/1/2011 | 0 |
| A601A-S | Residential Plans and Elevations - Unit 1 BR-A (1BR/1.5BA/Den) | 12/1/2011 | 0 |
| A601B-S | Residential Plans and Elevations - Unit 1 BR-A (1BR/1.5BA/Den) | 12/1/2011 | 0 |
| A602-S | Residential Plans and Elevations - Unit 1 BR-B ANSI A (1BR/1BA) | 12/1/2011 | 0 |
| A603-S | Residential Plans and Elevations - Unit 1 BR/DEN-C ANSI A (1BR/1BA/Den) | 12/1/2011 | 0 |
| A604-S | Residential Plans and Elevations - Unit 1 BR/DEN-D (1BR/1BA/Den) | 12/1/2011 | 0 |
| A605A-S | Residential Plans and Elevations - Unit 1 BR/E (1 BR/1.5 BA/Den) | 12/1/2011 | 0 |
| A605B-S | Residential Plans and Elevations - Unit 1 BR/E (1 BR/1.5 BA/Den) | 12/1/2011 | 0 |
| A606A-S | Residential Plans and Elevations - Unit 2 BR-A ANSI A (2BR/2BA) | 12/1/2011 | 0 |
| A606B-S | Residential Plans and Elevations - Unit 2 BR-A ANSI A | 12/1/2011 | 0 |



#537156


BOZZUTO

**Exhibit 1: List of Drawings & Specifications**
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| | (2BR/2BA) | | |
| A607A-S | Residential Plans and Elevations - Unit 3 BR-C (3BR/2 BA) | 12/1/2011 | 0 |
| A607B-S | Residential Plans and Elevations - Unit 3 BR-C (3BR/2BA) | 12/1/2011 | 0 |
| A608A-S | Residential Plans and Elevations - Unit 3 BR-A (3BR/3BA) | 12/1/2011 | 0 |
| A608B-S | Residential Plans and Elevations - Unit 3 BR-A (3BR/3BA) | 12/1/2011 | 0 |
| A609A-S | Residential Plans and Elevations - Unit 3 BR-B ANSI A (3BR/2.5BA) | 12/1/2011 | 0 |
| A609B-S | Residential Plans and Elevations - Unit 3 BR-B ANSI A (3BR/2.5BA) | 12/1/2011 | 0 |
| A640-S | Fairhousing Requirements (Requirements: 2 to 7-A) | 12/1/2011 | 0 |
| A641-S | Fairhousing Requirement (Requirement: 7B) | 12/1/2011 | 0 |
| A642-S | Unit Details | 12/1/2011 | 0 |
| A650-S | Unit Bathroom Details | 12/1/2011 | 0 |
| A680-S | Unit Typical Kitchen Millwork Details | 12/1/2011 | 0 |
| | | | |
| **Civil** | | | |
| CS1 | Cover Sheet | 4/16/2012 | 0 |
| C1.01 | Legend and General Notes | 4/16/2012 | 0 |
| C2.00 | Overall Development Plan | 4/16/2012 | 0 |
| C2.01 | Layout and Materials Plan (North) | 4/16/2012 | 0 |
| C2.02 | Layout and Materials Plan (South) | 4/16/2012 | 0 |
| C2.03 | Signage and Striping Plan | 4/16/2012 | 0 |
| C3.01 | Grading and Drainage Plan (North) | 4/16/2012 | 0 |
| C3.02 | Grading and Drainage Plan (South) | 4/16/2012 | 0 |
| C3.05 | ADA Ramp Geometry Location Plan | 4/16/2012 | 0 |
| C3.06 | ADA Ramp Geometry Details | 4/16/2012 | 0 |
| C3.07 | ADA Ramp Geometry Details | 4/16/2012 | 0 |
| C4.01 | Utility Plan (North) | 4/16/2012 | 0 |
| C4.02 | Utility Plan (South) | 4/16/2012 | 0 |
| C5.01 | Profiles - Storm Drainage | 4/16/2012 | 0 |
| C5.02 | Profiles - Storm Drainage | 4/16/2012 | 0 |
| C5.03 | Profiles - Storm Drainage | 4/16/2012 | 0 |
| C5.04 | Profiles - Storm Drainage | 4/16/2012 | 0 |
| C5.05 | Profiles - Sanitary Sewer | 4/16/2012 | 0 |
| C5.06 | Profiles - Sanitary Sewer | 4/16/2012 | 0 |
| C5.07 | Profiles - Sanitary Sewer | 4/16/2012 | 0 |



#537156

 **BOZZUTO**

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| C5.08 | Profiles - Waterline Wisconsin Avenue NW | 4/16/2012 | 0 |
| C5.09 | Profiles - Waterline Newark Street and Idaho Avenue NW | 4/16/2012 | 0 |
| C5.10 | Profiles - Waterline Service Connections | 4/16/2012 | 0 |
| C5.11 | Profiles - Roadway Idaho Avenue NW | 4/16/2012 | 0 |
| C5.12 | Profiles - Roadway Idaho avenue NW and 38th Street NW | 4/16/2012 | 0 |
| C5.13 | Profiles - Roadway Newark Street | 4/16/2012 | 0 |
| C5.14 | Profiles - Roadway Wisconsin Avenue NW | 4/16/2012 | 0 |
| C5.15 | Profiles - Roadway Wisconsin Avenue NW | 4/16/2012 | 0 |
| C6.01 | Details - Site | 4/16/2012 | 0 |
| C6.02 | Details - Site | 4/16/2012 | 0 |
| C6.03 | Details - Site | 4/16/2012 | 0 |
| C6.04 | Details - Site | 4/16/2012 | 0 |
| C6.05 | Details - Drainage | 4/16/2012 | 0 |
| C6.06 | Details - Drainage | 4/16/2012 | 0 |
| C6.07 | Details - Sanitary Sewer | 4/16/2012 | 0 |
| C6.08 | Details - Water | 4/16/2012 | 0 |
| C6.09 | Details - Water | 4/16/2012 | 0 |
| C7.01 | Cross Sections - Idaho Avenue NW | 4/16/2012 | 0 |
| C7.02 | Cross Sections - Newark Street and 38th Street NW | 4/16/2012 | 0 |
| C7.03 | Cross Sections - Wisconsin Avenue NW | 4/16/2012 | 0 |
| SL1.01 | Site Lighting Plan (North) | 4/16/2012 | 0 |
| SL1.02 | Site Lighting Plan (South) | 4/16/2012 | 0 |
| RW1.01 | Retaining Wall Location Plan | 4/16/2012 | 0 |
| RW1.02 | Retaining Wall Layout and Elevations | 4/16/2012 | 0 |
| Er1.01 | Erosion & Sediment Control Plan (Phase 1) | 4/16/2012 | 0 |
| Er1.02 | Erosion & Sediment Control Plan (Phase 2) | 4/16/2012 | 0 |
| Er2.01 | Erosion & Sediment Control Narrative and Details | 4/16/2012 | 0 |
| TCP-1 | Maintenance of Traffic Plan (Phase 1) | 4/9/2012 | 0 |
| TCP-2 | Maintenance of Traffic Plan Notes (Phase 1) | 4/9/2012 | 0 |
| TCP2-1 | Maintenance of Traffic Plan (Phase 2) | 4/9/2012 | 0 |
| TCP2-2 | Maintenance of Traffic Plan Notes (Phase 2) | 4/9/2012 | 0 |
| TCP3-1 | Maintenance of Traffic Plan (Phase 3A) | 4/9/2012 | 0 |
| TCP3-2 | Maintenance of Traffic Plan (Phase 3B) | 4/9/2012 | 0 |
| TCP3-3 | Detour Plan (Phase 3A and 3B) | 4/9/2012 | 0 |



#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| TCP3-4 | Maintenance of Traffic Plan (Phase 3C) | 4/9/2012 | 0 |
| TCP3-5 | Maintenance of Traffic Plan (Phase 3D) | 4/9/2012 | 0 |
| TCP3-6 | Detour Plan (Phase 3C and 3D) | 4/9/2012 | 0 |
| TCP4-1 | Maintenance of Traffic Plan (Phase 4A) | 4/9/2012 | 0 |
| TCP4-2 | Maintenance of Traffic Plan (Phase 4B) | 4/9/2012 | 0 |
| TCP4-3 | Maintenance of Traffic Plan (Phase 4C) | 4/9/2012 | 0 |
| TCP4-4 | Maintenance of Traffic Plan (Phase 4D) | 4/9/2012 | 0 |
| TCP4-5 | Maintenance of Traffic Plan (Phase 4E) | 4/9/2012 | 0 |
| TCP4-6 | Maintenance of Traffic Plan (Phase 4F) | 4/9/2012 | 0 |
| TCP5-1 | Maintenance of Traffic Plan (Phase 5) | 4/9/2012 | 0 |
| TCP-6 | Maintenance of Traffic Plan Notes and Details | 4/9/2012 | 0 |
| 1 of 2 | Boundary & Topographic Survey | 2/21/2012 | 0 |
| 2 of 2 | Boundary & Topographic Survey | 2/21/2012 | 03 |
| 1 of 10 | Cover Sheet (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 2 of 10 | Proposed Townhome Electric Conduit Plan (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 2A of 10 | Proposed Town-Home Comm. Conduit Plan (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 3 of 10 | Proposed Pepco Relocation Plan (Proposed Dry Utility Conduit Plan Set) | 5/2/2012 | 0 |
| 3A of 10 | Proposed Dry Utility Overall Plan (Proposed Dry Utility Conduit Plan Set) | 5/8/2012 | 0 |
| 4 of 10 | Proposed Dry Utility Conduit Plan "South Parcel" (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 5 of 10 | Proposed Dry Utility Conduit Plan "North Parcel" (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 6 of 10 | Proposed Temp Service Plan - Idaho Ave. (Proposed Dry Utility Conduit Plan Set) | 4/26/2012 | 0 |
| 7 of 10 | Proposed Temp Service Plan - 38th & Macomb (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 8 of 10 | Pepco Details (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| 8A of 10 | Pepco Details  (Proposed Dry Utility Conduit Plan Set) | 4/25/2012 | 0 |
| N-1 OF 7 | NOTES & SCHEDULES (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-2 OF 7 | PLAN VIEW (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-3 OF 7 | ELEVATIONS (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-4 OF 7 | ELEVATIONS (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-5 OF 7 | DETAILS (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-6 OF 7 | SECTIONS (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| N-7 OF 7 | SECTIONS (SUPPORT OF EXCAVATION - NORTH) | 5/1/2012 | 1 |
| S-1 OF 7 | NOTES & SCHEDULES (SUPPORT OF EXCAVATION | 5/1/2012 | 1 |



#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| | - SOUTH) | | |
| S-2 OF 7 | PLAN VIEW (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |
| S-3 OF 7 | ELEVATIONS (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |
| S-4 OF 7 | ELEVATIONS (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |
| S-5 OF 7 | DETAILS (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |
| S-6 OF 7 | SECTIONS (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |
| S-7 OF 7 | SECTIONS (SUPPORT OF EXCAVATION - SOUTH) | 5/1/2012 | 1 |

**Demolition**

| | | | |
|--------|-------|----------|-----|
| Dm1.01 | Demolition Plan (North) | 4/16/2012 | 0 |
| Dm1.02 | Demolition Plan (South) | 4/16/2012 | 0 |

**Electrical**

| | | | |
|--------|-------|----------|-----|
| E001-N | Electrical Cover Sheet | 12/1/2011 | 0 |
| E101A-N | Parking Level 2 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E101B-N | Parking Level 2 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E102A-N | Parking Level 2 Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E102B-N | Parking Level 2 Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E103A-N | Parking Level 1 Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E103B-N | Parking Level 1 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E104A-N | Parking Level 1 Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E104B-N | Parking Level 1 Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E105A-N | Ground Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E105B-N | Ground Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E106A-N | Ground Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E106B-N | Ground Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E107A-N | Second Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E107B-N | Second Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E108A-N | Second Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E108B-N | Second Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E109A-N | Third Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E109B-N | Third Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E110A-N | Third Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E110B-N | Third Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |



#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| E111A-N | Fourth Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E111B-N | Fourth Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E112A-N | Fourth Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E112B-N | Fourth Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E113A-N | Fifth Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E113B-N | Fifth Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E114A-N | Fifth Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E114B-N | Fifth Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E115A-N | Roof Plan - Part A - Lighting, Power and Communication | 12/1/2011 | 0 |
| E115B-N | Roof Plan - Part B - Lighting, Power and Communication | 12/1/2011 | 0 |
| E401-N | Enlarged Residential Plans - 2nd Floor - Lighting & Power | 12/1/2011 | 0 |
| E402-N | Enlarged Residential Plans - 2nd Floor - Lighting & Power | 12/1/2011 | 0 |
| E403-N | Enlarged Residential Plans - 2nd Floor - Lighting & Power | 12/1/2011 | 0 |
| E404-N | Enlarged Residential Plans - 2nd Floor - Electrical | 12/1/2011 | 0 |
| E405-N | Enlarged Residential Plans - 3rd & 4th Floor - (Typical) Electrical | 12/1/2011 | 0 |
| E406-N | Enlarged Residential Plans - 3rd & 4th Floor - (Typical) Electrical | 12/1/2011 | 0 |
| E407-N | Enlarged Residential Plans - 3rd & 4th Floor - (Typical) Electrical | 12/1/2011 | 0 |
| E408-N | Enlarged Residential Plans - 3rd & 4th Floor - (Typical) Electrical | 12/1/2011 | 0 |
| E409-N | Enlarged Residential Plans - 5th Floor - Electrical | 12/1/2011 | 0 |
| E410-N | Enlarged Residential Plans - 5th Floor - Electrical | 12/1/2011 | 0 |
| E411-N | Enlarged Residential Plans - 5th Floor - Electrical | 12/1/2011 | 0 |
| E412-N | Enlarged Residential Plans - 5th Floor - Electrical | 12/1/2011 | 0 |
| E501-N | Power Riser Diagrams - Electrical | 12/1/2011 | 0 |
| E502-N | Switchboard Elevations and Electrical Rooms | 12/1/2011 | 0 |
| E503-N | Fire Alarm Riser Diagram | 12/1/2011 | 0 |
| E504-N | Telecommunications Riser Diagram | 12/1/2011 | 0 |
| E701-N | Panel Schedules | 12/1/2011 | 0 |
| E702-N | Panel Schedules | 12/1/2011 | 0 |
| E001-S | Electrical Cover Sheet | 12/1/2011 | 0 |
| E101A-S | Parking Level 2 Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E101B-S | Parking Level 2 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E102A-S | Parking Level 2 Floor Plan - Part A - Power and | 12/1/2011 | 0 |



#537156

 **BOZZUTO**

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| | Communication | | |
| E102B-S | Parking Level 2 Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E103A-S | Parking Level 1 Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E103B-S | Parking Level 1 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E104A-S | Parking Level 1 Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E104B-S | Parking Level 1 Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E105A-S | Ground Level 2 Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E105B-S | Ground Level 2 Floor Plan - Part B - Lighting | 12/1/2011 | 0 |
| E106A-S | Ground Level Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E106B-S | Ground Level Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E107A-S | Second Floor Plan - Part A - Lighting | 12/1/2011 | 0 |
| E107B-S | Second Floor Plan - Part B - Lighting | 12/1/2011 | 03 |
| E108A-S | Second Floor Plan - Part A - Power and Communication | 12/1/2011 | 0 |
| E108B-S | Second Floor Plan - Part B - Power and Communication | 12/1/2011 | 0 |
| E109-S | Loft Level Floor Plan - Lighting, Power and Communication | 12/1/2011 | 0 |
| E110A-S | Roof Plan - Part A - Lighting, Power and Communication | 12/1/2011 | 0 |
| E110B-S | Roof Plan - Part B - Lighting, Power and Communication | 12/1/2011 | 0 |
| E301-S | Enlarged Second Floor Plan - Electrical | 12/1/2011 | 0 |
| E302-S | Enlarged Loft Level Floor Plan - Electrical | 12/1/2011 | 0 |
| E401-S | Power Riser Diagrams - Electrical | 12/1/2011 | 0 |
| E402-S | Switchboards Elevation and Details | 12/1/2011 | 0 |
| E501-S | Fire Alarm Riser Diagram | 12/1/2011 | 0 |
| E601-S | Telecommunications Riser Diagram | 12/1/2011 | 0 |
| E701-S | Panel Schedules | 12/1/2011 | 0 |
| E702-S | Panel Schedules | 12/1/2011 | 0 |

**Interior Design**

| | | | |
|--------|-------|----------|-----|
| CS3 | Cover Sheet (NP ID Drawings) | 12/16/2011 | 03 |
| IDN-01-N | General Notes, Abbreviations, Legend And Drawing Index | 12/1/2011 | 03 |
| IDN-02-N | ICC/ANSI A117.1-2003 Standards | 12/1/2011 | 03 |
| IDS-01-N | Specifications - North & South Parcel | 12/1/2011 | 03 |
| IDS-02-N | Door/Window/Transition Details and Specifications - North & South Parcel | 12/1/2011 | 03 |



#537156

 **BOZZUTO**

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| IDS-03-N | Finish Specifications | 12/1/2011 | 03 |
| N-ID1-01 | Design Plan - North Parcel Ground Floor - Amenities Spaces | 12/1/2011 | 03 |
| N-ID1-02 | Design , Finish and Furniture Plan - North Parcel - Floor 2 Corridor | 12/1/2011 | 03 |
| N-ID1-03 | Design Plan - North Parcel - 2nd Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID1-04 | Design, Finish, and Furniture Plan - North Parcel - Floors 3-5 Typ. Corridors | 12/1/2011 | 03 |
| N-ID2-01 | Reflected Ceiling Plan - North Parcel - Ground Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID2-02 | Reflected Ceiling, Power and Communication Plan - North Parcel - Floor 2 Corridor | 12/1/2011 | 03 |
| N-ID2-03 | Reflected Ceiling Plan - North Parcel - 2nd Floor Amenity Plan | 12/1/2011 | 03 |
| N-ID2-04 | Reflected Ceiling, Power and Communication Plan - North Parcel - Floor 3-5 Typ. Corridor | 12/1/2011 | 03 |
| N-ID3-01 | Power and Communications Plan - North Parcel - Ground Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID3-02 | Power and Communications Plan - North Parcel - 2nd Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID4-01 | Finish Plan - North Parcel - Ground Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID4-02 | Finish Plan - North Parcel - 2nd Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID5-01 | Furniture Plan - North Parcel - Ground Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID5-02 | Furniture Plan - North Parcel - 2nd Floor Amenity Spaces | 12/1/2011 | 03 |
| N-ID5-03 | Furniture Plan - North Parcel - 2nd Floor Outdoor | 12/1/2011 | 03 |
| N-ID5-04 | Furniture Plan - North Parcel - Roof Area | 12/1/2011 | 03 |
| N-ID6-01A | Architectural Millwork Details - Library Lobby Seating, Lobby, Vestibule | 12/1/2011 | 03 |
| N-ID6-01B | Architectural Millwork Details - Library Lobby Seating, Lobby, Vestibule | 12/1/2011 | 03 |
| N-ID6-02 | Architectural Millwork Details - Leasing Seating | 12/1/2011 | 03 |
| N-ID6-03A | Architectural Millwork Details - Concierge Desk | 12/1/2011 | 03 |
| N-ID6-03B | Architectural Millwork Details - Concierge Desk | 12/1/2011 | 03 |
| N-ID6-04 | Architectural Millwork Details - Mail Room & Library | 12/1/2011 | 03 |
| N-ID6-05 | Architectural Millwork Details - Elevator Lobby | 12/1/2011 | 03 |
| N-ID6-06 | Architectural Millwork Details - Fitness Center | 12/1/2011 | 03 |
| N-ID6-07A | Architectural Millwork Details - Clubroom | 12/1/2011 | 03 |
| N-ID6-07B | Architectural Millwork Details - Clubroom | 12/1/2011 | 03 |
| N-ID6-07C | Architectural Millwork Details - Clubroom | 12/1/2011 | 03 |
| N-ID6-08 | Architectural Millwork Details - 2nd Floor Women's Rm. Typ. Unit Entry | 12/1/2011 | 03 |
| N-ID6-09 | Architectural Millwork Details - 2nd Floor Elevator Lobby | 12/1/2011 | 03 |



#537156



Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| N-ID7-01 | Elevations | 12/1/2011 | 03 |
| N-ID8-01 | Details | 12/1/2011 | 03 |
| N-ID8-02 | Details | 12/1/2011 | 03 |
| CS8 | Cover Sheet (SP ID Drawings) | 12/1/2011 | 03 |
| IDN-01 | General Notes, Abbreviations, Legend and Drawing Index | 12/1/2011 | 03 |
| IDN-02 | ICC/ANSI A117.1 2003 Standards | 12/1/2011 | 03 |
| IDS-01 | Specifications  North and South Parcel | 12/1/2011 | 03 |
| IDS-02 | Door / Window / Transition Details and Specifications - North and South Parcels | 12/1/2011 | 03 |
| IDS-03 | Finish Specifications | 12/1/2011 | 03 |
| S-ID1-01 | Design Plan, Reflected Ceiling Plan, Power Communication Plan, Finish and Furniture Plan | 12/1/2011 | 05 |
| S-ID1-02 | Design, Finish and Furniture Plan Floor 2 Corridor | 12/1/2011 | 05 |
| S-ID2-02 | Reflected Ceiling , Power and Communications Plan Floor 2 Corridor | 12/1/2011 | 03 |
| S-ID8-01A | Architectural Millwork Details  Lobby | 12/1/2011 | 04 |
| SP-ID8-01B | Architectural Millwork Details  Lobby | 12/1/2011 | 03 |
| S-ID8-02 | Architectural Millwork Details  Elevator Lobby and Mailroom | 12/1/2011 | 04 |
| S-ID8-03 | Architectural Millwork Details  Elevator Lobby Unit Entry & Typical Pilaster | 12/1/2011 | 03 |

Landscape

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| L1.01 | Planting Plan (North) | 4/16/2012 | 0 |
| L1.02 | Planting Plan (South) | 4/16/2012 | 0 |
| L2.01 | Planting Details | 4/16/2012 | 0 |
| L3.01 | Irrigation Coverage Plan (North) | 4/16/2012 | 0 |
| L3.02 | Irrigation Coverage Plan (South) | 4/16/2012 | 0 |
| L201-N | Materials Plan - Newark Plaza & Gateway Planter | 9/11/2012 | 1 |
| L202-N | Materials Plan - North Courtyard | 9/11/2012 | 1 |
| L203-N | Materials Plan - North Roof Terrace | 9/11/2012 | 1 |
| L301-N | Layout Plan - Newark Plaza & Gateway Planter | 9/11/2012 | 1 |
| L302-N | Layout Plan - North Courtyard | 9/11/2012 | 1 |
| L303-N | Layout Plan - North Roof Terrace | 9/11/2012 | 1 |
| L401-N | Grading & Soils Plan - Newark Plaza & Gateway Planter | 9/11/2012 | 1 |
| L402-N | Grading & Soils Plan - North Courtyard | 9/11/2012 | 1 |
| L403-N | Grading & Soils Plan - North Roof Terrace | 9/11/2012 | 1 |
| L501-N | Planting Plan - Newark Plaza & Gateway Planter | 9/11/2012 | 1 |

#537156

 BOZZUTO

**Exhibit 1: List of Drawings & Specifications**
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| L502-N | Planting Plan - North Courtyard | 9/11/2012 | 1 |
| L503-N | Planting Plan - North Roof Terrace | 9/11/2012 | 1 |
| L504-N | Planting Details | 9/11/2012 | 1 |
| L505-N | Planting Details & Schedule | 9/11/2012 | 1 |
| L601-N | Hardscape Details | 9/11/2012 | 1 |
| L602-N | Hardscape Details | 9/11/2012 | 1 |
| L603-N | Hardscape Details | 9/11/2012 | 1 |
| L604-N | Hardscape Details | 9/11/2012 | 1 |
| L701-N | Lighting Plan | 9/11/2012 | 1 |
| L702-N | Lighting Plan | 9/11/2012 | 1 |
| L703-N | Lighting Plan | 9/11/2012 | 1 |
| L201-S | Materials Plan - South Courtyard | 9/11/2012 | 1 |
| L301-S | Layout Plan South Courtyard | 9/11/2012 | 1 |
| L401-S | Grading and Soils Plan - South Courtyard | 9/11/2012 | 1 |
| L501-S | Planting Plan - South Courtyard | 9/11/2012 | 1 |
| L502-S | Planting Details & Schedule | 9/11/2012 | 1 |
| L601-S | Hardscape Details | 9/11/2012 | 1 |
| L701-S | Lighting Plan (South) | 9/11/2012 | 1 |

**Mechanical**

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| M001-N | Cover Sheet - Mechanical | 12/1/2011 | 0 |
| M002-N | Code Compliance Mechanical | 12/1/2011 | 0 |
| M101A-N | Parking Level 2 Floor Plan - Part A | 12/1/2011 | 0 |
| M101B-N | Parking Level 2 Floor Plan - Part B | 12/1/2011 | 0 |
| M102A-N | Parking Level 1 Floor Plan - Part A | 12/1/2011 | 0 |
| M102B-N | Parking Level 1 Floor Plan - Part B | 12/1/2011 | 0 |
| M103A-N | Ground Floor Plan - Part A | 12/1/2011 | 0 |
| M103B-N | Ground Floor Plan - Part B | 12/1/2011 | 0 |
| M104A-N | Second Floor Plan - Part A | 12/1/2011 | 0 |
| M104B-N | Second Floor Plan - Part B | 12/1/2011 | 0 |
| M105A-N | Third Floor Plan - Part A | 12/1/2011 | 0 |
| M105B-N | Third Floor Plan - Part B | 12/1/2011 | 0 |
| M106A-N | Fourth Floor Plan - Part A | 12/1/2011 | 0 |
| M106B-N | Fourth Floor Plan - Part B | 12/1/2011 | 0 |
| M107A-N | Fifth Floor Plan - Part A | 12/1/2011 | 0 |



#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| M107B-N | Fifth Floor Plan - Part B | 12/1/2011 | 0 |
| M108A-N | Roof Plan - Part A | 12/1/2011 | 0 |
| M108B-N | Roof Plan - Part B | 12/1/2011 | 0 |
| M401-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| M402-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| M403-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| M404-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| M501-N | Riser Diagrams | 12/1/2011 | 0 |
| M601-N | Details | 12/1/2011 | 0 |
| M701-N | Schedules | 12/1/2011 | 0 |
| C67 | Cover Sheet - South Parcel - Volume 2 of 2 | 12/1/2011 | 0 |
| M001-S | Cover Sheet Mechanical | 12/1/2011 | 0 |
| M002-S | Code Compliance | 12/1/2011 | 0 |
| M101A-S | Parking Level 2 Floor Plan - Part A | 12/1/2011 | 0 |
| M101B-S | Parking Level 2 Floor Plan - Part B | 12/1/2011 | 0 |
| M102A-S | Parking Level 1 Floor Plan - Part A | 12/1/2011 | 0 |
| M102B-S | Parking Level 1 Floor Plan - Part B | 12/1/2011 | 0 |
| M103A-S | Ground Level Floor Plan - Part A | 12/1/2011 | 0 |
| M103B-S | Ground Level Floor Plan - Part B | 12/1/2011 | 0 |
| M104A-S | Second Level Floor Plan - Part A | 12/1/2011 | 0 |
| M104B-S | Second Level Floor Plan - Part B | 12/1/2011 | 0 |
| M105-S | Loft Level Floor Plan | 12/1/2011 | 0 |
| M106A-S | Roof Plan - Part A | 12/1/2011 | 0 |
| M106B-S | Roof Plan - Part B | 12/1/2011 | 0 |
| M401-S | Enlarged Second Level Floor Plan | 12/1/2011 | 0 |
| M402-S | Enlarged Loft Floor Plan | 12/1/2011 | 0 |
| M501-S | Riser Diagrams | 12/1/2011 | 0 |
| M601-S | Details | 12/1/2011 | 0 |
| M701-S | Schedule | 12/1/2011 | 0 |

**Plumbing**

| | | | |
|---|---|---|---|
| P001-N | Cover Sheet Plumbing | 12/1/2011 | 0 |
| P101A-N | Parking Level 2 Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P101B-N | Parking Level 2 Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |

#537156



**BOZZUTO**

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| P102A-N | Parking Level 1 Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P102B-N | Parking Level 1 Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P103A-N | Ground Floor Plan - Part A - Waste, Vent and Storm | 4/13/2012 | 02 |
| P103B-N | Ground Floor Plan - Part B - Waste, Vent, and Storm | 4/13/2012 | 02 |
| P104A-N | Second Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P104B-N | Second Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P105A-N | Third Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P105B-N | Third Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P106A-N | Fourth Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P106B-N | Fourth Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P107A-N | Fifth Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P107B-N | Fifth Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P108A-N | Roof Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P108B-N | Roof Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P201A-N | Parking Level 2 Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P201B-N | Parking Level 2 Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P202A-N | Parking Level 1 Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P202B-N | Parking Level 1 Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P203A-N | Ground Level Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P203B-N | Ground Level Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P204A-N | Second Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P204B-N | Second Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P205A-N | Third Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P205B-N | Third Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P206A-N | Fourth Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P206B-N | Fourth Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P207A-N | Fifth Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P207B-N | Fifth Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P208A-N | Roof Plan - Part A - Gas and Water | 12/1/2011 | 0 |
| P208B-N | Roof Plan - Part B - Gas and Water | 12/1/2011 | 0 |
| P301-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |
| P302-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |
| P303-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |



#537156

BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|--------|-------|----------|-----|
| P304-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |
| P305-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |
| P306-N | Sanitary Riser Diagrams | 12/1/2011 | 0 |
| P307-N | Fire Riser Diagram | 12/1/2011 | 0 |
| P308-N | Water Riser Diagrams | 12/1/2011 | 0 |
| P309-N | Water Riser Diagrams | 12/1/2011 | 0 |
| P310-N | Water Riser Diagrams | 12/1/2011 | 0 |
| P311-N | Water and Gas Riser Diagrams | 12/1/2011 | 0 |
| P401-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P402-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P403-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P404-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P501-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P502-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P503-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P504-N | Enlarged Residential Plans | 12/1/2011 | 0 |
| P601-N | Plumbing Details | 12/1/2011 | 0 |
| P602-N | Plumbing Specifications and Details | 4/13/2012 | 02 |
| P603-N | Plumbing Specifications and Details | 4/13/2012 | 02 |
| P604-N | Plumbing Schedules, Details and Specifications | 12/1/2011 | 0 |
| P001-S | Cover Sheet  Plumbing | 12/1/2011 | 0 |
| P101A-S | Parking Level 2 Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P101B-S | Parking Level 2 Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P102A-S | Parking Level 1 Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P102B-S | Parking Level 1 Floor Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |
| P103A-S | Ground Level Floor Plan - Part A - Waste, Vent and Storm | 4/13/2012 | 02 |
| P103B-S | Ground Level Floor Plan - Part B - Waste, Vent and Storm | 4/13/2012 | 02 |
| P104A-S | Second Level Floor Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P104B-S | Second Level Floor Plan - Part B - Waste, Vent and Storm | 4/13/2012 | 02 |
| P105-S | Loft Level Floor Plan - Waste, Vent and Storm | 12/1/2011 | 0 |
| P106A-S | Roof Plan - Part A - Waste, Vent and Storm | 12/1/2011 | 0 |
| P106B-S | Roof Plan - Part B - Waste, Vent and Storm | 12/1/2011 | 0 |



#537156

 **BOZZUTO**

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| P201A-S | Parking Level 2 Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P201B-S | Parking Level 2 Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P202A-S | Parking Level 1 Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P202B-S | Parking Level 1 Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P203A-S | Ground Level Floor Plan - Part A  - Water, Fire and Gas | 4/13/2012 | 02 |
| P203B-S | Ground Level Floor Plan - Part B - Water, Fire and Gas | 4/13/2012 | 02 |
| P204A-S | Second Level Floor Plan - Part A - Water, Fire and Gas | 12/1/2011 | 0 |
| P204-B | Second Level Floor Plan - Part B - Water, Fire and Gas | 12/1/2011 | 0 |
| P205-S | Loft Level Floor Plan - Water, Fire and Gas | 12/1/2011 | 0 |
| P206A-S | Roof Plan - Part A - Water, Gas and Fire | 12/1/2011 | 0 |
| P206B-S | Roof Plan - Part B - Water, Gas and Fire | 12/1/2011 | 0 |
| P301-S | Sanitary Waste and Vent Riser Diagrams | 12/1/2011 | 0 |
| P302-S | Sanitary Waste and Vent Riser Diagrams | 12/1/2011 | 0 |
| P303-S | Sanitary Waste/Vent and Storm Riser Diagrams | 12/1/2011 | 0 |
| P304-S | Storm Water and Drainage System Riser Diagrams | 12/1/2011 | 0 |
| P305-S | Water Riser Diagrams | 12/1/2011 | 0 |
| P306-S | Water and Gas Riser Diagrams | 12/1/2011 | 0 |
| P401-S | Enlarged Second Level Floor Plan -Waste and Vent | 12/1/2011 | 0 |
| P402-S | Enlarged Loft Level Floor Plan -Waste and Vent | 12/1/2011 | 0 |
| P501-S | Enlarged Second Level Floor Plan -Water | 12/1/2011 | 0 |
| P502-S | Enlarged Loft Level Floor Plan -Water | 12/1/2011 | 0 |
| P601-S | Plumbing Details | 12/1/2011 | 0 |
| P602-S | Plumbing Specifications and Details | 4/13/2012 | 02 |
| P603-S | Plumbing Specifications and Details | 4/13/2012 | 02 |
| P604-S | Plumbing Schedules, Details and Specifications | 4/13/2012 | 02 |

**Structural**

| | | | |
|---|---|---|---|
| CS4 | Cover Sheet - North Parcel - Volume 2 of 2 | 12/1/2011 | 0 |
| S001-N | General Notes | 4/13/2012 | 01 |
| S002-N | Structural Special Inspections Statement | 12/1/2011 | 0 |
| S101A-N | Foundation / Parking Level 2 Plan - Part A | 4/13/2012 | 01 |
| S101B-N | Foundation / Parking Level 2 Plan - Part B | 4/13/2012 | 01 |
| S102A-N | Parking Level 1 Framing Plan - Part A | 4/13/2012 | 01 |
| S102B-N | Parking Level 1 Framing Plan - Part B | 12/1/2011 | 0 |

#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| S103A-N | Ground Floor Framing Plan - Part A | 4/13/2012 | 01 |
| S103B-N | Ground Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S104A-N | Second Floor Framing Plan - Part A | 12/1/2011 | 0 |
| S104B-N | Second Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S104LA-N | Second Floor / Residential Framing Loading Plan - Part A | 12/1/2011 | 0 |
| S104LB-N | Second Floor / Residential Framing Loading Plan - Part B | 12/1/2011 | 0 |
| S105A-N | Third Floor Framing Plan - Part A | 12/1/2011 | 0 |
| S105B-N | Third Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S106A-N | Fourth Floor Framing Plan - Part A | 12/1/2011 | 0 |
| S106B-N | Fourth Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S107A-N | Fifth Floor Framing Plan - Part A | 12/1/2011 | 0 |
| S107B-N | Fifth Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S108A-N | Roof Framing Plan - Part A | 12/1/2011 | 0 |
| S108B-N | Roof Framing Plan - Part B | 12/1/2011 | 0 |
| S201-N | Column Schedule and Typical Details | 4/13/2012 | 01 |
| S301-N | Typical Foundation & Slab On Grade Details | 4/13/2012 | 01 |
| S302-N | Typical Concrete Wall Details | 4/13/2012 | 01 |
| S303-N | Typical Shear Wall Details | 12/1/2011 | 0 |
| S311-N | Typical Concrete Framed Slab Details | 12/1/2011 | 0 |
| S312-N | Concrete Beam Schedule & Typical Details | 12/1/2011 | 0 |
| S313-N | Sections & Details | 12/1/2011 | 0 |
| S401-N | CMU Wall Sections & Details | 12/1/2011 | 0 |
| S601-N | Residential Framing Details | 12/1/2011 | 0 |
| S001-S | General Notes | 4/13/2012 | 01 |
| S002-S | Structural Special Inspections Statement | 12/1/2011 | 0 |
| S101A-S | Foundation / Parking Level 2 Plan - Part A | 4/13/2012 | 01 |
| S101B-S | Foundation / Parking Level 2 Plan - Part B | 4/13/2012 | 01 |
| S102A-S | Parking Level 1 Framing Plan - Part A | 4/13/2012 | 01 |
| S102B-S | Parking Level 1 Framing Plan - Part B | 12/1/2011 | 0 |
| S103A-S | Ground Floor Framing Plan - Part A | 4/13/2012 | 01 |
| S103B-S | Ground Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S104A-S | Second Floor Framing Plan - Part A | 12/1/2011 | 0 |
| S104B-S | Second Floor Framing Plan - Part B | 12/1/2011 | 0 |
| S105A-S | Main Roof / Residential Framing Plan - Part A | 12/1/2011 | 0 |



#537156

 **BOZZUTO**

**Exhibit 1: List of Drawings & Specifications**
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| S105B-S | Roof Plan - Part B | 12/1/2011 | 0 |
| S106-S | Residential Framing Plans | 12/1/2011 | 0 |
| S201-S | Coulumn Schedule and Typical Details | 4/13/2012 | 01 |
| S202-S | Coulumn Schedule | 4/13/2012 | 01 |
| S203-S | Coulumn Schedule | 4/13/2012 | 01 |
| S301-S | Typical Foundation and Slab on Grade Details | 4/13/2012 | 01 |
| S302-S | Typical Concrete Wall Details | 4/13/2012 | 01 |
| S303-S | Typical Shear Wall Details | 12/1/2011 | 0 |
| S311-S | Typical Concrete Framed Slab Details | 12/1/2011 | 0 |
| S312-S | Concrete Beam Schedule and Details | 12/1/2011 | 0 |
| S313-S | Concrete Sections and Details | 12/1/2011 | 0 |
| S401-S | CMU Wall Sections and Details | 12/1/2011 | 0 |
| S501-S | Typical Steel Framing Details | 12/1/2011 | 0 |
| S502-S | Typical Joist and Roof Framing Details | 12/1/2011 | 0 |
| S503-S | Typical Joist and Roof Framing Details | 12/1/2011 | 0 |
| S511-S | Braced Frame Elevations & Typical Details | 12/1/2011 | 0 |
| S601-S | Residential Framing Details | 12/1/2011 | 0 |

**Reports**

**Civil**

| AS#1 - Civil Narrative | AS#1 - Civil Narrative 4/16/2012 | 4/16/2012 | 1 |
|---|---|---|---|

**Environmental**

| CAP | Corrective Action Plan - Voluntary Cleanup Program - Cathedral Commons (Wisconsin Avenue Giant) | 9/19/2011 | 0 |
|---|---|---|---|
| VCAP | Voluntary Cleanup Action Plan Approval Letter (District Department of the Environment) | 10/26/2011 | 0 |
| PHIENV | Phase I Environmental Site Assessment - Proposed Giant Re-Development | 8/26/2008 | 0 |
| PHIIENV | Phase II Environmental Site Assessment - Wisconsin Avenue Giant | 1/8/2009 | 0 |
| SCA | Site Characterization Assessment - Cathedral Commons (Wisconsin Avenue Giant) | 6/30/2011 | 0 |
| RSE | Report of Subsurface Exploration - CTP Soundings at Cathedral Commons | 4/18/2012 | 0 |
| HAZ | All American Environmental Contractors, LLC - Asbestos & Lead Based Paint Report | 12/9/2011 | 0 |

**Geotechnical**

| GEO1 | FINAL GEOTECHNICAL REPORT - WISCONSIN AVENUE GIANT; NEWARK STREET NW AND | 7/28/2011 | 0 |
|---|---|---|---|

#537156

 **BOZZUTO**

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| | WISCONSIN AVENUE NW, WASHINGTON, DC (SCHNABEL ENGINEERING) | | |
| GEO2 | REPORT OF GEOTECHNICAL EXPLORATION: PUBLIC ROADWAYS AND RETAINING WALLS - CATHEDRAL COMMONS - GEO-TECHNOLOGIES, INC. | 4/25/2012 | 0 |

**Sketch**

**Civil**

| DCNP | Design Calculations - Temporary Excavation Support for Cathedral Commons - North Parcel | 4/30/2012 | 0 |
| DCSP | Design Calculations - Temporary Excavation Support for Cathedral Commons - South Parcel | 4/30/2012 | 0 |

**Specifications**

**Architectural**

| 00 00 00 | Project Team Directory | 12/1/2012 | 0 |
| 01 10 00 | Summary Of Work | 12/1/2012 | 0 |
| 01 25 00 | Substitution Procedures | 12/1/2012 | 0 |
| 01 30 00 | Administrative Requirements | 12/1/2012 | 0 |
| 01 31 00 | Project Management and Coordination | 12/1/2012 | 0 |
| 01 33 00 | Submittal Procedures | 12/1/2012 | 0 |
| 01 40 00 | Quality Requirements | 12/1/2012 | 0 |
| 01 60 00 | Product Requirements | 12/1/2011 | 0 |
| 01 73 00 | Execution | 12/1/2011 | 0 |
| 01 74 19 | Construction Waste Management and Disposal | 12/1/2011 | 0 |
| 01 77 00 | Closeout Procedures | 12/1/2011 | 0 |
| 01 78 23 | Operation and Maintenance Data | 12/1/2011 | 0 |
| 01 78 39 | Project Record Documents | 12/1/2011 | 0 |
| 01 91 01 | General Commissioning Requirements | 12/1/2011 | 0 |
| 01 91 13.13 | Sustainable Design Requirements - LEED for New Construction and Major Renovations | 12/1/2011 | 0 |
| 03 30 00 | Cast-In-Place Concrete | 12/1/2011 | 0 |
| 03 49 00 | Glass-Fiber Reinforced Concrete | 12/1/2011 | 0 |
| 04 05 11 | Masonry Mortaring and Grouting | 12/1/2011 | 0 |
| 04 20 00 | Unit Masonry | 12/1/2011 | 0 |
| 04 42 00 | Exterior Stone Cladding | 12/1/2011 | 0 |
| 04 72 00 | Cast Stone Masonry | 12/1/2011 | 0 |
| 05 70 00 | Decorative Metal | 12/1/2011 | 0 |

#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 06 16 00 | Sheathing | 12/1/2011 | 0 |
| 06 20 00 | Finish Carpentry | 12/1/2011 | 0 |
| 06 40 13 | Exterior Architectural Woodwork | 9/11/2012 | 1 |
| 06 61 00 | Simulated Stone Fabrications | 12/1/2011 | 0 |
| 07 11 13 | Bituminous Dampproofing | 12/1/2011 | 0 |
| 07 13 00 | Sheet Waterproofing | 12/1/2011 | 0 |
| 07 21 00 | Thermal Insulation | 12/1/2011 | 0 |
| 07 25 00 | Weather Barriers | 12/1/2011 | 0 |
| 07 33 63.16 | Vegetated Roofing System on Concrete Deck | 12/1/2011 | 0 |
| 07 46 46 | Fiber Cement Siding | 12/1/2011 | 0 |
| 07 51 30 | Cold Process Built-Up Asphalt Roofing | 12/1/2011 | 0 |
| 07 54 00 | Thermoplastic Membrane Roofing | 12/1/2011 | 0 |
| 07 62 00 | Sheet Metal Flashing and Trim | 12/1/2011 | 0 |
| 07 92 00 | Joint Sealers | 12/1/2011 | 0 |
| 07 95 00 | Expansion Control | 12/1/2011 | 0 |
| 08 33 00 | Overhead Coiling Service Doors | 12/1/2011 | 0 |
| 08 42 29 | Automatic Entrances | 12/1/2011 | 0 |
| 08 43 13 | Aluminum-Framed Storefronts | 12/1/2011 | 0 |
| 08 44 13 | Glazed-Aluminum Curtain Walls | 12/1/2011 | 0 |
| 08 51 13 | Aluminum Windows | 12/1/2011 | 0 |
| 08 91 00 | Louvers | 12/1/2011 | 0 |
| 09 21 16 | Gypsum Board Assemblies | 12/1/2011 | 0 |
| 09 51 00 | Acoustical Ceilings | 12/1/2011 | 0 |
| 09 65 00 | Resilient Flooring | 12/1/2011 | 0 |
| 09 65 66 | Resilient Athletic Flooring | 12/1/2011 | 0 |
| 10 22 13 | Wire Mesh Partitions | 12/1/2011 | 0 |
| 10 56 23 | Wire Storage Shelving | 12/1/2011 | 0 |
| 11 13 13 | Loading Dock Bumpers | 12/1/2011 | 0 |
| 11 13 19 | Stationary Dock Lift | 12/1/2011 | 0 |
| 11 82 26 | Waste Compactors and Destructors | 12/1/2011 | 0 |
| 12 35 30 | Residential Casework | 12/1/2011 | 0 |
| 12 36 40 | Stone Countertops | 12/1/2011 | 0 |
| 12 48 13 | Entrance Floor Mats and Frames | 12/1/2011 | 0 |
| 14 21 00 | Traction Elevators | 12/1/2011 | 0 |

#537156

 **BOZZUTO**

**Exhibit 1: List of Drawings & Specifications**
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 14 24 00 | Hydraulic Elevators | 12/1/2011 | 0 |
| 14 31 00 | Escalators | 12/1/2011 | 0 |
| 14 91 00 | Facility Chutes | 12/1/2011 | 0 |
| 27 11 00 | Common Work for Communications | 12/1/2011 | 0 |
| 28 13 00 | Access Control | 12/1/2011 | 0 |
| **Civil** | | | |
| 07 16 00 | Traffic Coatings | 12/1/2011 | 0 |
| **Demolition** | | | |
| 02 41 19 | Selective Demolition | 12/1/2011 | 0 |
| **Electrical** | | | |
| 01 82 00 | Electrical Systems Commissioning Requirements | 12/1/2011 | 0 |
| 26 00 10 | Basic Electrical Requirements | 12/1/2011 | 0 |
| 26 01 11 | Conduit | 12/1/2011 | 0 |
| 26 01 23 | Building Wire and Cable | 12/1/2011 | 0 |
| 26 01 30 | Boxes | 12/1/2011 | 0 |
| 26 01 41 | Wiring Devices | 12/1/2011 | 0 |
| 26 01 70 | Grounding and Bonding | 12/1/2011 | 0 |
| 26 01 90 | Supporting Devices | 12/1/2011 | 0 |
| 26 01 95 | Electrical Identification | 12/1/2011 | 0 |
| 26 04 21 | Utility Service Entrance | 12/1/2011 | 0 |
| 26 04 22 | Packaged Engine Generator Systems | 12/1/2011 | 0 |
| 26 04 26 | Distribution Switchboards | 12/1/2011 | 0 |
| 26 04 41 | Enclosed Switches | 12/1/2011 | 0 |
| 26 04 70 | Panelboards | 12/1/2011 | 0 |
| 26 04 80 | Motor Control | 12/1/2011 | 0 |
| 26 04 85 | Contactors | 12/1/2011 | 0 |
| 26 04 95 | Automatic Transfer Switch | 12/1/2011 | 0 |
| 26 05 10 | Interior Luminaries | 12/1/2011 | 0 |
| 26 06 70 | Lighting Protection Systems | 12/1/2011 | 0 |
| 26 09 02 | Electric Controls and Relays | 12/1/2011 | 0 |
| 26 27 13 | Electricity Metering | 12/1/2011 | 0 |
| 28 05 00 | Common Work Results for Electronic Safety and Security | 12/1/2011 | 0 |

#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| **Fire Protection** | | | |
| 07 84 00 | Firestopping | 12/1/2011 | 0 |
| 10 44 00 | Fire Protection Specialties | 12/1/2011 | 0 |
| 21 05 00 | Basic Fire Protection Requirements | 12/1/2011 | 0 |
| 21 11 00 | Fire Protection Piping | 12/1/2011 | 0 |
| 21 13 13 | Wet/Dry Pipe Sprinkler Systems | 12/1/2011 | 0 |
| 21 31 13 | Fire Pumps | 12/1/2011 | 0 |
| 28 07 23 | Multiplex/Addressable Fire Alarm Systems | 12/1/2011 | 0 |
| **Interior Design** | | | |
| 08 11 13 | Hollow Metal Doors and Frames | 12/1/2011 | 0 |
| 08 14 16 | Flush Wood Doors | 12/1/2011 | 0 |
| 08 31 00 | Access Doors and Panels | 12/1/2011 | 0 |
| 08 62 00 | Unit Skylights | 12/1/2011 | 0 |
| 08 71 00 | Door Hardware | 12/1/2011 | 0 |
| 09 06 05 | Color Schedule | 12/1/2011 | 0 |
| 09 30 00 | Tiling | 12/1/2011 | 0 |
| 09 68 00 | Carpeting | 12/1/2011 | 0 |
| 09 90 00 | Painting and Coating | 12/1/2011 | 0 |
| 10 28 00 | Toilet, Bath and Laundry Accessories | 12/1/2011 | 0 |
| 10 28 19 | Shower Enclosures | 12/1/2011 | 0 |
| 10 55 23 | Mail Boxes | 12/1/2011 | 0 |
| 11 31 00 | Residential Appliances | 12/1/2011 | 0 |
| 12 93 13 | Bicycle Racks | 12/1/2011 | 0 |
| **Landscape** | | | |
| 03 45 00 | Precast Architectural Concrete | 9/11/2012 | 0 |
| 12 93 00 | Site Furnishings | 9/11/2012 | 0 |
| 32 91 13 | Soil Preparation | 8/12/2012 | 0 |
| 32 12 73 | Pavement Joint Sealants | 9/12/2012 | 0 |
| 32 14 00 | Unit Pavers | 9/12/2012 | 0 |
| 32 93 00 | Exterior Plants | 9/12/2012 | 0 |
| **Mechanical** | | | |
| 01 81 51 | Commissioning of HVAC | 12/1/2011 | 0 |
| 23 05 00 | Basic Mechanical Requirements and Motors | 12/1/2011 | 0 |



#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log  (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 23 05 29 | Supports and Anchors | 12/1/2011 | 0 |
| 23 05 48 | Vibration Isolation | 12/1/2011 | 0 |
| 23 05 53 | Mechanical Identification | 12/1/2011 | 0 |
| 23 05 93 | Testing, Adjusting and Balancing | 12/1/2011 | 0 |
| 23 07 00 | Ductwork Insulation | 12/1/2011 | 0 |
| 23 09 00 | Controls | 12/1/2011 | 0 |
| 23 21 13 | Condensate Drain Piping | 12/1/2011 | 0 |
| 23 23 00 | Refrigerant Piping | 12/1/2011 | 0 |
| 23 31 13 | Metal Ducts | 12/1/2011 | 0 |
| 23 33 00 | Ductwork Accessories | 12/1/2011 | 0 |
| 23 34 23 | Ventilators | 12/1/2011 | 0 |
| 23 36 00 | Air Terminal units | 12/1/2011 | 0 |
| 23 37 13 | Air Devices | 12/1/2011 | 0 |
| 23 74 13 | Packaged, Outdoor Central-Station Air Handling Units | 12/1/2011 | 0 |
| 23 81 26 | Split-System Air Conditioning / Heat Pumps | 12/1/2011 | 0 |
| 23 81 27 | Ductless Split Systems | 12/1/2011 | 0 |
| 23 82 39 | Terminal Heat Transfer Units | 12/1/2011 | 0 |

**Plumbing**

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 22 05 00 | Basic Plumbing Requirements | 12/1/2011 | 0 |
| 22 05 33 | Electrical Heating Cables | 12/1/2011 | 0 |
| 22 05 48 | Vibration Isolation | 12/1/2011 | 0 |
| 22 07 00 | Piping Insulation | 12/1/2011 | 0 |
| 22 11 16 | Plumbing Piping | 12/1/2011 | 0 |
| 22 11 23 | Plumbing Equipment | 12/1/2011 | 0 |
| 22 13 19 | Plumbing Specialties | 12/1/2011 | 0 |
| 22 40 00 | Plumbing Fixtures | 12/1/2011 | 0 |

**Structural**

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 05 12 00 | Structural Steel Framing | 12/1/2011 | 0 |
| 05 21 00 | Steel Joist Framing | 12/1/2011 | 0 |
| 05 31 00 | Steel Decking | 12/1/2011 | 0 |
| 05 40 00 | Cold-Formed Metal Framing | 12/1/2011 | 0 |
| 05 50 00 | Metal Fabrications | 12/1/2011 | 0 |
| 05 51 00 | Metal Stairs | 12/1/2011 | 0 |

#537156

 BOZZUTO

Exhibit 1: List of Drawings & Specifications
Summary Log (Portrait)

| Number | Title | Rev Date | Rev |
|---|---|---|---|
| 06 10 00 | Rough Carpentry | 12/1/2011 | 0 |
| 06 10 63 | Exterior Rough Carpentry | 12/1/2011 | 0 |
| 07 41 13 | Metal Roof Panels | 12/1/2011 | 0 |
| 07 42 13 | Metal Wall Panels | 12/1/2011 | 0 |
| 07 42 43 | Composite Metal Panels - Dry Seal | 12/1/2011 | 0 |
| 31 63 29 | Drilled Concrete Piers | 12/1/2011 | 0 |

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 035
DATE: 4/20/2013

## EXHIBIT "2"

## SCOPE OF WORK

### HEATING, VENTILATION, AND AIR CONDITIONING

The following Divisions as applies to your Work:

**DIVISION 1 – GENERAL REQUIREMENTS
SECTION 07-078400 – FIRESTOPPING
DIVISON 11 – EQUIPMENT
DIVISON 23 – MECHANICAL SPECIFICATIONS
DISIVION 26 – ELECTRICAL**

This Subcontractor will furnish and install all labor, materials, equipment and services necessary for and incidental to the execution and completion of all HVAC for Site Improvements and planned structures in accordance with the Contract Documents, applicable codes, District of Columbia Standards, and all onsite and offsite work necessary to complete the Cathedral Commons Project as related to this scope of work. Work performed by this Subcontractor will be complete in every respect. This description of work and separation of the documents into various sections is for convenience only and is not intended in any way to limit the scope of this Agreement.

### GENERAL:

1.  The Work of this Subcontract will be in strict accordance with the Contract Documents, including all applicable Requests for Information. Should any of the items noted below be in conflict with the Contract Documents, this Subcontractor will notify the Contractor immediately in writing prior to proceeding with the work.

2.  In addition to the other requirements of this Agreement, it is understood that the Subcontractor is expected to provide complete and operational systems fit for their intended purpose, which are free of any defects and consistent with the intent of the Contract Documents. Accordingly, additional compensation will not be allowed for coordinating the Work of this Subcontract with the work of other trades and/or the Contract Documents, complying with the requirements bearing on the Work of this Subcontract by any authority having jurisdiction over the Project, and/or performing minor changes or corrections to the Contract Documents. This Subcontractor will ensure that all work meets the requirements and guidelines of applicable codes, including but limited to the Fair Housing Act (FHA), the Americans with Disabilities Act (ADA), and the American National Standard Institute (ANSI), DC Water, DCRA, DDOE and DDOT, as applicable.

3.  This Subcontractor will be responsible for the transfer and fees of any permits or licenses necessary for the execution of its work. This Subcontractor further certifies that they are licensed to do business within the project jurisdiction.

4.  The Subcontractor will not revise or alter any approved submittals without prior approval. Any and all costs incurred as a result of unapproved changes or modifications will be borne by this Subcontractor.

5.  In addition to the insurance requirements listed elsewhere in this Agreement, this Subcontractor, or Subcontractor's lower tier subcontractor, is required to furnish professional liability insurance with limits of at least $2 million dollars per occurrence and $2 million in the aggregate. Both the Contractor and Owner (and all affiliates) shall be named additionally insureds. This insurance will be provided under the Subcontractor's general liability policy.

6.  This Subcontractor will provide all certified flagmen, traffic control, plates, cones, drums, flashing arrow panels, barricades and any other traffic control appurtenances, as required, to complete this Subcontractors scope of work. Subcontractor will clean the public streets at the end of each work day as a result of the performance of the Work of this Agreement. This Subcontractor will clean all equipment and truck tires prior to entering street(s) adjacent to the Project site.

7.  All trash generated by this Subcontractor will be cleaned on a daily basis and placed in a dumpster provided by the Contractor. Break down trash and debris to the maximum extent possible prior to placement in dumpster.

8.  This Subcontractor will layout, furnish, coordinate, and install all sleeves and boxouts with Concrete Subcontractor or Masonry Subcontractor and the Structural Engineer as part of the coordination drawings. Sleeve all penetrations through and under footings, walls, concrete slabs and elevated decks per the contract documents. Underground work will not be installed in the area that extends out at a 45-degree angle from the bottom of the footings. Provide supervision during all concrete pours that contain the Work of this Subcontract and be prepared to make adjustments to facilitate concrete placement. Include incidental overtime as required to meet the Project Schedule.

SUB _____
PM _____

#537156

9. This Subcontractor will provide temporary measures to maintain continuous watertight conditions around and through floor and roof openings, and penetrations made by this Subcontractor to prevent water passage to floor below. This Subcontractor will provide a PVC cap at all sleeves or will seal all sleeves with duct tape. Provide the link seals through the foundation wall to provide a complete and watertight sleeve. This Subcontractor will furnish and install caps on all pipes and sleeves during construction to prevent debris and trash from entering the system.

10. This Subcontractor will provide all core drilling of concrete and masonry floors and walls required to complete the work of this agreement if such sleeving is not installed prior to concrete installation. All costs associated with this work, such as engineering, x-ray, design, engineering review, layout, inspections, etc. shall be the sole responsibility of this Subcontractor. No core drilling will be performed without the prior approval of the Structural Engineer of Record and the Contractor. Locating post-tension cables (GPR, X-ray, etc.) is the responsibility of this Subcontractor.

11. This Subcontractor will firestop and seal all floor and wall penetrations resulting from performance of the work of this Agreement as required by the Contract Documents and building codes.

12. This Subcontractor will furnish and layout access panels, as required for this work. A rated panel must be used in a rated wall assembly. Furnish panel to drywall Subcontractor as requested in sequence with the work – prior to hanging and finishing drywall at each panel location. Layout access panels as requested by the Contractor's Superintendent.

13. This Subcontractor will maintain and/or reinstall all fall protection and/or opening covers removed during the course of your work.

14. This Subcontractor will provide all engineering and layout as required to complete the Work of this Subcontract. Horizontal and vertical benchmarks will be provided by the Contractor.

15. This Subcontractor will provide incidental material and labor required to assist the Owner's independent testing and inspection agency for the completion of your work. Coordinate inspections and testing with local code authority and Owner's testing and inspection agency. The testing and inspection agency will provide recommendations for any issues encountered in the field. However, direction on any recommendation will come solely from the Contractor.

16. This Subcontractor will provide all thermal protection and temporary heat required for the completion of the Work. Apply and pay for any permits that may be required by Local Code Authorities for the use of temporary heating equipment and fuel sources.

17. This Subcontractor will provide Contractor with a detailed daily report, submitted to the on-site Superintendent each day by 10:00 am, for previous day's work. Information in the report should include at a minimum: manpower, locations of work, equipment deliveries, equipment used on site, and material deliveries.

18. Any water (standing/infiltrating water) caused by the work of this Subcontractor must be immediately removed and dried to prevent mold formation. Any mold growth on materials attributable to water contamination caused by the work of this Subcontractor shall be removed, properly disposed, and the affected materials replaced at this Subcontractor's cost. No porous building materials shall be delivered to the project or installed in a wet or damp condition.

19. This Subcontractor will produce coordinated Shop Drawings from backgrounds by others, and provide to the Contractor, as well as other Subcontractors (as determined by the Contractor). Drawings to be in electronic format compatible for use by the Sprinkler, Plumbing, Electrical, Fire Alarm, and Telephone Data subcontractors to physically overlay their work for coordination purposes. Coordinated shop drawings shall include but are not necessarily limited to all sleeves, box-outs, embed piping, ductwork, control lines, mechanical equipment placements, etc. as applies. These drawings shall include reflected ceiling drawings, showing coordinated ceiling penetrations.

20. This Subcontractor will meet all the Sustainable Requirements within the Contract Documents and provide all required certifications, submittals, material tracking, and paperwork required by the U.S. Green Building Council, LEED 2009 for New Construction and Major Renovations, including but not limited to, recycled content, regional materials, Energy Star requirements, and VOC limits for materials and recycling of construction waste.

21. This Subcontractor will furnish and install any work necessary for three (3) full unit mockups and teardowns in a location designated by the Contractor.

## HVAC:

1. This Subcontractor will furnish and install all heating, ventilating, and air conditioning equipment and accessories as required for a complete HVAC system including but not limited to metal duct work, flex duct, duct insulation, fire rated dryer vent box, access panels, registers, fire dampers, programmable thermostats, control wiring, refrigerant lines, refrigerant, controls, grills, sleeves, bath fans, exhaust fans, electric heaters, unit heaters, base board heaters, circulating fans, roof curbs, equipment pads, vibration isolators, all hand/off/auto switches, motor starters, control panels, etc. as shown on the Contract Documents. The Mechanical System will be furnished and installed in accordance with all applicable building codes and the Contract Documents, whichever is more stringent.

2. This Subcontractor will furnish and install all rods, hangers, clamps, blocking, inserts, mounts, pads, vibration isolation, AHU platforms (including steel channels, posts and plywood decking), bases, fittings, supports, blocking, inserts, anchors, risers, and accessories for your work per the Contract Documents.

SUB
PM

#537156

3.  This Subcontractor will furnish and install all volume dampers, air turning devices, relief vents, flexible connections, grounding straps, cleanouts, and accessories in the duct systems per the Contract Documents.

4.  This Subcontractor will furnish and install all garage carbon monoxide detection systems, fire dampers, smoke dampers, and combination smoke/fire dampers, heat sensors, controls, and accessories, at all fire rated walls and slabs, where required by NFPA 90-A, and the Contract Documents.

5.  This Subcontractor will furnish and install all duct smoke detectors.

6.  This Subcontractor will furnish and install Goodman 15 SEER equipment in the apartment units except for the following apartments which will be supplied with 15 SEER First Company and Carrier Split System AHU/Heat Pumps:

    a.  In the North Parcel, apartments #318, 418 and 518 will be provided with FC-430 units per original mechanical drawings.

    b.  In the South Parcel apartments #201 and 207 will be provided with FC-430 units per original mechanical drawings.

    c.  In the South Parcel apartments #202, 203, 204, 205 and 206 will be provided with FC-130 units per original mechanical drawings.

7.  This Subcontractor will furnish and install code minimum duct insulation in the residential units in lieu of the specified duct insulation. In all other areas, this Subcontractor will furnish and install all duct and pipe insulation as required by the Contract Documents.

8.  This Subcontractor will furnish the air handling units with integral disconnect switches.

9.  This Subcontractor will furnish and install all escutcheons and floor plates for HVAC piping.

10. This Subcontractor will provide disconnects (internal or external) at all air handling units, furnaces, condensers, motors, etc. Coordinate power requirements with the Contractor and the Electrical Subcontractor.

11. This Subcontractor will provide all condensate drainage from installed work, both primary and secondary drainage, including drain pans. Run condensate lines from the HVAC unit to the drain and/or risers as required by the Contract Documents. Provide final connection. Provide condensate pump at HVAC equipment, if required, due to indirect drain. Piping for condensate drain to a floor drain if required.

12. All duct work is to be insulated in accordance with the Contract Documents, including shields and other related specialty items.

13. This Subcontractor will furnish and install shut off valves on all refrigerant piping (each supply/return line) at each air handler to allow individual unit to be serviced without affecting the remainder of the building system.

14. This Subcontractor will furnish and install all digital programmable thermostats, humistats, motor starters, meters, gauges, and control devices for the work of this Subcontractor per the Contract Documents. Locate all the top of the thermostats per ADA requirements, not higher than 4'-0" AFF. This Subcontractor will also furnish a thermostat for every device requiring one whether it is shown on the drawings or not.

15. This Subcontractor will layout all equipment pads required for the Work. Concrete placement to be completed one time only at each building by the Concrete Subcontractor prior to top-out of the concrete structure.

16. This Subcontractor will protect all mechanical, piping, and condenser lines with metal plates at all floor and ceiling penetrations.

17. This Subcontractor will furnish and install exterior vents, including those with integral bird screen, to be mounted on a siding block that is provided by the Contractor and installed by this Subcontractor. All vents will be shop painted with owner/architect approved color and finish. This Subcontractor excludes the furnishing and installing of the architectural louvers.

18. The location of all duct penetrations through the exterior of the building will align both horizontally and vertically and will be approved by the Contractor and Owner. This Subcontractor will be responsible for properly sealing and flashing their penetrations through the exterior skin of the building per the building wrap manufacturer's specifications.

19. This Subcontractor will provide sound baffles for return air.

20. This Subcontractor will furnish and install dryer venting and booster fans, if necessary. Verify dryer vent layout complies with all applicable codes and the dryers specified for the project.

21. This Subcontractor will provide dryer boxes and exhaust lines, including a fire or fire/smoke damper if required by code, and any associated louvers or vents. All venting and exhaust as required by the Contract Documents. Include dryer boxes, where wall box is in a fire rated wall. Insulate around box to maintain rating. This Subcontractor will verify that all dryer runs meet the requirements of the dryer manufacturer.

22. This Subcontractor will furnish and install UL rated fire dampers at all penetrations through rated walls or ceilings as required by the Contract Documents and local building officials. Include UL rated fire dampers at plenum penetration of rated ceiling.

SUB
PM

#537156

23. This Subcontractor will provide secured storage for all materials and equipment delivered to the site.

24. This Subcontractor will provide all identification / labeling of the mechanical systems.

25. This Subcontractor will furnish, install, and maintain all HVAC system protection per the Contract Documents to protect the system from dust, debris, and microbial contaminants throughout construction. This Subcontractor will shrink wrap the ends of all ductwork in the fabrication shop before delivery to the project site.

26. This Subcontractor will connect microwaves and/or hoods, furnished by others, and flexible dryer exhaust vents (supplied by others) between dryer and vent pipes.

27. This Subcontractor will coordinate rooftop installations with Roofing Subcontractor to assure proper flashing of curbs and penetrations. Provide all necessary flashing, bases, boots, clamps, "Dog Houses", pipe portals, and skirts for your work, for installation by others. Provide prefabricated curb for all rooftop HVAC units and fans. All roof hoods, condensing units and roof fans are the responsibility of this Subcontractor. This Subcontractor will furnish and install condenser and fan roof top supports including galvanized support beams, vibration insolation pads, etc. per detail G/M601 (North Parcel) and P/M601 (South Parcel).

28. Ceiling penetrations in common areas are to be governed by the Interior Design drawings and coordinated with the Contractor.

29. This Subcontractor will furnish and install temporary thermostats with a maximum temperature setting of 45 - 65 degrees in the heating mode and 80 degrees in A/C mode for temporary heating and cooling, if required by the Contractor.

30. This Subcontractor will furnish and install MERV 8 air filters for the mechanical systems, and replace as necessary, during construction. This Subcontractor will change filters as indicated in the Contract Documents at time of turnover to the owner when directed by the Contractor's Superintendent.

31. This Subcontractor will furnish Contractor with a list of the serial numbers of all equipment, corresponding to the unit addresses. Permanently, and in a manner acceptable to the Contractor and Owner, label outside condenser units with the room number/name.

32. This Subcontractor will provide certified air balancing, testing, and inspections of the mechanical systems for each common area system and all of the residential units.

33. This Subcontractor will provide and participate in all testing, documentation, and training associated with the commissioning of the building, including tests for HVAC water piping pressure, HVAC system balancing, Building Automation System operations, and as required by the Contract Documents. This Subcontractor will maintain the Indoor Air Quality requirements for the project.

34. This Subcontractor will provide contacts, as required, for interface of HVAC equipment with fire alarm system. Coordinate work with Electrical Subcontractor and provide final connection of fire alarm to all mechanical equipment installed by this Subcontractor. If HVAC equipment does not have integral controls to function with fire alarm system, this Subcontractor will provide a motor controller or starter.

35. This Subcontractor will furnish, deliver, and install all garage exhaust fans and equipment as shown in the Contract Documents.

## SCHEDULE:

Time is of the essence in the execution of the work of this Agreement. Therefore, sufficient labor and materials must be provided at all times to meet the Job Progress Schedule as reasonably updated by the Contractor. This Subcontractor will take whatever steps necessary, including additional manpower, equipment, overtime, additional shifts, etc. at its sole cost and expense, to perform its work in the time frame indicated below. Saturday and Sunday work will be performed, at no additional cost to the Contractor, as required to meet the schedule. A bar chart schedule outlining the phasing of the project is attached as Exhibit 10.

## ALTERNATES:

If directed in writing by the Contractor, the Subcontractor will perform the alternate work described below. A corresponding Change Order will be issued by the Contractor adjusting the Contract Sum by the amount of the alternate. All other terms and conditions of this Subcontract will apply to any alternate work complete under this Subcontract. The alternate amounts include all cost associated with the work including labor, material overhead and profit.

1. If requested, delete certified testing and balancing of a portion of the residential apartment units – DEDUCT $350.00 per apartment unit.

2. If requested, furnish and install a complete mechanical and plumbing system for the eight (8) townhouses per the permit plans and specifications dated 12/21/12 – ADD $247,000.00.

**END OF EXHIBIT "2"**

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 033
DATE: 4/20/2013

## EXHIBIT "3"

### GENERAL REQUIREMENTS FOR SUBCONTRACTORS

### PART I: PROJECT SPECIFIC REQUIREMENTS

1.  <u>WORK HOURS</u>: WEEKDAYS 7:00 AM - 5:00 PM

2.  <u>DELIVERY HOURS</u>: WEEKDAYS 7:00 AM - 2:00 PM

3.  <u>REQUISITIONS</u>: Due on or Before: 25th day of each month.

### PART II: GENERAL REQUIREMENTS

1.  <u>COORDINATION OF WORK</u> - The Subcontractor shall familiarize himself with the methods of construction and the work sequence that the Contractor plans to use in order to plan his own Work in such a way as to expedite construction operations. The Subcontractor shall setup and maintain a rate of progress subject to the Contractor's direction and control for purposes of coordinating the overall construction progress. The Subcontractor assumes full responsibility for coordinating his Work with that of the other trades and, before proceeding, the Subcontractor shall request and obtain from the Contractor all information necessary to enable him to properly fit his Work to all surrounding work. The Subcontractor shall immediately notify the Contractor of any deviations or discrepancies between Contract Documents and work already installed and, in such case, shall not proceed with his work until he has received instructions from the Contractor. Should any work be necessary for the proper completion of the Project, such work shall be performed as fully as if described and delineated herein. If Subcontractor proceeds with work, he has accepted the condition of the site and work previously performed.

2.  <u>EROSION CONTROL</u> - Avoid, wherever possible, disturbing the existing vegetation of the site, and in the event vegetation is disturbed, stabilize the disturbed area after completion of the work to minimize erosion. In the event this Subcontractor disturbs, either intentionally or unintentionally, any erosion control structures to do his work, he will replace or repair said structures at the close of each working day.

3.  <u>COMPLETENESS</u> - It is understood and agreed that this Subcontractor will provide a finished and acceptable product and will be responsible for all details, accessories and appurtenances necessary to accomplish a complete and acceptable job whether the specific details are indicated on the plans or not.

4.  <u>CUTTING AND PATCHING</u> - This Subcontractor will be responsible for all cutting and patching required for his work. Any cutting or patching required as a result of this Subcontractor's failure to prosecute or coordinate his work in a timely manner will be this Subcontractor's responsibility at no additional cost to Contractor and/or Owner. This work will include any sealing (fireproofing) at any penetrations through walls, ceilings or floors.

5.  <u>DEFECTS</u> - Subcontractor shall report in writing to Contractor any alleged defects in the work of any other party, on or in which Subcontractor is to install the Work and Subcontractor's failure to do so shall be deemed to be an acknowledgment by Subcontractor that such other work is fit and proper for the Work of Subcontractor, and Subcontractor shall thereby waive any claim or defense based upon such alleged defect to justify any failure of performance on Subcontractor's part.

6.  <u>MATERIALS AND SAMPLES</u> - Prior to delivery of material, the Subcontractor shall submit to the Contractor and Owner for approval or rejection, a sample and, if required, product data for each item to be supplied by him. These samples, after such approval, shall constitute a minimum acceptable standard for the Project, provided they meet all specifications required by the Agreement. Materials not in accordance with the accepted sample or the specifications shall not be installed and shall be removed and replaced by the Subcontractor at his expense. The Subcontractor, at his own expense, shall furnish such samples of his work and make or cause to be made such material tests or test of his work performed as may be required from time to time by the Contractor and any governmental agencies that may have jurisdiction over the Project.

#537156

7.  SHOP DRAWINGS - Before installation, the Subcontractor shall submit to Contractor, Owner and Architect, for their approval, complete Shop Drawings and samples as Contractor, Owner or Architect may deem necessary for the proper performance of the Work, shall make such corrections in any such Shop Drawings as may be required by Contractor, Architect or Owner and shall resubmit corrected Shop Drawings to Contractor without delay. Approval of any Shop Drawings or samples shall be general and shall not relieve Subcontractor from responsibility of furnishing and installing the Work in accordance with the Contract Documents or for proper measurements and fitting of the Work. All Shop Drawings and samples shall be submitted so as to cause no delay in the Contractor's progress schedule for the construction. In addition, Subcontractors shall furnish Contractor with a duplicate copy of all plans and specifications, drawings, diagrams and applications prepared and submitted in conjunction with obtaining such permits as may be required by law, regulation or ordinance.

8.  RECORD DRAWINGS - Record drawings shall be maintained at the job site to indicate any deviation from the Bid Set. The record drawing shall be delivered to the Contractor at the completion of the Work.

9.  SERVICE/MAINTENANCE MANUAL - The Subcontractor shall submit to the Contractor (prior to acceptance of the first apartment units) three (3) typed service and maintenance manuals. The manuals shall include operating information, troubleshooting information; instructions for ordering parts; recommendations for stocking of spare parts; names, addresses and phone numbers of suppliers and local maintenance facilities.

10. OPERATING TESTS - Upon completion and prior to acceptance of this Subcontractor's Work, this Subcontractor will subject all systems installed by him to such operating tests as may be required by the Contractor, Owner, the Architect, and Federal, State and local inspectors to demonstrate satisfactory functional and operating efficiency. All instruments, facilities and labor required to conduct the tests will be provided by this Subcontractor at no cost to the Contractor and/or any other parties.

11. INSTRUCTIONS - The Subcontractor will thoroughly instruct the Owner's designated representatives in the proper operation and maintenance of all systems.

12. PRINCIPAL AXIS LINES - Contractor shall establish principal axis lines and levels on which Subcontractor shall layout the Work. However, Subcontractor shall layout the Work and be responsible for the accuracy thereof, using care to insure that all finished surfaces are in perfect alignment. Subcontractor shall be liable for any damage suffered by Contractor or other Subcontractors caused by his failure to layout and install his Work correctly.

13. STORED MATERIALS – This Subcontractor may be eligible for payment for materials properly stored if allowed by the Owner and the Owner's Lender. If allowed and in addition to any other requirements contained herein, Subcontractor will prepare and execute a "Bill of Sale" that explicitly describes the materials sold to Contractor on a form acceptable to Contractor, Owner, and Owner's lenders. Subcontractor shall provide an "All Risk" insurance policy in an amount sufficient to cover the replacement cost of the material. This policy will name as the insureds the Contractor and Owner. The deductible on this policy is $100.00 per occurrence. Payment for materials stored offsite will in no way be acknowledged by the Contractor as acceptance of materials. It will be the responsibility of the Subcontractor to assure delivery and installation of all materials as specified in this Contract.

14. CLEANUP - This Subcontractor will be responsible to cleanup after himself on a daily basis and deposit such trash as is generated by his work in a receptacle to be designated by the Project Superintendent. If Subcontractor fails to cleanup his debris as herein specified, the Contractor is hereby granted the authority to cleanup the Subcontractor's debris at this Subcontractor's expense and to backcharge this Subcontractor for all expenses incurred, including a 15% overhead factor.

15. DELIVERY, STORAGE AND HANDLING - This Subcontractor includes the expediting, receiving, handling, hoisting, rigging, storage and protection of all materials and equipment required for the performance of this Subcontract, whether purchased by this Subcontractor or others. Subcontractor shall notify and coordinate with the Contractor prior to scheduling the delivery of any "bulk" materials. All deliveries shall be made between WEEKDAYS 7:00 AM - 2:00 PM, Monday through Friday (unless other restrictions apply due to local site conditions)

16. CONFLICT OR INCONSISTANCY - In the event of any inconsistency (with respect to the Scope of Work being provided by this Subcontractor) between items contained within this Agreement and/or between items contained within this Agreement and the Contract Documents, the higher standard or larger quantity shall govern and be included within this Agreement.

17. MEETINGS – An authorized representative of this Subcontractor shall attend all on site job progress and safety meetings while this Subcontractor is working on site and at other times as requested by the Contractor.

#537156

18. <u>TEMPORARY POWER AND LIGHTING</u> – This Subcontractor is responsible for providing all temporary power and lighting necessary to complete the work of this Subcontract.

19. <u>PERMITS</u> – The building permit will be obtained by others. This Subcontractor is required to obtain all other permits necessary to complete the work of this Subcontract.

20. <u>PAYMENT APPLICATIONS</u> – This Subcontractor shall submit all payment applications through the electronic GCPay system for approval. Instructions for GCPay will be provided by the Contractor to the Subcontractor.

**END OF EXHIBIT "3"**

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 032
DATE: 4/30/2013

## EXHIBIT "4"
## PAYMENT SCHEDULE

| SUBCONTRACTOR /VENDOR: | Design Build Mechanical Corporation | | CONTRACT NUMBER: | 032 | |
|---|---|---|---|---|---|
| PROJECT: | Cathedral Commons | | PROJECT NO.: | 1152 | |

| ITEM NO. | COST CODE | DESCRIPTION | UNIT | UNIT PRICE | VALUE $ |
|---|---|---|---|---|---|
| 001 | 51400-15700-0000 | Heating, Ventilating and Air Conditioning (HVAC) | 1 | $29,144.00 | $29,144.00 |
| 002 | 51400-15700-0000 | Submittals | 1 | $10,000.00 | $10,000.00 |
| 003 | 51400-15700-0000 | Permits | 1 | $15,000.00 | $15,000.00 |
| 004 | 51400-15700-0000 | Sleeve Drawings | 1 | $12,000.00 | $12,000.00 |
| 005 | 51400-15700-0000 | Coordination Drawings | 1 | $18,000.00 | $18,000.00 |
| 006 | 51400-15700-0000 | Mobilization | 1 | $25,000.00 | $25,000.00 |
| 007 | 51400-15700-0000 | O&M Manuals | 1 | $10,000.00 | $10,000.00 |
| 008 | 51400-15700-0000 | As-Builts | 1 | $10,000.00 | $10,000.00 |
| 009 | 51800-15700-0000 | South Parcel | 1 | $0.00 | $0.00 |
| 010 | 51800-15700-0000 | Punchout - Parking & Retail | 1 | $3,000.00 | $3,000.00 |
| 011 | 51800-15700-0000 | Balancing - Parking & Retail | 1 | $3,000.00 | $3,000.00 |
| 012 | 51800-15700-0000 | P2 - Garage | 1 | $0.00 | $0.00 |
| 013 | 51800-15700-0000 | Rough-in | 1 | $47,000.00 | $47,000.00 |
| 014 | 51800-15700-0000 | Set & connect Fans/units | 1 | $52,000.00 | $52,000.00 |
| 015 | 51800-15700-0000 | Trim out and controls | 1 | $7,000.00 | $7,000.00 |
| 016 | 51800-15700-0000 | CO Monitoring | 1 | $27,500.00 | $27,500.00 |
| 017 | 51800-15700-0000 | Start-up | 1 | $5,000.00 | $5,000.00 |
| 018 | 51800-15700-0000 | P1 - Garage | 0 | $0.00 | $0.00 |
| 019 | 51800-15700-0000 | Rough-in | 1 | $47,000.00 | $47,000.00 |
| 020 | 51800-15700-0000 | Set & connect Fans/units | 1 | $52,000.00 | $52,000.00 |
| 021 | 51800-15700-0000 | Trim out and controls | 1 | $7,000.00 | $7,000.00 |
| 022 | 51800-15700-0000 | CO Monitoring | 1 | $27,500.00 | $27,500.00 |
| 023 | 51800-15700-0000 | Start-up | 1 | $5,000.00 | $5,000.00 |
| 024 | 51800-15700-0000 | Ground Floor - Giant Retail | 1 | $0.00 | $0.00 |
| 025 | 51800-15700-0000 | Rough-in | 1 | $35,000.00 | $35,000.00 |
| 026 | 51800-15700-0000 | Set & connect units | 1 | $40,000.00 | $40,000.00 |
| 027 | 51800-15700-0000 | Trim out and controls | 1 | $6,000.00 | $6,000.00 |
| 028 | 51800-15700-0000 | Start-up | 1 | $4,000.00 | $4,000.00 |
| 029 | 51800-15700-0000 | Ground Floor - Retail | 1 | $0.00 | $0.00 |
| 030 | 51800-15700-0000 | Rough-in | 1 | $28,000.00 | $28,000.00 |
| 031 | 51800-15700-0000 | Set & connect units | 1 | $22,000.00 | $22,000.00 |
| 032 | 51800-15700-0000 | Trim out and controls | 1 | $5,000.00 | $5,000.00 |
| 033 | 51800-15700-0000 | Start-up | 1 | $3,000.00 | $3,000.00 |
| 034 | 51800-15700-0000 | 2nd Floor - Retail / Flex Office | 1 | $0.00 | $0.00 |
| 035 | 51800-15700-0000 | Rough-in | 1 | $27,000.00 | $27,000.00 |
| 036 | 51800-15700-0000 | Set & connect units | 1 | $22,000.00 | $22,000.00 |
| 037 | 51800-15700-0000 | Trim out and controls | 1 | $5,000.00 | $5,000.00 |
| 038 | 51800-15700-0000 | Start-up | 1 | $3,000.00 | $3,000.00 |
| 039 | 51800-15700-0000 | Roof - Retail & Parking | 1 | $0.00 | $0.00 |
| 040 | 51800-15700-0000 | Set Roof Fans and Units | 1 | $20,000.00 | $20,000.00 |
| 041 | 51400-15700-0000 | 2nd Floor - Residential Units | 1 | $0.00 | $0.00 |
| 042 | 51400-15700-0000 | Rough-in | 1 | $40,000.00 | $40,000.00 |
| 043 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $37,000.00 | $37,000.00 |
| 044 | 51400-15700-0000 | Trim out and controls | 1 | $14,000.00 | $14,000.00 |
| 045 | 51400-15700-0000 | Start-up / Balance | 1 | $7,000.00 | $7,000.00 |
| 046 | 51400-15700-0000 | Roof - Residential | 1 | $0.00 | $0.00 |
| 047 | 51400-15700-0000 | Set & connect outdoor units | 1 | $25,000.00 | $25,000.00 |
| 048 | 51400-15700-0000 | Start-up | 1 | $2,000.00 | $2,000.00 |
| 049 | 51400-15700-0000 | North Parcel | 1 | $0.00 | $0.00 |
| 050 | 51400-15700-0000 | Punchout | 1 | $3,000.00 | $3,000.00 |
| 051 | 51400-15700-0000 | Balancing | 1 | $3,000.00 | $3,000.00 |
| 052 | 51400-15700-0000 | P2 - Garage | 1 | $0.00 | $0.00 |
| 053 | 51400-15700-0000 | Rough-in | 1 | $20,000.00 | $20,000.00 |
| 054 | 51400-15700-0000 | Set & connect Fans/units | 1 | $25,000.00 | $25,000.00 |
| 055 | 51400-15700-0000 | Trim out and controls | 1 | $4,000.00 | $4,000.00 |
| 056 | 51400-15700-0000 | CO Monitoring | 1 | $10,500.00 | $10,500.00 |
| 057 | 51400-15700-0000 | Start-up | 1 | $3,000.00 | $3,000.00 |
| 058 | 51400-15700-0000 | P1 - Garage | 1 | $0.00 | $0.00 |
| 059 | 51400-15700-0000 | Rough-in | 1 | $20,000.00 | $20,000.00 |

#537156

| 060 | 51400-15700-0000 | Set & connect Fans/units | 1 | $25,000.00 | $25,000.00 |
|---|---|---|---|---|---|
| 061 | 51400-15700-0000 | Trim out and controls | 1 | $4,000.00 | $4,000.00 |
| 062 | 51400-15700-0000 | CO Monitoring | 1 | $10,500.00 | $10,500.00 |
| 063 | 51400-15700-0000 | Start-up | 1 | $3,000.00 | $3,000.00 |
| 064 | 51400-15700-0000 | P1 - Common Area & Corridors | 1 | $0.00 | $0.00 |
| 065 | 51400-15700-0000 | Rough-in | 1 | $5,000.00 | $5,000.00 |
| 066 | 51400-15700-0000 | Set & connect Fans/units | 1 | $3,000.00 | $3,000.00 |
| 067 | 51400-15700-0000 | Trim out and controls | 1 | $1,000.00 | $1,000.00 |
| 068 | 51400-15700-0000 | Ground Floor Retail | 1 | $0.00 | $0.00 |
| 069 | 51800-15700-0000 | Rough-in | 1 | $34,000.00 | $34,000.00 |
| 070 | 51800-15700-0000 | Set & connect units/fans | 1 | $27,000.00 | $27,000.00 |
| 071 | 51800-15700-0000 | Trim out and controls | 1 | $5,000.00 | $5,000.00 |
| 072 | 51800-15700-0000 | Start-up | 1 | $3,000.00 | $3,000.00 |
| 073 | 51400-15700-0000 | Ground Floor - Clubhouse | 1 | $0.00 | $0.00 |
| 074 | 51400-15700-0000 | Rough-in | 1 | $15,000.00 | $15,000.00 |
| 075 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $7,000.00 | $7,000.00 |
| 076 | 51400-15700-0000 | Trim out and controls | 1 | $2,000.00 | $2,000.00 |
| 077 | 51400-15700-0000 | Ground Floor- Common Area & Corridors | 1 | $0.00 | $0.00 |
| 078 | 51400-15700-0000 | Rough-in | 1 | $5,000.00 | $5,000.00 |
| 079 | 51400-15700-0000 | Set & connect units/fans | 1 | $3,000.00 | $3,000.00 |
| 080 | 51400-15700-0000 | Trim out and controls | 1 | $1,000.00 | $1,000.00 |
| 081 | 51400-15700-0000 | 2nd Floor - Common Area & Corridors | 1 | $0.00 | $0.00 |
| 082 | 51400-15700-0000 | Rough-in | 1 | $15,000.00 | $15,000.00 |
| 083 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $5,000.00 | $5,000.00 |
| 084 | 51400-15700-0000 | Trim out and controls | 1 | $2,000.00 | $2,000.00 |
| 085 | 51400-15700-0000 | 2nd Floor - Residential units | 1 | $0.00 | $0.00 |
| 086 | 51400-15700-0000 | Rough-in | 1 | $73,000.00 | $73,000.00 |
| 087 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $78,000.00 | $78,000.00 |
| 088 | 51400-15700-0000 | Trim out and controls | 1 | $22,000.00 | $22,000.00 |
| 089 | 51400-15700-0000 | Start-up / Balance | 1 | $9,000.00 | $9,000.00 |
| 090 | 51400-15700-0000 | 3rd Floor - Corridors | 1 | $0.00 | $0.00 |
| 091 | 51400-15700-0000 | Rough-in | 1 | $15,000.00 | $15,000.00 |
| 092 | 51400-15700-0000 | Trim out | 1 | $2,000.00 | $2,000.00 |
| 093 | 51400-15700-0000 | 3rd Floor - Residential units | 1 | $0.00 | $0.00 |
| 094 | 51400-15700-0000 | Rough-in | 1 | $74,000.00 | $74,000.00 |
| 095 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $79,000.00 | $79,000.00 |
| 096 | 51400-15700-0000 | Trim out and controls | 1 | $23,000.00 | $23,000.00 |
| 097 | 51400-15700-0000 | Start-up / Balance | 1 | $10,000.00 | $10,000.00 |
| 098 | 51400-15700-0000 | 4th Floor - Common Area & Corridors | 1 | $0.00 | $0.00 |
| 099 | 51400-15700-0000 | Rough-in | 1 | $15,000.00 | $15,000.00 |
| 100 | 51400-15700-0000 | Trim out | 1 | $2,000.00 | $2,000.00 |
| 101 | 51400-15700-0000 | 4th Floor - Residential units | 1 | $0.00 | $0.00 |
| 102 | 51400-15700-0000 | Rough-in | 1 | $74,000.00 | $74,000.00 |
| 103 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $79,000.00 | $79,000.00 |
| 104 | 51400-15700-0000 | Trim out and controls | 1 | $23,000.00 | $23,000.00 |
| 105 | 51400-15700-0000 | Start-up / Balance | 1 | $10,000.00 | $10,000.00 |
| 106 | 51400-15700-0000 | 5th Floor - Common Area & Corridors | 1 | $0.00 | $0.00 |
| 107 | 51400-15700-0000 | Rough-in | 1 | $15,000.00 | $15,000.00 |
| 108 | 51400-15700-0000 | Trim out | 1 | $2,000.00 | $2,000.00 |
| 109 | 51400-15700-0000 | 5th Floor - Residential units | 1 | $0.00 | $0.00 |
| 110 | 51400-15700-0000 | Rough-in | 1 | $73,000.00 | $73,000.00 |
| 111 | 51400-15700-0000 | Set & connect indoor units/fans | 1 | $78,000.00 | $78,000.00 |
| 112 | 51400-15700-0000 | Trim out and controls | 1 | $22,000.00 | $22,000.00 |
| 113 | 51400-15700-0000 | Start-up / Balance | 1 | $9,000.00 | $9,000.00 |
| 114 | 51400-15700-0000 | Roof - Residential | 1 | $0.00 | $0.00 |
| 115 | 51400-15700-0000 | Set & connect outdoor units, fans, equipment | 1 | $144,356.00 | $144,356.00 |
| 116 | 51400-15700-0000 | Start-up | 1 | $19,500.00 | $19,500.00 |

**CONTRACT TOTAL:** | $1,972,000.00 |

ACCEPTED BY: _____

Design Build Mechanical Corporation

ACCEPTED BY: _____ Bozzuto Building Company

RETAINER TERMS: 10.00% (For Accounting Use Only)

**END OF EXHIBIT "4"**

#537156

## EXHIBIT "5"

### INSURANCE REQUIREMENTS

Certificate Holder - Contractor: <u>Bozzuto Building Company</u>

The Subcontractor shall provide at his own expense, all necessary insurance in amounts equal to or greater than the limits set forth below:

1.  Commercial General Liability Coverages:

| | | |
|---|---|---|
| a. | General Aggregate | $2,000,000 |
| b. | Products/Completed Operation (such coverage to continue for three years after completion of all work) | $2,000,000 |
| c. | Personal and Advertising Injury | $1,000,000 |
| d. | Each Occurrence | $1,000,000 |
| e. | Fire Damage (any one fire) | $ 100,000 |
| f. | Medical Expenses (any one person) | $ 5,000 |

   g.  Contractual Liability Coverage for all written Contracts.

   h.  Exclusions X, C, U (Explosion, Collapse, Underground) will be deleted.

2.  Automobile Liability Coverages - Any automobile, with Combined Single Limit of $1,000,000.

3.  Excess Liability - Umbrella Form, with Each Occurrence and Aggregate Limit of $5,000,000.

4.  Workmen's Compensation and Employer's Liability Insurance with Limits set forth under the State Regulations governing each workman employed in, about or upon the Project as provided in each and every statue applicable to Workmen's Compensation and Employer's Liability.

The Certificate of Insurance shall state:

<u>Bozzuto Building Company, Cathedral Commons Partners, LLC, Cathedral Commons Partners, LLC, BA Cathedral Commons, LLC, Giant Cathedral, LLC, Friendship Macomb SC, Inc., Bozzuto Development Company and Bozzuto & Associates, Inc., including all subsidiaries, affiliated or associated companies, corporations, limited partnerships, limited liability companies or other related entities are additional insured with respect to liability for work performed on their behalf by Design Build Mechanical Corporation. All such entities and persons shall be additional insureds under endorsements to the Subcontractor's General Liability policy.</u>

Certificates of Insurance shall be forwarded to the General Contractor. The certificate shall state that the policy shall not be cancelled or otherwise amended without first providing the Owner, the General Contractor and any mortgage lenders with thirty (30) days advance notice by registered mail of said cancellation. The Subcontractor acknowledges and agrees that a "Hold Harmless" made out in the name of the General Contractor and Owner is part of this Subcontract and shall include the following language:

The Subcontractor hereby indemnifies the General Contractor, the Owner, and their respective officers, directors, agents and employees, and lending institutions, and holds each of them harmless from and against any and all liability, suits, action, demands, loss or damage (just or unjust) and all costs or fees including, without limitation, attorneys' fees, associated therewith, on account of injuries to person or property, including accidental death and damage to adjoining structures and premises, occurring on the site of the Project, or in connection with the work, or by reason of the operations under this contract, whether or not such liability be the result of negligence, errors or omissions, acts or actions, or for any other reasons or causes of this Subcontractor, his agents, servants, employees and contractors.



At least seven (7) days prior to commencing any work covered by the Contract, the Subcontractor shall furnish to the General Contractor a certificate or certificates in triplicate of the insurance required under the foregoing provisions. Such certificates shall list the various coverages and shall contain, in addition to any provisions hereinbefore required, a provision that it will be automatically renewed upon expiration and continued in full force until final acceptance by the Owner and General Contractor of all work covered by the Subcontract and the Contract, including the period for all warranty work under the Subcontract and Contract, unless the General Contractor is given written notification as described above. Upon request, the Subcontractor shall furnish the General Contractor with a certified copy of each policy and endorsement. All insurance required to be procured and maintained as aforesaid must be procured from insurance companies approved by the General Contractor and authorized to do business in the and/or the State of the Project. If at any time the above policies shall be cancelled, terminated or modified so that the insurance is not in effect as above required, then, if the General Contractor shall so direct, the Subcontractor shall suspend performance of the work covered in the Subcontract. If the said work is so suspended, no extension of time shall be due on account thereof. If said work is not suspended, then the General Contractor may at its option obtain insurance affording coverage equal to that afforded above and the cost of such insurance shall be deducted in full amount from the monthly requisition of payment due the Subcontractor.

Subcontractor expressly waives all rights of recovery against the Owner, the General Contractor and such other parties as are covered by Subcontractor's insurance coverages pursuant to the foregoing provisions. Subcontractor will ensure that its subcontractors also waive all such claims covered by any insurance.

The abovesaid Subcontractor's policies shall be primary insurance for all claims related to the Subcontract, with all policies of the Owner, the General Contractor or others being secondary non-contributory policies. Neither the procurement nor the maintenance of any type of insurance by the Owner or the General Contractor shall in any way be construed or be deemed to limit, discharge, waive or release the Subcontractor from any of the obligations and risks imposed upon him by the Contract or Subcontract or by law or to be a limitation on the nature or extent of such obligations and risks.

Any insurance not described above which this Subcontractor desires for his own protection shall be at his own responsibility and at his own expense.

#537156

EXHIBIT "5" CONTINUED

## ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YY) |
| --- | --- |
| | XX/XX/XX |

| PRODUCER | Phone Number |
| --- | --- |
| Your Agent<br>Street Address<br>City, State  Zip Code | |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

### COMPANIES AFFORDING COVERAGE

| COMPANY A | ABC Insurance Company |
| --- | --- |
| COMPANY B | |
| COMPANY C | |
| COMPANY D | |

| INSURED |
| --- |
| Design Build Mechanical Corporation<br>3635 Concorde Parkway<br>Suite 700<br>Chantilly, VA  20151 |

SAMPLE

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EFFECTIVE DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- |
| A | GENERAL LIABILITY | XXXX1234567 | XX/XX/XX | XX/XX/XX | GENERAL AGGREGATE | $ 2,000,000 |
| | [X] COMMERCIAL GENERAL LIABILITY | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | [ ] CLAIMS MADE [X] OCCUR | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | EACH OCCURRENCE | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | FIRE DAMAGE (Any one fire) | $ 100,000 |
| | [X] POLICY | | | | MED EXP (any one person) | $ 5,000 |
| A | AUTOMOBILE LIABILITY | XXXX1234567 | XX/XX/XX | XX/XX/XX | | |
| | [X] ANY AUTO | | | | COMBINED SINGLE LIMIT | $ 1,000,000 |
| | [ ] ALL OWNED AUTOS | | | | | |
| | [ ] SCHDULED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | [X] HIRED AUTOS | | | | | |
| | [X] NON OWNED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| A | GARAGE LIABILITY | XXXX1234567 | XX/XX/XX | XX/XX/XX | AUTO ONLY - EA ACCIDENT | $ |
| | [ ] ANY AUTO | | | | OTHER THAN AUTO ONLY | $ |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | EXCESS LIABILITY | XXXX1234567 | XX/XX/XX | XX/XX/XX | EACH OCCURRENCE | $ 5,000,000 |
| | [X] OCCUR [ ] CLAIMS MADE | | | | AGGREGATE | $ 5,000,000 |
| | [ ] DEDUCTIBLE | | | | | |
| | [ ] RETENTION | | | | | |
| A | WORKERS COMPENSATION | XXXX1234567 | XX/XX/XX | XX/XX/XX | [ ] WC STATUTORY LIMITS | |
| | EMPLOYERS' LIABILITY | | | | [X] OTHER | |
| | THE PROPRIETOR/ | | | | EL EACH ACCIDENT | $ 100,000 |
| | PARTNERS/EXECUTIVE [ ] INCL | | | | EL DISEASE - POLICY LIMIT | $ 500,000 |
| | OFFICERS ARE: [ ] EXCL | | | | EL DISEASE - EA EMPLOYEE | $ 100,000 |
| | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

ADDITIONAL INSUREDS: SEE NEXT PAGE

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| BOZZUTO BUILDING COMPANY<br>7850 WALKER DRIVE, SUITE 400<br>GREENBELT, MD 20770<br><br>ADDITIONAL INSUREDS: SEE NEXT PAGE | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL MAIL 30 DAYS PRIOR WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT.<br><br>AUTHORIZED REPRESENTATIVE |

| ACORD 25-S (1/95) | 7-55 | ACORD CORPORATION 1988 |
| --- | --- | --- |

#537156

EXHIBIT "5" CONTINUED

ADDITIONAL INSUREDS

Bozzuto Building Company, Cathedral Commons Partners, LLC, Cathedral Commons Partners, LLC, BA Cathedral Commons, LLC, Giant Cathedral, LLC, Friendship Macomb SC, Inc., Bozzuto Development Company and Bozzuto & Associates, Inc., including all subsidiaries, affiliated or associated companies, corporations, limited partnerships, limited liability companies or other related entities are additional insured with respect to liability for work performed on their behalf by Design Build Mechanical Corporation. All such entities and persons shall be additional insureds under endorsements to the Subcontractor's General Liability policy.

END OF EXHIBIT "5"

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 033
DATE: 4/20/2012

## EXHIBIT "6"

## TAXPAYER IDENTIFICATION NUMBER

| Form **W-9**<br>(Rev. November 2005)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)

Business name, if different from above.

Check appropriate box: ☐ Individual/Sole proprietor   ☐ Corporation   ☐ Partnership   ☐ Other ▶ ................   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)            Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

**Social security number**

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Employer identification number**

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

| Sign<br>Here | Signature of<br>U.S. person ▶ | Date ▶ |
|---|---|---|

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                Form **W-9** (Rev. 11-2005)

#537156

Form W-9 (Rev. 11-2006)
Page 2

• The U.S. grantor or other owner of a grantor trust and not the trust, and

• The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments (after December 31, 2002). This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 4 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see Special rules regarding partnerships on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** If you are a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Treasury regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line. Check the appropriate box for your filing status (sole proprietor, corporation, etc.), then check the box for "Other" and enter "LLC" in the space provided.

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

### Exempt From Backup Withholding

If you are exempt, enter your name as described above and check the appropriate box for your status, then check the "Exempt from backup withholding" box in the line following the business name, sign and date the form.

#537156

Form W-9 (Rev. 11-2005)                                                                                          Page 3

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

Note. If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

Exempt payees. Backup withholding is not required on any payments made to the following payees:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2).

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission.

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt recipients listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt recipients except for 9 |
| Broker transactions | Exempt recipients 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt recipients 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt recipients 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f), even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, and payments for services paid by a federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-owner LLC that is disregarded as an entity separate from its owner (see Limited liability company (LLC) on page 2), enter your SSN or EIN, if you have one). If the LLC is a corporation, partnership, etc., enter the entity's EIN.

Note. See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at www.socialsecurity.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer ID Numbers under Related Topics. You can get Forms W-7 and SS-4 from the IRS by visiting www.irs.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note. Writing "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.

#537156

Form W-9 (Rev. 11-2006)

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt recipients, see *Exempt From Backup Withholding* on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or single-owner LLC | The owner [3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Sole proprietorship or single-owner LLC | The owner [3] |
| 7. A valid trust, estate, or pension trust | Legal entity [4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one). If you are a sole proprietor, IRS encourages you to use your SSN.

[4] List first and circle the name of the legal trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules regarding partnerships* on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply.

### END OF EXHIBIT "6"

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 032
DATE: 4/20/2013

EXHIBIT "7"

## ACKNOWLEDGEMENT OF PAYMENT AND SETTLEMENT DUE
(SAMPLE)

TO:          Cathedral Commons
Bozzuto Building Company
7850 Walker Drive, Suite 400
Greenbelt, MD 20770

SUBCONTRACTOR:    Design Build Mechanical Corporation
3635 Concorde Parkway, Suite 700
Chantilly, VA  20151

PROJECT LOCATION:    3336 & 3406 Wisconsin Avenue, N.W.
Washington, DC  20016

SUBCONTRACT DATE:    4/20/2013
SUBCONTRACTOR TRADE:   HVAC

To induce Bozzuto Building Company to pay funds to the undersigned on or about the date hereof, the undersigned represents and agrees as follows:

I.    Amount of payment requested:
    A.   CONTRACT SUMMARY
       1.   The original price of the aforesaid contract is $1,972,000.00
       2.   Extra changes to the contract in accordance with Work Orders which have been agreed to by both parties, as noted above, are $0.00
       3.   The adjusted contract price therefore is $1,972,000.00
       4.   Repairs and misc. supplies not included in the adjusted contract are $0.00
       5.   The adjusted contract price plus non-contract work/supplies is $1,972,000.00

    B.   PAYMENT SUMMARY
       1.   As of _Period to Date_ the company has earned on the aforesaid contract and non-contract work/supplies by reason of its performance of labor and services and/or supplying of materials the sum of $0.00
       2.   Total retainage to date is $0.00
       3.   Total earned less retainage is $0.00
       4.   Prior to this settlement, the company has received in payment on said contract the sum of $0.00
       5.   The company is now requesting payment in the amount of $0.00

    C.   BALANCE DUE
       1.   The balance owing upon the completion of the contract including retention, if any, after this payment will be $0.00

II.    Affidavit of Payment of Debts and Claims:
    The undersigned hereby certifies and warrants, under oath, that, except as listed below, he has paid in full or has otherwise satisfied all obligations for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims for damages, including all applicable taxes, arising in any manner to date in connection with the performance of the Contract referenced above.

    EXCEPTIONS: (If none, write "None". If required, the Subcontractor shall furnish satisfactory bond to Bozzuto Building Company for each exception.)

III.   Affidavit of Release of Lien:
    For the above said consideration, the undersigned waives any rights in the nature of lien, claims or bond claims, which it may have for labor performed and/or materials furnished to date and agrees that payment of the amount stated in item B(5) above by Bozzuto Building Company is in full settlement of any amount due for any and all labor performed and/or material furnished to date, except as listed below. The undersigned warrants that he has not assigned any claim for payment.

    EXCEPTIONS: (If none, write "None". If required, the Subcontractor shall furnish bond satisfactory to Bozzuto Building Company for each exception.)

    It is also acknowledged that the priority date as to any subsequent liens is hereby waived. The undersigned also warrants that he is duly authorized to make oath hereto and to act for the subcontractor.

ATTEST:                    EXECUTED UNDER SEAL ON _____
                                       (Insert Date)

State of _____ County of _____

Subscribed & sworn to before me this

____ Day of _____, 20 ____        BY: _____

Notary Public _____

My Commission Expires _____    _____
                                       (Name & title)

#537156

## ACKNOWLEDGEMENT OF PAYMENT AND SETTLEMENT DUE
(SAMPLE)

TO:             Cathedral Commons
                   Bozzuto Building Company
                   7850 Walker Drive, Suite 400
                   Greenbelt, MD 20770

SUBCONTRACTOR:      Design Build Mechanical Corporation
                   3635 Concorde Parkway, Suite 700
                   Chantilly, VA  20151

PROJECT LOCATION:    3336 & 3406 Wisconsin Avenue, N.W.
                   Washington, DC  20016

SUBCONTRACT DATE:    4/20/2013
SUBCONTRACTOR TRADE:  HVAC

To induce Bozzuto Building Company to pay funds to the undersigned on or about the date hereof, the undersigned represents and agrees as follows:

IV.    Amount of payment requested:
    A.   CONTRACT SUMMARY
        1.   The original price of the aforesaid contract $1,972,000.00.
        2.   Extra changes to the contract in accordance with Work Orders which have been agreed to by both parties, as noted above, are $0.00
        3.   The adjusted contract price therefore is $0.00
        4.   Repairs and misc. supplies not included in the adjusted contract are
        5.   The adjusted contract price plus non-contract work/supplies is $0.00

    B.   PAYMENT SUMMARY
        1.   As of Period to Date the company has earned on the aforesaid contract and non-contract work/supplies by reason of its performance of labor and services and/or supplying of materials the sum of $0.00
        2.   Total retainage to date is $0.00
        3.   Total earned less retainage is $0.00
        4.   Prior to this settlement, the company has received in payment on said contract the sum of $0.00
        5.   The company is now requesting payment in the amount of $0.00

    C.   BALANCE DUE
    The balance owing upon the completion of the contract including retention, if any, after this payment will be $0.00

V.    Affidavit of Payment of Debts and Claims:
    The undersigned hereby certifies and warrants, under oath, that, except as listed below, he has paid in full or has otherwise satisfied all obligations for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims for damages, including all applicable taxes, arising in any manner to date in connection with the performance of the Contract referenced above.

    EXCEPTIONS: (If none, write "None".  If required, the Subcontractor shall furnish satisfactory bond to Bozzuto Building Company for each exception.)

VI.    Affidavit of Release of Lien:
    For the above said consideration, the undersigned waives any rights in the nature of lien, claims or bond claims, which it may have for labor performed and/or materials furnished to date and agrees that payment of the amount stated in item B(5) above by Bozzuto Building Company is in full settlement of any amount due for any and all labor performed and/or material furnished to date, except as listed below. The undersigned warrants that he has not assigned any claim for payment.

                              FULL AND FINAL LIEN RELEASE

    It is also acknowledged that the priority date as to any subsequent liens is hereby waived. The undersigned also warrants that he is duly authorized to make oath hereto and to act for the subcontractor.

ATTEST:                           EXECUTED UNDER SEAL ON _____
                                           (Insert Date)

State of:_____ County of:_____

Subscribed & sworn to before me this

____ Day of_____ 20___

Notary Public:_____

My Commission Expires:_____                BY:_____

                                                        (Name & title)

#537156

## AFFIDAVIT OF OUTSTANDING ACCOUNTS
(SAMPLE)

### Cathedral Commons

We further certify that all outstanding claims for labor, insurance, unemployment benefits, taxes, union benefits, subcontracts materials, rental, expendable equipment and any other obligation incurred in the performance of said agreement have been paid in full in accordance with our requirements of said agreements except such outstanding claims as are listed below, which statement contains all claims against the Subcontractor which are not yet paid (all amounts owed, even if under extended periods of credits, must be included in this statement);

We also certify that these due and payable accounts will be paid as shown below out of funds to be received from the Contractor for this period and signed receipts will be presented prior to and as a condition of receiving the next check, if requested by the Contractor.

|  |  | PAYMENTS DUE AND TO BE MADE |  |
|---|---|---|---|
| NAME OF FIRM: | AMOUNT OWING: | AMOUNT | DATE: |
|  |  |  |  |

(Use your own continuation sheet if required, if "none" so state)

The undersigned Subcontractor, having heretofore entered in to a subcontract with the Bozzuto Building Company to perform certain services in connection with the above operation, and having made AFFIDAVIT OF OUTSTANDING ACCOUNTS, in connection with request for payment in order to induce the Bozzuto Building Company to make a payment at this time in the amount of $[total_due] agrees as follows:

1. That said payment is in strict compliance with the terms and conditions of said contract.

2. That said payment shall be received as a trust fund and applied by the undersigned, first for the discharge of his obligations for all labor, subcontract work, materials, equipment, supplies, services, Etc, in connection with this project.

3. That said payment will not be deposited with any depository to whom the Subcontract has given any evidence of an indebtedness which gives to the depository any legal rights to such funds or any part there of.

4. That the person executing this Certificate on behalf of the Subcontractor is an authorized officer of the Subcontractor, having personal knowledge of all of the matters hereinabove set forth and duly authorized to execute this Certificate and bind the Subcontractor hereto.

Design Build Mechanical Corporation

(Name of Subcontractor)                                        (Signature of Officer)


(Date)                                                        (Title of Officer)


STATE OF

COUNTY OF

Being familiar with penalties for making a false statement under oath, as to any matters herein above set forth, I solemnly swear that I am the

_____ of Design Build Mechanical Corporation

(Title of Officer)

The Subcontractor named herein and who executed the forgoing statement; that I am familiar with all of the matters set forth, and that I have read the forgoing statement subscribed by me and I know the contents thereof, and that the same is true to my knowledge.

SWORN AND SUBSCRIBED TO BEFORE ME

This ____ Day of _____ 20__            BY: _____
                                              (SIGNATURE OF OFFICER)

(NOTARY PUBLIC AFFIX STAMP)


(COMMISSION EXPIRES)

### END OF EXHIBIT "7"

Page 3 of 3

#537156

## EXHIBIT "8"

### PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, 3635 Concorde Parkway, Suite 700, Chantilly, VA   20151 (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME, a corporation organized and existing under the laws of the State of BONDING COMPANY STATE, (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of ONE MILLION NINE HUNDRED SEVENTY TWO THOUSAND DOLLARS, ($1,972,000.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by Cathedral Commons Partners, LLC, for Cathedral Commons and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/20/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of Heating, Ventilation, Air and Cooling for North and South Parcel, ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond; and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

The said Principal and Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, 20_____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____
(Principal)                          (Seal)

Design Build Mechanical Corporation
3635 Concorde Parkway, Suite 700
Chantilly, VA  20151

Witness:                                By:

_____       _____
Or, Secretary's Attest                 (Signature and Title)          (Seal)

_____
(Surety)

BONDING COMPANY
By:

Witness:

_____       _____
Or, Secretary's Attest                 (Signature and Title)          (Seal)

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 022
DATE: 4/20/2013

## EXHIBIT "8"

### PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, 3635 Concorde Parkway Suite 700, Chantilly, VA 20151 (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME a corporation organized and existing under the laws of the State of BONDING COMPANY STATE, (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of ONE MILLION NINE HUNDRED SEVENTY TWO THOUSAND DOLLARS, ($1,972,000.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract"), by Cathedral Commons Partners, LLC. for Cathedral Commons and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/20/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of Heating, Ventilation, Air and Cooling for North and South Parcel, ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of said Subcontract within the time provided therein and any extensions thereof that may be granted by the Obligee, and during the life of any guaranty required under said Subcontract, and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract that may hereafter be made, and shall indemnify and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee may sustain by reason of failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this _____ day of _____, 20_____, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____    _____
(Principal)                        (Seal)

Design Build Mechanical Corporation
3635 Concorde Parkway
Suite 700
Chantilly, VA 20151

Witness:                           By:

_____    _____    _____
Or, Secretary's Attest             (Signature and Title)                (Seal)

_____
(Surety)

BONDING COMPANY
Witness:                           By:

_____    _____    _____
Or, Secretary's Attest             (Signature and Title)                (Seal)

END OF EXHIBIT "8"

#537156

# Exhibit 09 - First Source Agreement

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Department of Employment Services

★ ★ ★

VINCENT C. GRAY
MAYOR

LISA M. MALLORY
DIRECTOR

July 11, 2012,

Jamie D. Gross
Associate Director
Goulston & Storrs
1999 K ST., NW, SUITE 500
Washington, DC 20006-1101

Dear Ms. Gross:

Enclosed is your copy of the signed First Source Employment Agreement between the D.C. Department of Employment Services (DOES) and the Friendship-Macomb SC, Inc. Under the terms of the Agreement, you are required to use DOES as the first source to fill all new jobs created as a result of Project: Friendship Shopping Center. In addition, at least 51% of the newly created jobs must be filled by D.C. residents, as well as, at least 35% apprentices and trainees must be District residents.

You should post your job vacancies to the Department of Employment Services' Virtual One-Stop (VOS) at www.dcnetworks.org. We also ask that you contact one of the members of our customer relationship management team who will work with you to identify qualified District residents for placement. Please contact Ms. Anetta Graham at (202) 698-3757 and a DOES representative will be happy to refer you.

The First Source Program has implemented an electronic compliance database which will provide a more efficient way for employers to enter and track their monthly First Source data. If you have any questions regarding the Monthly Compliance Reporting Database, please contact DeCarlo Washington at (202) 698-5772.

Thank you for participating in the First Source Employment Agreement Program, and we are looking forward to working with you.

Sincerely,

James H. Moore, Jr., Ph.D.
Deputy Director
Office of Policy, Performance and Economics

Enclosure

4058 Minnesota Ave, N.E. • Suite 5000 • Washington, D.C. 20019 • Office: 202.671.1900





Exhibit 09 - First Source Agreement

FIRST SOURCE EMPLOYMENT AGREEMENT

| | |
|---|---|
| Contract Number: | Zoning Commission Case No. 08-15 |
| Contract Amount: | |
| Project Name: | Friendship Shopping Center |
| Project Address: | 3326, 3400-3430, 3440 Wisconsin Avenue, NW |
| | Ward: 3 |

Nonprofit Organization with 50 Employees or Less: (Yes) _____ (No) X

This First Source Employment Agreement, in accordance with D. C. Law 14-24, D.C. Law 5-93, as amended and Mayor's Order 83-265 for recruitment (the "Employment Agreement" or "Agreement"), referral, and placement of District of Columbia residents, is between the District of Columbia Department of Employment Services, hereinafter referred to as DOES, and Friendship-Macomb SC, Inc., hereinafter, referred to as EMPLOYER. Employer is developing a mixed-use project in Ward 3 of the District of Columbia that will include approximately 78,000-80,000 square feet of retail use and 146 residential units ("Project"). Under this Employment Agreement, the EMPLOYER will use DOES as its first source for recruitment, referral, and placement of new hires or employees for the new jobs created by the development of real property located at the addresses listed on the attached sheet and will hire 51% District of Columbia residents for all new jobs created, as well, as 51% of apprentices employed in connection with the project shall be District residents registered in programs approved by the District of Columbia Apprenticeship Council.

I.   GENERAL TERMS

    A.   The EMPLOYER will use DOES as its first source for the recruitment, referral and placement of employees.

    B.   The EMPLOYER shall require all contractors and subcontractors, performing work on the Project with contracts totaling $100,000 or more, to enter into a First Source Employment Agreement or an agreement substantially equal to this Agreement with DOES relating to such contracted work.

    C.   DOES will provide recruitment, referral and placement services to the EMPLOYER subject to the limitations set out in this Agreement.

    D.   DOES participation in this Agreement will be carried out by the Office of the Director, with the Office of Employer Services, which is responsible for referral and placement of employees, or such other offices or divisions designated by DOES, (collectively, the "Contract Officer").

    E.   This Agreement shall take effect when signed by the parties below and shall be fully effective until thirty (30) days after the completion of the construction of the Project. Any First Source Agreement entered into by any contractor as the result

DCDOCS\1031012.1

1

#537156

# Exhibit 09 - First Source Agreement

of this Agreement shall be fully effective for the duration of the relevant contract with Employer and any extensions or modifications to that contract.

F.   This Agreement shall not be construed as an approval of the EMPLOYER'S bid package, bond application, lease agreement, zoning application, loan, or contract/subcontract.

G.   DOES and the EMPLOYER agree that for purposes of this Agreement, new hires and jobs created (both union and nonunion) include all EMPLOYER'S job openings and vacancies in the Washington Standard Metropolitan Statistical Area created as a result of internal promotions, terminations, and expansions of the EMPLOYER'S workforce, related to the Project, including loans, lease agreements, zoning applications, bonds, bids, and contracts, subject to the exemptions listed in Section VII of this Agreement.

H.   For purposes of this Agreement, apprentices as defined in D.C. Law 2- 156, as amended, are included.

I.   The EMPLOYER shall register an apprenticeship program with the D.C. Apprenticeship Council for construction or renovation contracts or subcontracts totaling $500,000 or more. This includes any construction or renovation contract or subcontract related to the Project signed as the result of, but is not limited to, a loan, bond, grant, Exclusive Right Agreement, street or alley closing, or a leasing agreement of real property for one (1) year or more.

J.   All contractors who contract with the Government of the District of Columbia to perform information technology work with a single contract or cumulative contracts of at least $500,000, let within any twelve (12) month period shall be required to register an apprenticeship program with the District of Columbia Apprenticeship Council.

K.   The term "information technology work" shall include, but is not limited to, the occupations of computer programmer, programmer analyst, desktop specialist, technical support specialist, database specialist, network support specialist, and any other related occupations as the District of Columbia Apprenticeship Council may designate by regulation.

II.   RECRUITMENT

A.   The EMPLOYER will complete the attached Employment Plan, which will indicate the number of new jobs projected, salary range, hiring dates, and union requirements to the extent such information is known. The EMPLOYER will notify DOES of its specific need for new employees as soon as that need is identified.

B.   Notification of specific needs, as set forth in Section II.A. must be given to DOES at least three (3) business days (Monday - Friday) before using any other referral source, and shall include, at a minimum, the number of employees needed by job

2

#537156

# Exhibit 09 - First Source Agreement

title, qualification, hiring date, rate of pay, hours of work, duration of employment, and work to be performed.

C.  Job openings to be filled by internal promotion from the EMPLOYER'S current workforce need not be referred to DOES for placement and referral.

D.  The EMPLOYER will submit to DOES, prior to starting work on the Project, the names, and addresses of all current employees, including apprentices, trainees, and laid-off workers who will be employed on the Project, if such information is known.

III.  REFERRAL

DOES will screen and refer applicants according to the qualifications supplied by the EMPLOYER.

IV.  PLACEMENT

A.  DOES will notify the EMPLOYER, prior to the anticipated hiring dates, of the number of applicants DOES will refer. DOES will make every reasonable effort to refer at least two qualified applicants for each job opening.

B.  The EMPLOYER will make all decisions on hiring new employees but will in good faith use reasonable efforts to select its new hires or employees from among the qualified persons referred by DOES.

C.  In the event DOES is unable to refer the qualified personnel requested, within three (3) business days (Monday - Friday) from the date of notification, the EMPLOYER will be free to directly fill remaining positions for which no qualified applicants have been referred. Notwithstanding the foregoing, the EMPLOYER will still be required to make a good faith effort to hire, consistent with D.C. law, 51% District residents for the new jobs created by the development and construction of the Project, to the extent qualified candidates are available at market compensation.

D.  After the EMPLOYER has selected its employees, DOES will not be responsible for the referred employees' actions and the EMPLOYER hereby releases DOES, and the Government of the District of Columbia, the District of Columbia Municipal Corporation, and the officers and employees of the District of Columbia from any liability for employees' actions.

V.  TRAINING

DOES and the EMPLOYER may agree to develop skills training and on- the-job training programs; the training specifications and cost for such training will be mutually agreed upon by the EMPLOYER and DOES and set forth in a separate Training Agreement.

VI.  CONTROLLING REGULATIONS AND LAWS

DC3XDC3W363015.1

3

#537156

## Exhibit 09 - First Source Agreement

A.   To the extent this Agreement is in conflict with any labor laws or governmental regulations, the laws or regulations shall prevail.

B.   DOES will make every effort to work within the terms of all collective bargaining agreements to which the EMPLOYER is a party.

C.   The EMPLOYER will provide DOES with written documentation that the EMPLOYER has provided the representatives of any involved collective bargaining unit with a copy of this Agreement and has requested comments or objections. If the representative has any comments or objections, the EMPLOYER will promptly provide them to DOES.

## VII.   EXEMPTIONS

A.   Contracts, subcontracts or other forms of government-assistance less than $100,000.

B.   Employment openings that the Employer or a contractor will fill with individuals already employed by the company.

C.   Job openings to be filled by laid-off workers according to formally established recall procedures and rosters.

D.   Suppliers located outside of the Washington Standard Metropolitan , Statistical Area and who will perform no work in the Washington Standard Metropolitan Statistical Area.

## VIII.   AGREEMENT MODIFICATIONS, RENEWAL, MONITORING, AND PENALTIES

A.   If, during the term of this Agreement, the EMPLOYER should transfer possession of all or a portion of the Project affected by this Agreement to any other party by sale, assignment, merger, or otherwise, the EMPLOYER as a condition of transfer shall:

1.   Notify the party taking possession of the existence of the EMPLOYER'S Agreement.

2.   Notify the party taking possession that full compliance with this Agreement is required in order to avoid termination of the Project.

3.   EMPLOYER shall, additionally, advise DOES within seven (7) business/calendar days of the transfer. This notification will include the name of the party taking possession and the name and telephone number of that party's representative.

B.   DOES shall monitor EMPLOYER'S performance under this Agreement. The EMPLOYER will cooperate in DOES' monitoring effort and will submit a Contract Compliance Form to DOES monthly.

DCDOCS\7653012.1

4

Exhibit 09 - First Source Agreement

C. To assist DOES in the conduct of the monitoring review, the EMPLOYER will make available payroll and employment records for the review period indicated.

D. If additional information is needed during the review, the EMPLOYER will provide the requested information to DOES.

E. With the submission of the final Contract Compliance Form to DOES, the EMPLOYER shall:

　　1. Document in a report to the Contracting Officer its compliance with the requirement that 51% of the new employees hired in connection with the development and construction of the Project be District residents; or

　　2. Submit a request to the Contracting Officer for a waiver of compliance with the requirement that 51% of the new employees hired by the Project be District residents and include the following documentation:

　　　　a. Material supporting a good faith effort to comply;

　　　　b. Referrals provided by DOES and other referral sources; and

　　　　c. Advertisement of job openings listed with DOES and other referral sources.

F. The Contracting Officer may waive the goal that 51% of the new employees hired by the Project be District residents, if the Contracting Officer finds that:

　　1. A good faith effort to comply is demonstrated by the Employer (or contractor);

　　2. The EMPLOYER is located outside the Washington Standard Metropolitan Statistical Area "and none of the contract work is performed inside the Washington Standard Metropolitan Statistical Area;

　　　　The Washington Standard Metropolitan Statistical Area includes the District of Columbia, the Virginia Cities of Alexandria, Falls Church, Manassas, Manassas Park, Fairfax, and Fredericksburg; the Virginia Counties of Fairfax, Arlington, Prince William, Loudon, Stafford, Clarke, Warren, Fauquier, Culpeper, Spotsylvania, and King George; the Maryland Counties of Montgomery, Prince Georges, Charles, Frederick, and Calvert; and the West Virginia Counties of Berkeley and Jefferson.

　　3. The EMPLOYER enters into a special workforce development training or placement arrangement with DOES; or

　　4. DOES certifies that insufficient numbers of District residents in the labor market possess the skills required by the positions created as a result of the contract.

DCDOCS/07/3013.1

5

#537156

Exhibit 09 - First Source Agreement

G.   Willful breach of this Agreement by the EMPLOYER, or failure to submit the Contract Compliance Report within fifteen (15) business days after notice of such failure has been given to Employer, or deliberate submission of falsified data, may be enforced by the Contracting Officer through imposition of penalties calculated as 5% of the total amount of the direct labor costs of the contract.

H.   Nonprofit organizations with 50 or less employees are exempted from the requirement that 51% of the new employees hired on the Project be District residents.

I.   The EMPLOYER and DOES, or such other agent as DOES may designate, may mutually agree to modify this Agreement. This Agreement shall not create third party rights in any party not a signatory to this Agreement.

J.   The terms of, and all information provided as a result of, this Agreement is confidential and shall not be disclosed without prior written permission from Employer.

IX.   Is your firm a certified Local, Small, Disadvantaged Business Enterprise (LSDBE)?
YES   NO X
If yes, certification number:_____

X.   Do you have a registered Apprenticeship program with the D.C. Apprenticeship Council?
YES   NO
If yes, D.C. Apprenticeship Council Registration Number:_____

XI.   Indicate whether your firm is a subcontractor on this project:   YES      NO X
If yes, name of prime contractor:_____

Dated this _____ day of _____ 20__      cur

_____
Signature Dept. of Employment Services

_____
Signature of Employer

Friendship Macomb SC, Inc.
Name of Company

c/o The Stop & Shop Supermarket Co.
1385 Hancock Street
Quincy, MA 02169
Address

Telephone_____
E-mail

DCDOCS/1033013.1

-6-

# Exhibit 09 - First Source Agreement

## EMPLOYMENT PLAN

NAME OF FIRM  Friendship Macomb SC, Inc.

ADDRESS  1385 Hancock Street, Quincy, MA 02169

TELEPHONE NUMBER _____ FEDERAL IDENTIFICATION NO. _____

CONTACT PERSON  Guy Stutz  TITLE  V.P., Real Estate

E-mail:  gstutz@stopandshop.com   TYPE OF BUSINESS: for-profit development company

ORIGINATING DISTRICT AGENCY:  Office of Zoning

CONTRACTING OFFICER: _____ TELEPHONE NUMBER: 727.6311

TYPE OF PROJECT  Planned Unit Development  FUNDING AMOUNT _____

PROJECTED START DATE  Spring 2012   PROJECT DURATION  Construction of the first
phase of development is anticipated to last 24 months.

NEW JOB CREATION PROJECTIONS (Attach additional sheets, as needed.) Please indicate
the new position(s) your firm will create as a result of this project.

| | JOB TITLE | # OF JOBS F/T P/T | SALARY RANGE | UNION MEMBERSHIP REQUIRED NAME LOCAL # | PROJECTED HIRE DATE |
|---|---|---|---|---|---|
| A | See Exhibit A | | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| E | | | | | |
| F | | | | | |
| G | | | | | |
| H | | | | | |
| I | | | | | |
| J | | | | | |

DCDOCS/7253013.1

#537156

Exhibit 09 - First Source Agreement

CURRENT EMPLOYEES: Please list the names and addresses of all current employees including apprentices and trainees who will be employed on the project. Attach additional sheets as needed.

| NAME OF EMPLOYER | ADDRESSES or EMPLOYER IDENTIFICATION NUMBER |
|---|---|
| SEE BELOW | |
| See attached list [2] | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

[1] The general contractor has not yet determined the staffing requirements for this Project. All contractors and sub-contractors will be required to comply with the Employment Agreement.

2

[2] The attached list of names is comprised of potential employees from one contractor that may be employed on the project. Actual names of

#537156

# Exhibit 09 - First Source Agreement

CURRENT EMPLOYEES: Please list the names and social security numbers of all current employees including apprentices and trainees who will be employed on the project. Attach addition sheets as needed.

**NAME OF EMPLOYEE**

**SOCIAL SECURITY NUMBER or EMPLOYEE IDENTIFICATION NUMBER**

[not provided per DOES direction]

Daniel Carter, Jr.
Wayne G. Creel
Donald Wallace
Stephen Craig Hajos
John E. Mead
Tommy L. Kennedy
Jose R. Zelaya
Arthur Johnson
Sterling Lee
Roberto Bonilla
Rosalio Lopez
Jose O. Bonilla
Aurel I. Lucanu
Roberto A. Hernandez
Walter A. Canales
Carlos A. Alvarez Martinez
Jose Carlos Hernandez
Juan A. Martinez
Carlos A. Martinez
Lucas Ayala Ayala
Oscar S. Bonilla Chavez
Leo J. Martel Vasquez
Juan Pablo Rivera Merino
Francisco Pineda
Ricardo Pelayo
Prudencio M. Alvarado
Ruben A. Saravia
Angel Ruben Ortez
Catalino E. Bonilla
Rogelio Alvarez
Hector A. Rivera
William R. Sorto Hernandez
Jose V. Villanueva
Robert D. Poloski
Isaias Anaya Aguilar
William D. Green
James E. Johnson
Edgar Raymundo Grijalva
Peter A. Garland

Exhibit 09 – First Source Agreement

Carlos A. Padilla
Miguel A. Bonilla
Jose D. Martinez
Fidel Escoto Parada
William R. Bonilla
Jose M. Arevalo
Marcelo Escobar
Jerson Jeremias Martinez
Roberto A. Artiaga
Armando Osorio
Melvin Pineda-Garcia
Leonardo Castillo-Amaya
Jose A. Chavez-Ticas
Gary J. Ball II
Henry Adonay Villalta
Walter A. Henriquez
Ernest R. Hubbard
Miguel Angel Cruz
Miguel Hernandez Flores
Michael R. Lipps
Lewis W. Dixon
Belter Augusto Lucero Castillo
James B. Starnes
Ramon A. Gamero
Jesus O. Merino Ortiz
Pedro A. Villatoro
Herbert O. Delcid Cabrera
Jose Abel Martinez
Alcides J.C. Jovel
Adonis M. Vargas Cubas
Jose O. Hernandez
Jose A. Zelaya
Mario Rafael Vasquez
Marvin Vargas Garcia
Margarito Argueta
Gilbert Ramos Hernandez
Juan F. Colato Perez
Pedro Cruz
Juan Fuentes
Cristobal Rivas Salinas
Antonio Davis
Oscar Rolando Garcia
Guillermo B. Hernandez
Edwin Garcia
Byran Price



Exhibit 09 - First Source Agreement

James Sleasman
John R. Mead
Christopher Buhmann
Santiago Turcios
Andres Amaya Ochoa
Jaime Melgar
Willie Morris
Nelson Posada Aguilera
Luis A. Cruz-Romero
Rafael Zapana
Jay D. McMillan
Shawn Reynolds
ShaMeka Burroughs
Shane Franklin Gray
Delvin W. Savoy JR
Carlos A. Gil
Derek Hoffman
Joseph Pierce
Stanley Tines
Thomas W. Smith
Lloyd Heflin
Dion Gray
Cornell Jones
Brent Schaeffer
Jose Juan Lopez Hernandez
James M. Dolin
Leon Fisher, Jr.
Trevor J. Staebler
Eusebio Ventura
Gonzalo Granados
Reginald Hayes
William Gamero Iglesias
Glenn T. Thompson

Exhibit 09 - First Source Agreement

## Exhibit A

### NEW JOB CREATION PROJECTIONS

#### GENERAL CONTRACTOR

The hiring needs of the general contractor have not yet been determined for the Project. All contractors performing work on the Project with contracts equal to or greater than $100,000 will be required to comply with the requirements of this Employment Agreement.

#### SUB-CONTRACTORS

All sub-contractors performing work on the Project with contracts equal to or greater than $100,000 will be required to comply with the requirements of this Employment Agreement.

DCDOCS\783\013.1

#537156



Brazucci Building Company
Cathedral Commons
Exhibit "10" Project Schedule

(Fig. 1-5)

#537156



Bozzuto Building Company
Cathedral Commons
Exhibit "B" Project Schedule

#537156

## Cathedral Commons Partners, LLC/ANC 3C Construction Management Agreement

This Construction Management Agreement (Agreement) provides the framework, limits, and enforcement for the construction projects at 3306-36 and 3400-34 Wisconsin Avenue, NW ("Cathedral Commons"), currently known as Friendship Shopping Center. All contractors and sub-contractors (and including all project employees) engaged in this construction project shall be given a copy of this Agreement and shall commit to comply with its provisions as a condition of employment. The terms of the Agreement, including the obligations of the current owner, Cathedral Commons Partners, LLC ("CCP"), shall apply to any successor owner of the property if the project is sold before or during construction, including a partial sale or a sale/leaseback (in which case it shall apply to both the purchaser and CCP jointly).

### Establishment of Construction Liaison Committee

A Construction Liaison Committee (Committee) shall be established consisting of twelve (12) members. The Committee shall include ANC 3C representatives for the 05, 06, 07, and 09 single member districts, a CCP corporate representative, a construction representative, a representative from the Cleveland Park Citizens Association, a representative from Vaughan Place, a representative from Macomb Gardens, a representative from the Chesterfield, a representative from The Abby, and a representative from the Cathedral Heights neighborhood. The CCP representative shall be authorized to make decisions on behalf of CCP. This Committee shall be in effect for all construction performed by CCP pursuant to Zoning Commission Order 08-15. Members of the Committee may appoint an alternate. The Committee shall meet monthly in public session and produce public minutes that shall be posted on the ANC 3C web site. A chair shall be appointed by the Committee to schedule meetings, provide notice of meetings and minutes to the public, and preside at meetings. A secretary shall be appointed by the Committee to take and prepare minutes.

Issues that arise between meetings shall be conveyed to all members of the Committee by email with solutions proposed by a majority of the Committee through email communication that occurs at least two days prior to the need for a decision. When any Committee member fails to respond to the email notice, the Chair shall call the member(s) to seek assurance that notification was received.

**Schedule:** Meetings shall begin one month prior to demolition. There shall be at least one meeting each month during construction, unless a majority of the Committee agrees to meet less often. Any three (3) Committee members may call a meeting more often than once a month, but not more than every-other week, with three days notice by email or telephone to all members. Meetings must have a quorum and minutes must be taken of every meeting and posted on the ANC 3C web site. A quorum for these purposes shall be seven (7) members.

**Responsibilities:** Committee shall be informed in writing by CCP representative of pre-construction survey activities, including the zone of impact for each construction activity, the results of notification of property owners within zone of impact, the completion of surveys and distribution of survey results to the individual property owners, complaints of construction-related property damage within the zone of impact or elsewhere, and the publicly available terms regarding the resolution of claims. Committee shall discuss and propose resolutions to any construction-related issues arising from the Agreement. Committee shall maintain a file of all



applicable D.C. ordinances related to each construction activity, and make them available through links on the ANC 3C website to the community. Upon ANC 3C request, the CCP representative and the construction representative shall supplement the ANC 3C Committee representatives' report at the ANC 3C public meeting held during the construction period on the status of the construction project.

## Pre-Construction

CCP shall have an engineer (selected and paid for by CCP) determine the zone of impact for each phase of the construction prior to the beginning of the construction of the project, and shall perform the survey in accordance with industry-standard practices. The zone of impact shall be based on potential for damage from construction activity, including hydrology impact. Each property owner within the zone of impact (including commercial owners) shall be notified by CCP at least 45 days prior to the commencement of demolition activities that a pre-construction survey, at no cost, can be conducted on their property. Such notification shall take place via Certified Mail. The pre-construction surveys shall be conducted by the CCP-hired engineer and shall establish a baseline to assess any changes that may result from construction activities of the CCP project. The appropriate ANC Commissioner shall be notified by CCP if there is a lack of response to the first notice from any owner whose property is deemed to be in the zone of impact. Any property owner who does not respond within 30 days of the first certified mailing, shall be deemed to have been properly notified and to have declined the survey. The surveys shall serve as a baseline against which to measure impacts from the construction on each property within the zone of impact. Each surveyed owner shall be furnished a copy of his/her survey prior to the beginning of construction activities.

A copy of the preliminary project schedule, in Gantt chart format, as well as a full set of the approved Demolition, Site and Grading and Utility Construction Documents and Specifications shall be given to the Liaison Committee prior to the commencement of demolition activities on the Cathedral Commons. This information shall be provided electronically or in hardcopy, if requested.

## Construction

**Communication:** CCP shall designate a representative, who is knowledgeable and authorized to address complaints, to be the key contact for members of community regarding construction of the structures and exterior improvements. Representative or its staff shall have a local office, and 24-hour phone, email, fax, and voice mail, and be reasonably accessible during business hours and for emergencies, such as loss of property or safety issues, at any time. CCP shall report all reasonable complaints within two business days to the ANC Committee representatives. Emergency matters shall be handled immediately and non-emergency matters within a reasonable period of time. Contact information for the CCP representative and a schedule of construction activities shall be prepared and posted on the construction bulletin boards at Wisconsin Avenue and also on Idaho Avenue at Newark Street intersection and on a project-related web site managed by CCP. The schedule, which shall be posted every week, shall list the construction activities for the following 2 weeks of construction.

**Work Hours:** Construction work on Monday through Friday shall only be conducted during hours permitted by the District of Columbia. Work on Saturday shall begin no earlier than 8AM and end by 5PM, unless previously approved by Committee. Requests for permission for extended Saturday work hours and requests for permission to work on the occasional Sunday

shall not be unreasonably denied by the Committee. Unless specifically required by DC due to "off-peak" requirements (ie: road work), no noisy behavior or activities by CCP's contractors or sub-contractors shall be allowed prior to the beginning of or after construction hours. Construction deliveries shall be scheduled only during authorized Work Hours.

Parking: CCP shall endeavor to maximize on-site parking and require that subcontractors and their employees accept the Parking Management Plan (Exhibit A), which shall identify alternative parking resources and facilitate their use by project employees needing parking. No parking on local or collector streets or Wisconsin Avenue, or in public alleys within the prohibited parking radius shall be allowed. CCP shall also require that contractors and sub-contractors ensure that operators of all construction vehicles are properly licensed and insured. CCP shall not request the temporary elimination of public parking supply, unless there is an emergency situation or closure is critical for performance of the construction work (ie: curb and road work).

Traffic: Newark Street (at Idaho & Wisconsin) shall be the construction entrance for all construction activities, unless the District Dept. of Transportation finds that a different entrance is warranted. CCP shall require all construction/project vehicles (including, but not limited to, trucks, personal or company vehicles of construction workers) to utilize only arterial roadways for access to and from the site within a 1-mile radius of the site (see Exhibit A), except as approved by the Committee. Trucks shall use arterial roadways and are prohibited from traveling on residential streets outside of the project boundaries. Truck idling that violates D.C. Code Section XXX shall be prohibited and truck queuing outside of construction entrance shall be minimized and shall be actively managed. There shall be no queuing of trucks on blocks other than where the construction entrance is located. Construction-related vehicles may stage at the construction site no earlier than 6AM, but there shall be no noise resulting from that allowance prior to 7AM. Flagmen shall be provided to facilitate traffic and the safe arrival and departure of trucks throughout the day. Dump trucks shall be covered and cleaned before leaving the site so as to minimize any gravel or dirt from leaving the construction site. Pedestrian movement on the sidewalks surrounding the construction area shall be maintained pursuant to the approved District Department of Transportation Traffic Control Plan. The Traffic Control Plan shall be shared with ANC 3C and the ANC shall post the plan on its web site.

Site Management: All construction materials and equipment, including construction storage, trailers, and dumpsters, shall be secured nightly on the Cathedral Commons property with construction fencing. CCP shall, on a nightly basis, lock all motorized equipment and vehicles, stack any building materials (i.e., brick, lumber, etc.), and comply with the DC approved erosion and sediment control plan. Security lighting shall be provided from dusk to dawn to provide safety and shall be directed away from any residences.

Cleanliness: CCP shall require every other day removal of rubbish, food and drink containers and construction debris during the normal construction workday and during any other periods of work. All construction workers shall eat and drink on-site or in an eating establishment. CCP shall locate portable toilets away from neighborhood and service them frequently. Trucks carrying debris or excavation materials or fill shall be covered both entering and exiting the construction site, and they shall be cleaned prior to exiting the site so as to minimize dust or dirt outside the site. Removal and replacement of dumpsters shall occur only during approved construction hours. CCP shall require that any streets or alleys that surround the construction area and/or serve as construction routes are kept clean of dirt and any trash and debris resulting from construction activities or workers. CCP shall develop and implement proactively a rodent control program in cooperation with Committee prior to the commencement

of demolition.  CCP shall ensure that storm water outlets are efficiently covered to filter construction materials and maintain drainage.  CCP shall also periodically conduct vibration and noise monitoring as necessary and provide monitoring reports to the Committee and propose solutions to mitigate both noise and vibration, particularly during demolition and excavation.

**Hazardous Materials/Blasting:**  If hazardous or toxic materials, including underground storage tanks, are identified and need to be abated or removed, removal shall be conducted in compliance with the DDOE-approved Corrective Action Plan.  If any hazardous or toxic substances are used in conjunction with construction work, other than those typical of construction activity (ie: gasoline), the Committee shall be notified.  Such substances shall only be used if they can be used safely and in compliance with all applicable federal and D.C. laws.

Should blasting be required during any construction project, CCP shall notify the Committee and post a notice on its bulletin boards and on the project web site at least 48 hours prior to the commencement of blasting activities.  CCP shall give at least 72 hours notice to Committee prior to any pile-driving activities, as well as posting it on the bulletin boards and on the construction web site.

## Enforcement

**Complaints:**  CCP is committed to speedy resolution of disputes with neighbors.  Any construction-related complaint that cannot be resolved within 1 week of the CCP-designated contact person receiving the complaint shall be referred to the Committee by the claimant's ANC representative.  The Committee shall make recommendations to resolve complaint.  If complaint is not resolved within 1 month of the Committee having received the complaint, Claimant or CCP may pursue other options, such as mediation. CCP shall pay 75% of the cost of mediator for up to 3 (three) complaints per year provided the mediation period does not exceed 60 (sixty) days.  Each party shall incur its own legal representation costs for any and all complaints.  Process of choosing mediator will follow standard practices as outlined by the American Arbitration Association.

**Reimbursement for Damage:**  To the extent caused specifically by the construction of the Project, CCP shall reimburse reasonable costs to repair or replace damage to private property.  For damage to private property in the zone of impact, the pre-construction survey shall serve as the baseline to determine the nature and extent of damage.

Attested to by

Jeff Kayce
Cathedral Commons Partners, LLC
c/o Bozzuto Development Company

On  9-18-12

Attested to by

Victor Silveira
Chair, ANC 3C

On 9 - 18 12

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Wednesday, August 15, 2012

Mr. Jeff Kayce
Bozzuto Development Company
7850 Walker Drive
Suite 400
Greenbelt, MD 20770

RE:    Cathedral Commons (Wisconsin Avenue Giant) – 1152
       Parking and Site Utilization Plan

Dear Mr. Kayce,

This letter and attachments are being provided in order to outline parking and site utilization procedures to be used by Bozzuto Building Company (BBC) during construction of the Cathedral Commons (Wisconsin Avenue Giant) Project, located at 3336 & 3406 Wisconsin Avenue, NW Washington, DC 20016. Additionally we expect that this letter and attachments will be used to meet the site plan requirements regarding information to be provided to the District of Columbia, local citizens associations, local business and the like as to the parking management practices that will be put in place by BBC at the Project site. Further BBC will maintain a copy of this document and attachments onsite and in our contract documents with our Subcontractors and Vendors in order to outline parking availability, restrictions and alternate means of transportation to the Project site. Please see the following attached documents: Cathedral Commons Project Site, Prohibited Parking Radius Map, Construction Truck Route Illustration, Cathedral Commons Site Use and Sequence Plan, Cathedral Commons Off-site Parking Locations, and the Cathedral Commons Metro Locations.

Manpower requirements are expected to fluctuate throughout the various stages of the work. These various stages have been broken down into the following broad categories: demolition, foundation, vertical / MEP rough-in and finishes. BBC anticipates that the manpower requirements can be roughly broken down as follows: demolition / foundation (20-40) workers per day, vertical / MEP rough-in (35-70) workers per day, finishes (35-70) workers per day.

BBC will provide a metro rail subsidy to all subcontractors that use Metro. The subsidy will be provided for the duration of time that each Subcontractor is active on the project and will cover 50% of the daily metro fare that each Subcontractor pays. BBC will also provide and maintain information on site regarding project specific parking and restricted areas, transportation and delivery requirements and routing, as well as direction from the various locations. Also provided will be information for alternative transportation for workers such as Metro, bus routes and offsite parking options and restrictions and ride share information.

#537156

BBC will make this information available to all of our Subcontractors, Vendors, and Suppliers prior to issuance of subcontract and purchase agreements. All agreements will include language regarding parking requirements and restrictions which will allow BBC to take appropriate action in the event that there are any violations.

Please contact BBC if you have any questions or concerns regarding any of the attachments.

Sincerely,
BOZZUTO BUILDING COMPANY


Michael Green
Vice President


File: 1152

#537156





#537156



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans





#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 — Site
Utilization Plan

Wisconsin Ave. Utility Work   Detail

Sequence 6

Legend:
- Temp Fence
- Covered Walk
- Utility Work
- Street Work
- Sidewalk Work
- Sidewalk Access
- Construction Traffic
- Construction Entrance

North

BOZZUTO

#537156



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 — Site
Utilization Plan

**Building Envelope
Interior Finishes**

Month 15 to 16

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
South Parcel Hardscape

Month 17 to 18

Temp Fence
Covered Walk
Utility Work
Street Work
Sidewalk Work
Sidewalk Access
Construction Traffic
Construction Entrance

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
South Parcel Hardscape
North Parcel Hardscape

Month 19 to 20

| | Temp Fence |
| | Covered Walk |
| | Utility Work |
| | Street Work |
| | Sidewalk Work |
| | Sidewalk Access |
| | Construction Traffic |
| | Construction Entrance |

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
South Parcel Hardscape
North Parcel Hardscape

Month 20 to 21

| | = Temp Fence |
| | = Covered Walk |
| | = Utility Work |
| | = Street Work |
| | = Sidewalk Work |
| | = Sidewalk Access |
| | = Construction Traffic |
| | = Construction Entrance |

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
North Parcel Hardscape – Phase 1

Month 20

| | |
|---|---|
| ~~~~~~~ | = Temp Fence |
| | = Covered Walk |
| | = Utility Work |
| | = Street Work |
| | = Sidewalk Work |
| | = Sidewalk Access |
| ⟶ | = Construction Traffic |
| ⟵⟶ | = Construction Entrance |

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
North Parcel Hardscape – Phase 2

Month 21

= Temp Fence
= Covered Walk
= Utility Work
= Street Work
= Sidewalk Work
= Sidewalk Access
= Construction Traffic
= Construction Entrance

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



Cathedral Commons
Exhibit 11 – Site
Utilization Plan

Interior Finishes
North Parcel Hardscape – Phase 3

Month 21

Temp Fence
Covered Walk
Utility Work
Street Work
Sidewalk Work
Sidewalk Access
Construction Traffic
Construction Entrance

North

BOZZUTO

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans



#537156



Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans

## Cathedral Commons – Project Site

### 3336 & 3406 Wisconsin Avenue, NW Washington, DC 20016





#537156

Cathedral Commons · Prohibited Parking Radius Map

Exhibit I to Construction Management Agreement (CMA) with Parking and Site Utilization Plans

Construction parking will not be allowed on local streets, collector streets, Wisconsin Avenue, or in public alleys within the prohibited parking radius.



Page 4

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Bus Utilization    18

## CATHEDRAL COMMONS - TRUCK ROUTE (ENTERING AND EXITING THE PROJECT SITE)

*Project entrance will depend on the construction phase. Reference the Site Use and Sequence Plan for more information.*



*Reference the DC truck route map on the next page showing the designated truck travel paths throughout the city.    Page 5

#537156



Page 6

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans

# Cathedral Commons – Offsite Parking Locations



## PUBLIC PARKING OPTIONS:

| | NAME | ADDRESS | HOURS OF OPERATION |
|---|---|---|---|
| A | Colonial Parking Inc. | 4000 Wisconsin Ave, NW | Mon-Fri 5:30 AM to 11:00 PM ; Sat-Sat 6:00 AM to 10:00 PM |
| B | Landmark Parking | 4301 Connecticut Ave, NW | Mon-Fri 6:00 AM to 10:30PM; Sat 7:00 AM to 11:00 PM; Sun 7:00 PM to 9:30 PM |
| C | Park America | 4201 Connecticut Ave, NW | Mon-Fri 7:00 AM to 7:00 PM |
| D | Circle Park | 4530 40th Street, NW | Mon-Sat 7:00 AM to 11:00 PM; Sun 7:00 AM to 9:00 PM |
| F | National Cathedral Parking | 3101 Wisconsin Ave, NW | Mon-Fri 6:00 AM to 4:00 PM; Sat-Sun 6:00 AM to 11:00 PM |
| G | Tenley Mall Parking | Van Ness Street, N.W. 4200 Wisconsin Ave, N.W. | Mon-Fri 7:00 AM – 9:00 PM ; Sat 7:00 AM to 4:00 PM |
| J | Colonial Parking Inc. | 4455 Connecticut Ave, NW | Mon-Fri 7:00 AM to 8:00 PM; Sat-Sat 10:00 AM to 6:00 PM |

Bozzuto Building Company | 7850 Walker Drive, Suite 400 Greenbelt, MD 20770



#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans

## Cathedral Commons – Metro Locations



**METRO LOCATIONS:**

    A.  Cleveland Park Metro (0.8 mi from project site)

    B.  Van Ness – UDC Metro (0.8 mi from project site)

    C.  Tenleytown Metro (0.9 mi from project site)

Bozzuto Building Company | 7850 Walker Drive, Suite 400 Greenbelt, MD 20770

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans

## METRORAIL FARES:

Note: Effective Aug. 1, 2010, customers paying Metrorail fare using SmarTrip® receive a 25¢ discount.

**Regular fare (in effect on weekdays from opening to 9:30 a.m. and 3-7 p.m. and weekends midnight to closing)**

* $1.95 minimum
* $5.00 maximum

Note: A 20¢ fee is added to regular fares during the peak-of-the-peak period (weekdays 7:30-9 a.m. and 4:30-6 p.m.), based on the starting time of the trip.

**Reduced fare (All other times)**

* $1.60 minimum
* $2.15 mid-range
* $2.75 maximum

For fares between stations, go to Metrorail Station page and click on the station where you are starting your trip.

Transfers
Metro riders can take advantage of free bus-to-bus transfers within a two-hour time period and discounted rail-to-bus transfers by using a SmarTrip® card. Customers who use SmarTrip® instead of cash receive a 20¢ discount on bus fares, so it saves riders money, too.

**Metrobus to Metrobus.** Bus-to-bus transfers with a SmarTrip® card are valid for free, unlimited Metrobus connections (including round trips) within a two-hour period.

**Metrobus to Metrorail.** Metrobus riders who transfer to the Metrorail system will receive a discount of 50¢ if they use a SmarTrip® card.

**Metrorail to Metrorail at Farragut Crossing.** Farragut Crossing gives customers an alternative to Metro Center when transferring between the Red and Blue/Orange lines. A customer traveling from Ballston to Bethesda, for example, can now exit at Farragut West, walk across the square and reenter at Farragut North to continue the trip. With Farragut Crossing, the customer pays one fare – not two. See Farragut Crossing details.

**Metrorail to Metrobus.** Metrorail riders who transfer to Metrobus will receive a discount of 50¢ if they use a SmarTrip® card.

**Metrorail senior/disabled fares (All times)**

* 1/2 of the regular fare

Senior citizens 65 and older, persons with disabilities, and customers with a Medicare card and valid photo ID ride for half the regular fare. On Metrorail, use a SmarTrip® card or farecard for seniors or persons with disabilities to pay the reduced fare.

Acceptable valid forms of ID to participate in the reduced fare program include:

* Metro Senior ID (Effective June 29, 2008, no new applications accepted.)
* Metro Disability ID
* Government issued ID with photo
* Medicare card and photo ID

For more information about qualifying for a disability ID card and buying a reduced fare SmarTrip® card or farecards, see Senior SmarTrip® Card or Metro Disability ID information or call 202-637-7000 or TTY 202-638-3780.

Metro will issue visitors a one-time courtesy Metro Disability ID card good for up to one month. You must present a valid transportation ID card from another transit agency along with a valid government-issued photo ID. Bring them to our Metro Transit Accessibility Center located at 600 5th Street, NW, Washington, DC. Visitors 65 years of age or older may get the senior citizen discount by showing a photo ID card including date of birth and address.

Free orientations on how to use Metrobus and Metrorail services are available to persons with disabilities and senior citizens by calling 202-962-1100 or TTY 202-962-2033.

#537156

Exhibit 11 - Construction Management Agreement (CMA) with Parking and Site Utilization Plans

## METROBUS FARES:

* Regular routes
  $1.50 using SmarTrip®
  $1.70 using cash
  75¢ seniors and people with disabilities
  (75¢ w/ Senior SmarTrip card/ $.85 using cash, with proper Senior ID)
* Express routes
  $3.65 using SmarTrip®
  $3.85 using cash
  $1.90 (using cash) $1.80 (using SmarTrip®) seniors and people with disabilities
* Airport express routes
  $6
  $1.90 (using cash) $1.80 (using SmarTrip®) seniors and people with disabilities

Express Buses: J7, J9, P17, P19, W13, W19, 11Y, 17A, 17B, 17G, 17H, 17K,17L, 17M, 18E, 18G, 18H, 18P, 29E, 29G, 29H, 29X.

Airport Express Buses: Metrobus 5A service to Dulles International Airport and Metrobus B30 service to Baltimore Washington International Thurgood Marshall Airport.

Exact change: Bus drivers do not carry money. Please have your pass or exact fare ready when you board.

Metrobus passes: Money-saving weekly passes are available for unlimited travel on Metrobus.

MARC, VRE and MTA fare media: Holders of Transit Link cards or weekly or monthly MARC and VRE passes ride free on regular Metrobus routes and pay a discounted fare of $2.15 on Metrobus express routes.

Children's fares: Up to two children, 4 years and younger, ride free with each adult paying full fare. Children 5 and older pay adult fares. Special discounted student farecards and passes are available for District of Columbia residents.

Adult Tokens: Adult tokens are no longer sold to the general public at our sales outlets or local commuter stores. However, tokens are still accepted on Metrobus for the regular cash fare.

Reduced fares for senior citizens and people with disabilities: Senior citizens 65 and older, people with disabilities, and customers with a Medicare card and valid photo ID ride for half the regular fare. On Metrobus, use fare media specifically created for use by senior citizens age 65 and older and people with disabilities to pay the reduced fare. The senior citizens and people with disabilities fare products include SmarTrip®, $7.50 weekly bus pass and a $10 farecard. You can also show a valid ID to the bus operator to pay the reduced Metrobus fare.

Acceptable valid forms of ID to participate in the reduced fare program include:

* Metro Senior ID (Effective June 29, 2009, no new applications accepted.)
* Metro Disability ID
* Government-issued ID with photo
* Medicare card and photo ID

For more information about purchasing a SmarTrip® card and buying passes, see Senior SmarTrip® card or Metro Disability ID information or call 202-637-7000 or TTY 202-638-3780.

Metro will issue visitors a one-time courtesy Metro Disability ID card good for up to one month. You must present a valid transportation ID card from another transit agency along with a valid government-issued photo ID. Bring them to our Metro Transit Accessibility Center located at 600 5th Street, NW, Washington, DC. Visitors 65 years of age or older may get the senior citizen discount by showing a photo ID card including date of birth and address.

Free orientations on how to use Metrobus and Metrorail services are available to people with disabilities and senior citizens by calling 202-962-1100 or TTY 202-962-2033.

Transfers
Metro riders can take advantage of free bus-to-bus transfers within a two-hour time period and discounted rail-to-bus transfers by using a SmarTrip® card. Customers who use SmarTrip® instead of cash receive a 20-cent discount on bus fares, so it saves riders money too.

---

Bozzuto Building Company | 7850 Walker Drive, Suite 400 Greenbelt, MD 20770



Metrobus to Metrobus: Bus-to-bus transfers with a SmarTrip® card are valid for free, unlimited Metrobus connections (including round trips) within a two-hour period. Metrobus to Metrorail: Metrobus riders who transfer to the Metrorail system will receive a discount of 50¢ if they use a SmarTrip® card.

Metrorail to Metrobus: Metrorail riders who transfer to Metrobus will receive a discount of 50¢ if they use a SmarTrip® card.

**Metrobus Hours of Operation**
Metrobus operates 24 hours a day, 7 days a week, but service intervals vary by time of day and by weekday/weekend to best meet demand. Please consult Metrobus timetables for service details on specific routes.

## EXHIBIT "R"

### STANDARD SUBCONTRACT RIDER FOR
### THE Cathedral Commons PROJECT* FOR
### DESIGN BUILD MECHANICAL CORPORATION, VA

The purpose of this Exhibit "R" is to make changes to the Contract No.1152-032 dated 4/20/2013 between Bozzuto Building Company ("Contractor") and Design Build Mechanical Corporation, VA ("Subcontractor") for the Scope of Work HVAC for the Cathedral Commons project located at: 3336 & 3406 Wisconsin Avenue, N.W., Washington, DC 20016

Changes to the standard long form Subcontract Agreement are to be made are as follows:

### ARTICLE 1. SCOPE OF WORK

#### (Deletions):

b.   Subcontractor represents that it is fully qualified to perform this Agreement. Subcontractor hereby agrees that the Work will be performed in strict accordance with the Contract Documents as hereinafter defined in Article 2 and any Work not conforming to this Agreement's requirements, including substitutions not properly approved, may be considered defective. Subcontractor agrees to perform the Work to the full satisfaction of Contractor, the Inspecting Architect, and the Owner. Subcontractor shall commence the Work immediately when notified by Contractor and shall prosecute said Work in a good and workmanlike manner with due diligence and without delay. The Subcontractor shall immediately repair or replace all defective Work upon discovery or notification by the Contractor. ~~The Contractor reserves the right to have any portion of the Work which the Subcontractor has not been directed to proceed with or has not begun, accomplished by his own forces or by others.~~

### ARTICLE 2. CONTRACT SUM AND PAYMENT PROCEDURES

#### (Deletions/Additions):

c.   All invoices shall be supported to the extent required by the Contractor by affidavits, or other evidence satisfactory to Contractor, showing that all labor and material bills, taxes and all other indebtedness incurred by the Subcontractor for the Project up to and including the date of invoicing have been paid in full.  The Contractor may ~~at its sole discretion~~ withhold payments due the Subcontractor until satisfactory evidence of payment of all the Subcontractor's obligations has been accomplished. A Partial Waiver of Lien and Subcontractor's Affidavit shall be provided with each request for payment, including the current request for payment, and a Final Waiver of Lien and Subcontractor's Affidavit shall be submitted with request for final payment.  All Waivers of Lien and Subcontractor's Affidavits shall be in a format acceptable to the Contractor.

e.   Anything herein contained to the contrary notwithstanding, the Contractor reserves the right, at its sole discretion and without any fault or breach by Subcontractor, to make any payments directly to laborers, materialmen, subcontractors, sub-subcontractors, or any subcontractors or materialmen of any of them, for or on account of work performed or materials furnished under this Agreement.  If such payments are made in good faith and upon reasonable evidence of their validity, the Contractor shall have no liability to Subcontractor in connection therewith and shall deduct such payments from any balance owed to the Subcontractor. Contractor shall notify subcontractor, in writing, three (3) business days prior to making such payments.

h.   The Contractor may withhold amounts otherwise due under this Agreement ~~or any other agreement between the parties~~ to cover the Contractor's reasonable estimate of any costs or liability the Contractor has incurred or may incur for which Subcontractor may be responsible under this Agreement ~~or any other agreement between the parties. For purposes of this paragraph, the phrase "any other agreement between the parties" shall be deemed to include any agreement between Subcontractor and the Contractor or any joint venture or other entity in which the Contractor has an ownership interest.~~  Appropriate adjustments to the withheld sums shall be made when the exact amounts owed are determined.

Design Build Mechanical Corporation, VA
SUB
PM

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Cathedral Commons
CONTRACT # 1152-952
DATE: 6/11/13

## ARTICLE 4.  LIEN RIGHT

(Additions/Deletions):

b.  To the extent that Subcontractor is paid to date for work accepted and approved, in accordance with the terms of this Agreement, Subcontractor will immediately discharge or cause to be discharged all liens, claims, or attachments which may be filed in connection with the Work and will hold Contractor harmless therefrom. If Subcontractor is paid to date for work accepted and approved. Failure to comply with the requirements of this Article within a period of seven (7) days after receipt of written notice from the Contractor of any lien, claim or attachment that may have been filed in connection with the Work shall place the Subcontractor in default and entitle the Contractor to exercise any of its remedies, including the right to terminate this Agreement in accordance with the provisions of Article 13.

c.  In the event that the Subcontractor fails to pay and discharge when due, any bills or obligations of any kind or nature whatsoever incurred by the said Subcontractor by reason of or in the fulfillment of this Agreement, whether or not a lien or notice of lien has been or may be filed with respect thereto, which bills or obligations in the opinion of Contractor are proper, the Contractor, and with three (3) business days prior written notice to subcontractor, but at its sole option but without being obligated to do so, may pay all or any part of such bills or obligations. The Subcontractor hereby appoints the Contractor as agent and attorney-in-fact of the Subcontractor for the purpose of payment and discharging such bills and obligations, and the Contractor may deduct the amount of such bills as well as any expenses incurred in the payment of same, including interest, court costs and attorney's fees, from any sums due or to become due to the Subcontractor. The Subcontractor hereby expressly waives any right of redress or recovery against the Contractor by reason of any act or omission of the Contractor while acting as such agent and attorney-in-fact of the Subcontractor.

## ARTICLE 6.  TIME IS OF THE ESSENCE

(Additions/Deletions):

b.  Subcontractor agrees to conform with the progress schedule, which the Contractor shall issue. This schedule shall allow the Subcontractor adequate time to complete his Work and, unless the Contractor is notified otherwise by the Subcontractor in writing within five (5) days of the receipt of the schedule, it shall be binding on the Subcontractor. The Contractor reserves the right to amend the progress schedule from time to time as the overall progress of the Project dictates, and, subject to the notice and response provisions in this Article 6.b, the Subcontractor hereby discharges the Contractor from any liability incurred on account of such changes.

c.  If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor and at its own cost and expense, work such overtime as may be necessary, in the opinion of the Contractor, to make up for all time lost and take all necessary measures to avoid delay in the completion of the Work and of the Project, and, in any case, Subcontractor shall be responsible for all loss, costs and damages incurred by the Contractor as a result of such delay, including but not limited to all delay damages assessed against the Contractor by the Owner.

## ARTICLE 7.  CHANGE ORDERS AND FIELD WORK ORDERS

(Additions/Deletions):

b.  Subcontractor shall submit to the Contractor any requests or claims for adjustment in the price, schedule or other provisions of the Agreement for changes directed by the Owner or the Contractor, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents. Said requests or claims shall be submitted in writing by Subcontractor within seven (7) business days of the date that Subcontractor knew or should have known that it had a claim for an adjustment or within such shorter time as may be necessary to allow the Contractor to comply with the applicable provisions of the Owner-Contractor agreement. If the claim is not made within seven (7) business days or the appropriate shorter period, the claim is waived. The Contractor shall process said requests or claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including the Contractor. Agreement adjustments shall be made only to the extent that the Contractor is entitled to relief from or must grant relief to the Owner and the Subcontractor has complied with this Article. Further, each Agreement adjustment shall be equal only to Subcontractor's allocable share of any adjustment in the Contractor's contract with the Owner. Subcontractor's allocable share shall be determined by the Contractor, after allowance of the Contractor's normal overhead and profit on any recovery and the Contractor's expense of recovery, by making a reasonable apportionment, if applicable, between Subcontractor, the Contractor and other subcontractors or persons with interests in the adjustment. This paragraph shall also cover other equitable adjustments or other relief allowed by the Contract Documents.

Design Build Mechanical Corporation, VA
SUB
PM

#537156

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Cathedral Commons
CONTRACT #1187-033
DATE: 8/1/2013

d.   For changes ordered by the Contractor independent of the Owner or the Contract Documents, Subcontractor shall be entitled to equitable adjustment in the Subcontract Amount. If Subcontractor considers any action or inaction by the Contractor other than a formal change order to be a change, it shall so notify the Contractor within three five (35) days of said action or inaction and seek a confirmation from the Contractor. Failure to comply with said confirmation procedure shall constitute a waiver of the right to compensation for the action or inaction.

## ARTICLE 9. INSURANCE

### (Additions/Deletions):

h.   Evidence of insurance coverages noted in Exhibit #5 shall be provided to the Contractor at least seven (7) days prior to the start of any work by the Subcontractor in the field. Any failure to so provide such insurance coverage on behalf of the Contractor, the Owner or other parties shall not relieve this Subcontractor in any way of his responsibilities, obligations and indemnification of the Contractor and the Owner from any acts, damages, accidents, injuries, claims and the like, that occur at the Project site as a result of the operations and activities of this Subcontractor. This Subcontractor agrees to indemnify, defend (with mutually agreeable counsel chosen by Contractor), and hold harmless the Contractor and Owner in all respects thereto. Insurance shall be carried by this Subcontractor for the duration of the entire construction of the Project including The Guarantee Period. All insurance provided by the Subcontractor on the Project is non-cancelable without first providing the Contractor with thirty (30) days advance notice by registered mail of said cancellation. Failure to maintain insurance coverage as described hereto and further set forth in Exhibit #5 shall be a breach of this Agreement by the Subcontractor.

## ARTICLE 11. LOSS OR DAMAGE TO WORK

### (Additions/Deletions):

a.   The Contractor shall not be responsible for loss or damage to equipment or materials belonging to the Subcontractor, except where incorporated or installed into the Project in a satisfactory manner in accordance with the provisions of this Agreement. The Contractor shall not be responsible for loss or damage to materials, tools, equipment, or other personal property owned, rented, or used by the Subcontractor or anyone employed by it in the performance of the Work, unless such damage is the negligence or willful misconduct of the Contractor, however caused.

c.   Subcontractor shall protect its work, materials, tools and equipment against any loss or damage by fire, theft, accident or other cause. In the event of any injury, loss or damage to Subcontractor, its agents or employees or to its work, materials, or equipment, Subcontractor shall make no claim against Contractor by reason thereof, unless loss or damages are due to the negligence of Contractor.

## ARTICLE 12. CLEANUP

a.   All debris resulting from the Work shall be removed from the Work areas by the Subcontractor to locations on the Project Site designated by the Contractor as and when instructed by the Contractor's Superintendent. The Contractor shall have the right, where the Subcontractor fails to comply with its obligations under this Article, after 24/8 hours prior written notice, to accomplish the Subcontractor's cleanup with its own forces and equipment, and withhold the amount of all costs incurred in so doing from any amounts due the Subcontractor.

## ARTICLE 13. SUBCONTRACT'S FAILURE TO PERFORM OR DEFAULT

### (Additions/Deletions):

a.   If, in the sole opinion of the Contractor, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality, (2) fail in any material respect to prosecute the Work according to the Contractor's current schedule, (3) cause, by any action or omission, the stoppage or delay of or interference with the work of the Contractor or of any other contractor or subcontractor, (4) fail to comply with any provision of this Agreement or other Contract Documents, (5) make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent, then, after serving three (3) days written notice to Subcontractor and Subcontractor Surety(s) and the Subcontractor fails to eliminate the condition specified in that notice within the time allowed, the Contractor, at its option, without voiding the other provisions of this Subcontract and without notice to the sureties, may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to the Contractor for all cost, expenses, and damages resulting therefrom, (ii) terminate this Agreement, or (iii) obtain specific performance or interlocutory mandatory injunctive relief requiring performance of Subcontractor's obligations

Design Build Mechanical Corporation, VA

SUB
PM

#537156

SUBCONTRACTOR: Design Building Mechanical Corporation, VA
PROJECT: Cathedral Commons
CONTRACT #1152-035
DATE: 6/11/13

hereunder, it being agreed by Subcontractor that such relief may be necessary to avoid irreparable harm to the Contractor and/or the Owner. In the event of termination by the Contractor, the Contractor may, at its option; (a) enter on the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) take assignment of any or all of Subcontractor's subcontracts, and/or (c) either itself or through others complete the Work by whatever method the Contractor may deem expedient. In case of termination by the Contractor, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full is made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the amount of all costs, expenses, and damages incurred by the Contractor including its reasonable overhead and profit, such excess shall be paid by the Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay the Contractor the difference immediately upon demand.

## ARTICLE 14.  GUARANTEES

### (Additions/Deletions):

b.   The Contractor shall notify the Subcontractor of improper or defective work and shall provide Subcontractor an opportunity to cure such defective or improper work. If the Subcontractor fails to commence and to diligently pursue to completion the repair or replacement of improper or defective work, as specified, within a reasonable period of time as determined by the Contractor in its sole discretion, the Contractor may proceed to arrange to have such work completed and do so by whatever method it may deem expedient and may charge the cost thereof against any monies due to the Subcontractor. If the unpaid balance of the Subcontract Amount shall exceed the expense of finishing the Work, including proper allowance for additional managerial and administrative expenses, such excess shall be paid to the Subcontractor. If such expense shall exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor immediately upon demand.

## ARTICLE 15.  LABOR TO BE EMPLOYED/SUBCONTRACTOR REPRESENTATIVE

### (Deletions):

b.   ~~Subcontractor understands that the Contractor, other subcontractors and/or other contractors of the Owner may employ both Union and Non-Union workers on the Project. If required by the Contract Documents or specified in an Exhibit to this Agreement, Subcontractor agrees to employ Union labor.~~

b.   The Subcontractor shall at all times enforce strict discipline and good order among its employees and shall not employ on the Work any person unfit for or not skilled in the work assigned to him. Subject to the foregoing and to preserving good relations with the public and requiring the discharge of any employees causing a breach of peace or other disturbance of said relations, the Contractor shall not in any way interfere with the Subcontractor's right to hire and fire its employees, assign duties to them, and fix their working hours, wages or terms and conditions of employment, which right shall be absolute. Exceptions to this provision shall apply in those instances where Federal, State or Local Agencies having jurisdiction over the Project dictate a level of prevailing wage or oversee and establish minimum working standards or establish non-working hours for the Project.

c.   Subcontractor shall maintain a foreman on the job at all times with full authority and expertise to execute and direct the Subcontractor's Work in accordance with the Contract Documents and as directed by the Contractor's Superintendent. The Subcontractor shall notify the Contractor's Superintendent upon arrival and departure of the Subcontractor's men from the job site. The Contractor shall from time to time schedule job meetings, which shall be attended by an authorized representative of the Subcontractor with authority to make commitments, which shall be binding on the Subcontractor.

d.   Should the Subcontractor fail to carry out or comply with the provisions of this Article, it shall be in default and the Contractor shall have the right to terminate this Agreement in accordance with Article 13 hereof.

## ARTICLE 17.  LIABILITY FOR DAMAGES AND INJURY

### (Deletions):

a.   Subcontractor shall defend (with a mutually agreeable attorney), indemnify, hold harmless and reimburse Owner, Contractor and their agents, officers, and employees (the "Indemnitees") from all claims, damages, losses and expenses (including, but not limited to attorney's fees and costs attributable to bodily injury, sickness, disease or death or injury to or destruction of tangible property, including but not limited to the loss of use resulting therefrom, arising out of or in connection with the performance of the Work or any negligent act or omission of Subcontractor at or in connection with the Project, by anyone directly or indirectly employed by

Design Build Mechanical Corporation, VA
SUB
PM

#537156

Subcontractor, its lower tier sub-subcontractors and suppliers, or anyone else for whose acts Subcontractor is liable, even if caused jointly and concurrently by the negligence of the Indemnitees and subcontractor (or any one or more of them of them). In any and all claims against the Indemnitees by any employee of Subcontractor or anyone for whose acts Subcontractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount of or type of damages, compensation or benefits payable by or for Subcontractor or any sub-subcontractor under Workers' or Workmen's Compensations Acts, disability benefits or other employee benefit acts nor by any requirement for insurance. Subcontractor does not assume liability for loss or damage due solely to the negligence of Contractor. The Subcontractor shall promptly reimburse the Contractor therefore, and if any such claims or suits remain outstanding at the time the Work is completed, final payment shall be deferred until they are adjusted. The Subcontractor shall ensure that all of its subcontractors agree to bring any claims for damages or injuries against Subcontractor and not to bring such claims against the Contractor or Owner to the fullest extent permitted by law.


ARTICLE 19. DISCONTINUANCE OR SUSPENSION OF WORK

(Addition/Deletions):

If, as a result of fire, earthquake, Act of God, war, strike, picketing, boycott, lockout or other cause beyond the control of Owner or Contractor, Owner or Contractor decide, in their sole discretion, that it is inadvisable to proceed with the Work hereunder then Subcontractor shall, upon receiving written notice thereof from Owner or Contractor, immediately discontinue any further work hereunder until such time as Owner or Contractor may deem it advisable to resume said Work. Subcontractor will resume the Work promptly upon receiving notice from Contractor to do so to the extent that the sum of any stoppages as outlined in this Article 19 does not exceed 130 days in any 365 day period, and Subcontractor shall not be entitled to any damages or compensation on account of any such cessation of work as a result of any of the causes set forth herein.


ARTICLE 23. EQUAL OPPORTUNITY AND NON-DISCRIMINATION

(Additions/Deletions):

Subcontractor agrees to indemnify, defend (with mutually agreeable counsel chosen by Contractor ), and hold Contractor harmless of, from and against any and all loss, cost, damage, charge or expense, caused or contributed to by the violation or claimed violation by the Subcontractor of the Labor-Management Relations Act of 1947, as amended, the equal employment opportunities laws, and any applicable and valid order, rule or regulation issued by any appropriate governmental agency in accordance with those laws. Subcontractor agrees to abide by and comply with all federal, state and local nondiscrimination laws, rules and regulations including but not limited to the Fair Housing Act, Americans with Disabilities Act, and similar state and local laws as they may apply to the Work.


ARTICLE 24. ATTORNEYS' FEES

(Deletions):

Should any litigation or arbitration be commenced between the parties hereto concerning the Work, any provision of this Agreement or the rights or obligations of either party in relation hereto, the party, Subcontractor or Contractor, prevailing in such litigation or arbitration shall be entitled to a reasonable sum for attorneys' fees in such proceedings, whose any part of this litigation or arbitration is related in an Article 13 dealing as part of Contractor's claim against Subcontractor or as part of Contractor's defense to Subcontractor's claim for payment.


ACCEPTED:

Design Build Mechanical Corporation, VA

By: _____

Title: _____

Date: ___6/12/13_____


Bozzuto Building Company

By: _____

Title: ___Vice President_____

Date: ___6/09/13_____


*This is not a Standard Rider. Future Contract terms and conditions will be negotiated on a project by project basis.

Design Build Mechanical Corporation, VA
SUB
PM

#537156

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT # 011
DATE: 4/20/2013

BOND NO. D00600055          EXHIBIT "8"

## PAYMENT BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, 3635 Concorde Parkway, Suite 780, Chantilly, VA  20151 (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME a corporation organized and existing under the laws of the State of BONDING COMPANY STATE (hereinafter called "Surety"), as Surety, are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400, Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of ONE MILLION NINE HUNDRED SEVENTY TWO THOUSAND DOLLARS, ($1,972,600.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

      *DARWIN NATIONAL ASSURANCE COMPANY      **STATE OF DELAWARE
      WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract") by Cathedral Commons Partners, LLC, for Cathedral Commons and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/20/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of Heating, Ventilation, Air and Cooling for North and South Parcel, ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT '2', which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this  1  day of
_____JULY_____, 20__13_, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

```
                                        _____
                                        (Principal)              (Seal)

                                        Design Build Mechanical Corporation
                                        3635 Concorde Parkway, Suite 780
                                        Chantilly, VA  20151

Witness:                                By:

_____                _____
Or, Secretary's Attest                  (Signature and Title)    (Seal)

                                        DARWIN NATIONAL ASSURANCE COMPANY
                                        (Surety)

                                        BONDING COMPANY
Witness:                                By:

_____                _____
Or, Secretary's Attest                  (Signature and Title)    (Seal)
                                        EAMONN LONG, ATTORNEY IN FACT
```

Page 1 of 2

EXHIBIT
5
#537156
(complaint)

SUBCONTRACTOR: Design Build Mechanical Corporation
PROJECT: Cathedral Commons
CONTRACT NO.:
DATE:

BOND NO. D08008055                    EXHIBIT "8"

## PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS, That Design Build Mechanical Corporation, 3635 Concorde Parkway, Suite 700, Chantilly, VA 20151 (hereinafter called "Principal"), as Principal and BONDING COMPANY NAME, a corporation organized and existing under the laws of the State of BONDING COMPANY STATE (hereinafter called "Surety"), are held and firmly bound unto Bozzuto Building Company, 7850 Walker Drive, Suite 400 Greenbelt, MD 20770 (hereinafter called "Obligee"), in the sum of ONE MILLION NINE HUNDRED SEVENTY TWO THOUSAND DOLLARS ($1,972,000.00), for the payment of which sum well and truly to be made, the said Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

*DARWIN NATIONAL ASSURANCE COMPANY **STATE OF DELAWARE

WHEREAS, the Obligee has been awarded a contract (hereinafter called the "Prime Contract") by Cathedral Commons Partners, LLC. for Cathedral Commons and;

WHEREAS, the Principal has entered into a written Subcontract with the Obligee, dated 4/26/2013 to perform, as Subcontractor, certain portions of the work in connection with said Prime Contract, consisting of Heating, Ventilation, Air and Cooling for North and South Parcel, ALL TO BE IN ACCORDANCE WITH THE TERMS OF THIS SUBCONTRACT AND EXHIBIT 2, which Subcontract is hereby referred to and made a part hereof.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of said Subcontract within the time provided therein and any extensions thereof that may be granted by the Obligee, and during the life of any guaranty required under said Subcontract, and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract that may hereafter be made, and shall indemnify and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee may sustain by reason of failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Subcontract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this ___1___ day of ____JULY_____, 20_13_, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

_____ (Principal)            (Seal)

Design Build Mechanical Corporation
3635 Concorde Parkway
Suite 700
Chantilly, VA 20151

Witness:                                       By:

_____         _____
Or, Secretary's Attest                    (Signature and Title)      (Seal)

DARWIN NATIONAL ASSURANCE COMPANY
(Surety)

BONDING COMPANY
By:

Witness:

_____         _____
Or, Secretary's Attest                    (Signature and Title)      (Seal)
                                           EAMONN LONG, ATTORNEY IN FACT
END OF EXHIBIT "8"

Page 2 of 2

#537156